

COPY

1   Robert S. Green (Calif. Bar No.136183)
    Robert A. Jigarjian (Calif. BarNo.171107)
2   **GREEN & JIGARJIAN LLP**
    235 Pine Street, 15th Floor
3   San Francisco, California 94104
    Telephone:  (415) 477-6700
4   Facsimile:  (415) 477-6710

5
    Mark C. Gardy
6   Charles H. Dufresne, Jr.
    **ABBEY GARDY, LLP**
7   212 East 39th Street
    New York New York 10016
8   Telephone:  (212) 889-3700
    Facsimile: (212) 684-5191
9

10  Attorneys for Plaintiff

11              **UNITED STATES DISTRICT COURT**

12          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13  ROBERT W. BAKER, JR., individually and on   Case No.
    Behalf of all others similarly situated,
14                                              **C 03 — 5642** JF
15                      Plaintiff,              **CLASS ACTION COMPLAINT FOR
                                                VIOLATIONS OF SECURITIES LAWS**
16  Vs.

17  JOEL M. ARNOLD, THOMAS L. CRONAN
18  III, KEVIN A. DeNUCCIO, PIERRE R.
    LAMOND, VINOD KHOSLA, VIVEK
19  RAGAVAN, and DENNIS P. WOLF,
                                                **JURY TRIAL DEMANDED**
20                      Defendants.

21

22                          **INTRODUCTION**

23

24        Plaintiff individually and on behalf of all other persons similarly situated, by his undersigned

25  attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and

26  upon information and belief as to all other matters, based upon, the investigation undertaken by

27  plaintiff's counsel, which investigation included analysis of publicly-available news articles and

28
    CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

reports, public filings with the Securities and Exchange Commission ("SEC") regarding Redback Networks, Inc. ("Redback" or the "Company"), press releases and other matters of public record.

## NATURE OF THE ACTION

This is a class action on behalf of all purchasers of the common stock of Redback, between April 12, 2000 to October 10, 2003, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). During the Class Period, Redback and some of its officers and directors issued a series of materially false and misleading statements to the marketplace concerning the Company's financial condition and its relationship with Qwest Communications International, Inc. ("Qwest"). Throughout the Class Period, Redback touted its relationship with Qwest and the importance of Qwest's business with Redback. However, defendants (defined below) knew, but failed to disclose, that the only reason Redback was able to report increasing revenues and earnings was through a scheme in which defendants gave shares of Redback stock to Qwest insiders in exchange for Qwest purchasing large quantities of Redback products.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

2.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.  In addition, defendant Redback is headquartered in this District at 300 Holger Way, San Jose, California 95134.

4.      In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

2
CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

**PARTIES**

5.    Plaintiff Robert W. Baker, Jr. purchased Redback common stock during the Class Period, as set forth in the accompanying certification, which is incorporated herein by reference, and was damaged thereby.

6.    On November 3, 2003, Redback filed for Chapter 11 bankruptcy protection. But for the automatic stay provision of the United States Bankruptcy Code, Redback would be a named defendant in this action. Rodback offers solutions for the edge of the network - subscriber management, edge router, next-generation SONET/SDH transport, and a set of network provisioning and management software.

7.    The Individual Defendants, at all times relevant to this action, served in the capacities listed below and received substantial compensation:

(a)    Defendant Kevin A. DeNuccio ("DeNuccio") has been president and chief executive officer at Redback since August 2001.  Prior to joining Redback defendant DeNuccio was the senior vice president of worldwide service provider operations at Cisco Systems.

(b)    Pierre R. Lamond ("Lamond") has served as Redback's Chairman of the Board since November 1996

(c)    Defendant Joel M. Arnold ("Arnold") was hired as senior vice president of field operations in January 2002.  He is responsible for developing Redback's business strategy and implementing strategic partnerships. Prior to joining Redback, defendant Arnold was the executive vice president of global business sales at Qwest from September 1991 to December 2001.  At Qwest, Arnold was responsible for the global business markets strategic business unit.  Prior to joining Qwest defendant Arnold served in a variety of sales and marketing positions for GTE Corporation. On February 25, 2003, the SEC filed a complaint against defendant Arnold, among others, charging him with violations of the federal securities laws.  The SEC complaint against defendant Arnold charges him with inflating Qwest's revenues by participating in a "scheme in which Qwest artificially characterized one transaction with Genuity, Inc., an Internet service provider, as two separate contracts."  Genuity, Inc. is a unit of defendant Arnold's former employer, GTE Corporation.

3

1      (d)      Defendant Thomas L. Cronan III ("Cronan") has served as senior vice
2  president of finance and administration and chief financial officer at Redback since January 2003.
3  Prior to that he was Vice President and General Counsel from April 2001 to January 2003.

4      (e)      Defendant Vinod Khosla ("Khosla") is and has been at all relevant times a
5  director of Redback and a director of Qwest.

6      (f)      Defendant Dennis P. Wolf ("Wolf") has served as Redbacks's Senior Vice
7  President of Finance and Administration and as Chief Financial Officer since January 2001.

8      (g)      Defendant Vivek Ragavan ("Ragavan") served as Redback's President and
9  Chief Executive Officer and directory from July 2000 to May 2001.  From March to July 2000,
10 defendant Ragavan served as Redback's President and Chief Operating Officer and a director.
11 The Individual Defendants, as senior officers and/or directors of the Company were controlling
12 persons of the Company. They exercised their power and influence to cause the Company to engage
13 in the fraudulent practices complained of herein.

14      8.      During the Class Period, the Individual Defendants, as senior executive officers
15 and/or directors of Redback were privy to confidential and proprietary information concerning
16 Redback, its operations, finances, financial condition, present and future business prospects.  The
17 Individual Defendants also had access to material adverse non-public information concerning
18 Redback, as discussed in detail below.  Because of their positions with Redback, the Individual
19 Defendants had access to non-public information about its business, finances, products, markets and
20 present and future business prospects via access to internal corporate documents, conversations and
21 connections with other corporate officers and employees, attendance at management and board of
22 directors meetings and committees thereof and via reports and other information provided to them in
23 connection therewith.  Because of their possession of such information, the Individual Defendants
24 knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to,
   and were being concealed from, the investing public

25      9.      The Individual Defendants are liable as direct participants in, and as co-conspirators
26 with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason
27 of their status as senior executive officers and/or directors were "controlling persons" within the

28
                                          4

meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Redback's business

10.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein

11.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Redback's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Redback's securities would be based upon truthful and accurate information.  The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations

12.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Redback's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Redback's business, operations and management and the intrinsic value of Redback's securities, and caused Plaintiff and members of the Class to purchase Redback's securities at artificially inflated prices

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Redback common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) defendants deceived the investing public regarding the Company 's business, its finances and the intrinsic value of Redback common stock; and (ii) caused plaintiff and other members of the Class to purchase Redback common stock at artificially inflated prices.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class (the "Class"), consisting of all persons who purchased or otherwise acquired Redback common stock between April 12, 2000 and October 10, 2003, inclusive and who were damaged thereby. Excluded from the Class are the Individual Defendants, members of the immediate family of the Individual Defendants, any subsidiary or affiliate of Redback and the directors, officers and employees of Redback or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

15.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. As of October 29, 2003, there were reportedly more than 182.99 million shares of Redback common stock outstanding. Throughout the Class Period, Redback common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "RBAK".   Record owners and other members of the Class may be identified from records maintained by Redback and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.     whether defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Redback;

d.     whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Redback;

e.     whether the market price of Redback common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

20.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: defendants made public misrepresentations or failed to disclose material facts during the Class Period; such omissions and misrepresentations were material; the securities of the Company traded in an efficient market; the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and plaintiff and the other members of the Class purchased the Company's securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

21.     Based upon the factors set forth in the preceding paragraph, Plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

22.     Redback's initial public offering ("IPO"), on May 17, 1999, was priced at $23. Within weeks of its IPO, on June 28, 1999, Redback announced a multiyear, multimillion dollar agreement with Qwest.  However, the duration and the specific amounts of the contract were not quantified.  On July 9, 1999, Redback stock was trading at $146.  Defendants knew that there was no real commitment by Qwest and that Qwest had only entered into the agreement solely because executives of Qwest had received shares of Redback stock on the IPO.  Throughout the Class Period Redback and Qwest continued this practice of Qwest purchasing products from Redback in exchange for shares of Redback stock.

23.     Throughout the Class Period defendants knew but failed to disclose that: (1) Qwest agreed to purchase large quantities of Redback products in exchange for shares of Redback stock; (2) Redback failed to disclose that it was giving shares of its stock to Qwest insiders in exchange for sales contracts from Qwest; and (3) Qwest, in fact, did not need or want the large quantities of product it had ordered and, in fact, had no strong obligation to purchase more product in the future.

24.     On November 28, 1999, Redback and Siara Systems, Inc., a Delaware corporation ("Siara") announced that they had entered into a Merger Agreement and Plan of Reorganization (the "Merger Agreement") wherein Siara would merge with and into the Company.   Upon consummation of the Merger, the holders of capital stock of Siara received an aggregate of

8

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

31,341,986 shares of common stock of Redback, representing approximately 38% of the Company's total common stock.

25.    In addition, pursuant to the Merger Agreement, Promod Haque, Vinod Khosla and Vivek Ragavan, members of Siara's board of directors, became members of Redback's board of directors; Vivek Ragavan, the Chief Executive Officer of Siara and a member of Siara's board of directors, became the President and Chief Operating Officer of Redback after the merger; William Kind and Pankaj Patel, officers of Siara, also became executive officers of Redback.

26.    Defendant Khosla who was also a member of the board of directors of Qwest was now a director of Redback and was therefore, in the unique position of knowing the importance of the relationship between Redback and Quest.

27.    On April 12, 2000, Redback reported record results for the quarter ended March 31, 2000. The press release stated, in relevant part, as follows:

> Net revenues for the first quarter of 2000 were $34.2 million, compared with $6.5 million for the same period in the prior year, an increase of 424 percent. Pro forma diluted net income for the first quarter of 2000 was $5.6 million or $0.05 per share after giving effect to the Company's two-for-one stock split effective April 3, 2000, and excluding acquisition-related and stock compensation charges and the research and development expense related to Siara Systems' operations. This compares to the first quarter of 1999 pro forma net loss of $2.7 million or $(0.16) per share on a post-split basis. Before pro forma adjustments, net loss for the first quarter of 2000 was $85.2 million or $(0.96) per share on a post-split basis compared to a net loss of $3.8 million or $(0.23) per share on a post-split basis for the same period in the prior year.

> "The first quarter of 2000 was a period of expansion for Redback in the subscriber management market," said Dennis Barsema, chief executive officer at Redback. "Redback continued its momentum in the North American market with both incumbent local exchange carriers (ILECs) and competitive local exchange carriers (CLECs), and announced significant new CLEC wins, including Covad Communications and the newly launched Maverix.net.

9

28.    On May 15, 2000, Redback filed with the SEC its Form 10Q for the quarter ended March 31, 2000.  The March 31, 2000, which was signed by Craig Gentner ("Gentner"), reiterated the financial results previously announced on April 12, 2000.

29.    On July 12, 2000, Redback issued a press release reporting record revenues for the quarter ended June 30, 2000. The press release stated, in relevant part, as follows:

> Net revenues for the second quarter of 2000 were $48.7 million, compared with $11.1 million for the same period in the prior year, an increase of 340 percent. Pro forma net loss for the second quarter of 2000 was $5.7 million or $(0.05) per share, which excludes acquisition-related and stock compensation charges. This compares to the second quarter of 1999 pro forma net loss of $2.6 million or $(0.06) per share. Before pro forma adjustments, net loss for the second quarter of 2000 was $286.7 million or $(2.41) per share compared to a net loss of $3.7 million or $(0.08) per share for the same period in the prior year. All share and per share amounts reflect the Company's two-for-one stock split effective April 3, 2000.

> "The second quarter of 2000 was a period of strong execution for Redback," said Dennis Barsema, chief executive officer of Redback Networks. "The Company continued its momentum in the metropolitan optical networking market with the launch and first production shipments of the SmartEdge 800," stated Barsema. "The SmartEdge platform has been well received by Redback customers and prospects, and we have received multi-million dollar orders from both carriers and service providers." Redback completed its testing of the SmartEdge platform and shipped its first production SmartEdge 800 units in the second quarter, with general availability scheduled for the third quarter.

30.    On August 10, 2000, Redback filed with the SEC its Form 10Q for the quarter ended June 30, 2000.  The June 30, 2000, which was signed by Gentner, reiterated the financial results previously announced on July 12, 2000.

31.    On September 25, 2000, Qwest announced that Qwest Cyber.Solutions LLC (QCS), the largest enterprise Application Service Provider (ASP), has been awarded, a 5 year contract worth $18 million from Redback. The press release stated, in relevant part, as follows:

> The Redback contract win signifies a major milestone for both QCS and the ASP industry, as it represents the largest enterprise ASP contract to date.

> As a successful and growing company in the aggressive Internet infrastructure market, Redback developed a plan that would create added

10
CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

competitive advantage for the company. By using QCS' ASP solution to connect and streamline their internal and external enterprise resource planning, customer relationship management and manufacturing operations, Redback will be empowered to focus on driving revenues and creating more satisfied customers.

At Redback, our aggressive schedule for turning out product requires us to have a system that keeps pace with our high customer demand. So we chose QCS to provide our IT application infrastructure because of their ability to respond quickly and enable us to refocus on the business of satisfying our customers, said Vivek Ragavan, CEO and president of Redback. With today's market becoming increasingly competitive, we appreciate the value brought by QCS' ASP services that will allow us to further accelerate our business.

The complex integrated ASP solution brings together Oracle's ERP applications and Siebel System's CRM applications with additional applications to create a truly integrated solution that will ensure the availability and movement of business critical data from Redback's sales ordering, manufacturing and delivery cycle all the way through to customer care. QCS will provide Redback with its Ultimate Freedom(TM) product, which includes the entire package of ASP services ranging from software to hosting, and ongoing management for this integrated solution. Additionally, QCS will host and manage four of Redback's already existing applications that will connect to the Oracle applications.

Redback is moving at breakneck speed and needs to be confident that their system will not slow them down," said John Charters, president and CEO of Qwest Cyber.Solutions. By combining multiple, best of breed applications in a fully hosted and managed environment, our manufacturing ASP solution will deliver the performance, scalability and efficiency that will keep Redback tracking for future successes.

32.     On October 13, 2000, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2000.  The press release stated, in relevant part, as follows:

Redback Networks, Inc., leading provider of advanced networking solutions, today reported record revenues for the quarter ended September 30, 2000, as well as its first profit on a pro forma basis since closing its merger with Siara Systems.

Net revenues for the third quarter of 2000 were $80.6 million, compared with $20.6 million for the same period in the prior year, an increase of 291 percent. Pro forma net income for the third quarter of 2000 was $3.2 million or $0.02 per share diluted, which excludes acquisition-related and

11

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

1   stock compensation charges. This compares to the third quarter of 1999 pro
2   forma net loss of $569,000 or $(0.01) per share. Before pro forma
    adjustments, net loss for the third quarter of 2000 was $308.1 million or
3   $(2.50) per share compared to a net loss of $1.6 million or $(0.02) per share
    for the same period in the prior year.

4       33.    In this same, October 13, 2000, press release defendant Ragavan was quoted as
5
stating:
6

7       Redback achieved some major milestones during the third quarter," said
        Vivek Ragavan, chief executive officer and president of Redback. "The
8       Company delivered a profitable quarter and achieved record revenue, with
        over 50% of that revenue coming from new products." Another key
9       milestone was the Company's acquisition of Abatis Systems of Vancouver,
        Canada. A leading developer of systems for enabling the scalable
10      deployment of value-added services, Abatis' offerings immediately expand
        Redback's broadband solution. "Redback acquired Abatis for its powerful set
11      of IP service management solutions and the benefits they will provide for
        customers as they extend their service offerings.
12

13      The Company continued its momentum in the metropolitan optical
        networking market with full production shipments of the SmartEdge
14      800,"said Ragavan. The platform has been well received by Redback
        customers and prospects, and the Company continues to receive multi-
15      million dollar orders from both carriers and service providers, as well as a
        significant number of system trials globally. "In the subscriber management
16      market, Redback was buoyed by strong demand across our complete line of
        SMS platforms," said Ragavan, "with particular demand and resulting
17      deployments for the SMS 10000.
18

19      34.     On November 13, 2000, the Company filed with the SEC a Form 10-Q for the quarter

20   ended September 30, 2000. The September 30, 2000 Form 10Q, which was signed by Gentner,

21   reiterated the financial statements announced on October 13, 2000 and further reported, in relevant

22   part, as follows:

23
24      In each of the eleven quarters in the period ended September 30, 2000, we
        have had at least one customer that accounted for 10% or more of our total
25      revenue in the quarter. In the third quarter of 2000, Qwest Communications
        International, Inc. accounted for 24% of our total revenue …

26

27

28
                                        12
CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

35.     On January 17, 2001, the Company issued a press release announcing its financial

results for its fourth quarter and year ended December 31, 2000.  The press release stated, in relevant

part, as follows:

> Net revenues for the fourth quarter of 2000 were $114.6 million, compared
> with $26.1 million for the same period in the prior year, an increase of 339
> percent. Pro forma net income for the fourth quarter of 2000 was $7.8
> million or $0.05 per share diluted, which excludes acquisition-related and
> stock compensation charges. This compares to the fourth quarter of 1999 pro
> forma net income of $2 million or $0.02 per share diluted. Before pro forma
> adjustments, net loss for the fourth quarter of 2000 was $327.6 million or
> $(2.47) per share compared to net income of $1.2 million or $.01 per share
> diluted for the same period in the prior year.

> For fiscal year 2000, net revenues were $278.0 million, an increase of 333
> percent from the $64.3 million posted in 1999. Pro forma net income for the
> fiscal year was $6.8 million or $0.04 per share diluted, which excludes
> acquisition-related and stock compensation charges. Before pro forma
> adjustments, net loss for fiscal 2000 was $1.0 billion or $(8.68) per share
> compared to net loss of $7.9 million or $(0.15) per share for the prior year.

36.     In this same, January 17, 2001, press release defendant Ragavan was quoted as

stating:

> Redback continued to achieve key objectives during the fourth quarter of
> 2000," said Vivek Ragavan, chief executive officer and president of
> Redback. "From a financial perspective, we delivered another profitable
> quarter with record revenue and net income. Equally important was the
> strong global demand for both our next generation products, the SMS™
> 10000 and SmartEdge™ 800, as well as our industry-standard SMS 500 and
> SMS 1800 subscriber management systems. We continue to consolidate our
> market position as a leading vendor of broadband subscriber management
> systems and next-generation metro optical solutions.

> During the quarter, the company expanded its global presence with new
> distribution agreements in Europe and Asia. International revenue grew 121
> percent sequentially, reflecting design wins at Korea Telecom and Belgacom
> S.A., among others. "The international markets are in the early phases of
> implementing their broadband access strategies," remarked Ragavan. "With
> global customer base and growing international presence, our strong cash
> position and powerful product portfolio, we begin 2001 well positioned to
> capitalize on the coming migration to next generation broadband and metro
> optical networks.

13

37.     On February 5, 2001, Redback announced that Qwest Communications International

Inc. agreed to a multi-year, multi-million dollar purchase of the Redback(R) SmartEdge(TM) 800.

Again, the announced did not specify the duration or specific amount of any contract with Qwest.

The press release stated in part, as follows:

> Qwest plans to deploy the SmartEdge 800 multi-service optical platform as part of its strategy to enhance and expand local broadband services for businesses and consumers in key metropolitan markets.
>
> The SmartEdge 800 features high port densities to efficiently aggregate Internet Protocol (IP) and traditional time division multiplexing (TDM) traffic, delivering operational efficiencies for Qwest and simplifying the migration to IP for customers.
>
> We're pleased to extend our successful relationship with Redback to accelerate the delivery and enhance the efficiency our IP-based metropolitan networks," said Augie Cruciotti, Qwest's executive vice president of national local networks. "We look forward to continuing our relationship with Redback to further improve service for our customers.
>
> Since embarking on the design of the SmartEdge 800, Redback has strongly believed that a successful metropolitan optical device must support providers delivering both TDM- as well as IP-based services," said Vivek Ragavan, Redback's president and chief executive officer. As a result, we are very pleased to be a part of Qwest's all-optical metro network initiative.

38.     On April 2, 2001, the Company filed with the SEC its Form 10-K for the year ended

December 31, 2000.   The 2000 Form 10-K, which was signed by defendants Ragavan, Wolf, and

Khosla, reiterated the financial results previously announced on January 17, 2001 and further

reported that:

> In each of the twelve quarters in the period ended December 31, 2000, we have had at least one customer that accounted for 10% or more of our total revenue in the quarter. In the fourth quarter of 2000, Qwest Communications International Inc. ... accounted for 18% ... of our total revenue. For the twelve months ended December 31, 2000, sales to Qwest Communications International Inc. accounted for 15% of our total revenue.

14

39.     Defendants knew that the preceding statements were materially false and misleading because they failed to disclose that: (1) Qwest agreed to purchase large quantities of Redback products in exchange for shares of Redback stock; (2) Redback failed to disclose that shares of its stock were being given to Qwest insiders in exchange for sales contracts from Qwest; and (3) Qwest, in fact, did not need or want the large quantities of product it had ordered and, in fact, had no strong obligation to purchase more product in the future.

40.     On April 11, 2001, the Company issued a press release announcing its financial results for its first quarter ended March 31, 2001.  The press release stated, in relevant part, as follows:

> Net revenue for the first quarter of 2001 was $90.9 million, compared with $34.2 million for the same period in the prior year, an increase of 166 percent. Pro forma net loss for the first quarter of 2001 was $18.4 million or $0.13 per share, which excludes acquisition-related charges, stock compensation charges, restructuring and certain inventory charges. This compares to pro forma diluted net income of $0.05 per share for Q4 2000 and $0.01 per share for the same period one year ago. Before pro forma adjustments, net loss for the first quarter of 2001 was $400.5 million or $2.92 per share compared to a net loss of $85.2 million or $0.96 per share for the same period in the prior year.

41.     On May 15, 2001, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2001.  The March 31, 2001 Form 10-Q, which was signed by defendant Wolf, reiterated the financial results previously announced on April 11, 2001 and further stated, in relevant part, as follows:

> In each of the periods presented, we have had at least one customer that accounted for 10% or more of our total revenue in the quarter. In the first quarter of 2001, Qwest Communications International Inc. … accounted for 28% … of our total revenue. For the twelve months ended December 31, 2000, sales to Qwest Communications International Inc. … accounted for 15% … of our total revenue. We anticipate that a small number of customers will continue to account for a majority of our quarterly revenue. However, we do not have any contracts or other agreements that guarantee continued sales to these or any other customers. If our customers alter their purchasing

15

habits, encounter a shortage of capital or reevaluate their need for our
products or purchase competing products, or if we fail to receive a large
order in any period, our business, results of operations and financial
condition would be materially adversely affected due to shortfall in
revenues. Because we sell primarily to major corporate customers, our
business also depends on general economic and business conditions that are
likely to affect these customers.

42.     On May 21, 2001, Redback announced that defendant Ragavan resigned from the
Company.

43.     On July 11, 2001, the Company issued a press release announcing its financial results
for its second quarter ended June 30, 2001.  The press release stated, in relevant part, as follows:

Net revenue for the second quarter of 2001 was $59.4 million, compared
with $48.7 million for the same period in the prior year. Pro forma net loss
for the second quarter of 2001 was $37.0 million or $0.26 per share,
compared to pro forma net loss of $0.13 per share for Q1 2001 and $0.05 per
share loss for the same period one year ago.

44.     On August 14, 2001, the Company filed with the SEC a Form 10-Q for its second
quarter ended June 30, 2001.  The Form 10-Q, which was signed by defendant Wolf, reiterated the
financial results previously announced on July 11, 2001.  The June 30, 2001 Form 10-Q, further
reported, in relevant part, as follows:

In the six months ended June 30, 2001, Qwest Communications and Verizon
Communications accounted for 27% and 14% of our total revenue,
respectively. For the twelve months ended December 31, 2000, sales to
Qwest Communications and Genuity accounted for 15% and 10% of our
total revenue, respectively. We anticipate that a small number of customers
will continue to account for a majority of our quarterly revenue. However,
we do not have any contracts or other agreements that guarantee continued
sales to these or any other customers. As we have experienced in the last two
quarters our customers alter their purchasing habits, encounter a shortage of
capital or reevaluate their need for our products or purchase competing
products, or if we fail to receive a large order in any period, our business,
results of operations and financial condition would be materially adversely
affected due to shortfall in revenues. Because we sell primarily to major
corporate customers, our business also depends on general economic and
business conditions that are likely to affect these customers.

16
CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

45.   On August 29, 2001, Redback announced that former senior Cisco executive Kevin DeNuccio has joined Redback Networks as president and chief executive officer.  DeNuccio also became a member of Redback's board of directors, and Pierre Lamond remained chairman of the board.  The press release stated as follows:

> As Redback continues to expand its role as one of the leading providers of next-generation metro equipment, the board realized that we needed someone who could drive this company to the next level," said Lamond. "Kevin provides the ideal mix of leadership skills, operational experience and telecommunications background, along with a fundamental understanding of, and relationship with, our customers."
> Kevin DeNuccio brings more than 20 years of telecommunications and senior
> management experience to Redback Networks. DeNuccio joins Redback from Cisco Systems Inc., where he was senior vice president of worldwide service provider operations. Prior to his six years at Cisco, he was the founder, president and chief executive officer of Bell Atlantic Network Integration Inc., a wholly owned subsidiary of Bell Atlantic (now Verizon Communications), with responsibility for corporate strategy and operations. Previously, he held senior management positions at both Unisys Corporation and Wang Laboratories, as vice president of the network integration and channel partner businesses.
> Redback is focused on some of the best opportunities for mid- to long-term growth in the metro network space - broadband subscriber management, intelligent optical transport, and soon, next generation routing platforms," said Kevin DeNuccio, president and CEO of Redback Networks.
> "Furthermore, we have a combination of outstanding engineering capabilities and world-class optical, ASIC, IP and subscriber management technology that enables us to continue expanding our product line, which our significant base of customers will use to build the networks of tomorrow.

46.   On October 10, 2001, the Company issued a press release announcing its financial results for its third quarter ended September 30, 2001.  The press release stated, in relevant part, as follows:

> Net revenue for the third quarter of 2001 was $37.0 million, compared with $59.4 million in the prior quarter and $80.6 million for the same period in the prior year.

17

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

47.     On January 16, 2002, the Company issued a press release announcing its financial results for its fourth quarter and year ended December 31, 2001. The press release reported, in relevant part, as follows:

> Net revenue for the fourth quarter of 2001 was $40.2 million, compared with $37.0 million in the prior quarter. For the full fiscal year 2001 net revenue was $227.5 million compared to $278.0 million in fiscal year 2000.
>
> The GAAP net loss for the fourth fiscal quarter was $0.67 per share compared to a loss of $21.71 in Q3 2001. For fiscal 2001 the GAAP loss was $28.78 per share compared to an $8.68 loss in fiscal 2000. The GAAP loss in fiscal Q3 2001 included a write down of goodwill aggregating $2.7 billion.

48.     On March 27, 2002, the Company filed with the SEC a Form 10-K for its year ended December 31, 2001. The December 31, 2001 Form 10-K, which was signed by defendants DeNuccio, Wolf and Khosla, reported that during 2001 Redback sold $41.5 million of goods and services to Qwest accounting for 18% of the Redback's revenues.

49.     As reported by Redback's 2001 Form 10-K Qwest was Redback's largest customer. The 2001 Form 10-K reported that:

> During 2001, our top two customers, Qwest Communications and Verizon, accounted for 18% and 15% of our revenue, and during 2000, our top two customers, Qwest Communications and Genuity, accounted for 15% and 10% of our revenue. Both of these customers are in the telecommunications industry, which has been depressed recently. In addition, significant consolidation has occurred recently in the telecommunications sector, and we therefore anticipate that a large portion of our revenues will continue to depend on sales to a limited number of customers. Moreover, the competition to sell products to this limited customer base has increased significantly. We do not have contracts or other agreements that guarantee continued sales to these or any other customers. If any one or more of these customers were to stop purchasing our products or significantly reduce their purchases and if we were unable to replace these customers with other significant customers, our revenues would significantly decline, and our results of operations would suffer.

50.     The preceding statements were materially false and misleading because they failed to disclose that: (1) Qwest agreed to purchase large quantities of Redback products in exchange for shares of Redback stock; (2) Redback failed to disclose that shares of its stock were being given to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

58.     On, August 14, 2002, Redback filed with the SEC a Form 10-Q for the period ended June 30, 2002.  The Form 10-Q, which was signed by defendant Wolf, reiterated the financial results previously announced on July 10, 2002.

59.     On October 7, 2002, Redback announced that Genuity Inc. selected the Redback(R) SmartEdge(TM) 800 Router for initial deployment in its international network to deliver highly reliable Gigabit Ethernet (GigE) services to its customers.   The press release stated, in part, as follows:

> Genuity's IP network infrastructure is designed to bring
> performance, scalability, security, and stability to the most mission
> critical business applications, and Redback's SmartEdge Router
> provides the type of carrier-grade hardware and software architecture
> needed to meet these demands," said Steven H. Blumenthal, senior vice
> president and chief technology officer at Genuity. "The deployment of
> robust network equipment such as the SmartEdge Router will enable us
> to provide high-availability GigE services to our customers, while at
> the same time reducing our operating expenditures and helping us to
> maintain our industry-leading service level agreements.
>
> A member of Redback's "user-to-network" product portfolio, the
> SmartEdge 800 Router was built from the ground-up to deliver
> ultra-high availability through both a highly resilient hardware
> architecture and a fault-tolerant aggregation operating system. This
> is key in allowing service providers to build a reliable
> infrastructure for IP service delivery. The software modularity of the
> platform also enables seamless binding of any user connection to any
> service resulting in ease of provisioning and speeding time to
> profitable services. Redback's custom developed ASICs enable high
> performance, distributed packet forwarding that eliminates a single
> point of failure in the platform. Further high port densities allow
> service providers to maximize use of rack space and conserve power,
> both of which contribute to reduction in operational expenses.
>
> To generate revenue from IP services, data networks need to be as
> reliable as the PSTN networks while at the same time be engineered for
> user-to-network functionality," said Georges Antoun, senior vice
> president of marketing and product management at Redback. "In addition
> to high scalability and reliability, the SmartEdge Router also offers
> advanced flexibility that is critical to support future IP services,
> protecting the service providers' investment and at the same time
> enabling rapid revenue-generation opportunities.

21

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

60.     The SEC complaint against defendant Arnold specifically charged him with inflating Qwest's revenues by participating in a "scheme in which Qwest artificially characterized one transaction with Genuity, Inc., an Internet service provider, as two separate contracts."

61.     On October 9, 2002, Redback announced its financial results for its third quarter ended September 30, 2002.   The press release reported that net revenue for the third quarter of 2002 was $17.4 million, compared to $40.1 million in the prior fiscal quarter and $37.0 million for the same quarter in the prior year.   Pro forma net loss for the quarter was $0.20 per share, compared to a loss of $0.16 in fiscal Q2 2002 and a loss of $0.28 in the third fiscal quarter of 2001.

62.     On, November 14, 2002, Redback filed with the SEC a Form 10-Q for the period ended September 30, 2002.  The Form 10-Q, which was signed and certified by defendants DeNuccio and Wolf, reiterated the financial results previously announced on October 9, 2002.

63.     On January 15, 2002, Redback announced its financial results for its fourth quarter and year ended December 31, 2002.  The press release reported that net revenue for the fourth quarter of 2002 was $27.6 million, compared with $17.4 million in the prior quarter. For the fiscal year 2002, net revenue was $125.6 million compared to $227.5 million in fiscal year 2001.

64.     On March 31, 2003, the Company filed with the SEC a Form 10-K for the year 2002, which was signed and certified by defendant DeNuccio.

65.     As reported by Lightreading.com Qwest had been accused of engaging in improper business transaction with at least 11 vendors. The article stated in relevant part as follows:

> During boom times, Qwest and other aggressive carriers such as Williams
> Communications Group hedged their bets on cutting-edge technology -- and
> helped enrich their executives -- by getting discounted shares from startups
> while they evaluated equipment. Qwest was among the most startup-friendly
> of them all. But as the Nasdaq bubble popped and the IPO market shut
> down, such strategies lost their allure.
>
> A prime example of this has been the tight relationship between Kleiner
> Perkins Caufield & Byers partner Vinod Khosla and Qwest. Khosla, who is a

22
CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

board member of Qwest, also held board positions at Corvis Corp., Cosine Communications Inc., Cerent (now owned by Cisco), Juniper Networks Inc., and Redback Networks Inc. while each of these equipment vendors negotiated deals with the carrier.

Here's an example of how it worked with CoSine Communications: Qwest helped CoSine design, test, and analyze its equipment, a Qwest spokesman confirmed. In return, CoSine let some senior Qwest executives -- including former executive VP of corporate development, Marc Weisberg; executive VP and general counsel Drake Tempest; and executive VP and chief strategy officer Lewis Wilks -- buy "friends and family" shares before the startup went public.

CoSine went public in 1999 and, in February 2000, it announced that Qwest had placed a multimillion-dollar purchase order for its gear.

Also, Qwest got warrants for agreeing to buy Tellium Inc's gear. Qwest executives accepted some $10 million worth of stock options from the startup in exchange for being allowed into its network.

66.    According to an article entitled "SEC Digging Deeper at Redback," which was released by Lightreading.com on October 2, 2003, the SEC is investigating Redback's past involvement with Qwest. The article states, in relevant part, as follows:

The filing may raise some eyebrows, as it looks as if the SEC is taking a more particular interest in the Redback/Qwest relationship. Qwest was a big player in Redback's rise as a startup, and the companies had several common ties that predate [Joel] Arnold's arrival at Redback.

In 2000, Redback's sales to Qwest accounted for 15 percent of its annual revenues, or about $42 million. In 2001, Qwest sales accounted for 18 percent of Redback's revenues, or about $40.8 million. For a time, the two companies shared a board member in Kleiner Perkins Kaufield & Byers partner Vinod Khosla, who was an investor in Redback. SEC filings and sources say that under Khosla's watch, several of Qwest's startup equipment suppliers gave top Qwest executives chances to buy their stock at dirt cheap prices.

Shortly after Redback began supplying Qwest with equipment, in late 2000, Qwest's Cyber Solutions group announced a five-year, $18 million contract with Redback to help the vendor with enterprise resource planning, customer relationship management, and manufacturing operations.

The revelation that the SEC is snooping into Redback's past came buried in the vendor's latest filing, which outlined to shareholders its proposed financial restructuring. Under terms of the plan, Redback needs its shareholders to approve a $467 million debt-for-equity swap that will leave

23

1    them with only 5 percent of the company. If shareholders don't accept the
     deal, Redback would likely file for bankruptcy protection.

2    67.    An article released on Broadbandlog.com on October 14, 2003 entitled "All Eyes on

3    Qwest?" states in relevant part as follows:

4            As you might already know companies like CoSine and Redback are under
5            the microscope for giving stock options and other benefits to some Qwest
             executives in exchange for hefty equipment orders.

6            And that is not all. The Post reports that a "top Redback executive and a
7            former Redback director have ties to Qwest. And they would be Joel Arnold,
             a former Qwest sales manager who left the company in December 2001 and
8            was sued by the SEC in February, joined Redback in 2002. Vinod Khosla, a
             director at Qwest, served on Redback's board until last year.
9
     68.    On October 10, 2003, the Company filed a SEC Form S-4, which was signed and
10
     certified by defendants DeNuccio and Cronan, stating, in relevant part, as follows:
11

12           One of our officers is facing a civil SEC lawsuit related to his previous
             employment, and any adverse determination may affect his ability to serve
13           as an officer of our company.
              On February 25, 2003, the SEC filed a civil lawsuit against eight current
14           and former officers and employees of Qwest Communications, regarding
             activities that occurred while each was employed at Qwest. One of the
15           individuals named is Joel Arnold, our Senior Vice President of Strategy and
             Marketing, who was formerly Executive Vice President of Qwest's Global
16           Business Unit. The lawsuit alleges that Mr. Arnold participated in activities
17           intended to artificially accelerate Qwest's recognition of revenue in two
             equipment sale transactions. The SEC is seeking, among other remedies, that
18           Mr. Arnold and four other defendants be permanently barred from serving as
             an officer or director of any public company. Although it is expected that
19           such a civil procedure will take two to three years or longer to be
20           adjudicated, an unfavorable result at the end of such action against Mr.
             Arnold may result in him being unable to serve as an officer. In addition,
21           Mr. Arnold may be distracted while defending against the allegations.

22   69.    On October 10, 2003, the Company filed a SEC Form S-4, which was signed and

23   certified by defendants DeNuccio and Cronan, stating, in relevant part, as follows:

24           We have been informed that the SEC is examining various transactions
             involving Qwest Communications, some of which were entered into between
25           us and Qwest...

26           The transactions with respect to which the SEC has requested information
             from us were all entered into prior to fiscal year 2002 and involve the sale of
27

28
                                               24
     CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

1

products by Redback to Qwest, the purchases of certain products and
services by Redback from Qwest and certain equity investments.

2

70.      A <u>Wall Street Journal</u> article released on October 14, 2003 states, in relevant part, as

3

follows:

4

5

6

7

8

9

Regulatory filings by Redback said the Securities and Exchange
Commission is looking into "certain equity investments" by Qwest.
Redback, based in San Jose, California, sold $81.5 million of goods and
services to Qwest in 2000 and 2001, and bought about $13.5 million in
services from Qwest, according to the filings. A federal grand jury is
investigating business transactions between Denver-based Qwest and 11 of
its vendors (*including Redback*) ... The grand jury is investigating whether
former Qwest executives took discounted stock from some vendors in
exchange for giving them business, some of which Qwest may not have
needed. (Parenthesis added)

10

71.      On November 3, 2003, Redback filed for Chapter 11 bankruptcy protection.

11

After trading as high as $179.12 during the Class Period Redback's stock is now worthless.

12

13

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

14

15

72.      At all relevant times, the market for Redback common stock was an efficient market

16

for the following reasons, among others:

17

18

(a)      Redback common stock met the requirements for listing, and was listed and

actively traded, on the Nasdaq National Market, a highly efficient market;

19

(b)      As a regulated issuer, Redback filed periodic public reports with the SEC;

20

21

22

23

(c)      Redback stock was followed by securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force

and certain customers of their respective brokerage firms. Each of these

reports was publicly available and entered the public marketplace.

24

25

26

(d)      Redback regularly issued press releases which were carried by national

newswires. Each of these releases was publicly available and entered the

public marketplace.

27

28

25

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

73.     As a result, the market for Redback securities promptly digested current information with respect to Redback from all publicly-available sources and reflected such information in Redback 's stock price. Under these circumstances, all purchasers of Redback common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Redback who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

75.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators

26

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

1   of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their

2   receipt of information reflecting the true facts regarding Redback and its business practices, their

3   control over and/or receipt of Redback's allegedly materially misleading misstatements and/or their

4   associations with the Company which made them privy to confidential proprietary information

5   concerning Redback were active and culpable participants in the fraudulent scheme alleged herein.

6   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information

7   that they caused to be disseminated to the investing public. This case does not involve allegations of

8   false forward-looking statements or projections but instead involves false statements concerning the

9   Company's business, finances and operations. The ongoing fraudulent scheme described in this

10  complaint could not have been perpetrated over a substantial period of time, as has occurred, without

11  the knowledge and complicity of the personnel at the highest level of the Company, including the

12  Individual Defendants. The Individual Defendants engaged in such a scheme to inflate the price of

13  Redback common stock in order to: (i) protect and enhance their executive positions and the

14  substantial compensation and prestige they obtained thereby; and (ii) enhance the value of their

15  personal holdings of Redback common stock and options.

### COUNT I

### (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants)

76.      Plaintiff repeats and realleges each and every allegation contained above.  Each of the

defendants: (a) knew or recklessly disregarded material adverse non-

public information about Redback's financial results and then existing business conditions, which

was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading

statements, releases, reports and other public representations of and about Redback.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

77.    During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.    Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Redback stock during the Class Period.

79.    Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Redback stock. Plaintiff and the Class would not have purchased Redback stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Individual Defendants

80.    Plaintiff repeats and realleges each and every allegation contained above. The Individual Defendants acted as controlling persons of Redback within the meaning of Section 20(a) of the Exchange Act. By reason of their senior executive and/or Board positions they had the power and authority to cause Redback to engage in the wrongful conduct complained of herein. By reason of such wrongful conduct, Redback and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

1    and the other members of the Class suffered damages in connection with their purchases of Redback

2    stock during the Class Period.

3                    **WHEREFORE,** plaintiff prays for relief and judgment, as follows:

4
5           A.      Determining that this action is a proper class action and certifying plaintiff as

6    class representative under Rule 23 of the Federal Rules of Civil Procedure;

7           B.      Awarding compensatory damages in favor of plaintiff and the other Class

8    members against all defendants, jointly and severally, for all damages sustained as a result of

9    defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

10          C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred

11   in this action, including counsel fees and expert fees; and

12          D.      Such other and further relief as the Court may deem just and proper.

13                              **JURY TRIAL DEMANDED**

14
15       Plaintiff hereby demands a trial by jury.

16   Dated: December 15, 2003                  **GREEN & JIGARJIAN LLP**

17
                                              By: _____
18                                                    Robert A. Jigarjian

19
20                                            Robert S. Green
                                              235 Pine Street, 15th Floor
21                                            San Francisco, CA  94104
                                              Telephone:  (415) 477-6700
22                                            Facsimile:  (415) 477-6710

23                                            Mark C. Gardy
                                              Charles H. Dufresne, Jr.
24                                            **ABBEY GARDY, LLP**
                                              212 East 39th Street
25                                            New York New York 10016
                                              Telephone:  (212) 889-3700
26                                            Facsimile: (212) 684-5191

27
                                              Attorneys for Plaintiff
28

                                              29
     CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Dated:  December _15_, 2003

Attorney Of Record
For Plaintiff Robert W. Baker, Jr.,

1

12-15-03 17:25   FROM-Abbey Gardy LLP #1      212-905-0508      T-505   P02/02   S-405

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _Robert W. Baker Jr_ declare as follows:

1.      I have reviewed a copy of the complaint filed in this action.

2.      I did not purchase the security that is the subject of this action [REDBACK NETWORKS, INC. (Nasdaq: RBAK)] at the direction of counsel, Abbey Gardy, LLP, or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase/Sale) | Quantity | Trade Date | Price Per Share/ Security |
|---|---|---|---|---|
| RBAKQ | BUY | 128.205 | 9/8/03 | .78 |
| " | BUY | 1,313.333 | 9/11/03 | .75 |
| " | SELL | 1,441.538 | 9/15/03 | .67 |
| " | BUY | 517.857 | 9/17/03 | .84 |
| " | BUY | 617.075 | 9/18/03 | .80 |
| " | BUY | 3,564.508 | 9/30/03 | .61 |
| " | SELL | 4,699.440 | 11/3/03 | .369 |

*List additional transactions on a separate sheet of paper, if necessary.  If the securities were purchased by joint owners, please provide the above information for the co-owner.

5.      I have not served as or sought to serve as a representative party on behalf of a class during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

        I declare under penalty of perjury that the foregoing is true and correct.

Dated: _12/3/03_                          Signed: _Robert W. Baker Jr_


Print Name: _Robert W. Baker Jr_