Stuart M. Grant (*pro hac vice*)
John C. Kairis (*pro hac vice*)
Lauren E. Wagner (*pro hac vice*)
Kimberly L. Wierzel (*pro hac vice*)
Redmond L. Clevenger (*pro hac vice*)
Grant & Eisenhofer PA
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Tel: 302.622.7000
Fax: 302.622.7100

Merrill Glen Emerick (State Bar No. 117248)
Anderlini, Finkelstein, Emerick & Smoot
400 S. El Camino Real - Suite 700
San Mateo, CA  94402

Attorneys for Lead Plaintiff
The Connecticut Retirement Plans and Trust Funds

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE REDBACK NETWORKS, INC. SECURITIES LITIGATION | Case Number C 03-05642 JF |
| | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| This Document Relates to:  All Actions | CLASS ACTION |
| | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.  NATURE AND SUMMARY OF THE ACTION .......................................................... 1

II.  THE PARTIES........................................................................................................ 4

 LEAD PLAINTIFF ................................................................................................ 4

 NON-PARTY REDBACK NETWORKS, INC. ......................................................... 5

 INDIVIDUAL DEFENDANTS ................................................................................ 6

 MICHAEL PERUSSE .......................................................................................... 12

 MARC B. WEISBERG ........................................................................................ 12

 PRICEWATERHOUSECOOPERS LLP.................................................................. 12

III.  JURISDICTION AND VENUE ............................................................................ 13

IV.  BACKGROUND AND SUBSTANTIVE ALLEGATIONS.................................... 14

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
 CLASS PERIOD................................................................................................... 26

 THE TRUTH BEGINS TO EMERGE AND THE COMPANY DESCENDS INTO BANKRUPTCY ..... 53

VI.  REDBACK'S FRAUDULENT ACCOUNTING PRACTICES ...................................... 60

 GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP")........................... 60

 SEC REGULATIONS........................................................................................... 60

 REDBACK'S FINANCIAL DISCLOSURES VIOLATED GAAP AND SEC REGULATIONS .......... 62

 THE OVERALL IMPACT OF THE GAAP AND SEC RULES VIOLATIONS ............................... 67

VII.  SCIENTER ......................................................................................................... 67

 PIERRE R. LAMOND ......................................................................................... 69

 VINOD KHOSLA ............................................................................................... 70

 PROMOD HAQUE ............................................................................................. 71

 KEVIN DENUCCIO ........................................................................................... 74

 JOEL ARNOLD .................................................................................................. 74

 VIVEK RAGAVAN ............................................................................................. 76

DENNIS BARSEMA ............................................................................................. 77

GAURAV GARG ................................................................................................. 77

WILLIAM H. KURTZ ......................................................................................... 77

CRAIG GENTNER ............................................................................................... 77

RANDALL KRUEP ............................................................................................. 78

WILLIAM MISKOVETZ ...................................................................................... 78

PANKAJ PATEL ................................................................................................. 79

DENNIS P. WOLF .............................................................................................. 79

THOMAS L CRONAN, III .................................................................................. 79

GEORGES ANTOUN ........................................................................................... 79

MICHAEL PERUSSE ........................................................................................... 81

MARC WEISBERG ............................................................................................. 81

PwC'S SCIENTER AND FALSE AND MISLEADING AUDIT REPORTS ................... 82

PwC'S AUDITS OF REDBACK FAILED TO COMPLY WITH GAAS ...................... 85

VIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR .............................. 95

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
DOCTRINE ...................................................................................................... 96

X.    CLASS ACTION ALLEGATIONS ............................................................. 97

FIRST CAUSE OF ACTION ................................................................................. 99

    VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10 b-5
    PROMULGATED THEREUNDER ...................................................................... 99

SECOND CAUSE OF ACTION ............................................................................. 102

    VIOLATION OF SECTION 18(a) OF THE EXCHANGE ACT ............................. 102

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD CAUSE OF ACTION ....................................................................... 104

    VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT ....................................... 104

PRAYER FOR RELIEF ............................................................................ 105

JURY TRIAL DEMANDED ......................................................................... 106

Lead Plaintiff, Connecticut Retirement Plans and Trust Funds (the "Connecticut Retirement Fund" or "Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others that purchased or otherwise acquired the common stock ("Plaintiffs") of Redback Networks, Inc. ("Redback" or the "Company") between and including April 12, 2000 and October 10, 2003 (the "Class Period"), alleges the following upon information and belief, except as to those allegations concerning the Connecticut Retirement Fund, which are alleged based upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included:  (a) a review and analysis of Redback's filings with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases, public statements, news articles and other publications disseminated by or concerning Redback or the defendants; (c) review and analysis of Redback's analyst conference calls; (d) review and analysis of securities analysts' reports regarding Redback; (e) interviews with over 15 former employees of Redback; (f) review and analysis of documents filed by Redback and other creditors and entities in the United States Bankruptcy Court for the District of Delaware during the course of Redback's bankruptcy proceedings; and (g) other publicly-available information concerning Redback and the defendants.

Plaintiffs believe that further substantial evidence exists to support the allegations in this Consolidated Class Action Complaint that will become available after a reasonable opportunity for discovery.  Most of the specific facts supporting the allegations herein are known only to defendants or are exclusively within their custody or control.

I.      **Nature and Summary of the Action**

1.      This is a federal securities class action against certain current and former officers and directors of Redback and other related third parties for violations of the Securities and Exchange Act of 1934 (the "Exchange Act").  The Connecticut Retirement Fund brings this action on its own behalf and as the representative of all other persons and entities that purchased or otherwise acquired the common stock of Redback (the "Class") in reliance upon the Company's materially false and misleading financial statements and other public statements during the Class Period.

1       2.       Redback is a telecommunications equipment provider that specializes in

2   equipment designed to facilitate and enhance high-speed broadband services.  Styled as a start-up

3   telecommunications company with state-of-the-art technology, Redback held its initial public

4   offering ("IPO") on May 17, 1999.  Redback's common stock was priced in the IPO at $23 per

5   share, and the Company registered and sold 2.875 million shares.  Through its IPO, Redback

6   raised from investors net proceeds in excess of $50 million and its common stock began trading

7   on the NASDAQ National Market under the symbol "RBAK".

8       3.       During the Class Period, the defendants embarked on a fraud simple in design but

9   devastating in effect.  Rather than obtain legitimate orders for Redback's products and record

10  real revenues from such sales, the defendants sought to prevail in the highly competitive

11  communications industry by paying bribes or otherwise purchasing the business of other

12  companies.  In particular, the defendants targeted telecommunications giant Qwest

13  Communications International, Inc. ("Qwest"), believing that Qwest's purchases of Redback's

14  products would provide the endorsement of an industry leader that would result in legitimate

15  purchase orders from other companies who would be deceived into believing that there was a

16  real demand for Redback's products.

17      4.       Redback entered a series of secret *quid pro quo* deals with Qwest in which it

18  improperly paid for Qwest's business without any disclosure to investors.  Redback secretly

19  transferred to Qwest and other executives "friends and family" shares worth millions in

20  Redback's IPO, and warrants in a company that Redback acquired (which warrants were

21  converted into Redback warrants worth millions of dollars), in order to obtain Qwest's

22  commitment to purchase Redback's products.  Later in the Class Period, Redback entered into

23  two additional secret sales pacts to buy services from a Qwest affiliate, and products from

24  Qwest, solely to obtain additional purchase orders from Qwest.  In each of these deals, Redback

25  did not want or need the products or services from Qwest or its affiliates, nor did Qwest want or

26  need Redback's products; in fact, Redback's products had performance problems and were not

27  even being tested by Qwest pursuant to its customary business practices, as Qwest simply

28  intended to store (and did store) the products in a warehouse.  However, the *quid pro quo* nature

1    of these deals was not disclosed to investors, who believed that there was a real demand by

2    Qwest for Redback's products, and that this demand was manifesting itself in large purchase

3    orders by Qwest, and revenues at Redback.

4         5.    Defendants' fraud was successful.  During the Class Period, Redback announced

5    numerous multi-million dollar contracts that it had won from Qwest and other prominent

6    telecommunications companies.  Upon news of the agreements Redback had purportedly

7    obtained from Qwest, Redback's common stock soared, splitting and rising more than 3000%

8    above the Company's IPO price within one year.  Qwest's purported purchases were a mark of

9    the quality and acceptability of Redback's products and technology and enabled Redback to

10   obtain the business of other telecommunications companies which purchased Redback's products

11   to complete nationwide networks for high-speed Internet users.  In 2000 and 2001 alone,

12   Redback reported more than $80 million in purported sales of goods and services to Qwest.  In

13   2000, reported sales to Qwest accounted for 15% of Redback's total revenue, and in 2001 this

14   percentage grew to 18%.  Thereafter, quarter after quarter, Redback heralded Qwest as its

15   marquis customer and reported artificial revenues and earnings that were based in large part on

16   the Company's undisclosed and illicit *quid pro quo* sales pacts with Qwest.

17        6.    Unbeknownst to investors, Qwest's true commitments to Redback were illusory,

18   and Redback's products were not functioning and were not even being tested by Qwest, but as

19   defendants concealed these facts, their scheme succeeded in driving Redback's stock price to

20   more than $181 per share (adjusted for splits) during the Class Period.

21        7.    Using its stock (which was artificially inflated by the defendants' fraud) as

22   currency, Redback made three acquisitions and grew from a Company with $64 million in

23   reported revenue in 1999 to one with over $278 million in 2000, and, despite the crash in the

24   technology and telecommunications industries, Redback stayed afloat, largely due to the

25   purported sales to Qwest, as Redback reported revenue of  $227.5 million in 2001, $125.6

26   million in 2002 and $107.5 million in 2003.  The Company's stock traded at artificially-inflated

27   prices due to the defendants' misrepresentations, and with the benefit of non-public information

28   about the true nature of Redback's faltering technology and Redback's secret sales pacts with

1  Qwest, Redback's officers and directors collectively sold more than $150 million of their

2  Redback common stock holdings during the Class Period.

3      8.      Redback and Qwest shared a common Board member, Vinod Khosla, who

4  through his Silicon Valley venture capital firm, Kleiner, Perkins, Caufield & Byers ("KPCB")

5  was a large investor in Redback.  Khosla and his firm reaped millions from Redback's

6  astronomical stock price increases during the Class Period.

7      9.      Near the end of the Class Period, Redback lost Qwest as its partner in the

8  fraudulent scheme when the SEC began an investigation into illicit reciprocal deals between

9  Qwest and its customers, and ultimately filed civil fraud charges against Defendant Joel M.

10  Arnold and other Qwest executives for securities law violations relating to their activities at

11  Qwest.  Redback disclosed for the first time in May 2003 that the SEC was examining certain

12  Qwest transactions with Redback.  When at the end of the Class Period the truth behind

13  Redback's multi-million-dollar "sales" to Qwest was finally exposed, shareholders realized that

14  Redback had overstated its revenues by more than $80 million during the Class Period, which

15  was 23% of the Company's revenues from June 2000 to June 2001.  Redback's revenues fell

16  almost 45% in 2002 and another 14% in 2003.  As Redback's biggest customer and largest

17  source of revenues was no longer purchasing Redback products, and as Redback's new

18  telecommunications equipment was not functioning properly and thus was not generating

19  demand or revenues, the Company filed for Chapter 11 bankruptcy on November 3, 2003.

20      10.      As a result of defendants' fraudulent scheme and material misrepresentations,

21  Redback's stock price was artificially inflated throughout the Class Period and shareholders have

22  lost hundreds of millions of dollars.

23  **II.      The Parties**

24                                      **Lead Plaintiff**

25      11.      Lead Plaintiff, the Connecticut Retirement Fund, is a public pension fund that

26  invests assets on behalf of public employees in the State of Connecticut.  With approximately

27  $20 billion in assets under management, the Connecticut Retirement Fund consists of six pension

28  funds and eight trust funds, representing, among others, approximately 160,000 teachers, police

officers, firefighters, state and municipal employees who are pension plan participants and beneficiaries.

12.    During the Class Period the Connecticut Retirement Fund purchased more than 180,000 shares of common stock of Redback and suffered losses in excess of $3 million.

13.    By Order dated June 25, 2004, the United States District Court for the Northern District of California (the "Court") appointed the Connecticut Retirement Fund as Lead Plaintiff in this case pursuant to 15 U.S.C. § 78u-4.

### Non-Party Redback Networks, Inc.

14.    Non-Party Redback is incorporated under the laws of the State of Delaware with headquarters located at 300 Holger Way, San Jose, California.  Redback's common stock is publicly traded and listed on the NASDAQ National Market under the symbol "RBAK." Redback is and was throughout the Class Period a seller and provider of broadband networking equipment that enables carriers and service providers to build broadband networks that can deliver broadband services to large numbers of subscribers.

15.    On November 3, 2003, shortly after news stories and public disclosures about the fraud described herein, the Company filed a voluntary pre-packaged Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Redback emerged from bankruptcy on January 2, 2004.  The Company's Plan of Reorganization included, *inter alia*,  a 73.39:1 reverse stock split that left the pre-bankruptcy shareholders with only 2.5 million shares of Redback common stock (5% of Redback's post-emergence equity), and an issuance of 47.5 million shares (95% of the Company's post-bankruptcy equity) to holders of Redback's 5% convertible subordinated notes due 2007, which were extinguished in the bankruptcy proceedings.

16.    Redback would be named a defendant herein, but for the Company's bankruptcy filing.

**Individual Defendants**

17.    Defendant Kevin A. DeNuccio ("DeNuccio") has been the President, Chief Executive Officer ("CEO") and a director of Redback since August 2001.  Prior to arriving at Redback, DeNuccio was a Senior Vice President of Worldwide Service Provider Operations at Cisco Systems, Inc. ("Cisco").  He was responsible for and signed all of Redback's SEC filings on Forms 10-Q and 10-K, Proxy Statements and Registration Statements while CEO and a Board member during the Class Period.  DeNuccio also signed Redback's Form 8-K that was filed with the SEC during July 2003.  Furthermore, pursuant to § 13(a) of the Exchange Act and § 906 of the Sarbanes-Oxley Act of 2002, he signed and certified Redback's Form 10-K for fiscal year 2002 (filed with the SEC on March 31, 2003) ("2002 10-K") and Quarterly Reports on Form 10-Q for the second quarter for fiscal year 2002 (filed on August 14, 2002, the "August 2002 10-Q"), the third quarter for fiscal year 2002 (filed on November 14, 2002, the "November 2002 10-Q"), the first quarter for fiscal year 2003 (filed May 15, 2003, the "May 2003 10-Q"), and the second quarter for fiscal year 2003 (filed on August 14, 2003, the "August 2003 10-Q").

18.    Defendant Pierre R. Lamond ("Lamond") served as Chairman of the Board of Directors of Redback ("Board") from November 1996 through May 2003.  He served on the Audit Committee of the Board until May 2003, and on the Nominating Committee from 2002 until May 2003.  As Chairman, Lamond signed Redback's Form 10-K for fiscal year 2000 (filed with the SEC on April 2, 2001) ("2000 10-K"), its Form 10-K for fiscal year 2001 (filed with the SEC on March 27, 2002) ("2001 10-K") 2001, and its 2002 10-K, as well as several Registration Statements during those years.  Lamond has been a partner in Sequoia Capital ("Sequoia") a venture capital firm, since 1981.  Sequoia, along with its affiliates, was an early investor in Redback, and was, at the time of Redback's IPO, the biggest investor in the Company, holding about 5 million preferred shares that it was issued for approximately $7.2 million ─ about a quarter of Redback's preferred stock prior to the IPO.  Lamond personally acquired almost 110,000 pre-IPO Redback preferred shares for slightly over one dollar per share and, with Sequoia, owned over 27% of Redback's outstanding stock before the IPO, which were converted to common stock following the IPO on a one-for-one basis.  During the Class Period, Sequoia

1   held a substantial position in Redback, controlling approximately 2-3% of Redback's common

2   stock.  Lamond, along with the other non-executive director defendants Khosla and Haque,

3   received compensation for his services on the Redback Board entirely in Redback stock options.

4   During the Class Period, Lamond received 300,000 Redback options for his Board service.

5       19.     Defendant Joel M. Arnold ("Arnold") served as Redback's Senior Vice President

6   of Worldwide Field Operations from January 2002 through July 2003.  Thereafter, he has served

7   as Redback's Senior Vice President of Strategy and Partnerships.  He is responsible for

8   developing Redback's business strategy and implementing strategic partnerships.  Before arriving

9   at Redback, he worked at Qwest for over 10 years (from September 1991 until December 2001)

10  in various positions, ending as Executive Vice President of Global Business Sales.  In February

11  2003, the SEC filed civil fraud charges in federal court in the District of Colorado, against Arnold

12  and seven other former and current Qwest executives, in an action styled as *SEC v. Arnold, et al*,

13  Civ. No. 03-Z-0328 (OES) (Feb. 25, 2003).  He was also implicated in the Department of Justice

14  criminal action involving Qwest (*United States v. Graham*, D. Colo., No. 03-CR-089 (Feb. 25,

15  2003), having been named (along with other Qwest executives) as an unindicted co-conspirator.

16  As Redback's Senior Vice President of Worldwide Field Operations, Arnold is responsible for

17  developing Redback's business strategy and implementing strategic partnerships.

18      20.     Defendant Thomas L. Cronan III ("Cronan") has served as Redback's Senior Vice

19  President of Finance and Administration and Chief Financial Officer ("CFO") since January

20  2003.  From April 2001 to January 2003, he served as Redback's Vice President, General

21  Counsel and Corporate Secretary.  Pursuant to §13(a) of the Exchange Act and § 906 of the

22  Sarbanes-Oxley Act of 2002, Cronan signed and certified Redback's 2002 10-K, May 2003 10-Q

23  and its August 2003 10-Q.  Cronan also signed Redback's Forms 8-K during 2003.

24      21.     Defendant Vinod Khosla ("Khosla") served as a director of Redback from 2000

25  through May 2003.  As a non-employee director, Khosla received his compensation for his Board

26  service entirely in Redback stock options, and he received 140,000 options during the Class

27  Period.  He was a member of the Board's Compensation Committee responsible for establishing

28  the Company's policy on executive and key-employee compensation.  Khosla came to Redback

1   from the board of Siara Systems, Inc. ("Siara") after Redback acquired that company in a stock

2   merger, which closed on March 8, 2000.  Khosla is a founder and former CEO of Sun

3   Microsystems, Inc. and founder of Daisy Systems.  He has been a general partner of the Silicon

4   Valley venture capital firm, KPCB, from February 1986 to the present.  KPCB held over 6% of

5   Redback's outstanding common stock, which it acquired in exchange for its interest in Siara in a

6   stock swap transaction with Redback in March 2000.  While at Redback, Khosla signed

7   Redback's 2001 10-K and 2002 10-K and Redback's Registration Statements that were filed in

8   those years.  Khosla has also been director of Qwest since June 1998.

9        22.    Defendant Dennis P. Wolf ("Wolf") served as Redback's Senior Vice President of

10  Finance and Administration and as CFO from January 2001 until January 2003.  Wolf signed

11  Redback's 2001 10-K, 2002 10-K, all the Forms 10-Q for fiscal years 2001 and 2002, and

12  Redback's Forms 8-K and Registration Statements for those same years.  Furthermore, pursuant

13  to § 13(a) of the Exchange Act and § 906 of the Sarbanes-Oxley Act of 2002, he signed and

14  certified Redback's August and November 2002 10-Q.

15       23.    Defendant Vivek Ragavan ("Ragavan") served as a director of Redback from

16  March 2000 through May 2001.  He also held various executive positions, including President

17  and CEO from July 2000 through May 2001, and President and Chief Operating Officer ("COO")

18  from March to July 2000.  Ragavan signed Redback's 2000 10-K, Redback's Proxy Statement for

19  2001, and Redback's Registration Statements in 2000 and 2001.  Between February 2001 and

20  May 2001, Ragavan sold 100,000 shares of Redback stock for more than $2.5 million.

21       24.    Defendant Dennis L. Barsema ("Barsema") was Redback's President, CEO, and a

22  director from November 1997 to July 2000.  Barsema continued as Vice Chairman of Redback's

23  Board until May 2001.  Between August 2000 and December 2000, Barsema sold over 620,000

24  shares of Redback stock at artificially inflated prices, reaping more than $70 million in proceeds.

25  During the Class Period, Barsema signed Redback's 2000 10-K, various Forms 10-Q, Proxy

26  Statements, and several Registration Statements.

27       25.    Defendant Gaurav Garg ("Garg") has served as a director of Redback since May

28  2001.  He served on the Nominating Committee in 2002 and 2003.  He was  also one of the

founders of Redback and was a Redback Senior Vice President of Product Management from August 1996 through May 2001.  Between October 2000 and August 2003, Garg sold 2,206,538 shares of Redback stock for $45 million.  Garg signed Redback's 2001 10-K and 2002 10-K, as well as the Company's various Registration Statements.  Garg has been a partner at Sequoia since May 2001.

26.     Defendant William H. Kurtz ("Kurtz") has served as a director of Redback since October 1999.  Like the other non-executive directors, he received compensation for his services on the Redback Board entirely in Redback stock options.  Kurtz was a member of the Audit Committee of the Board from 2000 through 2003, where he was held out as a certified public accountant with financial management expertise.  Kurtz signed Redback's 2000 10-K, 2001 10-K and 2002 10-K.  He also signed Redback Registration Statements filed with the SEC in those same years.  In October 2000, Kurtz sold 35,000 shares of Redback stock, reaping proceeds of almost $2.5 million.

27.     Defendant Craig Gentner ("Gentner") was Redback's Vice President of Finance, CFO and Corporate Secretary from 1999 to January 2001.  Mr. Gentner signed Redback's materially false and misleading Forms 10-Q for the first, second, and third quarters of 2000, and various Forms 8-K and Registration Statements during that same year.  During October 2000, Gentner sold 120,000 shares of Redback stock for $15.7 million.

28.     Defendant Randall J. Kruep ("Kruep") joined Redback in 1997 and was Redback's Vice President of Worldwide Sales from 1999 to February 2001.  Prior to 1999, Kruep served as the Company's Vice President of Sales.  Between August 2000 and October 2000, Kruep sold 64,600 shares of his Redback stock for more than $9.6 million.

29.     Defendant William E. Miskovetz ("Miskovetz") was Redback's Vice President of Engineering from May 1998 to 2001. In 1998, Miskovetz was paid $108,750 in salary and bonus. In 1998, Redback granted Miskovetz options for 317,500 shares of Redback's common stock. Between June 2000 and August 2000, Miskovetz sold 20,000 shares of his Redback common stock for more than $2.6 million.

30.     Defendant Pankay Patel ("Patel") was Redback's Senior Vice President of Engineering from March 2000 to January 2003.  Patel joined Redback in March 2000 as a result of Redback's acquisition of Siara.  In March 2001, Patel sold 144,000 shares of Redback stock for approximately $4.3 million.

31.     Defendant Promod Haque ("Haque") served as a director of Redback from March 2000 through 2003.  As a non-employee director, Haque was paid for his Board service entirely in Redback stock options, and he received 220,000 options during the Class Period.  He served on the Audit Committee from 2001 through 2003.  Haque signed Redback's 2001 10-K and 2002 10-K and various Registration Statements filed in those same years.  Haque has been a partner with Norwest Venture Partners since 1990. During the Class Period, Norwest Venture Partners maintained a substantial ownership position, as high as 4.76%, in Redback.

32.     Defendant Georges Antoun ("Antoun") was brought to Redback by fellow Cisco alumnus DeNuccio on August 29, 2001.  During the Class Period, Antoun served as Redback's Senior Vice President of Product Management and Marketing from August 2001 to January 2003, Senior Vice President of Engineering, Product Management and Marketing from January 2003 until July 2003, and thereafter as Senior Vice President of Worldwide Field Operations and Product Management.

33.     DeNuccio, Lamond, Arnold, Cronan, Khosla, Wolf, Ragavan, Barsema, Garg, Kurtz, Gentner, Kruep, Haque, Miskovetz, Patel, and Antoun are sometimes collectively referred to herein as the "Individual Defendants."

34.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Redback's business, operations, operational trends, sales, finances, revenue recognition markets and present and future business prospects. The Individual Defendants were privy to confidential information through Redback's internal corporate documents (including the Company's operating plans, budgets, forecasts, and reports of actual operations compared thereto), conversations, meetings and connections with other corporate officers and employees, conversations, meetings and connections with vendors and customers, attendance at sales, management, and Board meetings, including committees thereof,

1   and through reports and other information provided to them in connection with their roles and

2   duties as Redback officers and directors.

3        35.   The Individual Defendants, by virtue of their high-level positions within the

4   Company, directly participated in the management of the Company, were directly involved in the

5   day-to-day operations of the Company at the highest levels and were privy to confidential

6   proprietary information concerning the Company and its business, operations, sales, prospects,

7   growth, finances, and financial condition, as alleged herein.  Because of their positions and

8   access to material non-public information available to them but not to shareholders or the

9   investing public, each of the Individual Defendants knew that adverse facts specified herein were

10  not disclosed and that positive representations that they were causing Redback to make were

11  materially false and misleading when made.

12       36.   The Individual Defendants were involved in drafting, producing, reviewing,

13  approving and/or disseminating the materially false and misleading statements and information

14  alleged herein, including SEC filings, press releases, and other public documents, knew or with

15  deliberate recklessness disregarded the fact that materially false and misleading statements were

16  being issued regarding the Company, and approved or ratified these statements, in violation of

17  federal securities laws.

18       37.   As officers and controlling persons of a publicly-held company whose common

19  stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

20  NASDAQ, and governed by the provisions of the federal securities laws, the Individual

21  Defendants each had a duty to promptly disseminate accurate and truthful information with

22  respect to the Company's financial condition and performance, growth, operations, sales,

23  financial statements, business, markets, management, earnings and present and future business

24  prospects, and to correct any previously issued statements that had become materially misleading

25  or untrue, so that the market price of the Company's publicly-traded securities would be based

26  upon truthful and accurate information.  The Individual Defendants' material misrepresentations

27  and omissions violated these specific requirements and obligations.

28

38.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

**Michael Perusse**

39.     Defendant Michael Perusse ("Perusse") was Qwest's Senior Vice President of Engineering from 1998 through 2000.  Perusse's responsibilities included finding promising technologies and introducing Qwest to the companies that created them.  Perusse was one of the Qwest insiders who received "friends and family" shares of Redback.

**Marc B. Weisberg**

40.     Defendant Marc B. Weisberg ("Weisberg") was Executive Vice President, Corporate Development of Qwest from October 2000 until September 2001.  He joined Qwest as Senior Vice President, Corporate Development in September 1997.  Weisberg oversaw Qwest's strategic alliances.  He was also President and Chief Executive Officer of Qwest Investment Company, Qwest's whole-owned venture capital subsidiary.

**PricewaterhouseCoopers LLP**

41.     Defendant PricewaterhouseCoopers LLP, ("PwC"), which is headquartered in New York City, at all times relevant hereto, was a limited liability partnership. PwC, from its San Jose, California office, served as Redback's external auditor since the inception of the publicly traded Company in 1999.

42.     PwC issued clean and unqualified audit opinion letters in connection with Redback's financial statements for fiscal years 1999, 2000, 2001 and 2002, which were incorporated with PwC's approval in Redback's Form 10-K and other public filings in the Class Period.  PwC also reviewed Redback's quarterly financial statements, which were incorporated in the Company's Forms 10-Q filed with the SEC in 1999, 2000, 2001, 2002 and 2003.  PwC and

1   various individual partners of the firm have participated in the audits of Redback since 1996, and

2   prepared, reviewed, approved, and directed the production of financial statements, reports and

3   releases issued or disclosed by Redback throughout this period.

4          43.    PwC audited Redback's materially false and misleading financial statements

5   during all relevant periods and issued materially false and misleading opinions on those financial

6   statements.  PwC also consented to the use of its unqualified opinions in Redback's financial

7   statements and reports filed with the SEC, which were disseminated to the investing public

8   during all relevant periods.  These financial statements were incorporated into and made a part of

9   the Company's public filings and offering memoranda with the knowledge and express consent

10  of PwC.

11         44.    At all relevant times, as Redback's independent auditor, PwC was well aware that

12  revenue derived from sales to Qwest – Redback's largest customer – was material to Redback's

13  business and reported revenues.  PwC knew, through its audits and access to all of Redback's

14  financial information, or with deliberate recklessness disregarded, that Redback was issuing

15  discounted shares to Qwest executives, and purchasing Qwest's products and services that

16  Redback did not want or need, in exchange for Qwest's agreement to purchase millions of

17  dollars in products and services from Redback.

18  **III.   Jurisdiction and Venue**

19         45.    This Court has jurisdiction over the subject matter of this action pursuant to 28

20  U.S.C. §§ 1331, 1337, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange

21  Act"), 15 U.S.C. § 78aa.

22         46.    The claims asserted herein arise under and pursuant to Sections 10(b), 18 and

23  20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated

24  thereunder, 17 C.F.R. § 240.10b-5.

25         47.    Jurisdiction and venue are proper in this District pursuant to Section 27 of the

26  Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391 (b) and (c).  Venue is proper in this

27  District because many of the acts and practices complained of herein occurred in substantial part

28

1   in this District.  In addition, Redback is headquartered in this District at 300 Holger Way, San

2   Jose, California 95134.

3          48.     In connection with the acts and omissions alleged in this Consolidated Complaint,

4   the defendants, directly and/or indirectly, used the means and instrumentalities of interstate

5   commerce, including without limitation, the mails, interstate telephone communications and the

6   facilities of the national securities markets and exchanges.

7   **IV.    Background and Substantive Allegations**

8          49.     Redback provides telecommunications networking equipment and services that

9   enable carriers and service providers to deploy high-speed access to the Internet and corporate

10  networks.  The Company's product lines include the Subscriber Management System ("SMS™")

11  and SmartEdge™ family of networking hardware and software products that enhance and

12  manage a full-range of broadband connections, including Ethernet, DSL, cable and wireless

13  connections.  Redback's SMS™ products were designed to connect and manage devices used to

14  gather a large number of high-speed access technology subscribers such as DSL subscribers at

15  one end of the network with devices at the other end of the network used to connect to the

16  Internet.  The SmartEdge™ products were designed to enable service providers to add revenue-

17  generating services to their networks.

18         50.     Co-founded by defendant Gaurav Garg in 1996, Redback never sold a single

19  product or service until the end of 1997.  The Company lost almost $10 million in 1998, but

20  claimed that with the Internet "exploding" and "thousands of users going on-line each month,"

21  Redback's SMS™ technology offered an economical solution for the challenges associated with

22  scaling and configuring existing networks to accommodate a large number of users of new high-

23  speed services, without compromising network performance.

24         51.     In May 1999, Redback held its IPO, selling 2.875 million shares of its common

25  stock at $23 per share.  The Company raised over $50 million in the IPO, and its stock began

26  trading on NASDAQ under the symbol "RBAK".

27         52.     Redback's stock instantly became one of the many Internet darlings in the high-

28  tech sector.  With the promise that large telecommunications service providers were testing and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

1  going to implement Redback's SMS™ technology into their networks, the Company's stock rose

2  from its $23 IPO price to $99.49 by June 28, 1999.

3        53.    The promising start-up Company had an undisclosed secret to its success.  Prior to

4  the IPO, Redback provided "friends and family" shares of its stock to insiders and executives at

5  targeted telecommunications customers in exchange for vital commitments from those

6  companies to purchase Redback's products.  Many of the early commitments by

7  telecommunications giants to buy Redback's SMS™ technology were rewards for the lucrative

8  stock kickbacks.

9        54.    According to a former Director of Sales for WorldCom and other accounts at

10  Redback who worked at the Company from December 1999 through March 2002 (the "Redback

11  Sales Director"), the "friends and family" stock-give-away program was endemic to Redback's

12  business.  WorldCom's UUNET ("UUNET") division was one of the first users of Redback's

13  SMS™ technology.  Although UUNET had technical problems with the SMS™ products and

14  also discovered problems with features of the SmartEdge™ product when UUNET was testing

15  the product in its labs, UUNET never publicly disclosed the problems with Redback's products,

16  and according to the Redback Sales Director, UUNET purchased a large quantity of the

17  SmartEdge™ product.  The Redback Sales Director stated that he believed that UUNET received

18  stock from Redback in the "friends and family" secret offerings.

19        55.    Also prior to the IPO, and according to the Redback Sales Director, Redback

20  provided "friends and family" shares to executives at Qwest.  Qwest was viewed at Redback as

21  an extremely important customer whose endorsement of Redback's products would lead to

22  purchases by other telecommunications companies of Redback's products.

23        56.    On June 28, 1999, Redback announced that Qwest "would use the Redback

24  SMS™ 10000 to aggregate traffic from DSL, cable and wireless POPs, providing customers with

25  high-speed connectivity to the Qwest nationwide IP-based network and the Internet."  There was

26  no disclosure of the terms of any contractual arrangement between Redback and Qwest or the

27  amount of products that Qwest would buy from Redback; the Company vaguely stated only that

28  the deal was a "multi-year, multi-million dollar agreement."

57.     Despite the lack of detail in Redback's announcement about the terms of the Qwest deal, in response to the news, Redback's stock price jumped from a close of $99.49 on June 28, 1999 to $113.39 on June 29, 1999 and to $125.99 on June 30, 1999.  Redback and the Individual Defendants quickly understood that doing business with industry giant Qwest provided instant credibility to Redback and resulted in an immediate jump in the Company's stock price.  With Qwest's stamp of approval for Redback's products, the market perceived Redback not as a young start-up with its attendant risks, but as an established new telecommunications equipment supplier.  The Company's stock continued to climb, reaching $214.98 on August 19, 1999, and splitting two-for-one the next day, closing at $104.76 on August 20, 1999.

58.     Redback and the Individual Defendants decided to use the Company's rising stock as currency for acquisitions.  In November 1999, the Company announced that it would acquire another communications company, Siara Systems, Inc. ("Siara"), for approximately $4.5 billion.  Siara had only $7.6 million of book value assets and a $14.2 million deficit in stockholders' equity.  Siara had yet to record any revenue and had no saleable products at the time of the acquisition.  What caused Redback to make this acquisition was Siara's promising new networking product, the SmartEdge™ technology.  However, Redback and the Individual Defendants knew that they needed more than the one product that Siara could contribute to Redback to justify Redback's growing market value.  While Redback had enjoyed a meteoric rise in its stock price following its IPO and the announcement of a deal with Qwest, it now needed to show real financial results.  Qwest had not purchased any products from Redback, nor had Redback booked by the end of 1999 any revenues from its new relationship with industry titan Qwest.  Redback and the Individual Defendants wanted to start the next fiscal year with the hard revenues demanded by investors and the market as proof that Redback had staying power.

59.     Accordingly, Redback bribed executives at Qwest to purchase Redback products so that Redback could start booking revenues from its highly publicized deal with Qwest.  Kruep and other Individual Defendants caused Redback and Siara to agree to transfer 40,000 warrants for shares of Siara's stock to Qwest's executives in exchange for an agreement by Qwest to

1    purchase $40 million worth of Redback's products.  In March 2000, Redback consummated its

2    acquisition of Siara, and holders of shares, warrants and options of Siara received over 31

3    million shares of Redback's common stock, which was more than 38% of the Company's total

4    outstanding common stock.  The Siara warrants were exchanged for Redback warrants when the

5    merger of the companies was consummated, with the Siara warrants given to Qwest executives

6    having a value of approximately $6.8 million.

7          60.    Pursuant to the Merger Agreement between Redback and Siara, defendants

8    Haque, Khosla and Ragavan, who were members of Siara's board of directors, became members

9    of Redback's Board.  Defendant Ragavan, a director and the Chief Executive Officer of Siara,

10   also became the President and Chief Operating Officer of Redback after the merger.  Defendant

11   Khosla, now serving on the board of directors of both Redback and Qwest, was in a unique

12   position to understand the importance and nature of the relationship between Redback and

13   Qwest.

14         61.    A former Redback Vice President of Sales for North America ("Redback Sales

15   VP") who worked at the Company from August 1999 to March 2002 provided additional detail

16   on the illicit *quid pro quo* agreement between Redback and Qwest.  This former Redback

17   executive said that Redback agreed to provide the Siara warrants to Qwest executives and the

18   Anschutz Foundation, which is a charitable foundation headed by Philip F. Anschutz, the

19   founder and a director of Qwest.  The Redback Sales VP first learned about the secret warrants-

20   for-purchases deal with Qwest in late 1999, when Kruep informed him that there were large

21   Qwest orders that "were going to come" in the near future.  This news surprised the Redback

22   Sales VP, as he was in charge of the Qwest account and would thus be aware of Qwest's

23   purchases or plans to purchase Redback products.  Additionally, prior to making any purchases,

24   Qwest routinely conducted field trials and lab tests on products to ensure the quality of the

25   products and their usefulness to Qwest, but the Redback Sales VP was not aware of any such

26   tests by Qwest being conducted on any Redback products.  The Redback Sales VP discovered

27   that Defendant Kruep was communicating with Defendant Weisberg, the former Business

28   Development Chief at Qwest, regarding the terms of the warrants-for-purchases deal.  Kruep and

1   Weisberg worked out the basic terms of the exchange involving the transfer of Siara warrants to

2   Qwest executives (through the Anschutz Foundation) in return for Qwest's purchases of Redback

3   products.  The Redback Sales VP stated that he was "caught in the middle" with trying to make

4   his sales numbers, and that he received assurance only at critical points "at the end of each

5   quarter" that Qwest's orders as required under the sales pact would be placed to allow Redback

6   to make the numbers that Wall Street expected.

7        62.    The Company soon began to report the revenues it desperately needed to satisfy

8   investors.  Beginning on April 12, 2000, the first day of the Class Period, Redback began

9   reporting financial results derived in substantial part from its arrangement with Qwest.  For the

10   first two quarters of 2000, Redback reported record revenues of $183 million, a 370% increase

11   over the first two quarters of 1999.  As Redback and the Individual Defendants expected,

12   Redback's stock price continued its steep ascent.

13       63.    But Redback and the Individual Defendants needed additional revenues from

14   Qwest to sustain the illusion of business success at Redback.  Accordingly, they expanded their

15   fraudulent scheme to include another instance of Redback buying revenues from Qwest.  As part

16   of this scheme, in the third quarter 2000, Redback agreed to purchase $18 million of web-hosting

17   services over five years from Qwest Cyber.Solutions, LLC ("QCS"), an affiliate of Qwest that

18   was founded in July 1999, in exchange for Qwest's commitment to purchase Redback's

19   SMS™10000 product.

20       64.    According to the Redback Sales VP, Qwest had not tested Redback's SMS™

21   10000 product in Qwest's labs as required under Qwest's routine business practices.  Qwest

22   already knew (as did Redback and the Individual Defendants) that the SMS™10000 hardware

23   and software were unstable and knew that Qwest had no need or use for that product.  Indeed, the

24   SMS™10000 product purchased from Redback languished for years in Qwest's warehouse

25   where that product was stored.  While these facts were material to investors, they were not

26   important to Redback or Qwest, as Redback was simply seeking ways to book additional

27   revenues received from Qwest, and Qwest was seeking a customer to purchase and endorse the

28

1   QCS product.  Qwest was planning an IPO of QCS, which, if successful, would enable Qwest's

2   executives to reap millions from their QCS stock holdings.

3       65.    Just as Qwest had no need for Redback's SMS™10000  products, Redback had no

4   need or use for the web-hosting services purchased from QCS.  As stated by the former Redback

5   Sales VP, Kruep and others at Redback agreed to purchase the services from Qwest solely in

6   order to obtain in Qwest's agreement to purchase the SMS™10000, which was not selling well,

7   so that Redback could meet Wall Street's expectations for Redback.

8       66.    Having booked sales to Qwest, by April 2000 Redback could hold itself out as a

9   pioneer in network services with a proven client base including Qwest.  Redback and the

10  Individual Defendants decided to capitalize on their fraud by tapping the secondary markets

11  again, this time in a debt offering.  In or around July 2000, Redback sold $500 million of 5%

12  Convertible Notes due 2007 to the investing public.

13      67.    Based upon the purported sales to Qwest, Redback continued to report growing

14  revenues, and the amount of the revenue increase was staggering.  On October 13, 2000,

15  Redback issued an earnings release announcing its financial results with net revenues of $80.6

16  million for the third quarter of 2000, a 291% increase over the third quarter of 1999.  Upon news

17  of the record revenues, Redback's stock price soared from $102.70 the previous day to $121.53

18  on October 13 and to $138.76 on the next trading day, October 16, 2000.

19      68.    The Individual Defendants used Redback's artificially inflated stock during the

20  Class Period as currency to acquire more companies and their attendant revenues.  In October

21  2000, Redback acquired Abatis Systems Corporation ("Abatis Systems"), a developer of systems

22  for IP service management solutions, for approximately $655 million.  Former holders of shares,

23  warrants and options of Abatis Systems acquired 5.2 million shares of Redback's common stock

24  in that transaction, not aware that those shares were inflated by the defendants' fraud.

25      69.    Redback's CEO, Defendant Ragavan, heralded the acquisition as having

26  "significant operational cost savings and revenue generating benefits."  In reality, Redback

27  manipulated its accounting in connection with the Abatis and the Siara acquisitions to understate

28  the Company's expenses.  Through its acquisitions of Siara in March 2000 and Abatis in

September 2000, Redback improperly allocated $40.4 million of the purchase price for those companies to in-process research and development ("IPR&D") in order to manipulate future earnings.  By inappropriately allocating excessive amounts of the purchase price to IPR&D instead of to goodwill, Redback was able to charge-off the entire $40.4 million in the year of the acquisition as a one time "non-recurring" event instead of over the life of the goodwill asset and therefore, Redback eliminated future reductions in earnings.

70.    Defendants' fraud had a material effect on Redback's reported revenue, and therefore, its stock price as well.  Sales to Qwest accounted for 24% of Redback's total revenue for third quarter 2000, more than 18% for fourth quarter 2000 and 15% of the Company's total revenue for all of 2000.  For the entire 2000 year, Redback's sales to Qwest totaled $40 million, the amount required under the undisclosed sales pact.

71.    While the Individual Defendants caused Redback to tout the success of its sales to Qwest and continually held Qwest out as a key customer, they never disclosed that Redback was essentially paying for its own revenues through transfers of warrants (in Siara) or shares in Redback to Qwest and other telecommunications companies and their executives.  Unbeknownst to investors, Qwest did not need and had not tested the SMS™ products that it purchased from Redback, nor did Redback need the web-hosting services it purchased from Qwest.

72.    According to a former Vice President of North American Sales that worked at Redback from August 2000 through August 2001 (the "VP NA Sales"), in or around August or September 2000, Redback's engineers told Kruep and others at Redback that development on new capabilities for the SmartEdge™ product was not complete and that the product would not be ready to ship in 2001.  Kruep then immediately communicated these facts to the Board and warned that the Company's established revenue targets for 2001 could not be met.  The Board, however, refused to revise the unrealistic revenue targets or Redback's business plan for 2001, even though they knew that the Company could not generate sales sufficient to meet Redback's guidance or Wall Street's expectations.

73.    By November, 2000, Redback's stock price began to decline, along with the stock of Redback's telecommunications peers and other Internet companies.

74.     However, the Individual Defendants desperately wanted to distinguish their Company from their telecommunications and Internet brethren, and show that Redback had real revenues, which would continue to sustain the Company.  The Individual Defendants were determined to announce another big deal with Qwest, and, as a result, drive up the price of Redback's stock, or at least keep it at an artificially-inflated level and avoid the decline affecting the stocks of the Company's peers.

75.     In order to book more revenues from Qwest, Redback once again had to pay Qwest, this time, for a purchase of products that Redback did not want or need.  On February 5, 2001, Redback announced that Qwest had agreed to another multi-year, multi-million dollar purchase of Redback's SmartEdge™ 800 product.  Redback's stock price increased 9% on news of the new contract, going from $40.25 on February 2, 2001 to $44.25 the next day, even though Redback's announcement did not specify the term or amount of this new deal.

76.     When Redback attempted to actually close product sales to Qwest, Qwest refused and said that it would only purchase products from Redback if Redback would purchase products from Qwest.

77.     In late March 2001, Defendant Michael Perusse, a Senior Vice President of Engineering at Qwest, secretly approached Redback and proposed a  new fraudulent deal. Perusse stated that before Qwest would complete a previously-placed order for $30 million of Redback's product, Redback had to buy $7 million worth of Indefeasible Rights of Use ("IRU") on Qwest's fiber-optic network.

78.     Even though Redback had no need for and would never have <u>any</u> need for the IRU, Redback desperately needed additional revenues, so it agreed to Perusse's demands in order to obtain needed business from Qwest.

79.     According to the Redback Sales VP, Defendant Wolf authorized the $7 million payment to Qwest for the IRU.  The Redback Sales VP said that the Company later tried to sell the useless IRU to other telecommunications carriers, but was unsuccessful.

80.     Redback's secret *quid pro quo* arrangements with Qwest during the Class Period resulted in huge contributions to Redback's total reported revenues.  Redback disclosed that sales

1   to Qwest accounted for 28% of Redback's total revenue in the first quarter of 2001, and 27% of

2   Redback's total revenue for the six-month period ended June 30, 2001.  The Individual

3   Defendants failed to disclose to shareholders and investors that these revenues would not have

4   been generated without Redback's secret agreements to purchase products from Qwest (and

5   services from Qwest's affiliate QCS) that Redback did not want or need.

6       81.   During the Class Period, Redback booked over $80 million in revenues from sales

7   of SMS™ and other products and services to Qwest.  The reported revenues from Qwest's

8   purchases enabled Redback to complete at least three acquisitions in the Class Period and

9   artificially inflated the price of Redback's stock.  However, unbeknownst to investors and the

10  entire investment community, the impressive sales (for a start-up company) to an established

11  industry titan (Qwest) resulted from an undisclosed scheme in which Redback either bribed

12  Qwest executives or "round-tripped" Redback's own money to Qwest which was then returned

13  to Redback through bogus deals designed to artificially inflate Redback's reported revenues,

14  income and assets.  Redback entered these deals with Qwest solely to obtain Qwest's business

15  and to record revenues from sales that would not have occurred but for the fraud.

16      82.   In September 2001, Redback completed its third acquisition since going public in

17  1999.  In another all-stock deal valued at approximately $57 million, Redback acquired Merlin

18  Systems ("Merlin") by issuing 3.5 million shares of Redback's stock in exchange for all of

19  Merlin's outstanding stock, warrants and options.

20      83.   In December 2001, Qwest had announced that Defendant Arnold was leaving the

21  company "to spend more time with his family and pursue other interests."  Shortly thereafter, in

22  January 2002, Redback hired Arnold and created a position for him as the Senior Vice President

23  of Worldwide Field Operations to oversee a newly-combined sales and customer service

24  organization within Redback.  In the press release announcing Arnold's employment, DeNuccio

25  stated that he had "the utmost confidence" in Arnold and Redbacks' other key leaders and that

26  the new organizational structure was "in strong alignment with our growth strategy."  According

27  to a former Redback Sales Account manager (the "Redback Sales Manager") who worked at

28  Redback from July 2001 to October 2002 and had some responsibility for the Qwest account,

DeNuccio's decision to hire Arnold was "highly suspicious" because Arnold worked at Qwest and there were many known problems at Qwest.  The Redback Sales Manager said that although Arnold was hired to oversee the sales organization at Redback, Arnold was "was never around" and Redback's sales account managers "never saw him."

84.     Arnold had worked at Qwest from at least 1997 through December 2001 in various executive positions, including Executive Vice President of Global Business Markets.  The reasons that Arnold had euphemistically left Qwest "to pursue other interests" became apparent in March 2002 when Qwest acknowledged that the SEC was investigating accounting improprieties at Qwest and various transactions between Qwest and certain of its vendors.  Redback's sales to Qwest came to a quick end, although Redback continued in its press releases and public filings to hold Qwest out as an important customer.

85.     Arnold was implicated in the SEC's investigation and was named as a defendant in a civil fraud action filed by the SEC in February 2003 arising out of Arnold's participation in a fraudulent scheme to overstate Qwest's revenues in 2000 and 2001.  The scope of the SEC's investigation included Qwest's revenue-recognition from IRU sales and reciprocal sales of equipment to customers that purchased Internet services from Qwest or contributed equity financing to Qwest.

86.     According to the SEC's complaint, Qwest agreed to provide Genuity Inc. ("Genuity") with Internet services using equipment owned and operated by Qwest.  To overstate the revenues emanating from the agreement with Genuity, Arnold created two phony contracts.  In one contract Qwest purported to sell equipment to Genuity at an inflated price, recognizing the revenue immediately, while in the other contract Qwest purportedly sold services to Genuity at a loss and assumed all risk of loss and obsolescence on the equipment purportedly sold in the first contract.  The SEC also filed claims arising out of a separate transaction between Qwest and the Arizona School Facilities Board ("ASFB") in which Arnold improperly classified the equipment sales from Qwest to the ASFB as a "bill and hold" transaction to allow Qwest improperly to recognize immediately revenue from the "sale" of equipment that had not been delivered.

87.     According to the VP NA Sales, Defendant DeNuccio, while he was working at Cisco as the Senior Vice President of Worldwide Service Provider Operations, enlisted Arnold's help with an undisclosed transaction in late 2000 or early 2001.  Qwest had purchased $10-$20 million in products from Cisco that Qwest wanted to return to Cisco.  At the time, DeNuccio was head of sales and was under intense pressure because Qwest was suffering from dwindling revenues and deflated stock prices.  DeNuccio pressured Arnold not to return the unwanted products to Cisco.  Therefore, Qwest, at Arnold's direction, sold its unwanted Cisco products to Genuity, which at that time was on the brink of insolvency and soon thereafter filed for bankruptcy.  The products that Qwest purportedly sold to Genuity remained at Qwest, but Qwest nevertheless recognized revenue from the sales.

88.     The VP NA Sales stated that DeNuccio hired Arnold at Redback with a lucrative $500,000 package at a time when Redback was "hemorrhaging cash" as a payback for helping DeNuccio meet revenue expectations at Cisco with the Genuity deal.

89.     Arnold currently is named as an unindicted co-conspirator in a criminal action, and remains under criminal investigation, according to motions filed by the Department of Justice in the SEC's civil action against Arnold and other former Qwest executives.

90.     In 2001 and 2002,  Redback wrote off $143 million and $34 million, respectively, of "obsolete inventory."  During 2002, there was a significant decrease in demand for Redback's SMS™ equipment because the software and hardware had material defects.  Redback did not disclose these problems to shareholders.  According to the Redback Sales Director, the SMS™ 10000 product "did not work."  He had arranged for Redback's sale to UUNET of $3 million worth of the SMS™ 10000 product in 2001, and UUNET's labs had technical problems with the product.  Redback had agreed to allow UUNET to purchase the SMS™ 10000 equipment on a contingency basis under terms that allowed UUNET to return the product for a refund if it did not pass UUNET's lab tests.  When the SMS™ 10000 failed UUNET's lab tests, Redback was forced to take the SMS™ 10000 and issue a $2.9 million credit to UUNET.

91.     To prevent having to reverse the $3 million in revenues from the UUNET sales, the Redback Sales Director and one of his supervisors, Defendant Georges Antoun, held a

1  meeting at UUNET in early 2002 to try to convince UUNET to use the $2.9 million credit to

2  purchase Redback's SmartEdge™ equipment.  However, some of the features of the

3  SmartEdge™ product did not work well for UUNET, and the Redback Sales Director told

4  Defendant Antoun that Redback could not ship the SmartEdge™ product to UUNET because it

5  had not been lab tested and approved as required under UUNET's purchasing procedures.

6  Undeterred, Antoun arranged a meeting with UUNET's director of purchasing, Boots Bagby

7  ("Bagby"), who was close friends with Antoun.  Defendant Antoun excluded the Redback Sales

8  Director from the meeting, which culminated with Bagby agreeing to UUNET's purchase of the

9  SmartEdge™ equipment with the $2.9 million credit from Redback, and the product was

10  scheduled to ship in April or May 2002.

11      92.      The Redback Sales Director stated that he was shocked that UUNET agreed to

12  purchase the SmartEdge™ equipment.  He later understood what happened.  Antoun had cut a

13  *quid pro quo* deal with Bagby.  Bagby's son was hired as a sales person in Redback's Dallas,

14  Texas office, notwithstanding his complete lack of credentials necessary for the position.

15      93.      In October 2002, Redback introduced an updated version of the Company's

16  SMS™ 10000 product, which was called the "SMS™ 10000 SL."  The Redback Sales VP stated

17  that "like a fool" he directed engineers to go to Qwest's warehouse to implement the upgrade to

18  the millions of dollars worth of SMS™ 10000 equipment that continued to waste away in

19  Qwest's warehouse.  He later understood that Qwest had no use for and had never intended to

20  implement any of the SMS™ products into its network and that his attempts to update the

21  equipment were futile.

22      94.      In February 2003, Redback disclosed that Defendant Arnold had been sued by the

23  SEC relating to his activities while employed at Qwest.  The Company also disclosed that the

24  SEC was examining certain transactions between Redback and Qwest that were entered into

25  prior to 2002.  The SEC later that month filed civil fraud charges against Arnold and others at

26  Qwest, charging them with violations of the federal securities laws.

27      95.      Qwest could no longer engage in the illicit *quid pro* quo deals with Redback, and

28  so Redback lost its largest source of revenue.  With faulty products, stagnant sales and declining

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

1  revenues, Redback's stock sank below $1 per share, and NASDAQ warned that Redback would

2  be delisted.

3        96.     The Company failed to restructure its huge and growing debt and on November 3,

4  2003, Redback filed a pre-packaged bankruptcy plan of reorganization under Chapter 11.

5  Through the Company's bankruptcy reorganization, Redback eliminated $467 million of debt to

6  Convertible Noteholders and executed the approximate 73:1 reverse stock split.  After emerging

7  from bankruptcy in January 2004, Redback had 52 million shares of common stock outstanding,

8  compared to 183 million before its restructuring.  Through the complex recapitalization,

9  shareholders' stake in Redback's common stock was reduced to 5%, with the other 95% of the

10  shares created by the reverse split going to former Noteholders.

11  **V.     Defendants' False and Misleading Statements Issued During the Class Period**

12        97.     Beginning prior to Redback's IPO, Redback gave stock in Redback, or warrants in

13  companies Redback was acquiring, to executives at Qwest and other telecommunications

14  companies in exchange for those companies' commitments to purchase Redback's products.

15  From the start of the Class Period, Redback reported product sales and revenues which,

16  unbeknownst to investors, were based upon the business Redback had acquired through these

17  secret grants of stock and warrants.

18        98.     On April 12, 2000, Redback issued a press release in which it reported record

19  results for the quarter ended March 31, 2000.  The April 12, 2000 press release and subsequent

20  Form 8-K filed with the SEC stated, in relevant part, as follows:

21              Net revenues for the first quarter of 2000 were $34.2 million,
              compared with $6.5 million for the same period in the prior year,
22              an increase of 424 percent. Pro forma diluted net income for the
              first quarter of 2000 was $5.6 million or $0.05 per share after
23              giving effect to the Company's one-for-one stock split effective
              April 3, 2000, and excluding acquisition-related and stock
24              compensation charges and the research and development expense
              related to Siara Systems' operations. This compares to the first
25              quarter of 1999 pro forma net loss of $2.7 million or $(0.16) per
              share on a post-split basis. Before pro forma adjustments, net loss
26              for the first quarter of 2000 was $85.2 million or $(0.96) per share
27              on a post-split basis compared to a net loss of $3.8 million or
28

$(0.23) per share on a post-split basis for the same period in the prior year.

"The first quarter of 2000 was a period of expansion for Redback in the subscriber management market," said Dennis Barsema, chief executive officer at Redback. "Redback continued its momentum in the North American market with both incumbent local exchange carriers (ILECs) and competitive local exchange carriers (CLECs), and announced significant new CLEC wins, including Covad Communications and the newly launched Maverix.net.

*   *   *

. . . "In addition to expanding our presence in the subscriber management market, we executed on a major milestone by announcing the SMS 10000, the third platform in our subscriber management product line," said Vivek Ragavan, president and chief operating officer at Redback.  "In the metropolitan optical networking market, Redback took a major step forward by completing its merger with Siara Systems on March 8.  The merger gives Redback a strong advantage in terms of developing products and technologies for the New Access Network, including core competencies in IP development, SONET and optical networking, and ASIC design." . . .

Redback also completed a private placement of convertible subordinated notes in the first quarter raising net proceeds of approximately $486.5 million.

99.     On May 15, 2000, Redback filed with the SEC its Form 10-Q for the first quarter of 2000 (the "May 2000 10-Q"), signed by Defendant Gentner.  The May 2000 10-Q repeated the financial results reported by Redback in its April 12 press release.  The Company also explained that it would use its stock as currency for future acquisitions.

100.    On May 30, 2000, Redback issued a press release introducing to the market its new SmartEdge 800 product "for the fast-growing metropolitan optical market."  In order to demonstrate the immediate success of this new product launch, Redback reported that Qwest would be a significant purchaser of the SmartEdge 800, stating (and quoting a top Qwest executive) as follows:

"Qwest is building tremendous momentum for our nationwide all-optical network initiative," said David Boast, executive vice

president of engineering and operations from Qwest.  "To ensure that our aggressive implementation proceeds at unprecedented speed and quality, Qwest intends to use the SmartEdge 800 for deployment in our network.  Redback has been working with Qwest for the past 18 months designing SmartEdge capabilities for our next generation network."

101.   In response to this materially false and misleading press release, the Company's stock jumped from $72.07 on May 26, 2000 to $82.32 by May 30, 2000, going to $83.88 the next day, and climbing throughout the month of June 2000 to finally close at $179.14 on June 30, 2000.

102.   On July 12, 2000, Redback issued a press release reporting record revenues for the quarter ended June 30, 2000.  In addition to providing detail on the financial results, the press release and subsequent Form 8-K quoted Barsema, who falsely boasted that Redback's products were "well received by Redback customers."  The press release stated:

Net revenues for the second quarter of 2000 were $48.7 million, compared with $11.1 million for the same period in the prior year, an increase of 340 percent.  Pro forma net loss for the second quarter of 2000 was $5.7 million or $(0.05) per share, which excludes acquisition-related and stock compensation charges.  This compares to the second quarter of 1999 pro forma net loss of $2.6 million or $(0.06) per share.  Before pro forma adjustments, net loss for the second quarter of 2000 was $286.7 million or $(2.41) per share compared to a net loss of $3.7 million or $(0.08) per share for the same period in the prior year.  All share and per share amounts reflect the Company's two-for-one stock split effective April 3, 2000.

"The second quarter of 2000 was a period of strong execution for Redback," said Dennis Barsema, chief executive officer of Redback Networks.  "The company continued its momentum in the metropolitan optical networking market with the launch and first production shipments of the SmartEdge 800," stated Barsema.  "The SmartEdge platform has been well received by Redback customers and prospects, and we have received multi-million dollar orders from both carriers and service providers."  Redback completed its testing of the SmartEdge platform and shipped its first production SmartEdge 800 units in the second quarter, with general availability scheduled for the third quarter.

103.    Also on July 12, 2000, Redback held a conference call with investors in which it discussed its growing revenues.  In that call, Company executives alluded to an important agreement the Company had reached with Qwest.

104.    On July 13, 2000, research analyst First Security Van Kasper ("First Security") issued a research report that increased Redback's price target and reiterated its "Strong Buy" rating.  First Security based its recommendations on revenue estimates that were ahead of First Security's original estimate and Redback's expected shipment of the SmartEdge 800 system to Qwest one quarter ahead of schedule.  The report stated, in part, as follows:

> More importantly, management reported very positive results for the SmartEdge 800.  The company announced that it has added several new betas and has shipped one quarter ahead of schedule to Qwest and Cistron.

> *    *    *

> Driven by the software-intensive SMS solution, the company reported strong gross margins of 71.3%, ahead of our 70% estimate.  Going forward, we expect margins to decrease slightly as the lower margins of the SmartEdge and service revenues increase as a percentage of sales over the next year.  We expect the company to continue realizing the benefits of its 150%+ top-line growth as its R&D and SG&A expenses decline . . . .  We are also increasing our FY00 and FY01 EPS estimates to $0.10 and $0.49, respectively.  Redback's balance sheet remained strong with cash of $492 million and convertible debt of $500 million.

105.    On July 16, 2000, Lightreading.com, a widely-read internet news source in the telecommunications industry, reported that the Qwest contract discussed in Redback's July 12, 2000 conference call "may be a bigger deal than people think."  The article went on to state:

> Redback will shortly be announcing a deal with Qwest that includes an initial purchase order of roughly $6 million of its metropolitan optical product, the SmartEdge 800.  More importantly, however, the deal has the potential to reach hundreds of millions of dollars over the next couple of years, according to Light Reading sources.

> The SmartEdge 800 is Redback's first optical product, which gained in its acquisition of Siara last year. . . .

1

                                                   *   *   *

2

3

4

5

     "Cerent will have a lot more revenue than Redback's optical product this year, but following that conference call we are a lot more confident in [Redback's] ability to become more prominent in that market," says Conrad Leifur, analyst with U.S. Bancorp Piper Jaffray.

6

7

8

     "The [SmartEdge 800] was an interesting product from an architectural perspective, but it had development risk," said Leifur. "Now they've shown it's being deployed in networks."

9

10

11

     Redback officials have raised their "guidance" numbers on the SmartEdge product line with financial analysts, indicating they foresee an increase in sales growth.  They believe the company can ship $10 million worth of SmartEdge products in the next quarter and $150 million during 2001, says Leifur.

12

13

14

15

16

     Redback officials confirmed that details about a Qwest purchase order for a number of SmartEdge products are forthcoming.  One Redback spokesperson described the number of SmartEdge units involved as "North of dozens but South of thousands."  The product lists for between $70,000 and $150,000, depending on the configuration.

17

                                                    *   *   *

18

19

20

21

22

     But Redback's rising visibility at Qwest may mean the telecom engineers are taking a closer look at the IP services promised for the SmartEdge.  The product is designed to include seven application specific integrated circuits (ASICs), four of which handle Sonet and TDM capabilities (available now) and three of which will handle IP services (not yet available).  The IP services capabilities set the SmartEdge product apart from Cisco's offering.

23

     106.    As the Lightreading.com article demonstrated, the defendants' fraud had its

24

intended effect on the market.  The phony deals with Qwest had provided credibility to Redback

25

and created the illusion of huge demand for and sales of Redback's products.

26

     107.    On July 21, 2000, the Company filed a Form S-3/A with the SEC completing the

27

registration of its 5% Convertible Subordinated Notes due April 1, 2007.  The Prospectus was

28

signed by Defendants Gentner, Ragavan, Barsema, Khosla, and Lamond.  Redback identified

Qwest in the Registration Statement as a company that had purchased Redback's products and services. In the Registration Statement, the Company described how "one of the largest digital line providers in the world" – which investors knew was Qwest – was utilizing the Company's products:

> An unregulated affiliate of an incumbent local exchange carrier had been operating trials of its digital subscriber line Internet access service in a limited number of communities and households for over a year and planned to announce a much broader service deployment and breakthrough pricing levels. The affiliate needed a highly scalable and production-proven solution to handle the massive demand it expected to receive for its services.

> The affiliate selected our SMS products as the subscriber management platform to aggregate subscriber traffic in its service. Today, this provider is one of the largest digital subscriber line providers in the world, with very high volumes of traffic passing through its SMS platforms every day. Our SMS products are deployed in the affiliate's digital subscriber line-enabled subscriber aggregation points to manage live traffic from many thousands of subscribers, and the size of the deployment continues to grow every month.

108.    On August 14, 2000, Redback filed with the SEC its Form 10-Q for the second quarter of 2000 (the "August 2000 10-Q"), signed by Defendant Gentner. The August 2000 10-Q repeated the financial results Redback reported in its July 12 press release.

109.    In response to the materially false and misleading statements contained in the Company's 10-Q, the Company's stock jumped from an August 14, 2000 close of $146.59 to a closing price of $150.09 on August 15, 2000.

110.    All of the above statements by the defendants were false and misleading. From the Company's first revenue announcement in the Class Period on April 12, 2000 through the Company's August 2000 10-Q, the defendants misrepresented the terms of the Siara merger (by failing to disclose the provision requiring the transfer of warrants to Qwest executives) and falsely stated the Qwest intended to buy and use Redback's products, when the defendants knew that Qwest did not need or want Redback's products, but purchased them only because Redback

1    had given Qwest executives "friends and family" shares of Redback, and Siara warrants, as

2    payments for Qwest's business.

3        111.    In another attempt to obtain purchase orders from Qwest, Redback purchased

4    services it did not want or need from a Qwest affiliate to obtain Qwest's reciprocal purchase of

5    products from Redback, which Qwest did not want or need.  The defendants used this next facet

6    of their fraudulent scheme to report artificially inflated revenues at Redback, which, as the

7    defendants intended, resulted in an artificial inflation of Redback's stock price.

8        112.    On September 25, 2000, Qwest announced that Qwest Cyber.Solutions LLC

9    ("QCS"), deemed by Qwest to be the largest enterprise Application Service Provider ("ASP"),

10   had been awarded a five-year contract worth $18 million from Redback.  QCS is a joint venture

11   between Qwest and KPMG Consulting.

12       113.    On October 11, 2000, the Company issued a press release announcing its financial

13   results for the third quarter ended September 30, 2000. In the October 11, 2000 press release and

14   subsequent Form 8-K, the Company reported huge increases in its revenues, stating as follows:

15           Redback Networks, Inc., leading provider of advanced networking
             solutions, today reported record revenues for the quarter ended
16           September 30, 2000, as well as its first profit on a pro forma basis
             since closing its merger with Siara Systems.
17

18           Net revenues for the third quarter of 2000 were $80.6 million,
             compared with $20.6 million for the same period in the prior year,
19           an increase of 291 percent. Pro forma net income for the third
             quarter of 2000 was $3.2 million or 0.02 per share diluted, which
20           excludes acquisition-related and stock compensation charges. This
             compares to the third quarter of 1999 pro forma net loss of
21           $569,000 or $(0.01) per share. Before pro forma adjustments, net
             loss for the third quarter of 2000 was $308.1 million or $(2.50) per
22           share compared to a net loss of $1.6 million or $(0.02) per share
             for the same period in the prior year.
23

24

25       114.    Defendant Ragavan was quoted in the October 11 press release (filed with the

26   SEC in an 8-K on October 13, 2000) as stating:

27           "The Company continued its momentum in the metropolitan
             optical networking market with full production shipments of the
28           SmartEdge 800," said Ragavan.   The platform has been well

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

received by Redback customers and prospects, and the Company continues to receive multi-million dollar orders from both carriers and service providers, as well as a significant number of system trials globally.  "In the subscriber management market, Redback was buoyed by strong demand across our complete line of SMS platforms," said Ragavan, "with particular demand and resulting deployments for the SMS 10000."

115.   The materially false and misleading statements contained in the Company's October 11, 2000 press release and its October 13, 2000 Form 8-K drove up the Company's stock price, as had other prior false statements by the Company and the Individual Defendants. Between October 10, 2000 and October 16, 2000, the Company's stock price rose from $120.57 to $138.76.

116.   On November 13, 2000, Redback filed with the SEC its Form 10-Q (the "November 2000 10-Q") for the third quarter of 2000 (the period ending September 30, 2000) in which it reported the financial results previously reported in the Company's October 11, 2000 press release.  Redback also reported that during that quarter (the third quarter of 2000), Qwest accounted for 24% of Redback's total revenue.

117.   In a November 13, 2000 press release, the Company announced that Defendant Gentner would retire in the first quarter of 2000 "due to family medical issues."  The Company also stated that "due to strong business demand" its financial figures released on October 11, 2000 "remain[ ] unchanged."

118.   On November 14, 2000, the Company filed a Form 8-K with the SEC attaching its "unaudited proforma combined financial data for the nine months ended September 30, 2000, that presents the effect of the merger between Redback and Siara . . . as if the merger occurred on January 1, 2000."

119.   The Company also filed a Form S-3 on November 14, 2000 in which it registered 2,440,526 shares of its common stock for use in the acquisition of Abatis.  The Company repeated statements contained in prior filings regarding the importance of the timing and amount of its sales to its reported revenues, and the concentration of sales in the hands of a few

customers.  Redback identified Qwest as contributing 24% to the Company's revenues in its third quarter, more than any other customer.

120.   The materially false and misleading statements contained in the November 2000 10-Q, the November 14, 2000 Form 8-K, and the November 14, 2000 Form S-3 caused the Company's stock price to rise from $72.76 on November 13, 2000 to $79.95 on November 15, 2000.

121.   On January 17, 2001 the Company issued a press release announcing its financial results for both the fourth quarter and year ended December 31, 2000. The press release and subsequent 8-K stated, in relevant part, as follows:

> Redback Networks, Inc., leading provider of advanced networking solutions today reported record revenues for the quarter ended December 31, 2000, as well as its a profit of $.05 [sic] per share diluted on a pro forma basis.

> Net revenues for the fourth quarter of 2000 were $114.6 million, compared with $26.1 million for the same period in the prior year, an increase of 339 percent. Pro forma net income for the fourth quarter of 2000 was $7.8 million or $0.05 per share diluted, which excludes acquisition-related and stock compensation charges. This compares to the fourth quarter of 1999 pro forma net income of $2 million or $0.02 per share diluted. Before pro forma adjustments, net loss for the fourth quarter of 2000 was $327.6 million or $(2.47) per share compared to a net income of $1.2 million or $(0.01) per share for the same period in the prior year.

> For fiscal year 2000, net revenues were $278.0 million, an increase of 333 percent from the $64.3 million posted in 1999. Pro forma net income for the fiscal year was $6.8 million or $0.04 per share diluted, which excludes acquisition-related and stock compensation charges. Before pro forma adjustments, net loss for fiscal 2000 was $1.0 billion or $(8.68) per share compared to net loss of $7.9 million or $(0.15) per share for the prior year.

122.   The January 17, 2001 press release quoted Defendant Ragavan as boasting about the Company's record revenue and net income as follows:

> "Redback continued to achieve key objectives during the fourth quarter of 2000," said Vivek Ragavan, chief executive officer and president of Redback.  "From a financial perspective, we delivered

another profitable quarter with record revenue and net income. Equally important was the strong global demand for both our next generation products, the SMS 10000 and SmartEdge 800, as well as our industry-standard SMS 500 and SMS 1800 subscriber management systems. We continue to consolidate our market position as a leading vendor of broadband subscriber management systems and next-generation metro optical solutions."

During the quarter, the company expanded its global presence with new distribution agreements in Europe and Asia. International revenue grew 121 percent sequentially, reflecting design wins at Korea Telecom and Belgacom S.A., among others.  "The international markets are in the early phases of implementing their broadband access strategies," remarked Ragavan.  "With global customer base and growing international presence, our strong cash position and powerful product portfolio, we begin 2001 well positioned to capitalize on the coming migration to next generation broadband and metro optical networks."

123.    These materially false and misleading statements caused an artificial inflation of the Company's stock and further caused analysts to overvalue Redback's stock.  A January 18, 2001 Research Report by Morgan Stanley rated Redback as "outperform," in part because of the Company's new relationship with Qwest which generated "greater than 10% of [Redback's] quarterly revenues."

124.    All of the above statements by the defendants were false and misleading.  From the September 25, 2000 announcement of the QCS deal through the January 17, 2001 press release, the defendants fraudulently concealed that Redback had no need for QCS's services, but was purchasing them only to obtain Qwest's reciprocal agreement to purchase $20 million of Redback's products.  As Ragavan and the other defendants knew, Redback planned to report, and later did report, revenues based upon Qwest's purchases from Redback made solely in exchange for Redback's agreement to purchase web-hosting services from QCS.

125.    The purported "strong demand" for Redback's products was an illusion, created by outright bribes to and bogus "round trip" deals with Qwest and its executives.  In fact, Qwest did not perform its standard verification and laboratory tests on Redback's products to determine if they worked and would be useful to Qwest, as Qwest had no intention of ever using those

products.  The defendants kept these facts concealed from investors.  Also concealed was the fact that, as stated by a former Redback Sales VP, the SMS™ products that Qwest was "purchasing" were "unstable" and would not meet Qwest's standards, had Qwest bothered to test the products.  As the Individual Defendants and Qwest knew, Qwest was simply storing Redback's products in a warehouse, and building inventory would likely lead to drastically reduced sales to Qwest.  The Individual Defendants also knew that Redback's new SmartEdge™ product had not been fully developed and so would not be available for sale until late in 2001, and, therefore, that Redback's sales and revenues would be adversely affected.

126.    Finally, Redback's financial reporting in the third quarter of 2000 and throughout the Class Period was materially false because Redback was not properly accounting for the warrants it was giving Qwest executives in exchange for sales contracts.  As a result of the defendants' fraud, Redback's stock price was artificially inflated, enabling the Individual Defendants to sell their Redback stock at inflated prices, and enabling the Company to complete its acquisition of Abatis.

127.    The defendants continued to misrepresent Redback's sales to Qwest and the Company's revenues throughout 2001.

128.    On February 5, 2001, Redback announced that Qwest had agreed to a "multi-year, multi-million dollar purchase of the Redback SmartEdge 800."  The press release and subsequent Form 8-K quoted Ragavan and stated, in part, as follows:

> Qwest plans to deploy the SmartEdge 800 multi-service optical platform as part of its strategy to enhance and expand local broadband services for businesses and consumers in key metropolitan markets.
>
> The SmartEdge 800 features high port densities to efficiently aggregate Internet Protocol (IP) and traditional time division multiplexing (TDM) traffic, delivering operational efficiencies for Qwest and simplifying the migration to IP for customers.
>
> "We're pleased to extend our successful relationship with Redback to accelerate the delivery and enhance the efficiency of our IP-based metropolitan networks," said Augie Cruciotti, Qwest's executive vice president of national local networks.  "We look

> forward to continuing our relationship with Redback to further improve service for our customers."
>
> "Since embarking on the design of the SmartEdge 800, Redback has strongly believed that a successful metropolitan optical device must support providers delivering both TDM as well as IP-based services," said Vivek Ragavan, Redback's president and chief executive officer.  As a result, we are very pleased to be a part of Qwest's all-optical metro network initiative."

129.    The effect of this materially false and misleading statement caused the Company's stock price to rise from its February 2, 2001 close of $40.25 to $44.25 by the close on February 5, 2001.

130.    On February 9, 2001, the Company issued a press release announcing the departure of Defendant Kruep, "who has accepted the position of CEO at a start-up company." Defendant Kruep was replaced by Richard Bibb as the Senior Vice President of Worldwide Sales.  Richard Bibb reported directly to Defendant Ragavan.

131.    On February 6, 2001, the Company filed a Form S-8 with the SEC, registering the 80,000 shares acquired under a written compensatory agreement with Defendant Miskovetz at a price of $45.97 per share.  The Registration Statement was signed by Defendants Ragavan, Wolf, Barsema, Garg, Lamond, Khosla and Kurtz.  The Registration Statement incorporated all of the materially false and misleading statements in the May, August and November 2000 10-Qs, and the Company's Forms 8-K filed with the SEC on March 20, 2000, July 20, 2000, August 2, 2000, October 12, 2000, October 13, 2000, January 18, 2001 and January 25, 2001.

132.    On April 2, 2001, Redback filed its Form 10-K for the year ended December 31, 2000 (the "2000 10-K").  The 2000 10-K repeated the financial results for the fourth quarter of 2000 and for the fiscal year ended December 31, 2000 first reported in Redback's January 17, 2001 press release.  Defendants Ragavan, Wolf, Barsema, Garg, Haque, Khosla, Lamond and Kurtz signed the 2000 10-K.

133.    Redback explained in the 2000 10-K that in the fourth quarter of 2000 and for the entire 2000 fiscal year, Qwest accounted for 18% and 15%, respectively, of Redback's total revenue, more than any other company.

134.    The 2000 10-K contained a Report of Independent Accountants, signed by Defendant PwC, stating that:

> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Redback Networks Inc. and its subsidiaries at December 31, 2000 and 1999 and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2000 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.  We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

135.    On April 11, 2001, the Company issued a press release announcing its financial results for its first quarter ended March 31, 2001. The press release and subsequent Form 8-K stated, in relevant part, as follows:

> Net revenue for the first quarter of 2001 was $90.9 million, compared with $34.2 million for the same period in the prior year, an increase of 166 percent. Pro forma net loss for the first quarter of 2001 was $18.4 million or $0.13 per share, which excludes acquisition-related charges, stock compensation charges, restructuring and certain inventory charges. This compares to pro forma diluted net income of $0.05 per share for Q4 2000 and $0.01 per share for the same period one year ago. Before pro forma adjustments, net loss for the first quarter of 2001 was $400.5 million or $2.92 per share compared to a net loss of $85.2 million or $0.96 per share for the same period in the prior year.

136.    The materially false and misleading statements contained in the April 11, 2001 press release caused the Company's stock price to rise from $15.84 to $17.70, an increase of $1.86, or 12%, between April 11, 2001 and April 12, 2001.

137.    Not only was the investing public misled, so were analysts.  Wells Fargo Van Kasper ("Wells Fargo") maintained its strong buy rating on Redback in its April 12, 2001 research report, in part, because of the addition of Qwest as a customer.  Although the research report pointed out that "[m]anagement noted that several of its larger customers delayed deployments for both SMS and SmartEdge products," defendants knew that there was no delay on the part of Qwest because, in fact, Qwest would not be purchasing any Redback products whatsoever.  Moreover, defendants failed to disclose that Redback had not developed certain Router capabilities for the SmartEdge™ product that had been promised to customers.  Redback's Board and senior management had known since August or September 2000 that the product would not be available and intentionally or with deliberate recklessness failed to revise Redback's sales and revenue forecasts for 2001, which included hundreds of millions of dollars in revenues based on the new product.

138.    On April 17, 2001, the Company filed a Form S-3/A Registration Statement and Prospectus for a secondary offering of 2,440,526 shares of the Company's common stock.  The Prospectus stated that Qwest accounted for 18% of the Company's revenue, more than any other Company.  Defendants Wolf, Ragavan, Barsema, Garg, Haque, Khosla, and Lamond signed the Registration Statement filed in connection with the offering.

139.    The April 17, 2001 Registration Statement contained the consent of PwC to the incorporation of the Company's 2000 10-K and the reference to PwC as "Experts".

140.    The Company's share price rose from $18.80 on April 17, 2001 to $19.93 on April 18, 2001, a gain of $1.13, or 6%, as a result of the materially false and misleading statements contained in the Company's April 17, 2001 filings.

141.    On May 15, 2001, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2001 (the "May 2001 10-Q").  The May 2001 10-Q was signed by Defendant

Wolf.  It reiterated the financial results previously announced on April 11, 2001, and acknowledged:

> In each of the periods presented, we have had at least one customer that accounted for 10% or more of our total revenue in the quarter. In the first quarter of 2001, Qwest Communications International Inc. . . . accounted for 28% . . . of our total revenue. For the twelve months ended December 31, 2000, sales to Qwest Communications International Inc. . . . accounted for 15% of our total revenue.

142.    The filing of the May 2001 10-Q drove the Company's stock price higher – it rose $3.40 between May 15, 2001 and May 21, 2001, going from $15.60 to $19.00, a 22% increase.

143.    On May 21, 2001, Redback announced that Defendant Ragavan had resigned from the Company.  In the press release, Defendant Lamond confirmed that "[t]he current business and the product schedules continue to be on track with the guidance that we have previously given."

144.    On July 11, 2001, the Company issued a press release announcing its financial results for its second quarter ended June 30, 2001. The press release and subsequent Form 8-K stated, in relevant part, as follows:

> Net revenue for the second quarter of 2001 was $59.4 million, compared with $48.7 million for the same period in the prior year. Pro forma net loss for the second quarter of 2001 was $37.0 million or $0.26 per share, compared to pro forma net loss of $0.13 per share for Q1 2001 and $0.05 per share loss for the same period one year ago.  The Q2 GAAP loss, which includes acquisition-related charges, stock compensation charges, restructuring charges and charges for inventory and other impairments, was $460 million or $3.26 per share.  During Q2 the Company determined that based on the current business outlook, the carrying value of certain assets would not be recoverable and should be adjusted.  As a result, the Company recorded GAAP reserves and write-offs that totaled $74.9 million for inventory and related claims and commitments in excess of projected demand, as well as investment impairments.  In addition, under a headcount reduction program announced in April 2001, the Company recorded a charge of $3.9 million for severance and related benefits.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

145.   On August 14, 2001, the Company filed with the SEC a Form 10-Q for its second quarter ended June 30, 2001 (the "August 2001 10-Q").  The August 2001 10-Q, which was signed by Defendant Wolf, reiterated the financial results previously announced on July 11, 2001, and, as in prior filings, noted the importance of sales to key customers to Redback's revenue.  The filing stated that Qwest accounted for 27% of the Company's total revenue for the first six months of 2001 and 15% of Redback's revenue for all of 2000.

146.   On August 17, 2001, the Company offered former senior Cisco executive Kevin DeNuccio employment with the Company.  The offer letter (available on Findlaw.com) revealed that the Company provided Defendant DeNuccio with a base salary of $500,000 as well as $2.1 million in restricted stock, 6.5 million options to buy shares at $4.17 each, and a $3 million signing bonus.  These terms were confirmed in Redback's 2001 10-K.  On August 29, 2001, Redback announced that DeNuccio had joined Redback as President and Chief Executive Officer.  DeNuccio also became a member of Redback's Board, while Pierre Lamond remained Chairman of the Board.

147.   On October 10, 2001, the Company issued a press release announcing its financial results for its third quarter ended September 30, 2001. The press release and subsequent Form 8-K stated, in relevant part, that:

> Net revenue for the third quarter of 2001 was $37.0 million, compared with $59.4 million in the prior quarter and $80.6 million for the same period in the prior year.  Pro forma net loss for the third quarter of 2001 was $40.9 million or $0.28 per share, compared to pro forma net loss of $0.26 per share for Q2 2001 and $0.02 per share net income, using fully diluted shares, for the same period one year ago.

148.   On October 10, 2001, the Company filed a Form S-8 Registration Statement with the SEC, signed by Defendants DeNuccio, Wolf, Garg, Haque, Khosla, Lamond and Kurtz.  The Registration Statement incorporated by reference the Company's prior May 2001 and August 2001 10-Qs and it registered 10.7 million shares of Redback stock, including 6,500,000 shares at $1.675 by Defendant DeNuccio pursuant to a Stock Option Agreement.

149.    On November 13, 2001, Redback filed its Form 10-Q (the "November 2001 10-Q") with the SEC.  The Company's November 2001 10-Q was signed by Defendant Wolf and repeated the Company's financial results announced on October 10, 2001.  The November 2001 10-Q stated that Qwest accounted for 22% of the Company's revenues for the first nine months of 2001 and 15% of its revenues for all of 2000, more than any other company.

150.    All of the above statements by the defendants were false and misleading.  From Redback's February 5, 2001 announcement of its "multi-year, multi-million dollar" agreement with Qwest, through the rest of 2001, the defendants fraudulently misrepresented the Company's business deals with Qwest (and the Company's revenues), and falsely concealed that Qwest had no plans to purchase Redback's Smart Edge™ 800 product or any other Redback product absent Redback's reciprocal agreement to pay $7 million for IRU bandwidth on Qwest's network which Redback did not want or need and which it could not even unload on any third parties.  All of the above statements in 2001, like the Company's previous filings in the Class Period, were false and misleading, principally in their failure to disclose that the Company was, in effect, paying for Qwest's business, through Redback's transfers of securities (of Redback and Siara) to Qwest, and Redback's purchases of web-hosting services and Qwest products that Redback would not have purchased but for Qwest's agreement to purchase Redback products in exchange.  In disclosing that a large portion of the Company's revenues were from sales to Qwest, Redback was obliged to disclose that Qwest had no demand for Redback's products, and, in fact, Redback's products were not functioning properly, and were not even being tested by Qwest pursuant to its customary business practices.  Unbeknownst to investors, Qwest was "purchasing" useless and "unstable" Redback products and storing them in a warehouse, because Redback had agreed to buy certain Qwest products and services, or because Redback had simply paid Qwest executives for their allegiance.

151.    As a result of Redback's secret and illicit scheme with Qwest, Redback's stock price was artificially inflated.  Additionally, the Company's financial statements were not prepared in accordance with GAAP, as represented by PwC, nor had PwC completed its audit in accordance with GAAS.  Had PwC properly audited Redback's books and records, it would have

investigated the Company's largest sales accounts – to Qwest – and discovered that these sales were not the result of a real demand for Redback's products, but rather, the sales had been purchased by Redback through payments of securities to Qwest executives, or payments to Qwest and Qwest affiliates which were, in essence, gifts, as the products and services received by Redback in return were useless to Redback.

152.   Throughout the remainder of the Class Period, Redback continued to report success from revenues and product demand which were artificially inflated by its improper deals with Qwest, and failed to disclose the secret *quid pro quo* deals in which Redback purchased services and products from Qwest that Redback did not want or need, so that Redback's money would be "round-tripped" and returned to Redback through Qwest's purchases of Redback's products that Qwest did not want or need.

153.   Defendant Lamond and the other Board members and executives also failed to disclose to shareholders and investors that router capabilities for the Company's SmartEdge™ product had been significantly delayed in development and production, and consequently, Redback had no ability to meet its announced target sales and revenues.

154.   In January 2002, Redback hired Defendant Arnold.  Prior to joining Redback, Defendant Arnold held several positions at Qwest, including Senior Vice President of Global Business Markets, Senior Vice President of General Business and Regional Vice President of National Accounts, in which capacities Arnold structured and negotiated sales of Qwest products that would later be found to be improper.  Defendants failed to disclose that Defendant Arnold at that time was the subject of an SEC investigation into allegations that he and others at Qwest improperly inflated Qwest's revenues by approximately $144 million in 2000 and 2001 through improper sales in order to meet earnings projections and revenue expectations.

155.   On January 16, 2002, the Company issued a press release announcing its financial results for its fourth quarter of fiscal year 2001 and year ended December 31, 2001. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the fourth quarter of 2001 was $40.2 million, compared with $37.0 million in the prior quarter. For the full fiscal year 2001 net revenue was $227.5 million compared to $278.0 million in fiscal year 2000.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

The GAAP net loss for the fourth fiscal quarter was $0.67 per share compared to a loss of $21.71 in Q3 2001. For fiscal 2001 the GAAP loss was $28.78 per share compared to an $8.68 loss in fiscal 2000. The GAAP loss in fiscal Q3 2001 included a write down of goodwill aggregating $2.7 billion.

Pro-forma loss for the quarter was $0.20 per share compared to a loss of $0.28 in fiscal Q3.  Pro forma results exclude certain impairment charges, restructuring charges, stock and other compensation related charges, amortization of intangibles and other items . . . .

156.    On March 11, 2002, Qwest issued a press release acknowledging that the SEC was investigating its revenue recognition practices, including its sales of IRUs and the sale of equipment by Qwest to customers from which Qwest bought Internet services or to which it contributed equity financing.  Because Qwest was Redback's largest customer, PwC knew or with deliberate recklessness disregarded (because it failed to investigate) that Qwest's IRU sale to Redback in 2001 was an improper reciprocal transaction of the kind being investigated by the SEC.

157.    On March 27, 2002, the Company filed its 2001 10-K, which was signed by Defendants DeNuccio, Wolf, Garg, Hague, Khosla, Lamond and Kurtz.  The 2001 10-K reiterated the financial numbers contained in the January 16, 2002 press release, and reported that during 2001, Redback sold $41.5 million of goods and services to Qwest, representing 18% of the Company's revenue that year.

158.    The 2001 10-K contained a Report of Independent Accountants signed by Defendant PwC.  The audit opinion contained substantially the same language as in the audit report contained in the 2000 10-K, noting, in particular, that Redback's financial statements had been prepared in accordance with accounting principles generally accepted in the United States (or GAAP) and audited by PwC in accordance with auditing standards generally accepted in the United States (or GAAS).

159.    The 2001 10-K also reported that:

In 2000, we sold an aggregate of approximately $8 million of goods and services to Broadband Office, Inc.  One of our directors is a partner in an entity that owns more than 10% of Broadband's

outstanding stock.  In 2001 and 2000, we sold an aggregate of approximately $41.5 million and $41 million, respectively, of goods and services to Qwest Communications, Inc. ("Qwest") and purchased an aggregate of approximately $10.5 million and $3 million, respectively, of goods and services from Qwest.  A director of Redback is also a director of Qwest.

160.    In an April 2, 2002 article on Lightreading.com, Qwest was accused of engaging in improper business transactions with its vendors.  The article stated:

During boom times, Qwest and other aggressive carriers such as Williams Communications Group hedged their bets on cutting-edge technology – and helped enrich their executives – by getting discounted shares from startups while they evaluated equipment. Qwest was among the most startup-friendly of them all.  But as the NASDAQ bubble popped and the IPO market shut down, such strategies lost their allure.

A prime example of this has been the tight relationship between Kleiner Perkins Caufield & Byers partner Vinod Khosla and Qwest.  Khosla, who is a board member of Qwest, also held board positions at Corvis Corp., CoSine Communications Inc., Cerent (now owned by Cisco), Juniper Networks Inc., and Redback Networks Inc. while each of these equipment vendors negotiated deals with the carrier.

Here's an example of how it worked with CoSine Communications:  Qwest helped CoSign design, test, and analyze its equipment, a Qwest spokesman confirmed.  In return, CoSine let some senior Qwest executives – including former executive VP of corporate development, Marc Weisberg; executive VP and general counsel Drake Tempest; and executive VP and chief strategy officer Lewis Wilks – buy "friends and family" shares before the startup went public.

CoSine went public in 1999 and, in February 2000, it announced that Qwest had placed a multimillion-dollar purchase order for its gear.

Also, Qwest got warrants for agreeing to buy Tellium Inc.'s gear. Qwest executives accepted some $10 million worth of stock options from the startup in exchange for being allowed into its network.

161.    On April 10, 2002, the Company issued a press release announcing its financial results for its first quarter of 2002. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the first quarter of 2002 was $40.6 million, compared to $40.2 million in the prior fiscal quarter and $90.9 million for the same quarter in the prior year.
>
> The GAAP net loss for the quarter ended March 31, 2002 was $0.23 per share compared to a loss of $0.67 in fiscal Q4 2001 and $2.92 in fiscal Q1 2001.
>
> Pro-forma loss for the quarter was $0.19 per share compared to a loss of $0.20 in Q4 2001 and a loss of $0.13 in the first fiscal quarter of 2001.  Pro forma results exclude certain impairment charges, restructuring charges, stock and other compensation related charges, amortization of intangibles and other items . . . .

162.    On April 10, 2002, Wells Fargo Securities, LLC issued a research report in which it reiterated its strong buy rating on Redback based, in part, on the fact that "Redback has now stabilized its dominant position in the SMS industry.. . . [T]hree of the four domestic ILECs (Verizon, Qwest, and SBC) . . . have now bought into the SMS 10000."

163.    On April 22, 2002, Redback filed with the SEC a Form 10-Q for the period ended March 31, 2002 (the "April 2002 10-Q").  The April 2002 10-Q, which was signed by Defendant Wolf, reiterated the financial results previously announced on April 10, 2002.

164.    On July 10, 2002, Qwest announced that the SEC had begun a criminal probe of Qwest.

165.    On July 10, 2002, the Company issued a press release announcing its financial results for its second quarter of 2002. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the second quarter of 2002 was $40.1 million, compared to $40.6 million in the prior fiscal quarter and $59.4 million for the same quarter in the prior year.
>
> Pro-forma net loss for the quarter was $0.16 per share compared to a loss of $0.19 in Q1 2002 and a loss of $0.26 in the second fiscal quarter of 2002.

The GAAP net loss for the quarter ended June 30, 2002 was $0.40 per share compared to a loss of $0.23 in fiscal Q1 2002 and $3.26 in fiscal Q2 2001.

166. During the July 10, 2002 Redback earnings conference call, Defendant Wolf stated that the Company "had basically doubled the revenue from [the SMS] 10000 this quarter from two quarters ago." The product breakout for revenues for the Company was "roughly 6 million for service, 6 million for SmartEdge™ products and 28 million for SMS." The SMS™ 10000 made up approximately 60 percent of the sales of SMS products.

167. On August 14, 2002, Redback filed with the SEC a Form 10-Q for the period ended June 30, 2002 (the "August 2002 10-Q"). The August 2002 10-Q, which was signed by defendant Wolf, repeated the financial results previously announced on July 10, 2002.

168. On September 26, 2002, the Company announced that it expected lower third quarter 2002 results. The press release stated, in relevant part, that:

> [The Company] expects revenue in the current fiscal quarter ending September 30, 2002 will be approximately, $15 to $20 million and a pro forma net loss of between $0.23 and $0.25 per share.

169. During the September 26, 2002 Redback conference call, Defendant DeNuccio stated, in relevant part, that:

> [O]ur Q3 shortfall was compounded by the pending transition to the Next Generation SMS 10000 product, which we call Streamliner, which is scheduled for delivery in Q4.
>
> After working with our customers over the last couple weeks, and realizing the cost and margin impact to continue SMS 10000 deployment in Q3, we decided to preserve our long-term pricing model and gross margins and wait for the Next Generation delivery of the SMS product, which is expected to be delivered in Q4. With current SMS 10000 sales now accounting for approximately 70 percent of overall SMS sales, some customers delayed orders and/or delivery of current SMS 10000s, deciding to wait for the new technology.

170.    Defendants knew this statement was false and misleading because they knew the SMS™ 10000 was "unstable" and not functioning properly and that there was no demand for that product by Qwest, Redback's largest customer.

171.    On October 9, 2002, the Company issued a press release announcing its financial results for its third quarter of 2002. The press release reported, in relevant part, as follows:

> Net revenue for the third quarter of 2002 was $17.4 million, compared to $40.1 million in the prior fiscal quarter and $37.0 million for the same quarter in the prior year.
>
> Pro forma net loss for the quarter was $0.20 per share, compared to a loss of $0.16 in fiscal Q2 2002 and a loss of $0.28 in the third fiscal quarter of 2001.   Pro forma results exclude certain impairment charges, excess and obsolete inventory charges, restructuring charges, stock and other compensation related charges, amortization of intangibles and other items . . . .
>
> The GAAP net loss . . . for the quarter ended September 30, 2002 was $0.30 per share, compared to a loss of $0.40 in fiscal Q2 2002 and $21.71 in the third fiscal quarter of 2001.

172.    During the October 9, 2002 Redback earnings conference call, Defendant DeNuccio stated:

> We do not believe these numbers reflect a new trend in business activity for Redback.   The revenue shortfall was driven by significantly lower SMS sales, which resulted in only seven million in revenue for the quarter, versus our projected 28 million.
>
> *   *   *
>
> The Redback Board of Directors and management team remain fully committed to achieving cash flow break even in the first half of 2003.  . . . Let me reiterate our conviction – number one, we have enough cash to sustain us through the industry downturn; number two, we have a strategy to reach cash flow break even in the first half of 2003 through revenue growth, gross margin improvement and cost-cutting.   Number three – we are the only router vendor in the top three that have optimized its product portfolio and operating system with a user to network focus for the network edge, which positioned us right in the sweet spot for being the router vendor of choice to build next generation edge networks for service providers.  Finally, that our incumbent customer base

> continues to be delighted with our quality, our product design and
> our technical capability and is moving forward with us on both
> SMS and SmartEdge technology.

This was patently false, and DeNuccio knew it, as Qwest was not, as DeNuccio represented, "delighted with [Redback's] quality."

173.    On November 14, 2002, Redback filed with the SEC a Form 10-Q for the period ended September 30, 2002 (the "November 2002 10-Q"). The November 2002 10-Q, which was signed and certified by Defendants DeNuccio and Wolf, repeated the financial results previously announced on October 9, 2002.

174.    On January 15, 2003, the Company issued a press release announcing its financial results for its fourth quarter of 2002 and fiscal 2002. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the fourth quarter of 2002 was $27.6 million,
> compared with $17.4 million in the prior quarter. For the fiscal
> year 2002, net revenue was $125.6 million compared to $227.5
> million in fiscal year 2001.  The company also announced the
> restructuring of Redback's executive team to more appropriately
> reflect the size and direction of the company.
>
> The GAAP net loss for the fourth quarter of 2002 was $0.20 per
> share compared to a net loss of $0.30 in the prior quarter. For fiscal
> year 2002 the GAAP net loss was $1.13 per share compared to a
> $28.78 net loss in fiscal year 2001.  The GAAP net loss in fiscal
> year 2001 included a write down of good will aggregating $ 2.7
> billion.
>
> Pro-forma net loss for the fourth quarter was $ 0.15 per share
> compared to a net loss of $0.20 in the prior quarter.

175.    During the January 15, 2003 Redback earnings conference call, Defendant DeNuccio stated that he was "especially pleased with the company's cash management. The cash burn during the quarter was 21 million, brings our total cash to 118 million, higher than the range we had forecasted during the last call."  Defendant DeNuccio also announced the imminent departure of Defendant Wolf from Redback.

176.    The above statements were materially false and misleading because the defendants knew Redback's SMS™ 10000 product was not functioning properly and the reduction in customer orders resulted from problems with the SMS 10000, not with delayed orders.  Additionally, the defendants knew that, as the SEC was investigating Qwest's deals with equipment vendors, defendants could no longer purchase Qwest's business with illicit stock transfers and other schemes.

177.    On February 25, 2003, the SEC filed civil fraud charges against Defendant Arnold, among other executives at Qwest, charging him with violations of the federal securities laws.  The SEC's complaint charged Arnold with artificially inflating Qwest's revenue.  The SEC civil suit against Arnold specifically addressed transactions involving sales of Internet equipment and services to the Arizona School Facilities Board and Genuity Inc.

178.    The Company filed its Form Def 14A Proxy Statement (the "2002 Proxy Statement") on March 28, 2002, which stated, in relevant part, as follows:

> In 2001, Broadband Office, Inc. went into bankruptcy.  Kleiner Perkins Caufield & Byers, of which Vinod Khosla, a director of the company is a general partner, owns more than 10% of the outstanding stock of Broadband Office, Inc.  Redback is currently a creditor of the bankruptcy estate in the amount of $1.9 million.
>
> In 2001, Redback sold an aggregate of approximately $41 million of goods and services to Qwest Communications and purchased an aggregate of approximately $8 million of goods and services from Qwest Communications.  Vinod Khosla, a director of Redback, is also a director of Qwest Communications.

179.    On March 31, 2003, the Company filed with the SEC a Form 10-K for the year 2002 (the "2002 10-K"), which was signed and certified by Defendants DeNuccio and Cronan, reaffirming the financial results released on January 15, 2003.  The 2002 10-K was also signed by Defendants DeNuccio, Cronan, Garg, Haque, Lamond and Kurtz.

> The 2002 10-K reaffirmed that "[d]uring 2001, revenue from Qwest Communications . . . accounted for 18% . . . of our revenue . . . [and d]uring 2000, revenue from Qwest . . . accounted for 15% . . . of our revenue."

180. The 2002 10-K contained a Report of Independent Auditors, signed by Defendant PwC. The audit opinion was unqualified and in substantially the same form as the 2000 and 2001 10-Ks.

181. The 2002 10-K stated that Defendant Arnold was no longer a Redback director, and also stated, in relevant part, as follows:

> One of our officers is facing a civil SEC lawsuit related to his previous employment.

> On February 25, 2003, the SEC filed a civil lawsuit against eight current and former officers and employees of Qwest Communications, regarding activities that occurred while each was employed at Qwest. One of the individuals named is Joel Arnold, our Senior Vice President of Field Operations, who was formerly Executive Vice President of Qwest's Global Business Unit. The SEC is seeking, among other remedies, that Mr. Arnold and four other defendants be permanently barred from serving as an officer or director of any public company.

> Although it is expected that such a civil procedure will take two to three years or longer to be adjudicated, an unfavorable result at the end of such action against Mr. Arnold may result in him being unable to serve as an officer. In addition, Mr. Arnold may be distracted while defending against the allegations.

182. Although the SEC investigation was ongoing, the 2002 10-K failed to mention any investigation, informal or otherwise, by the SEC into Redback's dealings with Qwest although, as Arnold knew, that was, in fact, a subject of the SEC investigation.

183. On April 16, 2003, the Company issued a press release announcing its financial results for the first quarter of 2003. The press release reported, in relevant part, as follows:

> Net revenues for the first quarter of 2003 were $29.5 million, compared with $27.6 million for the fourth quarter of 2002 and $40.6 million for the first quarter of 2002.

> GAAP net loss for the first quarter of 2003 was $24.9 million or $0.14 per share compared to a net loss of $34.7 million or $0.23 per share in the first quarter of 2002. Non-GAAP net loss for the first quarter of 2003 was $23.2 million or $ 0.13 per share compared to $29.0 million or $0.19 per share in the first quarter of 2002. Non-GAAP results exclude amortization of intangible assets,

1    stock-based   compensation,   and   realized   gain   on   certain
2    investments.

3    184.    During Redback's April 16, 2003 Financial Release Conference Call, Defendant
4    DeNuccio stated as follows:

> First of all, gross margins improved to 46 percent, which
> represents a 10 percent sequential improvement from Q4.  And
> second, the important improvement in our cash management.  We
> reduced our cash use to only 16 million this quarter, also our
> lowest in two years leaving our cash balance at 103 million.

185.    All of the above statements, beginning with the January 16, 2002 press release, and continuing through the 2001 and 2002 10-Ks and interim quarterly reports, and the Company's other filings, press releases and public statements, were false and misleading, and the defendants knew it, as those filings failed to disclose that:

a.    Qwest did not need or want the products it purchased from Redback, and only purchased the products because Redback had transferred securities (in Siara) to Qwest executives, or because Redback agreed to purchase services or products from Qwest (or QCS) that Redback did not want or need;

b     The SMS system that Qwest was "purchasing" was "unstable" and had not even been tested by Qwest prior to its "purchase";

c.    Qwest was not using the products sold by Redback, but was simply storing them in a warehouse;

d.    Qwest's buildup of its inventory of unwanted Redback products would likely lead to drastically reduced sales to Qwest, or no sales at all, materially impacting Redback's revenues and earnings; and

e.    Redback's financial reporting was materially false because Redback was not properly accounting for the securities it gave the Qwest insiders in exchange for sales contracts, and was not properly accounting for Redback's reciprocal agreements to purchase Qwest products and services.

186.    Each of the defendants knew that but for their false and misleading statements and fraudulent scheme, Redback's stock price would have been much lower and Lead Plaintiffs, and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

52

other members of the Class, would not have purchased Redback's stock which, at the time of each purchase, was artificially inflated by defendants' fraud and false and misleading statements.

**The Truth Begins To Emerge And The Company Descends Into Bankruptcy**

187.    On May 15, 2003, the Company filed its Form 10-Q for the first quarter 2003 (the "May 2002 10-Q"). The May 2003 10-Q was signed by Defendants Cronan and DeNuccio. It reaffirmed the financial results announced on April 16, 2003.

188.    The May 2003 10-Q informed the investing public for the first time that the SEC was examining certain Qwest transactions involving Redback, stating, in relevant part, as follows:

> The Company has been informed that the SEC is examining various transactions involving Qwest Communications, some of which were entered into between the Company and Qwest. The Company is fully cooperating with the SEC regarding this matter. The transactions of which the Company is aware that are being reviewed were entered into prior to fiscal year 2002. The Company cannot predict the duration or outcome of the SEC's examination.

189.    On July 7, 2003, the Company announced that on June 23, 2003 it received a decision from the NASDAQ's Listing Qualifications Panel ("Panel") granting Redback's request for an exception to the National Market's minimum bid price requirement, as set forth in NASDAQ Marketplace Rule 4450(a)(5). According to the press release, the Panel decided to provide Redback with additional time to allow for developments in the SEC's rulemaking process and that accordingly, Redback had until August 23, 2003 to regain compliance with NASDAQ's minimum bid price requirement.

190.    The Company also announced on July 7, 2003 that it had "entered into a lock-up agreement with holders of 67% of Redback's 5% Convertible Subordinated Notes due 2007 ("Notes") relating to a proposed recapitalization transaction involving a debt for equity exchange." The press release further stated, in relevant part, that:

> "We're very excited that this restructuring will significantly improve Redback's balance sheet and cash flows, therefore creating financial stability," said Kevin A. DeNuccio, President

and CEO of Redback Networks.  "This new financial model will increase our ability to innovate and grow."

As part of the recapitalization, the Notes will be exchanged for common stock.  If all of the Notes are exchanged, the noteholders will receive approximately 95% of the issued and outstanding common stock immediately following completion of the transaction and the existing holders of common stock will initially retain approximately 5% of the issued and outstanding common stock of the company.  In addition, Redback's existing common stockholders will receive the right to increase their ownership by approximately an additional 10% of the company's outstanding common stock through the issuance of two types of seven-year warrants:  one for up to approximately 5% of the issued and outstanding common stock at an exercise price based on a company enterprise value of $250 million and one for up to approximately an additional 5% of the issued and outstanding common stock at an exercise price based on a company enterprise value of $500 million.

\*   \*   \*

Completion of the transaction is subject to the completion of the note exchange offer, which requires a minimum tender of 98% of the outstanding principal amount of the Notes, approval of existing stockholders, regulatory approval and other customary conditions.

191.   In Redback's July 7, 2003 Conference Call, Defendant DeNuccio pointed out that "the Lock-up Agreement . . . provides for the exchange of $467 million in outstanding debt for common equity."  Defendant DeNuccio further stated, in relevant part, that:

All in all, by accepting this deal, noteholders will receive common equity and can now participate in the upside of the company as we grow and regain our market leadership.  These noteholders have given us a strong vote of confidence by agreeing to take common equity in return for the elimination of our debt obligations.

Stockholders will no longer have $467 million in debt senior to their interest, and take a long-term view of the company, and once again begin to grow long-term value in our equity.

192.    During the July 7, 2003 conference call, Defendant Cronan pointed out that the lock-up agreement, combined with a reverse stock split shortly thereafter, maintained the Company's eligibility to list on the NASDAQ.

193.    During this same conference call, Defendant Cronan stated that:  "[w]ith two-thirds having agreed to the deal, we could go into a prepackaged reorganization plan if [the note exchange] fails to obtain adequate support."

194.    On July 16, 2003, the Company issued a press release announcing its financial results for the second quarter of 2003. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the second quarter of 2003 was $22.2 million, compared with $29.5 million for the first quarter of 2003 and $40.1 million for the second quarter of 2002.
>
> GAAP net loss for the second quarter of 2003 was $51.0 million or $0.28 per share compared to a GAAP net loss of $65.1 million or $0.40 per share in the second quarter of 2002. Non-GAAP net loss for the second quarter of 2003 was $26.3 million or $0.15 per share compared to a non-GAAP net loss of $26.4 million or $0.16 per share in the second quarter of 2002. Non-GAAP results exclude amortization of intangible assets, restructuring charges, stock-based compensation, realized gain and write-off of certain investments and certain impairment and inventory charges.

195.    During Redback's July 16, 2003 Earnings Conference Call, Defendant Cronan stated, in relevant part, that the Company's "quarter-end cash stood at $69.2 million, down $33.5 million from the previous quarter."  Defendant Cronan further stated that "of the $33.5 million, about $7.6 million was working capital.  About $10.4 was loss from operations, $2 million for capital purchases and $13.5 for the interest payments and restructuring."

196.    On August 6, 2003, the Company filed a Form S-4 Registration Statement containing an offer to exchange up to 47,500,000 post-reverse split shares of common stock for $467,500,000 aggregate principal amount of 5% convertible subordinated notes due 2007 and related accrued interest.

197.    On August 14, 2003, the Company filed its Form 10-Q for the second quarter of year 2003 (the "August 2003 10-Q").  The August 2003 10-Q reaffirmed the financial

1  information released on July 16, 2003, and was signed and certified by Defendants DeNuccio

2  and Cronan.

3       198.    On August 27, 2003, the Company announced that it had received another

4  extension from the NASDAQ Listing Qualifications Panel to October 11, 2003.

5       199.    On October 1, 2003, Redback launched an exchange offer for all outstanding debt

6  set to expire at 12:00 midnight, Eastern Standard Time, on October 30, 2003.  Under the terms of

7  the offer, "[h]olders of notes will receive approximately 101.6 shares of common stock, after

8  giving effect to an approximate 73.39:1 reverse stock split, for each $1,000 of principal amount

9  of notes and related accrued interest exchanged."

10       200.    All of the above public statements were false and misleading for their failure, like

11  other filings in the Class Period, to disclose the following material facts:

12       a.    Qwest did not need or want the products it purchased from Redback, and only

13            purchased the products because Redback had transferred securities (in Siara) to

14            Qwest executives or because Redback agreed to purchase services or products

15            from Qwest (or QCS) that Redback did not want or need;

16       b.    The SMS system that Qwest was "purchasing" was "unstable" and had not even

17            been tested by Qwest prior to its "purchase";

18       c.    Qwest was not using the products sold by Redback, but was simply storing them

19            in a warehouse;

20       d.    Qwest's buildup of its inventory of unwanted Redback products would likely lead

21            to drastically reduced sales to Qwest, or no sales at all, materially impacting

22            Redback's revenues and earnings; and

23       e.    Redback's financial reporting was materially false because Redback was not

24            properly accounting for the securities it gave the Qwest insiders in exchange for

25            sales contracts, and was not properly accounting for Redback's reciprocal

26            agreements to purchase Qwest products and services.

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

201.    As reported on the website Lightreading.com on October 2, 2003, the SEC

commenced an investigation into Redback's past involvement with Qwest.  The article, entitled

"SEC Digging Deeper at Redback?", states as follows:

> In a filing with the SEC on Wednesday, [October 1, 2003,] Redback said the SEC was looking at "the sale of products by Redback to Qwest, the purchases of certain products and services by Redback from Qwest, and certain equity investments."
>
> Redback senior VP Joel Arnold, who was an executive VP at Qwest until joining Redback in early 2002, is accused by the SEC of helping artificially accelerate Qwest's recognition of revenue in two transactions, one of which involved reselling telecom equipment.  "The SEC is seeking, among other remedies, that Mr. Arnold and four other defendants be permanently barred from serving as an officer or director of any public company," Redback's filing says.
>
> Redback notes in the filing that the SEC's civil suit against Arnold might cause some "distraction." . . . In this latest filing, however, Redback says the suit "may affect [Arnold's] ability to serve as an officer of our company."
>
> *   *   *
>
> Four former Qwest officials have been indicted this year for helping the carrier falsely recognize more than $33 million in revenues in 2001.  And at least one government agency has considered barring Qwest from future government business.

202.    The October 2, 2003 article further stated, in relevant part, as follows:

> The filing may raise some eyebrows, as it looks as if the SEC is taking a more particular interest in the Redback/Qwest relationship.  Qwest was a big player in Redback's rise as a startup, and the companies had several common ties that predate [Joel] Arnold's arrival at Redback.
>
> In 2000, Redback's sales to Qwest accounted for 15 percent of its annual revenues, or about $42 million.  In 2001, Qwest sales accounted for 18 percent of Redback's revenues, or about $40.8 million.  For a  time, the two companies shared a board member in Kleiner Perkins Kaufield & Byers partner Vinod Khosla, who was an investor in Redback.  SEC filings and sources say that under

Khosla's watch, several of Qwest's startup equipment suppliers gave top Qwest executives chances to buy their stock at dirt cheap prices.

Shortly after Redback began supplying Qwest with equipment, in late 2000, Qwest's Cyber Solutions group announced a five-year, $18 million contract with Redback to help the vendor with enterprise resource planning, customer relationship management, and manufacturing operations.

The revelation that the SEC is snooping into Redback's past came buried in the vendor's latest filing, which outlined to shareholders its proposed financial restructuring. Under terms of the plan, Redback needs its shareholders to approve a $467 million debt-for-equity swap that will leave them with only 5 percent of the company. If shareholders don't accept the deal, Redback would likely file for bankruptcy protection.

203. An article published on Broadbandlog.com on October 14, 2003 titled "All Eyes on Qwest?" states in relevant part as follows:

As you might already know companies like CoSine and Redback are under the microscope for giving stock options and other benefits to some Qwest executives in exchange for hefty equipment orders.

And that is not all. The Post reports that a "top Redback executive and a former Redback director have ties to Qwest. And they would be Joel Arnold, a former Qwest sales manager who left the company in December 2001 and was sued by the SEC in February, joined Redback in 2002. Vinod Khosla, a director at Qwest, served on Redback's board until last year.

204. A Wall Street Journal article published on October 15, 2003 also reported on the SEC investigation into Redback as follows:

Regulatory filings by Redback said the Securities and Exchange Commission is looking into "certain equity investments" by Qwest. Redback, based in San Jose, California, sold $81.5 million of goods and services to Qwest in 2000 and 2001, and bought about $13.5 million in services from Qwest, according to the filings. A federal grand jury is investigating business transactions between Denver-based Qwest and 11 of its vendors [including Redback] ....The grand jury is investigating whether former Qwest

executives took discounted stock from some vendors in exchange for giving them business, some of which Qwest may not have needed.

205.    On November 3, 2003, Redback filed for Chapter 11 bankruptcy protection.  After trading as high as $179 during the Class Period, Redback's stock closed at $0.36 per share.  The prepackaged bankruptcy plan was approved and became effective on January 2, 2004.

206.    A November 24, 2003 investigation by *The Denver Post* reports that Michael Perusse, "Qwest's former top vendor-relations executive," was described by former employees of two Qwest suppliers – Redback and Corvis – as "Qwest's point man for deals in which Qwest pressured those companies to buy unneeded services from it before it would complete orders for their telecommunications equipment."  The article described the secret *quid pro quo* deal between Qwest and Redback as follows:

Perusse approached Redback Networks in late March 2001 with a surprise demand:  Before Qwest would complete its $30 million order for Redback gear, Redback had to buy something from Qwest.

Perusse wanted Redback to buy $7 million worth of transmission rights on Qwest's fiber-optic network, according to two former Redback employees familiar with the talks.

Redback, a small maker of telecom gear, had no use for the rights, which most often were sold to much larger companies.   But Redback gave in to Qwest's demands anyway as a way to get Qwest to close its purchase.

\*   \*   \*

After relenting to Qwest's pressure, Redback tried to recoup its money by unloading the network rights – also called indefeasible rights of use, or IRUs – but found no takers, even at auction.

It wasn't Qwest's only swap with Redback.  In the third quarter of 2000, . . . Redback bought roughly $14 million of Web-hosting services from Qwest, the Redback veterans said.

In return, Qwest bought $20 million of a Redback product called SMS 10,000, which Qwest had not tested in its labs before the

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

59

deal, the two said.  Big telecom firms rarely, if ever, buy equipment without extensive testing.

## VI.   Redback's Fraudulent Accounting Practices

### Generally Accepted Accounting Principles ("GAAP")

207.   GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice.  Those principles are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").  GAAP includes various authoritative pronouncements and literature, including Statements of Financial Accounting Standards ("FAS"), APB Opinions and Statements of Financial Concepts ("CON").

208.   Management is responsible for preparing financial statements that conform to GAAP.  As noted by the AICPA Auditing Standards ("AU"), Section 110.03:

> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

### SEC Regulations

209.   SEC Regulation S-X sets forth the form and content of and requirements for financial statements required to be filed as part of annual reports under Sections 13 and 15(d) of the Exchange Act.  The Company, as a registrant under the Exchange Act, is subject to Regulation S-X and its accompanying rules.  As set forth in SEC Rule 4-01 (a) of SEC Regulation S-X, "financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a) (1).

1   SEC Regulation S-K states the requirements of non-financial statement portions of annual

2   reports under Section 13 or 15(d) of the Exchange Act.  The financial and non-financial

3   information required to be disclosed in accordance with Regulations S-X and S-K are reported

4   within Form 8-K, Form 10-Q and Form 10-K, among others.

5        210.    The SEC regulates statements by companies "that can reasonably be expected to

6   reach investors and the trading markets, whoever the intended primary audience."  SEC Release

7   No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13,

8   1984).  In addition to the periodic reports required under the Exchange Act, management of a

9   public company has a duty promptly "to make full and prompt announcements of material facts

10  regarding the company's financial condition."  SEC Release No. 34-8995, 3 Fed. Sec. L. Rep.

11  (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (Oct. 15, 1970).  The SEC has emphasized

12  that "[i]nvestors have legitimate expectations that public companies are making, and will

13  continue to make, prompt disclosure of significant corporate developments."  SEC Release No.

14  18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (Nov. 19,

15  1981).

16       211.    In Accounting Series Release 173, the SEC reiterated the duty of management to

17  present a true representation of a company's operations:

18              [I]t is important that the overall impression created by the financial
19              statements be consistent with the business realities of the
                company's financial position and operations.
20

21       212.    Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and

22  Analysis of Financial Condition and Results of Operations ("MD&A") require the issuer to

23  furnish information required by Item 303 of Regulation S-K [17 C.F.R. §229.303].  In discussing

24  results of operations, Item 303 of Regulation S-K requires the registrant to:

25              [d]escribe any known trends or uncertainties that have had or that
                the registrant reasonably expects will have a material favorable or
26              unfavorable or unfavorable impact on net sales or revenues or
                income from continuing operations.
27

28       213.    The Instructions to Paragraph 303(a) further state:

> [t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . .

214.   The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As Securities Act Release No. 33-671 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because of a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.   MD&A is intended to give the investor an opportunity to look at the company through the yes of management by providing both a short and long-term analysis of the business of the company.

### Redback's Financial Disclosures Violated GAAP and SEC Regulations

215.   During the Class Period, at the direction of defendants Kruep, Wolf and certain of the other Individual Defendants, Redback engaged in improper accounting practices and other improper disclosure practices in order to inflate the Company's reported revenues and overstate income from operations in violation of GAAP and SEC Regulations.  All of the Individual Defendants knew or with deliberate recklessness disregarded that Redback and Qwest engaged in a scheme to materially misrepresent Redback's financial results and prospects, as well as its compliance with applicable accounting rules and regulations requiring proper disclosures.  The illicit practices were undertaken with the knowledge or at the direction of Redback's top management, including defendants Kruep and Wolf, and were knowingly participated in by Perusse and Weisberg of Qwest.  Defendant PwC also knew or with deliberate recklessness disregarded that Redback and Qwest were entering into undisclosed *quid pro quo* arrangements to artificially inflate Redback's and Qwest's revenues and misrepresent the demand for and sales of Redback's products.

216.    Regulation S-K, paragraph 229.101, required Redback to disclose the *quid pro quo* arrangements with Qwest.  That regulation requires the following matters to be disclosed within the narrative description of the business:  "The dependence of [the Company] upon a single customer, or a few customers, the loss of which would have a material adverse impact on the [Company]. The name of the customer <u>and its relationship</u>, if any, with the registrant or its subsidiaries shall be disclosed if sales to the customer…are made in an aggregate amount equal to 10 percent or more of the registrant's consolidated revenues…"  Redback was required to fully disclose the nature of its relationship with Qwest, including the undisclosed sales pacts with Qwest and Qwest's executives.

217.    In addition, Redback's accounting for its sales to Qwest violated APB 29, *Accounting for Non-monetary Transactions,* which governs the accounting for exchanges between entities that involve non-monetary assets and liabilities.  ABP 29 requires that non-monetary transactions be accounted for based on the fair value of the assets or services involved using the same basis as that used in monetary transactions.  In particular, APB 29, paragraph 21, states that "accounting for the exchange of a non-monetary asset between an enterprise and another entity should be based on the recorded amount of the non-monetary asset relinquished."  This GAAP provision provides that the culmination of the earnings process does not occur in a situation where there is "an exchange of a product…held for sale in the ordinary course of business for product…to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange."

218.    Redback's exchanges with Qwest were essentially barter transactions in which the parties exchanged unwanted goods or services in phony purchase and sale arrangements.  In these exchanges, in accordance with APB 29, the $80 million in revenue Redback received from Qwest should have been recognized by Redback only to the extent of the recorded amount of the assets relinquished, which was arguably zero.  In essence, any money or securities provided by Redback to Qwest came back to Redback in the form of purchases of Redback products.  Qwest and Redback exchanged money and unwanted products and the exchanges were essentially bogus barter transactions for which Redback should not have recorded any revenue.

219.    In connection with the Company's acquisitions, Redback violated GAAP through improper purchase accounting.  Under APB 16, *Business* Combinations, the purchase price paid to acquire a company should be allocated to all identifiable assets and liabilities based on their fair market values.  FAS 2, *Accounting for Research and Development* Costs, provides that research and development costs should be charged to expense when incurred unless they have an alternative future use.  Redback's improper accounting techniques for IPR&D in the Company's acquisitions enabled Redback to acquire valuable research projects and technology from Siara and Abatis that would generate future revenue without incurring any associated costs, thus resulting in artificially inflated earnings.  By shifting $40.4 million from goodwill to one-time charge-offs in violation of GAAP, Redback was able to increase annual earnings by more than $1 million for each of the next 40 years.

220.    Redback not only violated accounting standards outlined in APB 29 and ABP 16, but also violated the basic foundation of GAAP.  Statement of Financial Accounting Concepts ("CON") No. 1, *Objectives of Financial Reporting by Business Enterprises*, requires that financial reporting be transparent and reliable, which means that it must provide useful information to shareholders, potential investors and others.  Under CON 1, companies also must provide accurate information about their financial performance during a reporting period.  The Company's undisclosed equity payments to and *quid pro quo* transactions with Qwest purposefully masked the true nature of the revenue generated by Redback's sales to Qwest throughout 2000 and 2001, and falsely enhanced the Company's general success in the telecommunications market.

221.    Likewise, as Redback's financial statements included bogus revenues resulting from the Company's secret sales pacts with Qwest, Redback violated Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting,*, which requires revenue recognized by a company in its financial statements to accurately reflect the business operations of the company and to be reliable.  CON 2 specifies that financial information must be presented in a conservative fashion and to ensure that uncertainties and risks inherent in the business are adequately considered.  Redback violated CON 2 by failing to provide complete information

1 about the underlying events and conditions of Qwest's agreements with and purchases from

2 Redback.  The illicit nature of Qwest's demands for lucrative stock kickbacks and *quid pro quo*

3 purchases was inherently risky and intentionally or with deliberate recklessness masked from

4 shareholders and investors in violation of CON 2.

5       222.    In addition, because the revenue recognized by Redback from Qwest resulted

6 from illicit deals, that revenue was contrived, uncertain and not reliable and should not have been

7 recognized in accordance with CON 5, *Recognition and Measurement in Financial Statements of*

8 *Business Enterprises*.  CON 5 sets forth certain fundamentals of accounting that are intended to

9 be the basis of financial accounting and reporting standards.  With respect to revenue

10 recognition, CON 5, paragraph 63 states that one of the fundamental revenue recognition criteria

11 is, "Reliability – The information is representationally faithful, verifiable and neutral."

12       223.    CON 5, paragraph 75 states that, "[t]o be reliable, information about an item must

13 be representationally faithful, verifiable, and neutral.  To be reliable information must be

14 sufficiently faithful in its representation of the underlying resource, obligation, or effect of events

15 and sufficiently free of error and bias to be useful to investors, creditors, and others in making

16 decisions.  To be recognized, information about the existence and amount of an asset, liability, or

17 change therein must be reliable."  The revenue recorded from Redback's bogus sales to Qwest

18 was not reliable as defined under CON 5, and so Redback should not have recorded the revenue.

19       224.    The Individual Defendants caused Redback to report in the Significant Policies

20 footnotes in its Consolidated Financial Statements in its annual reports on Form 10-K that in

21 2000, two customers accounted for 15% and 10% of the Company's revenue, and that in 2001,

22 two customers accounted for 18% and 15% of the Company's revenue.  These disclosures were

23 inadequate and violated both APB 22, *Disclosure of Accounting Policies,* and SEC Regulation S-

24 X.  APB 22, paragraph 8 states that, "a description of all significant accounting polices of the

25 reporting entity should be included as an integral part of the financial statements."  APB 22,

26 paragraph 12 states, "Disclosure of accounting policies should identify and describe the

27 accounting principles followed by the reporting entity and the methods of applying those

28 principles that materially affect the determination of financial position, changes in financial

1   position, or results of operations.  In general, the disclosure should encompass important

2   judgments as to appropriateness of principles relating to recognition of revenue."

3       225.    Qwest was the customer that accounted for 15% and 18% of Redback's 2000 and

4   2001 revenue, respectively, and the fact that the revenue from sales to Qwest was derived from

5   exchange transactions and illicit sales pacts should have been disclosed, as those facts directly

6   bear on the appropriateness of the revenue recognition.

7       226.    In the Company's Consolidated Financial Statements in its 2000 and 2001 10-Ks,

8   Redback reported that it had "issued 18,400 …shares of common stock to consultants [and other

9   non-employees] in 1999. Grants to non-employee service providers and other non-employees

10  were vested at the date of issuance…No shares were issued to consultants [and other non-

11  employees] in 2001 or 2000."  These disclosures were inadequate and violated both FAS 123 and

12  SEC Regulation S-X.

13      227.    FAS 123, *Accounting for Stock-Based Compensation,* governs the accounting and

14  disclosure requirements for transactions that involve the issuance of equity instruments such as

15  stock, options and warrants to employees and non-employees.  FAS 123, paragraph 8, states that,

16  "[e]xcept for transactions with employees that are within the scope of [APB] Opinion 25, all

17  transactions in which goods or services are the consideration received for the issuance of equity

18  instruments shall be accounted for based on the fair value of the consideration received or the

19  fair value of the equity instruments issued, whichever is more reliably measurable."

20      228.    In addition, FAS 123, paragraph 46 states that "an entity [that issues stock to

21  employees and non-employees] shall provide a description of the [reason the shares were issued]

22  including the general terms of the [stock] awards, such as vesting requirements, the maximum

23  term of options granted, and the number of shares authorized for grants of options or other equity

24  instruments."  Redback's failure to disclose the transfer of 40,000 Siara warrants to Qwest's

25  executives violated FAS 123 and SEC Regulation S-X.

26      229.    In violation of Regulation S-K, the Individual Defendants also knowingly or with

27  deliberate recklessness failed to disclose the uncertainties that they knew or reasonably expected

28  to have a material unfavorable impact on Redback's net sales, revenues and income from

Qwest's reported multi-year, multi-million dollar sales contracts.  In reality, Qwest made no commitment to purchase Redback's products and refused to honor its obligations unless Redback met Qwest's demands to purchase products and services from Qwest and its affiliates that had no value to Redback.  Further, in violation of Regulation S-K, the Individual Defendants also knowingly or with deliberate recklessness disregarded and failed to disclose Qwest's demands that Redback transfer securities to Qwest executives or purchase products or services from Qwest and QCS, in order for Qwest to purchase products from Redback.

### The Overall Impact of the GAAP and SEC Rules Violations

230.     The amount of Redback's overstatement of revenue was material and substantial.  In 2000, Redback's recognition of revenue from Qwest resulted in a $40 million overstatement of revenue, about 15% of the Company's overall revenue in fiscal 2000.  In 2001, Redback improperly recognized $40.6 million in revenue from Qwest, representing about 18% of the Company's overall revenue in fiscal 2001.

231.     As a result of Redback's and the Individual Defendants' violations of GAAP and SEC Regulations, approximately 16% ($80.5 million out of total reported revenue of $505.6 million) of Redback's revenue was materially overstated during the two-year period from January 2000 to December 2001.  During the one-year period from July 2000 to June 2001, Redback's revenue was materially overstated by 23% ($80.5 million out of total reported revenue of $345.5 million).  Also materially overstated during the Class Period as a result of Redback's fraudulent sales pacts with Qwest were Redback's net income, earnings per share, stockholder's equity, and accounts receivable, current assets and total assets.

232.     In addition, Redback's accumulated deficit as reported within the Company's Balance Sheet in all Forms 10-Q and Forms 10-K filed with the SEC subsequent to December 31, 2001 was materially understated to the extent of the net income derived from the $80 million in revenue from the Qwest contracts.

### VII.    Scienter

233.     As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company

1   were materially false and misleading, knew that such statements or documents would be issued

2   to the public, or acquiesced in the issuance or dissemination of such statements or documents as

3   primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the

4   Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding

5   Redback, their control over and/or receipt of information of Redback's materially misleading

6   misstatements and/or their associations with the Company that made them privy to confidential

7   proprietary information concerning Redback, participated in the fraudulent scheme alleged.

8        234.   Each of the defendants knew Redback's "contracts" and "revenues" from Qwest

9   were shams designed to create a false impression of demand for Redback's products and false

10  revenues, which were recorded by Redback during the Class Period.  The Individual Defendants

11  solicited, negotiated and authorized the deals with Qwest described herein, or with deliberate

12  recklessness allowed those deals to occur, and the defendants were well aware or with deliberate

13  recklessness disregarded the fact that the purpose and effect of those fraudulent deals was to

14  artificially inflate Redback's revenues and thereby artificially inflate the Company's stock price.

15  All of the defendants were aware that the SMS™ 10000 being touted as part of the Qwest deals

16  was an unstable product.  They also knew that the SmartEdge™ product with advanced features

17  was not ready for production or sales in 2001 when they touted the demand for that product and

18  falsely predicted revenues from sales that they knew would not be possible to obtain.

19       235.   Furthermore, the Individual Defendants had the motive to commit the fraud as

20  they enjoyed rich compensation packages, which depended in large part on the Company's stock

21  price.  In fact, the bulk of the Individual Defendants compensation was dependent on the price of

22  Redback's stock.  The Individual Defendants also received numerous options on Redback's

23  stock.  As Redback's stock increased in price, so did the value of the options granted to the

24  Individual Defendants.

25       236.   The Individual Defendants negotiated and approved, or with deliberate

26  recklessness allowed to occur, the bogus transactions with Qwest and the falsifications of

27  Redback's financial results, in order to convey the impression that there was a sustained demand

28  for Redback's products by Qwest.  The Individual Defendants engaged in the fraud to maintain

the illusion of growth and profitability at Redback, and to artificially inflate, and then maintain, Redback's stock price.  Throughout the Class Period, the Individual Defendants shared an overriding motive to enrich themselves through sales of Redback stock at prices inflated by this fraud.

### Pierre R. Lamond

237.    Defendant Lamond served as Chairman of Board from November 1996 through May 2003.  As Chairman, Lamond signed Redback's 2000, 2001and 2002 10-Ks, as well as several Registration Statements.

238.    As a member of the Audit Committee, Lamond was responsible for ensuring that Redback properly reported its financials in accordance with GAAP and GAAS.  This responsibility includes determining that the auditors had completed their audit in accordance with the true nature of the Company's material contracts, such as its large contracts with Qwest during the Class Period.  As stated in Redback's 2001 Proxy Statement:

> The audit committee reviews, acts on and reports to the Board of Directors with respect to various auditing and accounting matters, including the selection of Redback's accountants, the scope of the annual audits, fees to be paid to Redback's accountants, the performance of Redback's accountants and the accounting practices of Redback. The audit committee meets independently with our independent accountants and our senior management and reviews the general scope of our accounting, financial reporting, annual audit and the results of the annual audit, interim financial statements, auditor independence issues, and the adequacy of the Audit Committee Charter.

239.    In 1999, Sequoia distributed nearly 2 million shares of Redback common stock to its partners, including Lamond, during the post-IPO rally in Redback stock.  According to Redback's 2000 Proxy Statement, at the end of 1999 Sequoia still owned almost 2.5 million shares (5.6%) of Redback common stock and Lamond held an additional 400,000 shares (1.1%).

240.    On August 7, 2000, Sequoia distributed almost 1.6 million shares of Redback's common stock, about one-third of its holdings, to its partners, including Lamond.  Based on the closing price of $142.14 per share on the date of the distribution, the total value of the stock distribution was $226.2 million.  With the benefit of Lamond's non-public inside information,

Sequoia was able to execute the distribution near the height of the Class Period's artificial price inflation. It was Sequoia's only distribution of Redback's stock to its partners during the Class Period.

241. As Chairman of Redback's Board, where he was Sequoia's designated representative, Lamond knew or with deliberate recklessness disregarded the truth about Redback's fraudulent relationship with Qwest.

### Vinod Khosla

242. As stated in the 2001 Proxy Statement, defendants Ragavan, Lamond and Khosla collectively controlled, either directly or through beneficial ownership, at least 11% of Qwest's outstanding common stock.

243. On August 11, 2000 and October 17, 2000, when (during the Class Period) Redback's stock traded at its highest levels (and before the price began to decline), affiliates of KPCB (where Khosla was a general partner) distributed to their investors over $941.2 million in Redback stock. This was a major coup for KPCB and caused its funds to achieve extraordinary performance.

244. As a director of both Redback's and Qwest's boards, were he was KPCB's designee, Khosla knew or with deliberate recklessness disregarded the truth about Redback's fraudulent and material relationship with Qwest. In fact, as Khosla had positions on both sides of the transactions, he was in a unique position to know the true nature of Redback's and Qwest's fraudulent business relationship, and he fostered that relationship by arranging meetings between executives of Redback and Qwest. Additionally, Khosla was on Siara's board of directors at the time Qwest, Redback and Siara agreed to the transfer of 40,000 warrants in Siara to Qwest executives in exchange for Qwest's commitment to purchase Redback's products.

245. Khosla did not confine his improper activities to Redback, as he served on the boards of other equipment vendors who are charged with paying Qwest and Qwest insiders for Qwest's business. In addition to representing KPCB's financial investments as a director of Redback and Qwest, Khosla also represented KPCB on the boards of Corvis Corp., Siara, CoSine Communications Inc., Cerent and Juniper Networks Inc., while each of these equipment

1  vendors negotiated deals with Qwest.  Redback's improper deals with Qwest were known to and

2  facilitated by Khosla at the time he joined the Redback Board following the Siara merger.

3          246.    Khosla has admitted that he has helped set up deals between carriers and

4  equipment startups.  In a June 1, 2000 article in *Lightreading.com*, entitled "The Spotlight:

5  Vinod Khosla," Khosla explained how he provided what he called "venture assistance" in

6  arranging deals where a vendor agreed to ship products that it had not even developed.  Khosla

7  also stated that it would be "ethical" for an equipment startup to issue its equity to individuals at

8  its carrier customers, so long as the decision-maker at the carrier was "not the one getting the

9  equity" and as long as there was "full disclosure."

10         247.    Khosla has been linked directly to the improper activities at Qwest.

11 *Lightreading.com* reported on October 2, 2003 that, under Khosla's watch, several of Qwest's

12 startup equipment suppliers offered their stock to top Qwest executives at prices far below the

13 prevailing market prices on those stocks.

14                                     **Promod Haque**

15         248.    Defendant Haque's compensation for serving on Redback's board, as a "non-

16 employee" director, consisted entirely of stock options.

17         249.    Haque obtained his seat on the Redback Board due to the substantial investment

18 of Norwest Venture Partners VII L.L.P. ("Norwest")  in Redback. Hague is a managing partner

19 of Itasca VC Partners VII L.L.P., the general partner of Norwest.  During the Class Period,

20 Norwest held as much as 4.76%, of Redback's common stock.

21         250.    On August 15, 2000 and October 17, 2000, Norwest distributed 4 million shares

22 of Redback's common stock to its partners, disposing of nearly 60% of its holdings.  Based on

23 the closing prices of $150.09 and $135.26 per share on the dates of the distribution, respectively,

24 the total value of the stock distribution was $571.8 million.  Norwest executed the distribution

25 near the height of the Class Period's artificial price inflation.  This was a major coup for Norwest

26 and caused its funds to achieve extraordinary results.

27         251.    Haque was member of the Audit Committee of Redback's Board.  As a member

28 of the Audit Committee, Haque was responsible for ensuring that Redback properly reported its

1   financials in accordance with GAAP and they had been audited in accordance with GAAS.  This

2   responsibility includes determining the true nature of the Company's material contracts, such as

3   the contracts with Qwest.

4        252.    Haque knew or with deliberate recklessness disregarded the truth about Redback's

5   fraudulent and material relationship with Qwest.

6        253.    Below is a chart listing the Class Period distributions of Redback stock by the

7   venture capital firms associated with defendants Khosla, Lamond and Haque during the year

8   2000:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VENTURE CAPITAL FIRMS'
## REDBACK STOCK DISTRIBUTIONS DURING CLASS PERIOD

| Director/ Partner | Venture Capital Firm | Dividend Date | Shares Paid in Dividend | Closing Share Price | Value of Transaction on Dividend Date |
|---|---|---|---|---|---|
| **Vinod Khosla** | **KPCB** | | | | |
| | KPCB Entities | 8/11/2000 | 3,299,964 | $149.89 | 494,631,604 |
| | KPCB Entities | 10/17/2000 | 3,299,964 | $135.26 | 446,353,131 |
| | | **SUB TOTAL:** | **6,599,928** | | **$940,984,735** |
| **Pierre Lamond** | **Sequoia Capital** | | | | |
| | Sequoia Capital VII | 8/7/2000 | 1,504,112 | $142.14 | 213,794,479 |
| | Sequoia Tech. Partners VII | 8/7/2000 | 87,044 | $142.14 | 12,372,434 |
| | | **SUB TOTAL:** | **1,591,156** | **$142.14** | **$226,166,913** |
| **Promod Haque** | **Norwest Venture Partners VII** | | | | |
| | **Itasca VC Partners** | 8/8/2000 | 2,000,000 | $150.09 | 300,180,000 |
| | **Itasca VC Partners** | 10/17/2000 | 2,000,000 | $135.26 | 270,520,000 |
| | | **SUB TOTAL:** | **4,000,000** | | **$570,700,000** |
| **GRAND TOTAL:** | | | **12,191,084** | | **$1.7 Billion** |

**Kevin DeNuccio**

254.    On August 17, 2001, the Company offered Defendant DeNuccio employment with the Company.  Redback's 2001 10-K stated that the terms of his employment included a $500,000 base salary, 2.1 million in restricted stock, 6.5 million options to buy shares at $4.17 each and a $3 million signing bonus.

255.    Prior to joining Redback, Defendant DeNuccio was the Senior Vice President of Worldwide Service Provider Sales at Cisco.  He joined Redback in part because of his relationship with Defendant Lamond, a partner at Sequoia.  According to an August 24, 2001 Lightreading.com article, "Sequoia funded Cisco in its early days and, later, it backed several of the companies Cisco has acquired.  Sequoia is also a backer of Callisma Inc., where DeNuccio holds a board seat.  DeNuccio also holds board seats at Salesnet Inc., BroadRiver Communications, Netpliance, and consultancy KPMG, where Cisco has an investment."

256.    As CEO and President of Redback, DeNuccio is (and was throughout the Class Period) responsible for approving major contracts.  Accordingly, the granting of stock to Qwest insiders, and the purchases of Qwest products made as part of the *quid pro quo* deals to obtain Qwest's business, could not have been made without DeNuccio's knowledge and/or approval, or his deliberate reckless disregard that those fraudulent actions were taking place.

**Joel Arnold**

257.    As Redback's Senior Vice President of Worldwide Field Operations, Arnold was responsible for developing Redback's business strategy and implementing strategic partnerships, including partnership with telecommunications companies such as Qwest.

258.    Redback's 2001 10-K sets forth Arnold's huge compensation package:

> In January 2002, Redback entered into an employment agreement with Joel Arnold, SVP Field Operations. Pursuant to that Agreement the Company agreed to pay Mr. Arnold an annual salary of $250,000 and a guaranteed annual bonus of $250,000. In addition**,** the Company granted Mr. Arnold an option to purchase 1,000,000 shares of Redback common stock at a per share exercise price of $3.98. The stock options were priced at 74.7% of the fair market value on the date of grant. The option vests over four years at the rate of 25% after one year and thereafter monthly for the remaining three years. In addition, Redback agreed to loan Mr.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

1
2
3
4
5
6
7
8
9

> Arnold $500,000 to enable him to relocate to the San Jose area. The loan has a four year term, carries no interest and has a single balloon payment at the end of the term.
>
> If Mr. Arnold ceases to be employed for any reason by Redback, the loan becomes immediately due and payable within ninety (90) days. In the event of a change in control and his termination (other than for cause) or material changes in his scope of responsibility or salary, Mr. Arnold will receive acceleration of vesting of 25% of the shares granted pursuant to his 1,000,000 share option but not more than 100% of his option grant. Mr. Arnold will also receive up to 12 months salary continuation after such termination following a change in control.

Additionally, at least one half of Arnold's potential annual compensation, excluding equity grants, was contingent on his meeting his sales quota.

259. This is not the first time that Defendant Arnold has pumped a stock price through unlawful means. While Arnold was at Qwest he participated in a scheme to overstate Qwest's revenues through improper sales and Qwest consequently had to restate its financial statements for the fiscal years 2000 and 2001. Ultimately, Qwest admitted overstating its revenues by a staggering $5.7 billion over a twenty-seven month period from January 2000 to March 2002 and understating its losses by an incredible $2.5 billion. During that period, Qwest insiders, including Defendant Arnold, pocketed more than $600 million by selling Qwest stock at artificially inflated prices.

260. While at Qwest, Arnold participated in a fraudulent scheme to mischaracterize Qwest's revenue. Arnold was Qwest's Executive Vice President of Global Business Markets and was responsible for Qwest's sales, marketing and delivery of telecommunications services to Qwest's business customers. While Arnold was responsible for Qwest's sales, Qwest refused to complete a previously-placed order for $30 million of Redback's product unless Redback purchased an IRU for $7 million, which Redback did not need and could not resell. Arnold and others at Qwest forced Redback to purchase the IRU to fraudulently inflate Qwest's revenues. On February 25, 2003, the SEC filed civil fraud charges in federal court in the District of Colorado against Arnold and seven other former and current Qwest executives in an action styled as *SEC v. Arnold, et al*, Civ. No. 03-Z-0328 (OES) (Feb. 25, 2003). The SEC complaint alleged

1    that Arnold and the other Qwest executives engineered manipulative transactions solely for the

2    purpose of inflating Qwest's revenues by $144 million in order to meet earnings projections and

3    revenue expectations.

4        261.    Also on February 25, 2003, Attorney General John Ashcroft and SEC Chairman

5    William Donaldson announced that a federal grand jury in Denver indicted four former Qwest

6    executives (Grant Graham, Thomas Hall, John Walker and Brian Treadway), in an action styled

7    as *United States v. Graham,* D. Colo., Criminal Case No. 03-CR-089 (Feb. 25, 2003).  In a

8    February 25, 2003 Department of Justice press release, United States Attorney John Suthers of

9    the District of Colorado stated that:  "[t]oday's indictment concludes only the first phase of the

10   Qwest investigation by the Justice Department.  There are several other aspects of Qwest's

11   corporate conduct and the conduct of its executives that are the subject of a continuing

12   investigation."

13                              **<u>Vivek Ragavan</u>**

14       262.    Redback's 2002 Proxy Statement states that Ragavan was paid $413,000 in salary

15   and bonus in 2000 and $194,124 in salary and $250,000 in severance in 2001.

16       263.    In 2001, Ragavan sold 100,000 shares of Redback stock for $2,532,500.  On May

17   1, 2001, he transferred 1,188,835 shares, valued at the time of the transaction at over $23 million,

18   to the Ragavan Family 2000 Living Trust.  The trustees are Defendant Ragavan and his wife,

19   Nilima Ragavan.

20       264.    On May 21, 2001, the date Ragavan left Redback, the Company repurchased

21   624,820 common stock shares from the Ragavan Family 2000 Living Trust at an undisclosed

22   price.  Based upon the closing price of Redback stock on that date, the market value of the

23   transaction was almost $11.9 million.

24       265.    As CEO and President of Redback, Ragavan was responsible for approving major

25   contracts.  Accordingly, the transfers of securities to Qwest insiders and Redback's purchases of

26   products and services from Qwest and QCS that Redback did not want or need, as part of the

27   illicit *quid pro quo* deals with Qwest, would not have occurred without Ragavan's prior review

28   and approval or his deliberate reckless disregard for the propriety of those actions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Dennis Barsema**

266.    Redback's 2001 Proxy Statement stated that in 1999, Defendant Barsema's last full year as CEO of Redback, Barsema was paid $325,000 in salary and bonus.  In 2000, he was paid $150,801 and received 180,000 Redback options. Starting on August 2, 2000 and ending on December 8, 2000, just before a sharp drop off in price, Barsema sold 620,000 shares of Redback stock on the open market for over $70 million.

**Gaurav Garg**

267.    Redback's 2001 Proxy Statement stated that in 2000,  Defendant Garg was paid $170,000 in salary and received 240,000 options in addition to the 300,000 options he was awarded in 1998.

268.    During the Class Period, Garg sold 2,206,538 shares of Redback stock on the open market for a whopping $44,910,958.

**William H. Kurtz**

269.    While serving on Redback's Board throughout the Class Period, Defendant Kurtz signed Redback's materially false and misleading Forms 10-K for fiscal years 2000, 2001 and 2002, which he knew or with deliberate recklessness disregarded were false and misleading. Kurtz also signed Redback's materially false and misleading Registration Statements during those same years.  As a member of Redback's Audit Committee of the Board and a certified public accountant with expertise in financial management, Kurtz was in aptly qualified to understand that Redback failed to properly disclose material information about the Company's financial condition and prospects, and its "sales" to Qwest.  Like other Redback insiders, in October 2000, Kurtz sold 35,000 shares of Redback stock, reaping almost $2.5 million in illicit proceeds, which was more than he sold at any other time and was suspiciously timed to take advantage of the undisclosed material facts and information described herein.

**Craig Gentner**

270.    Redback's 2001 Proxy Statement stated that in 1999, Defendant Gentner received $45,000 in salary ($200,000 annualized) and 500,000 options.  In 2000, he received $300,000 in salary and bonus and an additional 50,000 options.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

271.    In October 2000, Gentner sold 120,000 shares of Redback for $15,705,000.

### Randall Kruep

272.    As stated in the 2001 Proxy Statement document, a large part of Kruep's compensation was contingent on his making his sales numbers and upon the price of Redback's common stock.  Redback's 2001 Proxy Statement stated that in 1999, Defendant Kruep received $125,000 in salary and $295,000 in bonus and sales commission.  In 2000, he received $125,000 in salary, $344,219 in bonus and sales commission and 290,000 options to buy Redback stock in addition to the 300,000 options he was granted in 1998.

273.    In August, September and October of 2000, Kruep sold a total of 64,000 shares of Redback stock for $9,647,218.

274.    Kruep was not content with the amount of his trading and complained in an August 12, 2002 Wall Street Journal article "Dialing for Dollars:  Before Telecom Industry Sank, Insiders sold Billions in Stock" that he would have sold much more if he could:

> [H]e "would have gotten out faster if I could have," and now wishes he could have sold double the $100 million [sic – it was $50 million] he sold in share transactions during 1999 and 2000. Tight trading "windows," which limited when insiders can sell their shares, prevented Mr. Kruep from doing additional selling, he says.

But for the trading restrictions in Redback stock, Defendant Kruep and the other Individual Defendants would have engaged in more extensive unlawful insider trading based on material non-public information.

### William Miskovetz

275.    On June 5, 2000 and August 5, 2000, Miskovetz sold a total of 20,000 shares of Redback common stock for over $2.6 million, which was suspiciously timed to take advantage of non-public information he acquired through his senior-level engineering position regarding material defects in the software and hardware in Redback's products.  Miskovetz sold no other stock during the Class Period and was at all relevant times aware of the true nature of Qwest's

purported purchases and Qwest's failure to test or implement the equipment it purchased from Redback.

### Pankaj Patel

276.   In 2000, Defendant Patel received $261,439 in bonus and salary, and was granted 225,000 options on Redback stock.  In 2001, he earned $249,115 and was granted 1,407,686 options.  In 2002, he received $267,188 in salary.

277.   On March 1, 2001, Patel sold 144,000 shares of Redback stock for $4,274,978, which was his only sale during the Class Period and was suspiciously timed to take advantage of non-public information he acquired through his senior-level engineering position regarding material defects in Redback's products.  Patel was at all relevant times, aware of the true nature of Qwest's purported purchases and Qwest's failure to test or implement the equipment it purchased from Redback.

### Dennis P. Wolf

278.   Redback's 2003 Proxy Statement stated that in 2001, Defendant Wolf received $360,833 in salary and bonus and options for 1,010,683 shares of Redback common stock.  In 2002, he received $285,000 in salary and 250,000 Redback options.

### Thomas L Cronan, III

279.   As Redback's General Counsel and CFO, Cronan was in a unique position to know the true nature of Redback's undisclosed *quid pro quo* contracts with Qwest and other telecommunications companies.  He also had the power to but failed to have Redback disclose that it had transferred securities to Qwest executives and purchased Qwest's products or services solely to obtain Qwest's business.  Redback's 2004 Proxy Statement stated that in 2001, Defendant Cronan received $168,750 in salary and bonus; in 2002, he received $192,500 in salary, and in 2003 he received $271, 875.  He also received 644,659 options in 2003.

### Georges Antoun

280.   Defendant Antoun was one of Redback's five highest paid executives.  Antoun participated in the fraudulent scheme by pressuring Redback's customers, including WorldCom/UUNET, to enter into undisclosed *quid pro quo* deals which concealed the

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

1   performance problems in and lack of demand for the Company's flagship products (including its

2   SMS™ and SmartEdge™ products) and the true nature of Redback's dealings with its

3   telecommunications customers.

4       281.    The motive of the Individual Defendants to commit fraud included their ability to

5   profit from sales of the Company stock at artificially inflated prices.  The Individual Defendants

6   engaged in extensive insider trading during the Class Period, taking advantage of Redback's

7   stock, which was artificially inflated by the defendants' fraud.  The Individual Defendants sold

8   almost $150 million of their personal holdings of Redback stock, the majority of the sales taking

9   place at prices many times the market price of Redback shares at the end of the Class Period.  All

10  of these sales took place prior to the revelations of the fraud in October 2003.

11      282.    The overwhelming bulk of the Individual Defendants' sales of Redback stock was

12  suspiciously timed and calculated to maximize personal benefit from undisclosed inside

13  information during the six-month period between June and December 2000.  This period is when

14  Qwest was actively purchasing Redback's products in undisclosed *quid pro quo* agreements and

15  immediately follows Redback's May 30, 2000 press release touting its new SmartEdge 800

16  product during the period of the greatest sustained inflated share prices of Redback's common

17  stock.  As demonstrated by the chart below showing Redback's stock price (adjusted for 2-for-1

18  splits on August 20, 1999 and April 4, 2000), from June 4, 1999 (before the Class Period) to

19  December 31, 2003, the Company's stock price rose dramatically from the beginning of the

20  Class Period in April 2000 and remained at Class Period highs throughout the period of the

21  greatest insider selling:

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF



Note:  The stock prices shown are adjusted for stock splits.

### Michael Perusse

283.    As Qwest's Senior Vice President of Engineering from 1998 through 2000, Perusse's responsibilities included finding promising technologies and introducing Qwest to the companies that created them.  Perusse abused his power at Qwest to demand that companies selling to Qwest grant Qwest executives stock at discount rates or buy Qwest products that they did not want or need.  Perusse made such demands to Redback and thereby participated in the scheme and plan to inflate Redback's revenue and mislead public investors.

284.    Additionally, Perusse was one of the Qwest insiders who received kickback stock from Redback.

### Marc Weisberg

285.    Defendant Weisberg was Executive Vice President, Corporate Development of Qwest from October 2000 until September 2001. He joined Qwest as Senior Vice President, Corporate Development in September 1997.  Weisberg oversaw Qwest's strategic alliances.  He was also President and Chief Executive Officer of Qwest Investment Company, Qwest's wholly-

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

1  owned venture capital subsidiary.  He conspired with defendant Kruep to transfer Siara warrants
2  to Qwest executives in return for Qwest's purchases of Redback products.

### PwC's Scienter And False And Misleading Audit Reports

4  286.  PwC is the largest firm of certified public accountants in the world and a member
5  of the AICPA.  As the long-time auditor of Redback, PwC was intimately familiar with
6  Redback's financial condition.  PwC had continual access to and knowledge of Redback's
7  confidential corporate financial and business information, including contract with Qwest and
8  internal monthly financial statements.  Accordingly, PwC was privy to, knew of, or disregarded
9  with deliberate or extreme recklessness the accounting improprieties and violations of GAAP set
10  forth above.  PwC allowed Redback to utilize the improper revenue recognition techniques
11  described herein and other improper accounting practices relating to the illicit *quid pro quo* and
12  barter transactions with Qwest, which PwC knew were improper and violated GAAP.

13  287.  Defendant PwC audited the financial statements of Redback beginning in 1996
14  and for each year thereafter including fiscal years 2000, 2001 and 2002 during the Class Period.
15  PwC also reviewed the Company's quarterly financial results in fiscal years 2000, 2001 and
16  2002 through third quarter 2003 before they were publicly reported.  At the conclusion of each
17  audit, PwC issued an unqualified opinion, stating that it had conducted its audits in accordance
18  with GAAS and that the financial statements fairly presented Redback's financial position in
19  accordance with GAAP.  PwC knew and expected that its audit opinions would be disseminated
20  to Redback's stockholders and other potential investors in the Company, who would rely upon
21  those opinions when making investment decisions.

22  288.  In addition to its audit work, PwC provided significant consulting, tax,
23  restructuring, securities filings, and acquisition-related services to the Company from 1996
24  through 2003 and received large fees for those services.

25  289.  The Audit Committee's Report in Redback's 2001 Proxy Statement, stated:

26      *Audit Fees*.  Fees for the fiscal year 2000 audit and the reviews of
27      the Forms 10-Q are $235,000.

28      ...

*All Other Fees.* Aggregate fees billed for all other services rendered by PricewaterhouseCoopers LLP for the fiscal year ended December 31, 2000 are $1,266,000, which principally related to acquisitions.

290.   The Audit Committee's Report in Redback's 2002 Proxy Statement, stated:

*Audit Fees.* Fees for the fiscal year 2001 audit and the reviews of the Forms 10-Q were $320,000.

...

*All Other Fees.* Aggregate fees billed for all other services rendered by PricewaterhouseCoopers LLP for the fiscal year ended December 29, 2001 were $809,509, which principally related to acquisitions, securities filings, restructuring and tax related services.

291.   The Audit Committee's Report in Redback's 2003 Proxy Statement, stated:

*Audit Fees.* Audit fees billed by PricewaterhouseCoopers LLP for the audit of our annual financial statements for the fiscal year ended December 31, 2002, and the review of our financial statements included in our quarterly reports on the Form 10-Q during the fiscal year ended December 31, 2002, totaled approximately $425,000.

...

*All Other Fees.* Aggregate fees billed for all other services rendered by PricewaterhouseCoopers LLP for the fiscal year ended December 31, 2002 were approximately $530,000, which principally related to tax related services. The audit committee has determined that the provision of such non-audit services is compatible with the independent accountants maintaining their independence.

292.   The Audit Committee's Report in Redback's 2004 Proxy Statement, stated:

*Audit Fees.* For the years ended December 31, 2003 and 2002, PricewaterhouseCoopers billed Redback $936,000 and $425,000, respectively, for professional services rendered for the audits of the consolidated financial statements of Redback, the review of Redback's financial statements included in quarterly reports and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

assistance with and review of the registration statements and other regulatory filings.

*Audit Related Fees.* For the years ended December 31, 2003 and 2002, PricewaterhouseCoopers billed Redback $59,000 and $54,000, respectively, for assurance and related services related to consultations concerning financial accounting and reporting standards and Sarbanes-Oxley Section 404 advisory work.

*Tax Fees.* For the years ended December 31, 2003 and 2002, PricewaterhouseCoopers billed Redback $398,000 and $476,000, respectively, for services related to federal, state, and international tax compliance, tax advice and tax planning.

*All Other Fees.* PricewaterhouseCoopers billed Redback $2,000 in each of the years ended December 31, 2003 and 2002 for services rendered for the license of an accounting and reporting research tool.

293. Thus, in total, PwC received fees of approximately $1.5 million, $1.1 million, $955,000, and $1.4 million respectively, in 2000, 2001, 2002 and 2003 for audit and other services performed for Redback.

294. Additionally, PwC was required to review the information in Redback's public filings that was outside the financial statements. AU § 550, *Other Information in Documents Containing Audited Financial Information*, states that the auditor "should read the other [non-financial] information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, in the financial statements." If the auditor determines that such other information is either inconsistent with the information contained in the financial statements or is aware of a material misstatement of fact contained in the other information, then the auditor should withhold the use of the audit report from the document containing the inconsistency or misstatement. AU § 550 at ¶¶ 04-06. Thus, PwC was required to review the non-financial disclosures in Redback's public filings to determine whether there was any inconsistency with the financial information presented in those filings and, if so, PwC was required to withhold its certification of the financials.

295.    Because PwC did not conduct its audits in accordance with GAAS, and because it acted with extreme and deliberate recklessness and consciously disregarded and ignored numerous warning signs that the Company's financial statements and other public statements were materially false and misleading, PwC did not discover, or deliberately ignored or with deliberate recklessness disregarded, the massive fraud being perpetrated by the defendants and the fact that the Company's financial statements were not prepared in accordance with GAAP.

296.    PwC failed to report or disclose the facts regarding the defendants' fraudulent scheme to the public because, by remaining silent and issuing false and misleading audit opinions, PwC could and did continue to receive millions of dollars in auditing and consulting work from Redback (and Redback's affiliated companies) and the Individual Defendants. Additionally, by participating in the fraud or with deliberate recklessness allowing it to occur, PwC could continue its campaign to increase its market share for auditing, accounting and consulting services to be performed for Internet and telecommunications companies in general.

### PwC's Audits of Redback Failed to Comply with GAAS

297.    In certifying Redback's financial statements for 2000, 2001 and 2002, PwC falsely represented that it had conducted its audits in accordance with GAAS, and that Redback's financial statements were prepared in conformity with GAAP.  GAAS are those standards recognized by the accounting profession as the professional standards issued by the Auditing Standards Board of the AICPA, which are to be followed by auditors in conducting an audit to determine if financial statements are presented in accordance with GAAP.

298.    During the Class Period, a series of unusual transactions, accounting practices and other facts put PwC on notice that enhanced audit procedures were necessary.  The rapid growth of Redback, especially in the face of a declining telecommunications sector, should have caused PwC to scrutinize Redback's accounting and its relationship with Qwest.  Additionally, the unusual and late-in-the-quarter transactions with Qwest, and the unusual (for Redback) IRU purchase from Qwest, constituted additional "red flags" to PwC as it planned for and conducted its audit.

299.    Rather than closely scrutinize Redback's financial statements and accounting as required by GAAS, PwC deliberately or with deliberate recklessness chose to overlook irregularities in Redback's sales to Qwest and improper revenue recognition from the sales. PwC knew that Qwest was Redback's single largest customer and that Redback and Qwest were entering into sales agreements that generated large sales at the end of each quarter, which not coincidentally generated the amount of revenue required for Redback to meet its financial targets and Wall Street's expectations.  PwC knew that Redback booked $80.6 million in revenue (approximately 20% of the Company's total revenue) from its sales to Qwest in *quid pro quo* deals, but PwC simply ignored the obviously improper nature of the revenue booked in these exchange transactions.

300.    Under GAAS, particularly SAS No. 82, *Consideration of Fraud in a Financial Statement Audit,* and AU § 110.01A, auditors have a defined responsibility to detect material misstatements in financial statements due to fraud.  SAS No. 82 specifically identifies risk factors relating to misstatements arising from fraudulent financial reporting, including the lack of internal controls, declining industry conditions, management incentive compensation plans, and other factors showing a declining business operation.  The SEC has long taken the position that auditors are expected to detect certain kinds of fraud.  *See* Accounting Series Releases Nos. 19 and 292 ("Since routine audit procedures cannot always be relied upon to detect management fraud, the auditor must always be alert to unusual discrepancies and inconsistencies – such as . . . illogical management explanations and major confirmation exceptions – and take appropriate steps to investigate them.").

301.    PwC violated SAS No. 82, which provides that an auditor must have considered the following factors in assessing audit risk:  (a) whether management compensation creates a motivation to engage in fraudulent financial reporting, (b) domination of management by a small group; (c) one's actions which are not supported by proper documentation or are not appropriately authorized; (d) reporting records or files that should be, but are not, readily available and are not promptly produced when requested; and (e) lack of timely inappropriate documentation for transactions.  PwC violated SAS No. 82 and the SEC rules governing its

conduct by failing to properly consider these risk factors and by failing to perform properly the audit procedures required in connection with the audits of Redback's 2000, 2001 and 2002 year-end financial statements.

302.   PwC ignored risk factors that pointed to fraudulent financial reporting as outlined in AU Section 316, *Fraud in a Financial Statement Audit*.  Among the many "red flags" putting PwC on notice that the accounting at Redback was improper, or at least demanded more scrutiny, are the following:

a.   Redback's executives had employment contracts that motivated them to engage in fraudulent financial reporting because their bonuses, stock options and other incentives were linked to the Company's operating results and financial position;

b.   Redback's management was dominated by a small group with very significant stock holdings and options, and the Company lacked compensating controls such as effective oversight by an independent board of directors and audit committee;

c.   Redback insiders sold $150 million of the Company stock and the Company contracted to purchase millions of dollars of products and services from a Qwest affiliate, all while Redback incurred overall operating losses;

d.   Redback was actively engaging in mergers and acquisitions and relying on a high stock price to fund the acquisitions;

e.   Redback's executives were employing aggressive purchase accounting in connection with the Company's acquisitions;

f.   The telecommunications sector was volatile in 2000 and 2001, and Redback's reported double-digit revenue growth ran counter to the struggling telecommunications industry;

g.   Redback was dependent on a select few customers, including Qwest, for its revenues;

h.   Redback reported two separate multi-year, multi-million dollar contracts with Qwest, but the Company's sales to Qwest immediately ceased in 2002 after the SEC began investigating suspicious revenue-recognition practices at Qwest;

i.   Redback entered into numerous material sales transactions with Qwest close to the end of a reporting period;

j.   Qwest was purchasing millions of dollars of products from Redback that had not been tested by Qwest, as was customary and required under Qwest's business procedures;

k.    Redback purchased an economically worthless IRU from Qwest for $7 million in 2001 that had absolutely no business purpose or function at the Company, and PwC was aware that in March 2002, the SEC began a public investigation of Qwest's improper revenue recognition practices in 2000 and 2001, including improper reciprocal IRU sales;

l.    Redback failed to timely pay Qwest for the $7 million IRU sale, and Qwest failed to timely pay Redback for its reciprocal $30 million purchase in 2001;

m.    At the direction of defendant DeNuccio, Redback hired defendant Arnold for a key executive position immediately prior to public disclosure of an SEC investigation of Arnold's participation in fraudulent revenue recognition practices at Qwest, although Arnold had no experience in Redback's business; and

n.    In February 2003, the SEC named Joel Arnold as a defendant in a civil action relating to his participation in a scheme to artificially inflate revenues while he was a sales executive at Qwest in 2000 and 2001, which was when Qwest and Redback engaged in a series of material reciprocal transactions.

303.    PwC further violated SAS No. 82, by failing to properly evaluate risks of material misstatements in Redback's financial records by (i) failing to exhibit the requisite professional skepticism with regard to Redback's financial statements, (ii) failing to assign technically proficient personnel to conduct the audits, (iii) failing to recognize that Redback's accounting policies were unusually aggressive, and (iv) failing to ensure that Redback maintained sufficient internal controls to prevent financial and accounting misstatements.

304.    PwC also violated GAAS because its audits improperly departed from GAAS in the following ways:

a.    PwC violated GAAS general standards that auditors should maintain independence in mental attitude for all matters relating to an engagement and that due professional care must be exercised in performance of the audit.

b.    PwC violated GAAS field work standards that require audits to be adequately planned and supervised and require the auditor to obtain a sufficient understanding of internal controls and sufficient, competent evidential matter to afford a reasonable basis to support an opinion on the financial statements under audit.

c.    PwC violated GAAS standards of reporting that require the audit report to state whether financial statements are prepared in accordance with GAAP, to identify circumstances that consistently fail to follow GAAP, to identify informative disclosures that are not reasonably adequate and to contain an expression of opinion or reasons why an opinion cannot be provided.

305.    GAAS required PwC to consider whether the disclosures in Redback's financial statements were adequate.  SEC rules and regulations and GAAS require adequate disclosure of all material matters.  GAAS requires the disclosure of matters related to the "form, arrangement and content of financial statements. . . .  An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time."  AU § 431.02-.03.  PwC knew that Qwest was Redback's largest customer and knew or with deliberate recklessness disregarded that Redback failed to adequately disclose material matters relating to its transactions with Qwest.  PwC needed corroborating documents to support the assertions made by Redback in the financial statements, as mandated by AU Section 326, *Evidential Matter*.  Without such evidence to support questionable transactions such as Qwest's purported multi-year, multi-million dollar agreements with Redback, PwC did not have a reasonable basis for its audit opinion.  PwC deliberately ignored or with deliberate recklessness failed to follow the auditing guidance in assessing Redback's inadequate disclosures regarding the Company's *quid pro quo* deals with Qwest, and PwC should have closely evaluated the fair value of all transactions between Redback and Qwest, including Redback's suspicious IRU purchase in 2001.

306.    PwC disregarded with deliberate or extreme recklessness Redback's obvious failure to report the nature of material transactions with Qwest that were essential to Redback's reported financial results.  Contrary to GAAS, PwC failed to require revisions to Redback's disclosures and failed to issue qualified opinions on Redback's financial statements.

307.    Throughout 2000 to October 2003, in connection with its audits of Redback's financial statements, PwC violated numerous professional standards, including the following:

    a.    PwC violated GAAS General Standard No. 1, which provides that "the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor."  Given the complex nature of Redback's and Qwest's products and sales transactions and the determination of acquisition-related charges for In-Process Research and Development projects, it was incumbent upon PwC to ensure the individuals who performed the audit had the requisite technical proficiency in those areas. PwC failed to do so.

    b.    PwC violated GAAS General Standard No. 2, which requires that an independence in mental attitude be maintained by the auditor in all matters related

to the assignment.  Given PwC's substantial non-audit fees paid by Redback, PwC lacked the requisite independence when it audited the Company's financial statements.

c.  PwC violated GAAS General Standard No. 3, and AU Section 230, *Due Professional Care in the Performance of Work,* paragraph .01 which require that due professional care be exercised by the auditor in the performance of the audit and the preparation of the report, as opposed to the deliberate reckless disregard described herein.  Due professional care concerns what the independent auditor does and how well he or she does it. It also requires that the auditor exercise professional skepticism. PwC violated this standard by not recognizing the questionable nature and accounting for Redback's *quid pro quo* sales to Qwest and its numerous acquisitions.  Given the pervasiveness of the accounting violations discussed herein, PwC failed to exhibit the requisite professional care in performing its audits.

d.  PwC violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  AU § 150.02. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02.  The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, structure and sets the tone of an organization.  After obtaining an understanding of an entity's internal control structure, the auditor assesses the entity's control risk.  AU § 319.02.  Control risk is the risk that a material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures.  AU § 319.29.  The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.  AU § 319.61.  The unrelenting downturn in the telecommunications industry was a significant factor that negatively affected the control environment at Redback and should have been a "red flag" to PwC as it planned for and conducted its audit.  In the course of auditing the financial statements of Redback, PwC either knew or with deliberate recklessness disregarded facts that evidenced that Redback's management was establishing unrealistic financial and sales expectations and entering into reciprocal transactions with Qwest with no real business purpose or need.  PwC disregarded weaknesses and deficiencies in Redback's internal control structures and failed to adequately plan the audit or expand the auditing procedures to include actual review of all agreements with Qwest and substantive tests of account balances as required by GAAS.

e.   PwC violated GAAS Standard of Reporting No. 1, which requires the auditor to attest to whether the financial statements are presented in accordance with GAAP. PwC's opinion falsely represented that Redback's financial statements were presented in conformity with GAAP when they were not for the reasons alleged herein.  Redback's improper accounting practices discussed above rendered the Company's financial statements materially false and PwC should have detected, corrected and disclosed the misstatements.

f.   PwC violated GAAS Standard of Reporting No. 3, which provides that "informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report."  The financial statement disclosures failed to adequately disclose the *quid pro quo* nature of the transactions entered into by and between Redback.  Furthermore, because of the magnitude and scope of the transactions with Qwest — which accounted for almost 20% of Redback's revenues in 2000 and 2001 — PwC should have insisted on, and in fact had a professional responsibility in demanding, full and complete disclosure of Redback's dealings with Qwest, including the resulting accounting irregularities prior to the public release of Redback's financial statements.

g.   PwC violated GAAS Standard of Reporting No. 4, which requires that when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.  PwC should have stated that no opinion could be issued by it on Redback's fiscal 2000, 2001 and 2002 financial statements or issued an adverse opinion stating that those financial statements were not fairly presented. PwC knowingly or with deliberate recklessness allowed Redback to make material misrepresentations regarding the Company to its shareholders and to the investing public during the relevant time period.

h.   PwC violated SAS No. 54 by failing to perform the audit procedures required in response to known or possible improper acts by Redback.  GAAS required PwC to develop a plan that accounted for risks that Redback's financial statements included material misstatements arising from fraudulent financial reporting.  AU § 315.16-18.  Specifically, to comply with GAAS, PwC should have considered, but did not, the risk factors identified above that were present at Redback in designing the audit procedures to be performed.  However, PwC ignored the risk factors and permitted Redback to overstate its revenue to meet unrealistic financial targets.  Thus, PwC failed to properly audit Redback's financial statements in accordance with GAAS and violated the trust placed in PwC by Redback's shareholders and investors.

i.   PwC violated GAAS and the standards set forth in SAS Nos. 1 and 53 at a minimum by, among other things, failing adequately to plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements.

j.      PwC violated GAAS in that it was required to communicate the presence of "reportable conditions" at Redback, including undisclosed related-party transactions and equity obligations.  AU § 325.

k.      PwC violated GAAS, particularly AU Section 333, *Management Representations,* which requires the auditor to obtain written representations from management and to investigate circumstances and evaluate the reliability of those representations when they are contradicted by other evidential matter obtained in the audit.  PwC improperly relied on Redback management's representations as a substitute for the application of thorough auditing procedures as a basis for PwC's unqualified opinions on Redback's financial statements.  PwC was aware that any representations made by management were suspect because management was establishing unrealistic financial targets and entering into undisclosed sales pacts with Qwest executives to meet its targets.  Redback's executives also had enormous personal financial incentives to prop up the Company's sales and revenues.  PwC therefore should have considered the reliability of all Redback management representations prior to accepting them.

l.      PwC violated all Section 341, *The Auditor's Consideration of an Entity's Ability to Continue As A Going Concern*, which requires the auditor to evaluate, based on relevant conditions and events that exist at or have occurred prior to the completion of field work, whether there is a substantial doubt about the entity's ability to continue as a going concern and, if so, to include an explanatory paragraph in the auditor's opinion to reflect that conclusion.  As PwC knew that Redback's financial condition was built upon sales to Qwest, Redback's largest customer, and knew or with deliberate recklessness disregarded that Redback was purchasing Qwest's business in the *quid pro quo* deals, PwC knew, or deliberately or with deliberate recklessness ignored the fact that Redback's ability to continue as a going concern was in jeopardy, and so PwC should have provided that conclusion in its audit opinions.

m.      PwC violated GAAS by failing to obtain sufficient "competent evidential matter" to afford a reasonable basis for an opinion regarding Redback's financial statements, as required by AU §326.  PwC issued "clean" unqualified opinions on Redback's financial statements throughout the relevant periods, when the Company's financial statements were not prepared in conformity with GAAP, a clear violation of this auditing standard.  In addition, PwC consistently failed to exercise the required professional skepticism for blatantly suspicious undisclosed related-party transactions with Qwest such as the IRU transaction in 2001.  AU§ 230.

n.      PwC violated GAAS in that it was required to identify all significant estimates for In Process Research and Development ("IPRD") and audit the amounts in relation to historical patterns, review subsequent transactions and develop its own expectation of the estimate in order to verify the amounts recorded in Redback's financial statements.  AU§ 342.  In particular, as part of performing its audits, PwC was required by AU Section 342, *Auditing Accounting Estimates*, paragraph

.01 to obtain and evaluate sufficient evidential matter to support significant accounting estimates.  Companies routinely take write-offs in connection with business combinations or acquisitions in a given period that are subject to some uncertainty at the time of the transaction.  If the charge taken is a fair estimate of the assets acquired and the liabilities undertaken, the charge is proper and appropriate.  The SEC has specifically denied excessive write-offs by companies such as Worldcom for IPRD for acquisitions of Internet or telecommunications companies.  By failing to obtain sufficient evidence to confirm the size of the various research projects at companies Redback acquired during the Class Period, or by simply disregarding the overstatement of Redback's charges for IPRD in connection with various acquisitions, PwC violated AU Section 342.

o.  PwC violated GAAS in that it was required to issue a qualified opinion or disclaim an opinion altogether as a result of Redback's ongoing fraudulent scheme with Qwest. AU § 410.  AU Section 410, *Adherence to Generally Accepted Accounting Principles,* paragraph .01 requires that the audit report state whether the financial statements are presented in accordance with GAAP.  Because a number of Redback's accounting practices violated GAAP, PwC should have issued adverse or negative audit reports. To the contrary, PwC issued "clean" unqualified opinions on Redback's financial statements throughout the Class Period, suggesting that the Company's financial statements were prepared in conformity with GAAP, when in fact they were not, a clear violation of this auditing standard.

p.  PwC was required to qualify its opinion if there was any doubt about the Company's ability to proceed as a going concern.  PwC knew that Qwest was Redback's largest customer and that sales to Qwest comprised a material (in some cases up to 27%) of Redback's total sales in a quarter.  PwC also knew or with deliberate recklessness disregarded that Redback's *quid pro quo* sales to Qwest were improper and that, as a result, Redback's ability to continue as a going concern was in jeopardy.  PwC ignored other factors that pointed to Redback's demise, such as the suspicious purchase of an IRU from Qwest that was unneeded and unwanted by any other company; excessive write-offs in acquisitions; reliance on Qwest and a few other customers in the declining telecommunications sector for all of Redback's revenues; and material sales to Qwest at the end of reporting periods that enabled Redback to meet unrealistic financial projections.  These facts required PwC to amend its audit report to bring Redback's precarious financial condition to the attention of shareholders as specified in AU Section 341, *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern*.

q.  PwC failed to obtain sufficient, competent evidential matter as to the fair presentation, in all material respects, of Redback's financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles.  AU §§ 110, 150.  AU Section 411, *The Meaning of Present Fairly in Conformity with GAAP*, recognizes the importance of reporting transactions in accordance with their substance.  PwC failed to request and obtain competent

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

93

evidential matter regarding Redback's sales to Qwest — its largest customer — that would have enabled PwC to determine whether those transactions had a business purpose or were properly accounted for in accordance with GAAP, or whether the substance of these transactions differed from their form, in which case PwC was required to insist that Redback comply with GAAP and fully disclose its relationship with and the nature of its dealings with Qwest. PwC failed to raise questions regarding Redback's suspicious purchases, obtuse financial disclosures and excessive write-offs in acquisitions. Had PwC taken those steps, it would have uncovered the fraudulent nature of Redback's accounting practices, but PwC's failure to do so, despite its responsibilities under GAAP and GAAS, and the presence of the many red flags, constitutes either knowledge of the fraud or deliberate reckless disregard of it.

r.  PwC violated GAAS in failing during its performance of interim reviews of quarterly financial statements to have a sufficient knowledge of internal controls, identify areas of potential misstatement and the likelihood of occurrence, or compare the amounts and ratios in the financial statements with expectations developed by PwC. Had PwC conducted an adequate quarterly review, PwC would have uncovered significant matters in the quarterly financial statements that were not in compliance with GAAP. Transactions such as recording revenues for transactions in which Redback was forced to buy valueless products and services from Qwest before Qwest would honor its obligations to Redback should have been adjusted and brought to the attention of the Audit Committee by PwC as required by AU Section 722, *Interim Financial Information.* PwC deliberately or with deliberate recklessness ignored Redback's routine practice of booking millions of dollars from sales to Qwest immediately prior to a reporting period and reciprocating by purchasing unwanted and unneeded products from Qwest immediately prior to or after the sales.

s.  PwC violated GAAS by failing to obtain evidence directly from third parties as a means of testing Redback's balance sheet amounts, as required by AU § 329. Had PwC performed any testing through confirmations with Qwest, it would have obtained evidence that Qwest was not testing Redback's products in its labs (as Qwest routinely did before products were incorporated into its network), and PwC would also have learned that Qwest stored products it purchased from Redback in warehouses because Qwest had no real business need for those products. AU § 329.

t.  PwC also ignored its professional responsibilities under SAS No. 53, *The Auditor's Responsibility to Detect and Report Errors and Irregularities,* by accepting Redback's misleading representations of management and financial records. Thus, PwC failed to exercise the "professional skepticism" required by SAS 53 in the planning and performance of the audit.

u.  AU Section 431, *Adequacy of Disclosure in Financial Statements,* paragraph .01 provides that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. The financial

statement disclosures failed to adequately disclose the terms or the motives behind the numerous transactions between Qwest and Redback, a clear violation of this standard.  PwC should have required, and in fact had a professional responsibility to demand, full and complete disclosure of important facts regarding Redback's dealings with Qwest prior to the public release of the Company's financial statements.

308.   Because Redback's financial statements were not in conformity with GAAP, PwC should have required Redback to make the appropriate adjustments to bring them in conformity with GAAP, or should have issued a qualified audit report or an adverse audit opinion stating that the financial statements did not present fairly the results of operations and financial position of Redback in conformity with GAAP as required by AU Section 508, *Reports of Financial Statements*.

## VIII.   Inapplicability Of Statutory Safe Harbor

309.   As alleged herein, the defendants acted with scienter in that the defendants knew at the time they issued them that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that persons were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.  As set forth elsewhere herein in detail, the defendants, by virtue of their receipt of information reflecting the true facts regarding Redback, their control over, and/or receipt of Redback's allegedly materially misleading misstatements and/or their association with the Company which made them privy to confidential proprietary information concerning Redback which were used to inflate financial results and which defendants caused or were informed of, participated in and knew of the fraudulent scheme alleged herein.  With respect to non-forward-looking statements and/or omissions, defendants knew and/or with deliberate recklessness disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.

310.    Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of Redback's material false or misleading statements.

311.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the defendants are liable for the false forward-looking statement pled herein because, at the time each forward-looking statement was made, the speaker knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Redback who knew that the forward-looking statement was false or misleading.  None of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## IX.    Applicability of Presumption of Reliance:  Fraud-On-The-Market Doctrine

312.    At all relevant times, the market for Redback's stock was an open, well-developed and efficient market at all relevant times for the following reasons, among others:

a.    Redback common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Redback was required to file and did file periodic reports with the SEC;

c.    Redback regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national and international circuits of major newswire services and

1    through other wide-ranging public disclosures, such as communications with the

2    financial press and other similar reporting services;

3    d.     Redback was followed by several securities analysts employed by major

4    brokerage firms who wrote reports which were distributed to the sales force and

5    certain customers of their respective brokerage firms, which reports were each

6    publicly available and entered the public marketplace; and

7    e.     The trading volume of Redback stock was substantial during the Class Period.

8    313.   As a result, the market for Redback common stock promptly digested current

9    information regarding Redback from all publicly available sources and reflected such

10   information in Redback's stock price.  Under these circumstances, all persons in the Class who

11   purchased Redback common stock during the Class Period based on Defendants' false and

12   misleading statements suffered similar injury through their purchase of shares of such stock at

13   artificially inflated prices and a presumption of reliance applies.

14   **X.     Class Action Allegations**

15   314.   Connecticut Retirement Plans brings this action as a class action pursuant to Rule

16   23 of the Federal Rule of Civil Procedure on behalf of itself and all persons who purchased or

17   acquired common stock in Redback (the "Class") between April 12, 2000 and October 10, 2003,

18   and who were damaged thereby.

19   315.   Excluded from the Class are defendants, their subsidiaries and affiliates, and the

20   officers and directors of Redback, members of their immediate families and their legal

21   representations, heirs, successors or assigns or any entity in which any of the foregoing has a

22   controlling interest.

23   316.   The Class is so numerous that joinder of all members is impractical.  Throughout

24   the Class Period, Redback common shares were actively traded on the NASDAQ.  As of October

25   10, 2003, Redback had outstanding over 183 million shares of its common stock.  While the

26   exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

27   through discovery, Plaintiff believes that there are thousands of members of the proposed class,

28   including  individuals and entities too numerous to bring separate actions.  It is reasonable to

1   assume that holders of Redback common stock are geographically dispersed throughout the

2   United States of America.

3        317.   Record owners and other members of the Class may be identified from records

4   maintained by Redback or its transfer agent and may be notified of the pendency of this action

5   by mail, using the form of notice similar to that customarily used in securities class actions.

6        318.   There are questions of law and fact that are common to the Class which

7   predominate over any questions affecting only individual Class members.  The common

8   questions include:

9        a.   Whether the defendants publicly disseminated or caused the Company to publicly

10         disseminate press releases, earnings pronouncements, regulatory filings and other

11         public statements during the Class Period which contained material

12         misrepresentations or omitted to state material facts necessary to make such

13         statements not misleading in violation of the federal securities laws as alleged

14         herein;

15        b.   Whether the defendants participated in a fraudulent scheme to artificially inflate

16         and misrepresent the proceeds from Redback's sales to Qwest and thereby

17         artificially inflate Redback's stock price;

18        c.   Whether the defendants acted intentionally with direct knowledge of the falsity of

19         such statements, or at least with deliberate recklessness, in making such

20         statements;

21        d.   Whether the defendants are "controlling persons" as that term is defined in

22         Section 20(a) of the Exchange Act;

23        e.   Whether the market prices of Redback's common stock during the Class Period

24         were artificially inflated due to material misstatements and omissions complained

25         of herein;

26        f.   Whether the defendants concealed their breaches of fiduciary duties in causing,

27         directing and/or approving, or allowing or permitting, material misrepresentations

28

and omissions in the Company's public statements and filings relating to certain transactions with Qwest and the Company's financial condition;

g.      Whether the individual Class members were improperly induced to purchase their Redback shares; and

h.      Whether the members of the Class have sustained damages and, if so, what the appropriate measure of damages should be.

319.    Lead Plaintiff is committed to prosecuting the Class claims and has retained competent counsel experienced in litigating claims of this nature.  Lead Plaintiff's claims are typical of the claims of other members of the Class.  Accordingly, Lead Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

320.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

321.    The prosecution of separate actions would create the risk of:

a.      Inconsistent or varying adjudications which would establish incompatible standards for conduct for the defendants; and/or

b.      Adjudications, which would as a practical matter be dispositive of the interests of other members of the Class.

322.    Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Additionally, because the damages suffered by individual members of the Class may in some circumstances be relatively small, the expense and burden of individual litigation make it impossible for such class members individually redress the wrongs done to them.

## FIRST CAUSE OF ACTION

**Violation Of Section 10(b) of The Exchange Act
And Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

323.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

324.    This Count is asserted by Lead Plaintiff on behalf of itself and the Class against all of the defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder.

325.    During the Class Period, the defendants, singularly and in concert, directly carried out a common plan, scheme and unlawful course of conduct, pursuant to which they intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Redback's stock; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire Redback's stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, collectively and each of them, took the actions set forth herein.

326.    The defendants intentionally or with deliberate recklessness:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's stock in an effort to maintain artificially high market prices for Redback's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

327.    The defendants engaged in the fraudulent activity described above knowingly and intentionally or with such extreme or deliberate recklessness as to constitute willful deceit and fraud upon Plaintiff and the Class.  The defendants knowingly or with extreme or deliberate recklessness caused their reports and statements to contain misstatements and omissions of material fact as alleged herein, which caused Redback's stock price to be inflated at the time of Plaintiffs' purchases.

328.    As a result of the defendants' fraudulent activity, the market price of Redback's stock was artificially inflated during the Class Period, and remained inflated until the market began to no longer believe the defendants' fraudulent statements.  Defendants'

misrepresentations induced a disparity between the transaction price and the true investment quality and value of Redback's stock at the time Plaintiffs purchased or acquired the stock.

329.    The market price of Redback's stock declined materially when the defendants could not prop up Redback's stock price any more through their fraud.

330.    In ignorance of the true financial condition of Redback, Plaintiff and other members of the Class, relying to their detriment on the integrity of the market and/or on the statements and reports of Redback containing the misleading information, purchased or otherwise acquired Redback stock at artificially inflated prices during the Class Period.

331.    Had Plaintiff and the other members of the Class known the truth, they would not have purchased Redback's stock or would not have purchased the stock at the inflated prices that were paid.

332.    Plaintiffs' losses were proximately caused by defendants' active and primary participation in Redback's scheme to defraud the investing public by misrepresenting and improperly accounting for reported revenue, intentionally misrepresenting market demand for Company products, mischaracterizing and falsely representing material contracts, failing to report *quid pro quo* swap arrangements and stock payment kick back schemes to material customer insiders, and overstating assets and fabricating cash flow.

333.    Plaintiff and the other Class members purchased Redback's stock in reliance on the integrity of the market price of the stock and/or defendants' fraudulent and misleading statements and regulatory filings, and defendants manipulated the price of Redback's stock through their misconduct as described above.

334.    Further, defendants' misconduct proximately caused the losses of Plaintiff and other Class members.  Plaintiffs' losses were a direct and foreseeable consequence of defendants' failure to disclose and concealment of, *inter alia*, the true nature of the Company's contracts with Qwest including Redback's *quid pro quo* stock grants to Qwest insiders, Redback's purchase of services and products from Qwest (and Qwest affiliates) solely to obtain Qwest's business, and the true nature of Redback's revenue and cash position.  As a direct and proximate cause of the defendants' wrongful conduct, Plaintiff and other members of the Class

1   suffered substantial damages in connection with their respective purchases and sales of

2   Redback's stock during the Class Period.

3   **SECOND CAUSE OF ACTION**

4   **Violation of Section 18(a) of the Exchange Act**

5   **Against DeNuccio, Lamond, Cronan, Kurtz, Khosla, Wolf,**
    **Gentner, Ragavan, Barsema, Garg, Haque, and PwC**

6   **(the "Section 18 Defendants")**

7       335.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

8   set forth herein.

9       336.    This Count is asserted by Lead Plaintiff on behalf of itself and the Class against

10  the Section 18 Defendants and is based upon Section 18 of the Exchange Act, 15 U.S.C. 78r.

11      337.    As set forth above, in reports and documents filed with the SEC filed during the

12  Class Period, including without limitation Redback's Forms 2000, 2001 and 2002 10-K and its

13  Forms 8-K issued during the Class Period, Defendants made or caused to be made statements

14  which were, at the time and in light of the circumstances under which they were made, false or

15  misleading with respect to material facts.

16      338.    Each of the above reports was filed with the SEC pursuant to the Securities and

17  Exchange Act of 1934.

18      339.    Each of the Section 18 Defendants that were officers and directors of the

19  Company signed certain of Redback's Forms 10-K and Forms 8-K filed with the SEC during the

20  Class Period, and PwC certified the financial statements in Redback's Forms 10-K as set forth

21  herein.

22      340.    The Section 18 Defendants knew or with extreme or deliberate recklessness

23  disregarded that such statements were false and misleading because defendants: (a) knew that

24  Qwest was a material Redback customer; (b) knew or had access to the materially adverse non-

25  public information regarding the true *quid pro quo* nature of Redback's contracts with Qwest;

26  and (c) had an obligation to inform themselves of the publicly-issued statements of the

27  Company.

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

341.    PwC consented to the use of its unqualified opinion in Redback's financial statements and reports filed with the SEC.  These financial statements were incorporated into and made a part of the Company's Exchange Act filings with the knowledge and express consent of PwC.  PwC knew or with extreme or deliberate recklessness disregarded that its unqualified opinions filed with the SEC were in fact false and misleading.

342.    The Section 18 Defendants' conduct resulted in the Company issuing false and misleading statements with respect to its revenues, income, earning per share and market demand for its products.  The Section 18 Defendants' conduct also resulted in the Company misrepresenting that its financial statements filed during the Class Period were presented in conformity with GAAP or principles of fair reporting.

343.    In connection with the purchase of Redback's stock, Plaintiff and other Class Members read and reasonably relied upon the statements contained in the reports and documents set forth above not knowing that such statements were false and misleading.

344.    As a direct result of the false and misleading statements in the Forms 10-K and Forms 8-K described herein, Plaintiff and other Class Members purchased Redback stock and an artificially-high price, and they were significantly damaged thereby.

345.    As a result of the Section 18 Defendants' fraudulent activity, the market price of Redback's stock was artificially inflated during the Class Period, and remained inflated until the market began to no longer believe the defendants' fraudulent statements.  Defendants' misrepresentations induced a disparity between the transaction price and the true, investment quality and value of Redback's stock at the time Plaintiffs purchased or acquired the stock.

346.    The market price of Redback's stock declined materially when the defendants could not prop up Redback's stock price any more through their fraud.

347.    The market price of Redback's stock declined materially when the defendants could not prop up Reback's stock price any more through their fraud.

348.    By virtue of the foregoing, defendants have violated Section 18 of the Exchange Act.

349.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection their purchases of Redback common stock during the relevant period.

### THIRD CAUSE OF ACTION

**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

350.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

351.    The Individual Defendants acted as controlling persons of Redback within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions, Board membership and/or stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various materially false and misleading statements, and artificially creating revenue and false product demand by entering into *quid pro quo* contracts with Qwest in which both companies sold products and services to each other that neither company needed or wanted and granting stock to Qwest insiders to secure large contracts. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements that they knew or with extreme or deliberate recklessness disregarded were materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

352.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and contracts with Qwest, or oversight responsibilities thereof, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

353.    As set forth above, Redback and each of the Individual Defendants committed a primary violation of Section 10(b) and Rule 10b-5 and Section 18 of the Exchange Act by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons

of Redback and certain of the Individual Defendants, all of the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Redback's stock.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and all other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Compelling the Individual Defendants to disgorge the proceeds from their unlawful insider trading;

(d)    Awarding Lead Plaintiff and all Class members their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees and experts' fees;

(e)    awarding such other and further relief as may be just and proper.

1

## **JURY TRIAL DEMANDED**

2

Plaintiffs hereby demand a trial by jury on all claims so triable.

3

Dated this 24th day of August, 2004

4

5

6

    /s/ Stuart M. Grant

7

Stuart M. Grant *(pro hac vice)*
John C. Kairis *(pro hac vice)*

8

Lauren E. Wagner *(pro hac vice)*
Kimberly L. Wierzel *(pro hac vice)*

9

Redmond L. Clevenger *(pro hac vice)*

10

**Grant & Eisenhofer PA**
Chase Manhattan Centre

11

1201 N. Market Street
Wilmington, DE 19801

12

Tel: 302.622.7000
Fax: 302.622.7100

13

14

*Lead Counsel for Lead Plaintiff The*

15

*Connecticut Retirement Plans and Trust Funds*

16

Merrill Glen Emerick (State Bar No. 117248)

**Anderlini, Finkelstein, Emerick & Smoot**

17

400 S. El Camino Real, Suite 700
San Mateo, CA  94402

18

Tel: 650.348.0102
Fax: 650.348.0962

19

20

*Local Counsel for Lead Plaintiff The*
*Connecticut Retirement Plans and Trust Funds*

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify the foregoing was served upon the following counsel of record by
electronic case filing on August 24, 2004:

4

5   Robert A. Jigarjian                    Marc L. Godino
    Robert S. Green                        Braun Law Group, P.C.
6   Green & Jigarjian LLP                  12400 Wilshire Blvd., Suite 920
    235 Pine Street, 15th Floor            Los Angeles, CA 90025
7   San Francisco, CA 94104
8                                          Kristin Anne Dillehay
    Mark C. Gardy                          John P. Stigi, III
9   Charles H. Dufresne                    Wilson, Sonsini, Goodrich & Rosati
    Abbey Gardy, LLP                       650 Page Mill Road
10  212 East 39th Street                   Palo Alto, CA 94304
    New York, NY 10016
11
                                           Darren J. Robbins
12                                         Lerach Coughlin Stoia Geller Rudman
    Luke O. Brooks                          & Robbins LLP
13  100 Pine Street, Suite 2600            401 B Street, Suite 1700
    San Francisco, CA 94111                San Diego, CA 92101
14
15  Lionel Z. Glancy                       Betsy C. Manifold
    Michael M. Goldberg                    Rachele R. Rickert
16  Glancy & Binkow  LLP                   Wolf Haldenstein Adler Freeman & Herz LLP
    1801 Avenue of the Stars, Suite 311    Symphony Towers
17  Los Angeles, CA 90067                  750 B Street, Suite 2770
                                           San Diego, CA 92101
18
19
20      I further declare, pursuant to Civil L.R. 23-3, that on the date hereof I served the
21  foregoing on the Securities Class Action Clearinghouse by electronic mail through the following
    electronic mail address provided by the Securities Class Action Clearinghouse:
22
23              Securities Class Action Clearinghouse
                    Stanford Digital Law Project
24                      559 Abbott Way
                     Stanford, CA 94305-8612
25               Email:  jcarlos@law.stanford.edu
26
                        __/S/__Lauren E. Wagner_____
27                              Lauren E. Wagner
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF