**E-Filed 3/20/06**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE REDBACK NETWORKS, INC. SECURITIES LITIGATION.<br><br>———————————————————<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS. | Case Number C 03-5642 JF (HRL)<br><br>ORDER DISMISSING THIRD AMENDED CONSOLIDATED COMPLAINT WITH LEAVE TO AMEND<br><br>[Doc. Nos. 194, 200, 201] |

In this securities fraud class action, Plaintiffs are suing a number of individual officers and directors of Redback Networks, Inc. (collectively, "the Redback Defendants")[1] and Redback's outside auditor, PricewaterhouseCoopers LLP ("PWC").[2] Both the Redback Defendants and PWC move to dismiss the operative third amended consolidated complaint

---

[1] The Redback Defendants are Kevin DeNuccio, Pierre Lamond, Thomas Cronan III, Vinod Khosla, Dennis Wolf, Vivek Ragavan, Dennis Barsema, Gaurav Garg, William Kurtz, Craig Gentner, Promod Haque and Randall Kruep.

[2] The Court previously dismissed without leave to amend Plaintiffs' claims against other Redback officers and directors, and against two officers of Qwest Communications International, Inc.

("TAC").[3]  The Court has considered the briefing of the parties as well as the oral argument presented at the hearing on August 10, 2005.  For the reasons discussed below, the Court will grant the motions with leave to amend.

## I. BACKGROUND

This is a securities class action suit brought by purchasers of stock in Redback Networks, Inc. ("Redback"), a telecommunications equipment provider headquartered in San Jose, California.  Several parallel class actions have been consolidated into the instant action, and the Court has appointed the Connecticut Retirement Fund as lead plaintiff.  The operative TAC was filed on May 27, 2005 and alleges that Defendants engaged in a scheme to defraud the market that injured persons who purchased Redback stock during a four-year class period from November 27, 1999 through October 10, 2003.

Overview Of Alleged Scheme

Redback was founded in 1996 and conducted its IPO in May 1999.  The IPO raised net proceeds in excess of $50 million, and Redback's common stock began trading on the NASDAQ.  Plaintiffs allege that at the time of the IPO and thereafter, Redback secured numerous multi-million dollar deals through bribery and *quid pro quo* arrangements, and publicly touted these deals as evidence of Redback's success without disclosing that the deals had been secured through illicit means.  *Id.*  Most of the alleged illicit deals were made with Qwest Communications International, Inc. ("Qwest"), which accounted for approximately 25% of Redback's revenues during 2000 and 2001.  Qwest was investigated by the SEC in 2002, and as a result could not continue making large *quid pro quo* purchases from Redback.  Once Qwest's

---

[3] The Court dismissed Plaintiffs' consolidated class action complaint with leave to amend on January 21, 2005.  Plaintiffs filed a first amended consolidated complaint on March 29, 2005.  However, at the case management conference on April 22, 2005, the Court granted Plaintiffs leave to amend in light of the Supreme Court's recent decision in *Dura Pharmaceuticals, Inc. v. Broudo*, --- U.S. ---, 125 S.Ct. 1627 (2005).  On May 6, 2005, Plaintiffs filed what they termed a "revised" first amended complaint, which actually was a second amended complaint.  On May 25, 2005, the Court granted reconsideration of its dismissal without leave as to Defendant Kruep and ordered that Plaintiffs could amend as to him.  On May 27, 2005, Plaintiffs filed another "revised" first amended complaint, which actually was a third amended complaint.  For clarity, the Court refers to this operative pleading as the "third amended complaint" or "TAC."

revenues dried up, Redback's stock fell to below $1 per share and Redback ultimately was forced to declare bankruptcy in November 2003. Plaintiffs allege that the following illicit transactions occurred:

### Pre-IPO Issuance Of Friends And Family Stock

Before the IPO, Redback transferred to Qwest and UUNET officers "friends and family" stock worth millions in the IPO. TAC ¶¶ 46, 52. In return for these bribes, Qwest and UUNET entered into agreements to purchase Redback products. *Id.* at ¶¶ 47, 53. Redback publicized these deals in order to convince the public that there was a legitimate and strong demand for Redback products. *Id.* at ¶ 54, 57.

### Q4 1999 - Siara Warrants

After the IPO, in late 1999, Redback negotiated to acquire Siara Systems, Inc. ("Siara"), another communications company. TAC ¶ 63. Before the deal was concluded, Siara's President and CEO (Defendant Ragavan) and a Siara board member (Defendant Khosla) caused Siara to issue a warrant for 100,000 shares of Siara's stock to Qwest and its executives, through another company, U.S. Telesource.[4] *Id.* at ¶ 64. In exchange, Qwest agreed to purchase $40 million worth of equipment from Siara or its successors. *Id.* Because Redback acquired Siara, Qwest's $40 million commitment effectively ran to Redback. *Id.* at 65. Within weeks after the merger, the stock issued to Qwest under the warrant agreement rose in value to $45 million; therefore, Qwest directly benefitted approximately $45 million from the warrant agreement. *Id.* at ¶ 66. After the merger was completed, Defendants Ragavan and Khosla became Redback directors, along with another former Siara board member, Defendant Haque. *Id.* at ¶ 70. Defendant Ragavan additionally became the CEO of Redback. *Id.*

A Siara warrant also was used to bribe Broadband Office ("Broadband") to enter an agreement that Broadband would deploy $40 million of Siara's equipment. *Id.* at ¶ 67. Because Siara and Redback already had announced their merger, it was understood that Broadband would be deploying $40 million of Redback's equipment. *Id.* The value of the warrant given to

---

[4] U.S. Telesource was wholly owned by Quest and the two companies shared a number of officers and board members. TAC ¶ 66.

Broadband is not known, but is estimated to be in excess of $1.48 million at the time of the merger. *Id.* at ¶ 69.

Redback did not disclose that these deals had been obtained through bribes. *Id.* at ¶ 68. The deals enabled Redback to report record revenues in the first two quarters of 2000, which reports caused Redback's stock price to climb steeply. *Id.* at ¶ 73.

Q3 2000 - *Quid Pro Quo* Cross-Purchases With Qwest

In the third quarter of 2000, Redback agreed to purchase $18 million of Application Service Provider ("ASP") services from a Qwest affiliate in return for Qwest's commitment to purchase $20 million of Redback's SMS 10000 product. TAC ¶ 75. Redback did not need the ASP services, which allowed companies to outsource their information and technology ("IT") departments, because Redback successfully managed its own IT systems. *Id.* at ¶ 79. Moreover, the $18 million that Redback agreed to pay for ASP services over five years – approximately $300,000 per month – was astronomical compared to the market price for ASP services. *Id.* Finally, the SMS 10000 product that Qwest agreed to buy was not even operational and it had not been tested by Qwest. *Id.* at ¶ 77. The SMS 10000 product had numerous bugs and problems, which were concealed from the public. *Id.* at ¶ 78. Qwest returned some products to Redback which were rebuilt and sent back to Qwest, but the products never worked properly and Qwest ended up simply holding the SMS 10000 products in a warehouse with no intention of deploying them. *Id.* at ¶ 83. The public nonetheless was given the impression that Qwest and other large companies had selected the SMS 10000 product for deployment in their networks. *Id.* at ¶¶ 86-87. Based upon these purported sales, Redback was able to report record revenues for the third quarter of 2000, which report caused Redback's stock price to rise 35% in three trading days. *Id.* at ¶ 88. The revenues from Qwest during the third quarter of 2000 constituted 24% of Redback's revenues. *Id.*

Q4 2000 - Dotcom Bubble Begins To Burst, Redback Executives Dump Stock, Redback Continues *Quid Pro Quo* Dealings With UUNET And Qwest

Redback had been projecting revenue of $750 million in 2001 based upon expected sales of its new SmartEdge product, which was to be an improvement on its basic SmartEdge 800

product. *Id.* at ¶¶ 95-96. Redback executives refused to revise those projections even when informed that there were problems with development of new SmartEdge product and that the projection could not be met without the new SmartEdge product. *Id.* at ¶ 97. A number of Redback executives dumped Redback stock holdings in the third and fourth quarters of 2000. *Id.*

In November 2000, Redback's stock price began to decline, along with the stock of other telecommunications and Internet companies. TAC ¶ 98. Redback took a number of actions designed to drive up the price of the stock.

In the fourth quarter of 2000, UUNET placed an order for SMS 10000 products valued at $4 or $5 million. TAC ¶ 89. This order was part of the *quid pro quo* transaction under which Redback had given UUNET executives friends and family stock prior to the IPO. *Id.* At the time UUNET placed the order, the OC-12 cards that read data in the SMS 10000 units were not working properly. *Id.* Redback shipped the SMS 10000 units without the OC-12 cards, even though the units were not operational without the cards, and booked the revenue. *Id.*

Redback also asked Qwest to purchase Redback's SmartEdge 800 product to fulfill Qwest's obligations under the Siara warrant agreement. *Id.* at ¶ 99. Qwest purchased $20 million of the SmartEdge 800 product and accepted shipment in the fourth quarter of 2000 even though Qwest had not tested the product. *Id.* Revenues from Qwest during the fourth quarter of 2000 constituted 18% of total revenues that quarter. *Id.* at ¶ 100.

Q1 2001 - More *Quid Pro Quo Deals* With Qwest And Williams

In February 2001, Redback announced that Qwest had agreed to a multi-year, multi-million dollar purchase of Redback's SmartEdge 800 product. TAC ¶ 101. Redback's stock rose on this news. *Id.* Qwest had not, in fact, agreed to a new deal. *Id.* Qwest had agreed to place a $30 million order for SmartEdge 800 products under the original *quid pro quo* arrangement entered into when the Siara warrants were issued. *Id.* However, when Redback attempted to ship the SmartEdge 800 products before the end of the first quarter of 2001, Qwest refused to go forward with the deal unless Redback purchased an Indefeasible Right of Use ("IRU") from Qwest. *Id.* at ¶ 102. An IRU is a right to use a specific amount of fiber capacity for a specified time period. *Id.* at ¶ 103. Redback, an equipment manufacturer, had not need for an IRU. *Id.*

However, Redback agreed to purchase the IRU for $7 million so that Qwest would go forward with the $30 million purchase of SmartEdge 800 products. *Id.* at ¶ 105. Redback tried to purchase an IRU that it could resell; however, Qwest insisted that Redback purchase an IRU that it could not resell. *Id.* at ¶ 104. The sale to Qwest accounted for 28% of Redback's total revenue in the first quarter of 2001. *Id.* at ¶ 106.

Also in the first quarter of 2001, Redback announced a multi-year, multi-million dollar agreement with Williams Communication Group ("Williams"). TAC ¶ 109. It was the largest deal Redback had made, and at least one analyst predicted that Williams could represent 10% of Redback's SmartEdge revenues for 2001 and 20% of SmartEdge revenues for 2002. *Id.* at ¶ 110. In May 2001, three months after Redback announced the huge Williams deal, Williams was on the brink of bankruptcy and told Redback that no revenues from Williams would be forthcoming. *Id.* at ¶¶ 111. Redback failed to disclose to the market that Williams in fact would not be ordering any equipment. *Id.*

### 2002 - *Quid Pro Quo* Deal With UUNET, Sales To Qwest Dry Up

In early 2002, UUNET had an outstanding $2.9 million credit from a previous purchase of SMS 10000 units that UUNET returned because they were not operational. TAC ¶ 115. The SMS 10000 products were inoperable throughout 2001 and 2002. *Id.* at ¶ 114. Redback did not disclose this fact to the market, but instead touted the launch of the SMS 10000 as a "major milestone." *Id.* To prevent having to reverse the $2.9 in revenues, Redback tried to convince UUNET to use the credit to purchase Redback's SmartEdge products. *Id.* at ¶ 115. The SmartEdge products had not been tested and approved under UUNET's purchasing procedures, and was not a good fit for UUNET. *Id.* at ¶¶ 115-16. UUNET's director of purchasing, Boots Bagby ("Bagby") nevertheless agreed to use the credit to purchase SmartEdge products after Redback agreed to hire Bagby's son as a sales person notwithstanding his complete lack of credentials. *Id.* at ¶ 116.

The SEC began investigating Qwest in 2002, and Qwest no longer could engage in *quid pro quo* deals with Redback. TAC ¶¶ 117-18. As a result, Redback lost its largest source of

revenue. *Id.* at ¶ 118. Between March 2002 and August 2002, when Redback was deprived of revenues generated from illicit deals with Qwest, Redback's stock price sank from above $4 per share to below $1 per share. *Id.* In March 2003 Redback filed its Form 10K for 2002, reporting a 45% decrease in revenues from 2001. *Id.* at ¶ 119. In May 2003 Redback filed its Form 10Q for the first quarter of 2003, stating for the first time that the SEC was examining certain Qwest-Redback transactions. *Id.* at ¶¶ 290-91. Redback filed a pre-packaged bankruptcy plan of reorganization under Chapter 11 in November 2003. *Id.* at ¶ 120.

      <u>Plaintiffs' Claims</u>

Plaintiffs assert that numerous public statements regarding sales to Qwest and others, and in fact Qwest's apparent success itself, were misleading because of the omission of the material facts that sales to Qwest and others were obtained through bribery and *quid pro quo* agreements. Based upon these allegations, Plaintiffs assert the following claims against individual officers and directors of Redback and against Redback's outside auditor, PWC: (1) violation of § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder; (2) violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder; (3) violation of § 10(b) of the Exchange Act and Rule 10b-5 by means of insider trading; (4) violation of § 20A of the Exchange Act by insider trading; (5) violation of § 18(a) of the Exchange Act; and (6) control person liability under § 20(a) of the Exchange Act.

## II. SECTION 10(b) CLAIMS

Section 10(b) of the Exchange Act makes it unlawful for any person, by means of any instrumentality of interstate commerce, the mails, or any facility of any national securities exchange, to use or employ "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe" in connection with the purchase or sale of any security registered on a national securities exchange. 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC") under § 10(b), makes it unlawful to: (a) "employ any device, scheme or artifice to defraud"; (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading"; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The United States Supreme Court has held that these provisions give rise to liability for two types of conduct: (1) the making of a material misstatement or omission or (2) the commission of a manipulative act. *Central Bank of Denver v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). Plaintiffs allege a "fraud on the market" claim based upon Defendants' alleged material misstatements and omissions (first claim); a claim that Defendants committed manipulative acts for which they are independently liable even absent misstatements and omissions (second claim); and a claim that Defendants committed manipulative acts by insider trading (third claim).

The Court has not discovered any authority for the proposition that a § 10(b) "manipulative act" claim may be asserted merely because the defendants' misrepresentations to the market occurred in the context of an organized "scheme" to defraud. As the Court noted in its prior order of January 21, 2005, dismissing the complaint with leave to amend, the thrust of Plaintiffs' § 10(b) claims are that the market was deceived into believing that Redback's revenues and other successes reflected the quality of Redback's products when in fact those successes were "bought" by means of bribes and *quid pro quo* arrangements. The Court held that such claims properly are characterized as claims based upon misstatements or omissions under the "fraud on the market" theory.[5] Accordingly, despite the fact that Plaintiffs attempt to characterize their second claim as a "manipulative act" claim rather than a "misstatements and omissions" claim, the Court will treat claim two as duplicative of claim one.

With respect to claim three, alleging a § 10(b) claim based upon insider trading, this is a new theory not previously asserted by Plaintiffs. The Supreme Court explicitly has recognized

---

[5] Under the fraud on the market theory, it is assumed that an investor who buys or sells stock at the price set by an efficient market does so in reliance on the integrity of that price. *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Because publicly available information is reflected in the market price, an investor's reliance on the price necessarily means that the investor is relying upon any public material misrepresentations or omissions. *Id.*

that insider trading may constitute a manipulative act for purposes of § 10(b) liability. *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (holding that an insider who trades on material, non-public information in breach of a fiduciary duty to the corporation may be held liable under § 10(b) and Rule 10b-5). While the cases addressing insider trading sometimes refer to a "deceptive device" rather than a "manipulative act," *see id.*, liability under this theory is not based upon the making of a material misstatement or omission but upon the breach of the relationship of trust and confidence existing between a corporation's shareholders and persons who have obtained confidential information by reason of their position within that corporation, *id*.

Putting aside for a moment the sufficiency of Plaintiffs' allegations of their § 10(b) claims in other respects, it is difficult to see how Plaintiffs' § 10(b) claims are viable in the broader sense. The Court understands Plaintiffs' theory to be as follows: starting even before the IPO, the Redback Defendants in essence "bought" revenues from Qwest and others through bribes and *quid pro quo* arrangements. These revenues constituted a significant percentage of Redback's total revenues[6] and, as a result, Redback's financial picture looked far better than it would have looked had Redback been reporting only legitimate revenues. As a result of this rosy financial picture, Redback's stock price rose, and class members bought at inflated prices. The stock price subsequently fell *not* because the truth about the illicit revenues was made public, but because those illicit revenues dried up when the SEC began investigating Qwest. Redback's stock price already was falling as a result of the collapse of the dotcom industry generally, but it fell much more precipitously because of the *additional* sudden withdrawal of the illicit revenues that previously had been padding Redback's revenues and keeping its stock price propped up.

Such a theory might support a viable § 10(b) claim if supported by adequate facts. However, Plaintiffs' theory is inconsistent with the way in which the stock price actually behaved, as alleged in the TAC. For example, at the time the Qwest revenues dried up – the occurrence that allegedly caused Redback's stock to drop more precipitously than it otherwise

---

[6] Plaintiffs allege that revenues from Qwest alone constituted as much as 25% of Redback's total revenues at various points in time.

would have dropped – Redback's stock was trading at *approximately $4 per share.* TAC ¶ 118. The stock allegedly dropped below $1 per share once the illicit Qwest revenues no longer were forthcoming. *Id.* While Plaintiffs' allegations might support a claim that class members were injured by the drop from $4 to $1 per share, this does not appear to be the claim that Plaintiffs are making here. Based upon the extremely lengthy four-year class period, the chart depicting the stock price over that class period, and the arguments presented by Plaintiffs, it appears that Plaintiffs are claiming injury based upon the fact that class members purchased Redback stock at inflated prices well over $100 per share throughout the class period. The Court is at a loss to understand how Plaintiffs' injury for such purchases was *caused by* the alleged fraud when the stock price already had fallen to $4 per share before the Qwest revenues dried up and before the truth about the Qwest transactions were made public. *See Dura Pharmaceuticals, Inc. v. Broudo*, --- U.S. ----, 125 S.Ct. 1627, 1633 (2005) (holding that it is insufficient to allege that plaintiffs purchased stock at prices that were inflated as a result of defendants' fraud, and that plaintiffs must demonstrate loss causation, i.e., a causal connection between the material misrepresentation and the loss). Because all of Plaintiffs' § 10(b) claims turn upon the same theory of loss, the Court will dismiss those claims so that Plaintiffs may clarify the precise nature of their injury and how that injury was caused by Defendants' conduct.

      The Court notes that the TAC provides much more specificity than Plaintiffs' previous pleadings with respect to the alleged illicit transactions, and the Court is satisfied that Plaintiffs have provided the basis for their belief that those transactions occurred. Plaintiffs also have provided more specificity with respect to their scienter allegations. The Court concludes that the scienter allegations may be sufficient with respect to at least some of the Redback Defendants. However, the Court need not decide the sufficiency of those allegations on a defendant-by-defendant basis unless and until Plaintiffs satisfy the Court with respect to the issue of loss causation, addressed above.

      With respect to PWC, the Court once again concludes that Plaintiffs have failed to state a claim upon which relief may be granted under the applicable standards. Those standards, set forth in the Court's previous order, are as follows: an outside auditor of a publicly held company

can be held liable under § 10(b). *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-90 (9th Cir. 2002) (discussing requirements for holding outside auditor liable under § 10(b)). However, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Id.* at 390 (quoting *In re Software Toolworks Inc.,* 50 F.3d 615, 627 (9th Cir. 1994)). The plaintiff must demonstrate that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.*

Here, although Plaintiffs allege that PWC's audits of Redback's financial statements during the class period were not completed in accordance with generally accepted auditing standards ("GAAS") or generally accepted accounting principles ("GAAP"), it is clear from the face of the complaint that all of the sales at issue actually took place. This is not a case in which revenue was realized improperly or in which accounts had to be restated. To the extent that sales to Qwest should have been offset by purchases from Qwest, which seems to be Plaintiffs' primary contention *vis a vis* PWC, Plaintiffs fail to set forth facts giving rise to a strong inference that this or any other accounting violations were the result of intent or deliberate recklessness rather than negligence. Given the allegations to date, the Court has grave reservations that Plaintiffs will be able to allege a viable § 10(b) claim against PWC. However, in light of the liberal standard for amendment in securities fraud cases, *see Foman v. Davis*, 371 U.S. 178, 182 (1962)*,* and in light of the requested clarification of Plaintiffs' § 10(b) theory, the Court once again will grant Plaintiffs leave to amend their claims against PWC.

### III. SECTION 20A CLAIM

Plaintiffs' fourth claim is asserted under § 20A of the Exchange Act, which imposes liability on any person who violates the Act or the rules and regulations promulgated thereunder by trading on securities while in possession of material, non-public information. 15 U.S.C. § 78t-1(a). A § 20A claim may be brought by any person who traded contemporaneously with the person possessing material, non-public information. 15 U.S.C. § 78t-1(a). Claims under § 20A

are derivative, and require proof of a separate underlying violation (a "predicate violation") of the Exchange Act. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).

As discussed above, Plaintiffs have failed to allege a predicate violation of the Exchange Act, and thus their § 20A claim is subject to dismissal. Because the § 20A claim is subject to dismissal on other grounds, the Court need not decide the boundaries of the contemporaneous requirement at this time. The term "contemporaneous" has not been precisely defined by the Ninth Circuit. *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002) (holding that "a shareholder must have traded with an insider or have traded at about the same time as an insider to be harmed by the insider's trading"). After reviewing the authorities cited by the parties, the Court is inclined to follow the reasoning of those district courts that have restricted the contemporaneous requirement even further to require trading on the same day. *See, e.g., In re AST Research Sec. Litig.*, 887 F.Supp. 231, 233 (C.D. Cal. 1995) (holding that "[t]he same day standard is the only reasonable standard given the way the stock market functions").

Even assuming that Plaintiffs had alleged a viable § 10(b) claim, and met the contemporaneous requirement, the Court concludes that Plaintiffs' allegations regarding the Redback Defendants' use of inside information are insufficient because they are conclusory.

### IV. SECTION 18 CLAIM

Plaintiffs' fifth claim is asserted under § 18 of the Exchange Act. The elements of a § 18 claim are: (1) a misrepresentation or omission (2) of a material fact (3) contained in an SEC filing (4) upon which the plaintiff relied in the purchase of a security. 15 U.S.C. § 78r(a). Scienter is not an element of a § 18 claim. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000) (discussing differences between claims under § 10(b) and § 18). Nonetheless, the heightened pleading standard applicable to alleging a material misrepresentation or omission must be met in § 18 cases. *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F.Supp.2d 559, 577 (E.D.N.Y. 2002). Moreover, a plaintiff suing under § 18 must demonstrate *actual* reliance on the fraudulent statement, and may not rely upon the "fraud on the market" theory that is available under § 10(b). *Howard*, 228 F.3d at 1062.

Plaintiffs' § 18 claim is based upon the same theory as their § 10(b) claim, with the

exception that the alleged misrepresentations and omissions regarding Redback's revenues are limited to those statements set forth in Redback's SEC filings. The Court will dismiss the § 18 claim with leave to amend for the reasons set forth in section II above, i.e., that Plaintiffs have not explained adequately how class members were injured by the alleged statements based upon the allegations set forth in the TAC.[7]

### V. SECTION 20(a) CLAIM

Finally, Plaintiffs allege that a number of the Redback Defendants are control persons under § 20(a) of the Exchange Act. That section imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. 15 U.S.C. § 78t(a). Because Plaintiffs have failed to allege a viable claim of securities fraud, there is no basis for asserting controlling person liability under § 20(a).

### IV. ORDER

(1) The motions to dismiss are GRANTED WITH LEAVE TO AMEND as to all defendants; and

(2) Any amended class action complaint shall be filed and served within sixty (60) days after service of this order.

DATED: 3/20/06

_____
JEREMY FOGEL
United States District Judge

---

[7] The Court once again defers the question of whether a § 18 claim may be maintained as a class claim until such time as Plaintiffs otherwise allege a viable § 18 claim.

1  This Order has been served upon the following persons:

2

3  Eric J. Belfi    ebelfi@murrayfrank.com

4  Luke O Brooks    lukeb@mwbhl.com, e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com

5  Merrill G. Emerick    memerick@afelaw.com,

6  Frederick Sexton Fields    ffields@cpdb.com, ral@cpdb.com

7  Marc L. Godino    service@braunlawgroup.com

8

9  Michael M. Goldberg    info@glancylaw.com

10  Stuart M. Grant    sgrant@gelaw.com, cmarks@gelaw.com

11  Robert S. Green    CAND.USCOURTS@CLASSCOUNSEL.COM

12  Cameron Powers Hoffman    choffman@wsgr.com,

13  Robert A. Jigarjian    CAND.USCOURTS@CLASSCOUNSEL.COM

14

15  Betsy C. Manifold    manifold@whafh.com

16  Marlon Quintanilla Paz    pazm@sec.gov, marlonpaz@vzavenue.net

17  Rachele R. Rickert    rickert@whafh.com

18  Darren J. Robbins    e_file_sd@lerachlaw.com, e_file_sf@lerachlaw.com

19

20  John P. Stigi , III    jstigi@wsgr.com, mmsmith@wsgr.com

21  Lauren E. Wagner    lwagner@gelaw.com,
sgrant@gelaw.com;jkairis@gelaw.com;cmarks@gelaw.com;kwierzel@gelaw.com;mswift@gelaw.com

22

23

24

25

26

27

28

Case No. C 03-5642 JF (HRL)
ORDER DISMISSING THIRD AMENDED CONSOLIDATED COMPLAINT WITH LEAVE TO AMEND
(JFLC2)