Stuart M. Grant (*pro hac vice*)
John C. Kairis (*pro hac vice*)
Lauren E. Wagner (*pro hac vice*)
Kimberly L. Wierzel (*pro hac vice*)
Grant & Eisenhofer P.A.
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Tel: 302.622.7000
Fax: 302.622.7100

Merrill Glen Emerick (State Bar No. 117248)
Anderlini, Finkelstein, Emerick & Smoot
400 S. El Camino Real - Suite 700
San Mateo, CA  94402

Attorneys for Lead Plaintiff
The Connecticut Retirement Plans and Trust Funds

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE REDBACK NETWORKS, INC. SECURITIES LITIGATION<br><br>This Document Relates to:  All Actions | Case Number C 03-05642 JF<br><br><br>FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br>CLASS ACTION<br><br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

Page

I.    NATURE AND SUMMARY OF THE ACTION ................................................................5

II.   The Parties .................................................................................................................8

      Lead Plaintiff .............................................................................................................8

      Non-Party Redback Networks, Inc. ...........................................................................9

      Individual Defendants ................................................................................................9

      PricewaterhouseCoopers LLP...................................................................................16

      Non-Party Pankaj Patel ...........................................................................................17

      Non-Party Marc B. Weisberg ..................................................................................17

      Jurisdiction And Venue.............................................................................................17

III.  Defendants' Fraudulent Scheme and Deceitful Course of Business ..................................18

      Undisclosed Pre-IPO Stock Bribes ............................................................................19

      Redback's Illicit Agreement With Weisberg And Qwest..................................................21

      Redback's Undisclosed Relationship With Qwest .........................................................22

      The Broadband Office Warrant ..................................................................................28

      Redback's Scheme Continues.....................................................................................29

      Material Delay of the New SmartEdge™ Router ..........................................................39

      The Williams Deal .....................................................................................................45

      Redback Uses Artificially-Inflated Stock For A Third Acquisition ..................................45

      Redback's SMS™ 10000 Operational Product's Problems Continued In
      2001 And 2002.......................................................................................................46

      Qwest's Illicit Practices Begin To Come To Light...........................................................47

IV.   Defendants' False and Misleading Statements .................................................................49

      Defendants' Pre-Class Period False and Misleading Statements .......................................49

      Defendants' False And Misleading Statements During The Class Period .........................53

      Without the Sales From Bribery and Quid Pro Quo Transactions with
      Qwest Redback Descends Into Bankruptcy and Investors Begin to
      Learn Why .............................................................................................................106

V.      Redback's Fraudulent Accounting Practices ............................................................112

        Generally Accepted Accounting Principles ("GAAP")..............................................112

        SEC Regulations ...................................................................................................112

        Redback's Financial Disclosures Violated GAAP And SEC Regulations ...................114

        The Overall Impact Of The GAAP And SEC Rules Violations...................................124

VI.     Scienter ................................................................................................................125

        Pierre R. Lamond ..................................................................................................127

        Vinod Khosla .......................................................................................................129

        Promod Haque ......................................................................................................132

        Kevin DeNuccio....................................................................................................135

        Vivek Ragavan .....................................................................................................136

        Dennis Barsema ....................................................................................................139

        Gaurav Garg.........................................................................................................140

        William H. Kurtz ..................................................................................................142

        Craig Gentner .......................................................................................................143

        Randall Kruep .......................................................................................................144

        Dennis P. Wolf ......................................................................................................146

        Thomas L. Cronan, III ...........................................................................................146

        PwC's Scienter And False And Misleading Audit Reports..........................................151

        PwC's Audits Of Redback Failed To Comply With GAAS.........................................156

VII.    Loss Causation .....................................................................................................166

VIII.   Inapplicability Of Statutory Safe Harbor.................................................................171

IX.     Applicability of Presumption of Reliance:  Fraud-On-The-Market
        Doctrine................................................................................................................173

X.      Class Action Allegations.........................................................................................173

        FIRST CAUSE OF ACTION ..................................................................................176

        SECOND CAUSE OF ACTION ..............................................................................178

        THIRD CAUSE OF ACTION ..................................................................................181

FOURTH CAUSE OF ACTION ..................................................................................................183

FIFTH CAUSE OF ACTION ....................................................................................................184

SIXTH CAUSE OF ACTION ....................................................................................................186

PRAYER FOR RELIEF ...........................................................................................................187

JURY TRIAL DEMANDED ......................................................................................................188

1    Lead Plaintiff, Connecticut Retirement Plans and Trust Funds (the "Connecticut

2  Retirement Fund" or "Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others that

3  purchased or otherwise acquired the common stock ("Plaintiffs") of Redback Networks, Inc.

4  ("Redback" or the "Company") between and including November 27, 1999 and October 10,

5  2003 (the "Class Period"), alleges the following upon information and belief, except as to those

6  allegations concerning the Connecticut Retirement Fund, which are alleged based upon personal

7  knowledge.  Plaintiffs' information and belief are based upon, among other things, the

8  investigation conducted by and through Plaintiffs' attorneys, which included:  (a) a review and

9  analysis of Redback's filings with the United States Securities and Exchange Commission (the

10 "SEC"); (b) review and analysis of press releases, public statements, news articles and other

11 publications disseminated by or concerning Redback or the defendants; (c) review and analysis

12 of Redback's analyst conference calls; (d) review and analysis of securities analysts' reports

13 regarding Redback; (e) interviews with over 20 former employees of Redback; (f) review and

14 analysis of documents filed by Redback and other creditors and entities in the United States

15 Bankruptcy Court for the District of Delaware during the course of Redback's bankruptcy

16 proceedings; (g) review and analysis of a Common Stock Warrant Agreement with Qwest

17 Investment Company (formerly known as U.S. Telesource, Inc.) dated November 27, 1999; (h)

18 review of the criminal indictment of Defendant Marc Weisberg; and (i) other publicly-available

19 information concerning Redback and the defendants.

20    Plaintiffs believe that further substantial evidence exists to support the allegations in this

21 Fourth Amended Consolidated Class Action Complaint For Violation of the Federal Securities

22 Laws ("Am. Compl.") that will become available after a reasonable opportunity for discovery.

23 Most of the specific facts supporting the allegations herein are known only to defendants or are

24 exclusively within their custody or control.

25 **I.  NATURE AND SUMMARY OF THE ACTION**

26    1.    During the Class Period, the defendants embarked on a fraudulent course of

27 business, simple in design, but devastating in effect.  The defendants engaged in a series of

28 transactions that had the purpose and effect to create the false appearance of legitimate revenue,

thus enabling Redback to meet or exceed targets set by analysts and maintain an artificial high price for Redback's stock.  Rather than obtain legitimate orders for Redback's products, the defendants sought to prevail in the highly-competitive communications industry by paying bribes to obtain business.  The defendants paid those bribes to some of Redback's customers' executives – some of whom have now been criminally indicted – and in return those customers ordered products from Redback that the customers did not need.  In some cases, the unneeded products did not even work, and in other cases they sat unused in warehouses.

2.      Redback held its initial public offering ("IPO") on May 17, 1999.  Redback's common stock was priced in the IPO at $23 per share, and the Company registered and sold 2.875 million shares.  Through its IPO, Redback raised from investors net proceeds in excess of $50 million and its common stock began trading on the NASDAQ National Market under the symbol "RBAK."  Subsequent to Redback's IPO, and continuing over the next two years during the Class Period, Redback touted numerous multi-million dollar deals, without disclosing that the deals had been secured by bribes rather than by legitimate demand for Redback products.  More than $80 million of the $345.5 million of Redback's total revenue booked during the two-year period from July 2000 through June 2001, was obtained through the defendants' illegal and undisclosed scheme.

3.      Redback's inflated stock price increased to more than $382 per share (adjusted for a two-for-one split on August 1999) as a result of the defendants' fraudulent scheme.  Its Class Period market capitalization reached $43 billion before the scheme began to unravel when Redback's illicit partner, Qwest Communications International, Inc. ("Qwest") became the subject of numerous governmental investigations and could no longer participate in the fraud.  Once Qwest found itself under governmental scrutiny, its executives could no longer accept bribes in return for business.  Qwest immediately stopped purchasing Redback products since Qwest had never needed those products in the first place.  As a result, Redback's revenue growth halted, its revenues began to decline and its stock price, which was based upon its purported revenue growth, declined to less than $1.00 per share by August 2002, and the Company eventually filed for bankruptcy on or about November 3, 2003.  While Redback's stock price

1   was inflated, the Redback insiders sold in the open market over $178 million of Redback stock,

2   unloading their shares on an unsuspecting public that – unlike the defendants -- did not realize

3   the shares were inflated by fraud. Defendants also distributed more than $2.1 billion to their

4   affiliates during the Class Period while the stock was inflated by fraud.

5      4.      Based upon these and other facts, Plaintiffs filed their consolidated and Class

6   Action Complaint, but on January 21, 2005, the Court dismissed that complaint with leave to

7   amend, providing Plaintiffs with an explanation of the deficiencies of the allegations and

8   directions on what would be necessary for the claims to be sustained.

9      5      After the Court's ruling, on or about February 17, 2005, a Grand Jury sitting in the

10  District of Colorado issued a criminal indictment of Marc Weisberg ("Weisberg"), a senior

11  executive at Qwest who perpetrated Qwest's massive fraud (including Qwest's fraudulent stock

12  kickback program with Redback). This indictment specified that Weisberg in April and May

13  1999, in connection with a multi-million dollar commercial transaction between Qwest and

14  Redback, improperly conditioned Qwest's participation in the deal on the receipt of personal

15  investment opportunities. Weisberg has since (on December 28, 2005) pled guilty to one count

16  in the indictment.

17     6.      Based upon the newly-revealed facts in the Weisberg indictment, and in

18  conjunction with facts previously known, Plaintiffs revised their claims pursuant to the Court's

19  direction in its January 21, 2005 opinion, and pursuant to the Supreme Court's decision in *Dura*

20  *Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005). On May 27, 2005,

21  Plaintiffs filed a revised amended complaint, asserting claims for violations of Section 10(b) and

22  Rule 10b-5 promulgated thereunder, Section 18, Section 20(A) and Section 20(a) of the

23  Securities and Exchange Act of 1934 (the "Exchange Act") against certain former officers and

24  directors of Redback and against Redback's accounting firm PriceWaterhouseCoopers LLP

25  ("PwC") to compensate Redback investors for the losses they suffered from the fraudulent

26  scheme.

27     7.      On March 20, 2006, the Court issued an opinion and order dismissing the revised

28  amended complaint with leave to amend. The Court was "satisfied that Plaintiffs have provided

the basis for their belief that those [improper *quid pro quo* and other] transactions occurred" and had "provided more specificity with respect to their scienter allegations" which "may be sufficient to at least some of the Redback Defendants."  However, the Court found that Plaintiffs needed to "clarify the precise nature of their injury and how that injury was caused by Defendants' conduct."  The Court therefore permitted Plaintiffs to amend, *inter alia*, their allegations regarding loss causation.

8.      As set forth below, beginning in April 2001, the Company did not, and could no longer, engage in improper *quid pro quo* transactions and other deals with companies such as Qwest.  Thus, starting on April 2, 2001, Redback began to trickle out bad news (by lowering earnings and revenue expectations and later by lowering actual reported earnings and revenues) so that the disappearing improper deals (and the disappearing revenues) would not be so obvious and would not trigger increased scrutiny from investors.  While Redback attempted to keep its stock price artificially inflated, it also continued to trickle out the bad news through the end of the Class Period.  The stream of corrective disclosures failed to alert investors to the fraud yet managed to cause a gradual correction in Redback's stock price, so that it dropped from $13.08 at the beginning of April 2001 to $0.55 when the true extent of the fraud was revealed at the end of the Class Period.

## II.  THE PARTIES

### <u>Lead Plaintiff</u>

9.      Lead Plaintiff, the Connecticut Retirement Fund, is a public pension fund that invests assets on behalf of public employees in the State of Connecticut.  With approximately $23 billion in assets under management, the Connecticut Retirement Fund consists of six pension funds and eight trust funds, representing, among others, approximately 160,000 teachers, police officers, firefighters, and state and municipal employees who are pension plan participants and beneficiaries.

10.      During the Class Period, the Connecticut Retirement Fund purchased more than 184,000 shares of common stock of Redback and suffered losses in excess of $7 million.

11.     By Order dated June 25, 2004, the United States District Court for the Northern District of California (the "Court") appointed the Connecticut Retirement Fund as Lead Plaintiff in this case pursuant to 15 U.S.C. § 78u-4.

**Non-Party Redback Networks, Inc.**

12.     Non-Party Redback is incorporated under the laws of the State of Delaware with its headquarters located at 300 Holger Way, San Jose, California.  Redback's common stock is publicly traded and listed on the NASDAQ National Market under the symbol "RBAK." Redback is and was throughout the Class Period a seller and provider of broadband networking equipment that enables carriers and service providers to build broadband networks that can deliver broadband services to large numbers of subscribers.

13.     On November 3, 2003, shortly after news stories and public disclosures about the fraudulent course of business described herein, the Company filed a voluntary pre-packaged Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Redback emerged from bankruptcy on January 2, 2004.  The Company's Plan of Reorganization included, *inter alia*, a 73.39:1 reverse stock split that left the pre-bankruptcy shareholders with only 2.5 million shares of Redback common stock (5% of Redback's post-emergence equity), and an issuance of 47.5 million shares (95% of the Company's post-bankruptcy equity) to holders of Redback's 5% convertible subordinated notes due 2007, which were extinguished in the bankruptcy proceedings.

14.     Redback would be named a defendant in this case if it were not for the Company's bankruptcy filing.

**Individual Defendants**

15.     Defendant Kevin A. DeNuccio ("DeNuccio") has been the President, Chief Executive Officer ("CEO") and a director of Redback since August 2001.  Prior to arriving at Redback, DeNuccio was a Senior Vice President of Worldwide Service Provider Operations at Cisco Systems, Inc. ("Cisco").  He was responsible for and signed Redback's SEC filings on Forms 10-Q and 10-K, Proxy Statements and Registration Statements while CEO and a Board member during the Class Period after he began working for Redback.  DeNuccio also signed

Redback's Form 8-K that was filed with the SEC during July 2003. Specifically, DeNuccio signed Redback's Form 10-K for fiscal year 2001 (filed with the SEC on March 27, 2002) ("2001 10-K"), and pursuant to § 13(a) of the Exchange Act and § 906 of the Sarbanes-Oxley Act of 2002, he signed and certified Redback's Form 10-K for fiscal year 2002 (filed with the SEC on March 31, 2003) ("2002 10-K"), Form 10-K for fiscal year 2003 (filed with the SEC on March 15, 2004) ("2003 10-K") and Quarterly Reports on Form 10-Q for the second quarter for fiscal year 2002 (filed with the SEC on August 14, 2002, the "August 2002 10-Q"), the third quarter for fiscal year 2002 (filed with the SEC on November 14, 2002, the "November 2002 10-Q"), the first quarter for fiscal year 2003 (filed with the SEC May 15, 2003, the "May 2003 10-Q"), and the second quarter for fiscal year 2003 (filed with the SEC on August 14, 2003, the "August 2003 10-Q").

16. Defendant Pierre R. Lamond ("Lamond") served as Chairman of the Board of Directors of Redback ("Board") from November 1996 through May 2003. When Defendant Vivek Ragavan was ousted from the Company as CEO in May 2001, Lamond assumed the role of acting CEO on May 21, 2001, and served as Redback's CEO until Defendant DeNuccio was hired on August 29, 2001. Lamond also served on the Audit Committee of the Board until May 2003, and on the Nominating Committee from 2002 until May 2003. As Chairman, Lamond signed Redback's Form 10-K for fiscal year 1999 (filed with the SEC on February 10, 2000) ("1999 10-K"), its Form 10-K for fiscal year 2000 (filed with the SEC on April 2, 2001) ("2000 10-K"), 2001 10-K, and its 2002 10-K, as well as several Registration Statements during those years. Lamond has been a partner in Sequoia Capital ("Sequoia") a venture capital firm, since 1981. Sequoia, along with its affiliates, was an early investor in Redback, and was, at the time of Redback's IPO, the biggest investor in the Company, holding about 5 million preferred shares that were issued for approximately $7.2 million — about a quarter of Redback's preferred stock prior to the IPO. Lamond personally acquired almost 110,000 pre-IPO Redback preferred shares for slightly over one dollar per share and, with Sequoia, owned over 27% of Redback's outstanding stock before the IPO, which were converted to common stock following the IPO on a one-for-one basis. During the Class Period, Sequoia held a substantial position in Redback,

controlling approximately 2-3% of Redback's common stock.  In August 2000 during the Class Period, Sequoia distributed approximately 1.6 million shares of Redback stock worth $226 million as a dividend to its partners and investors, of which Sequoia (Lamond's firm) received a significant portion.  Lamond, along with the other non-executive director Defendants Khosla and Haque, received compensation for his services on the Redback Board entirely in Redback stock options.  During the Class Period, Lamond received 300,000 Redback options for his Board service.

17.     Defendant Thomas L. Cronan III ("Cronan") has served as Redback's Senior Vice President of Finance and Administration and Chief Financial Officer ("CFO") since January 2003.  From April 2001 to January 2003, he served as Redback's Vice President, General Counsel and Corporate Secretary.  Pursuant to §13(a) of the Exchange Act and § 906 of the Sarbanes-Oxley Act of 2002, Cronan signed and certified Redback's 2002 10-K, May 2003 10-Q, 2003 10-K and its August 2003 10-Q.  Cronan also signed Redback's Forms 8-K during 2003.

18.     Defendant Vinod Khosla ("Khosla") served as a director of Redback from 2000 through May 2003.  As a non-employee director, Khosla received his compensation for his Board service entirely in Redback stock options, amounting to 140,000 options during the Class Period.  He was a member of the Board's Compensation Committee responsible for establishing the Company's policy on executive and key-employee compensation.  Khosla came to Redback from the board of Siara Systems, Inc. ("Siara") after Redback acquired that company in a stock merger, which closed on March 8, 2000.  Khosla is a founder and former CEO of Sun Microsystems, Inc. and founder of Daisy Systems.  He was also a director of Concentric Networks in 1999.  He has been a general partner of the Silicon Valley venture capital firm, KPCB, from February 1986 to the present.  KPCB held over 6% of Redback's outstanding common stock, which it acquired in exchange for its interest in Siara in a stock swap transaction with Redback in March 2000.  During August and October 2000 (during the Class Period), KPCB distributed approximately 6.6 million shares of Redback stock worth over $940 million to its investors and partners, of which KPCB (Khosla's firm) received a significant portion.  While

at Redback, Khosla signed Redback's 2000 10-K, and 2001 10-K and Redback's Registration Statements filed in those years.  Khosla has also been director of Qwest since June 1998.

19.     Defendant Dennis P. Wolf ("Wolf") served as Redback's Senior Vice President of Finance and Administration and as CFO from January 2001 until January 2003.  Wolf signed Redback's 2000 10-K, 2001 10-K, all the Forms 10-Q for fiscal years 2001 and 2002, and Redback's Forms 8-K and Registration Statements for those same years.  Furthermore, pursuant to §13(a) of the Exchange Act and § 906 of the Sarbanes-Oxley Act of 2002, he signed and certified Redback's August and November 2002 10-Q.  Wolf also signed Redback's Form 10-Qs for all of 2001 and the first quarter of 2002.

20.     Defendant Vivek Ragavan ("Ragavan") served as a director of Redback from March 2000 through May 2001.  He also held various executive positions, including President and CEO from July 2000 through May 2001, and President and Chief Operating Officer ("COO") from March to July 2000.  Ragavan signed the Siara Warrant Agreement, which obligated Qwest to purchase $40 million of Redback's products in a two-year period.  Ragavan subsequently signed Redback's 2000 10-K, Redback's Proxy Statement for 2001, and Redback's Registration Statements in 2000 and 2001, and he deliberately and recklessly omitted material information regarding the Siara Warrant Agreement from all SEC filings and press releases made by Redback (and authorized by Ragavan) during the Class Period.  Between February 2001 and May 2001, Ragavan sold 100,000 shares of Redback stock for more than $2.5 million.  In May 2001, Ragavan resigned from Redback and sold over 600,000 shares of Redback stock back to the Company for proceeds of $11.87 million, and transferred over 1.88 million shares of Redback stock (worth $23 million at the time) to a family trust.

21.     Defendant Dennis L. Barsema ("Barsema") was Redback's President, CEO, and a director from November 1997 to July 2000.  Barsema continued as Vice Chairman of Redback's Board until May 2001.  Between March 2000 and December 2000, Barsema sold over 677,000 shares of Redback stock at artificially inflated prices, reaping more than $86 million in proceeds.  During the Class Period, Barsema signed Redback's 1999 10-K, 2000 10-K, Proxy Statements, and several Registration Statements.

22.     Defendant Gaurav Garg ("Garg") has served as a director of Redback since May 2001.  He served on the Nominating Committee in 2002 and 2003.  He was  also one of the founders of Redback and was a Redback Senior Vice President of Product Management from August 1996 through May 2001.  Between October 2000 and August 2003, Garg sold 2,206,538 shares of Redback stock for $43 million.  Garg signed Redback's 2000 10-K, 2001 10-K and 2002 10-K, as well as the Company's various Registration Statements.  Garg has been a partner at Sequoia since May 2001.

23.     Defendant William H. Kurtz ("Kurtz") has served as a director of Redback since October 1999.  Like the other non-executive directors, he received compensation for his services on the Redback Board entirely in Redback stock options.  Kurtz was a member of the Audit Committee of the Board from 2000 through 2003, where he was held out as a certified public accountant with financial management expertise.  Kurtz signed Redback's 1999 10-K, 2000 10-K, 2001 10-K, 2002 10-K and 2003 10-K.  He also signed Redback's Registration Statements filed with the SEC in those same years.  In October 2000, Kurtz sold 35,000 shares of Redback stock, reaping proceeds of almost $2.5 million.

24.     Defendant Craig Gentner ("Gentner") was Redback's Vice President of Finance, CFO and Corporate Secretary from 1999 to January 2001.  Mr. Gentner signed Redback's materially false and misleading Forms 10-Q for the third quarter of 1999 and the first, second, and third quarters of 2000, and various Forms 8-K and Registration Statements during that same year.  He also signed Redback's 1999 10-K.  During October 2000, Gentner sold 120,000 shares of Redback stock for $15.7 million.

25.     Defendant Promod Haque ("Haque") served as a director of Redback from March 2000 through 2003.  As a non-employee director, Haque was paid for his Board service entirely in Redback stock options, receiving 220,000 options during the Class Period.  He served on the Audit Committee from 2001 through 2003.  Haque signed Redback's 2000 10-K, 2001 10-K and 2002 10-K and various Registration Statements filed in those same years.  Haque has been a partner with Norwest Venture Partners since 1990.  During the Class Period, Norwest Venture Partners maintained a substantial ownership position, as high as 4.76%, in Redback.  During

August and October 2000, Northwest Ventures distributed 4 million shares of Redback stock worth approximately $571 million to its investors and partners, of which Norwest Venture (Haque's firm) received a significant portion.

26. Defendant Randall J. Kruep ("Kruep") joined Redback in 1997 and was Redback's Vice President of Worldwide Sales from 1999 to February 2001, and he was one of Redback's highest-paid executives. Prior to 1999, Kruep served as the Company's Vice President of Sales. One of Kruep's responsibilities was to provide sales and revenue information for Redback's press releases and SEC filings. Between March 2000 and October 2000, Kruep sold 114,600 shares of his Redback stock for more than $25.9 million.

27. DeNuccio, Lamond, Cronan, Khosla, Wolf, Ragavan, Barsema, Garg, Kurtz, Gentner, Haque and Kruep are sometimes collectively referred to herein as the "Individual Defendants."

28. By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Redback's business, operations, operational trends, sales, finances, revenue recognition markets and present and future business prospects. The Individual Defendants were privy to confidential information through Redback's internal corporate documents (including the Company's operating plans, budgets, forecasts, and reports of actual operations compared thereto), conversations, meetings and connections with other corporate officers and employees, conversations, meetings and connections with vendors and customers, attendance at sales, management, and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Redback officers and directors.

29. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, sales, prospects, growth, finances, and financial condition, as alleged herein. Because of their positions and access to material non-public information available to them but not to shareholders or the

investing public, each of the Individual Defendants knew that adverse facts specified herein were not disclosed and that the positive representations that they were causing Redback to make were materially false and misleading when made.

30. The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases, and other public documents, knew or with deliberate recklessness disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of federal securities laws.

31. As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, sales, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements were materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions violated these specific requirements and obligations.

32. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

**PricewaterhouseCoopers LLP**

33.     Defendant PricewaterhouseCoopers LLP, ("PwC"), which is headquartered in New York City, at all times relevant hereto was a limited liability partnership. PwC, from its San Jose, California office, served as Redback's external auditor since it began as a publicly-traded Company in 1999.

34.     PwC issued clean and unqualified audit opinion letters in connection with Redback's financial statements for fiscal years 1999, 2000, 2001 and 2002, which were incorporated with PwC's approval in Redback's Form 10-K and other public filings in the Class Period. PwC also reviewed Redback's quarterly financial statements, which were incorporated in the Company's Forms 10-Q filed with the SEC in 1999, 2000, 2001, 2002 and 2003. PwC and various individual partners of the firm have participated in the audits of Redback since 1996, and prepared, reviewed, approved, and directed the production of financial statements, reports and releases issued or disclosed by Redback throughout this period.

35.     PwC audited Redback's financial statements during all relevant periods and issued materially false and misleading opinions on those financial statements. PwC also consented to the use of its unqualified opinions in Redback's financial statements and reports filed with the SEC, which were disseminated to the investing public during all relevant periods. These financial statements were incorporated into and made a part of the Company's public filings and offering memoranda with the knowledge and express consent of PwC.

36.     At all relevant times, as Redback's independent auditor, PwC was well aware that revenue derived from sales to Qwest – Redback's largest customer – was material to Redback's business and financial statements. PwC knew, through its audits and access to all of Redback's financial information, or with deliberate recklessness disregarded, that Redback was issuing stock kickbacks to Qwest executives, and purchasing Qwest's products and services that Redback did not want or need, in exchange for Qwest's agreement to purchase millions of dollars in products and services from Redback.

**Non-Party Pankaj Patel**

37.     Pankaj Patel ("Patel") was Redback's Senior Vice President of Engineering from March 2000 to January 2003.  Patel joined Redback in March 2000 as a result of Redback's acquisition of Siara.  In March 2001, Patel sold 144,000 shares of Redback stock for approximately $4.3 million.

**Non-Party Marc B. Weisberg**

38.     Marc B. Weisberg ("Weisberg") was Executive Vice President, Corporate Development of Qwest from October 2000 until September 2001.  He joined Qwest as Senior Vice President, Corporate Development in September 1997.  Weisberg oversaw Qwest's strategic alliances.  He was also President and Chief Executive Officer of Qwest Investment Company, formerly known as U.S. Telesource, Inc. ("U.S. Telesource"), which is a direct wholly-owned subsidiary of Qwest Communications Corporation, which is a direct wholly-owned subsidiary of Qwest Corporation.  According to documents filed with the SEC, Qwest Corporation is a wholly-owned subsidiary of Qwest.  Philip Anschutz owns 100% of the stock of the Anschutz Company, which in turn owns 39% of Qwest.  According to a Form SC 13D filed by U.S. Telesource in November 1999, U.S. Telesource's principal business "is to acquire and hold securities and other investment assets."  On or about February 16, 2005, Weisberg was indicted by the U.S. Attorney's office in Denver, Colorado on federal criminal charges for wire fraud, money laundering, and forfeiture of $2.9 million of illegal proceeds in connection with undisclosed pre-IPO private placement investments in at least 9 different technology companies that were vendors of Qwest, including Redback.  Weisberg's Indictment is attached hereto as Exhibit "A" and is incorporated herein by reference.  On December 28, 2005, Weisberg pled guilty to one count in the indictment.  But for the Court's Order dated January 21, 2005, dismissing Weisberg from this action, Weisberg would be named as a defendant in this Amended Complaint.

**Jurisdiction And Venue**

39.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa.

40.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

41.     Jurisdiction and venue are proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391 (b)-(c).  Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, Redback is headquartered in this District at 300 Holger Way, San Jose, California 95134.

42.     In connection with the acts and omissions alleged in this Amended Complaint, the defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications and the facilities of the national securities markets and exchanges.

III.    **DEFENDANTS' FRAUDULENT SCHEME AND DECEITFUL COURSE OF BUSINESS**

43.     Redback provides telecommunications networking equipment and services that enable carriers and service providers to deploy high-speed access to the Internet and corporate networks.  The Company's product lines include the Subscriber Management System ("SMS™") and SmartEdge™ family of networking hardware and software products that enhance and manage a full-range of broadband connections, including Ethernet, DSL, cable and wireless connections.  Redback's SMS™ products were designed to connect and manage devices used to gather a large number of high-speed access technology subscribers such as DSL subscribers at one end of the network with devices at the other end of the network used to connect to the Internet.  Redback's earliest-developed SMS™ products such as the SMS™ 10000 product were designed to support several thousand subscribers.  During the Class Period, large telecommunications companies were interested in a product being developed by Redback known as the SMS™ 10000, which was supposed to be able to support 100,000 subscribers.  The SmartEdge™ products were designed to enable service providers to add revenue-generating services to their networks.

44.     Founded by Defendant Gaurav Garg and others in 1996, Redback never sold a single product or service until the end of 1997.  The Company lost almost $10 million in 1998, but claimed that with the Internet "exploding" and "thousands of users going on-line each month," Redback's SMS™ technology offered an economical solution for the challenges associated with scaling and configuring existing networks to accommodate a large number of users of new high-speed services, without compromising network performance.

45.     In May 1999, Redback held its IPO, selling 2.875 million shares of its common stock at $23 per share, raising over $50 million from investors.

46.     Redback's stock instantly became one of the many Internet darlings in the high-tech sector.  With the promise that large telecommunications service providers like Qwest, Concentric Networks and UUNET were testing and going to implement Redback's SMS™ technology into their networks, the Company's stock rose from its $23 IPO price to $99.49 by June 28, 1999.

**Undisclosed Pre-IPO Stock Bribes**

47.     The promising start-up Company had an undisclosed secret to its success – bribes and sales incentives paid to customers to obtain sales (and the coveted announcement of new sales agreements) in order to create the false appearance of legitimate demand for Redback's products with the purpose of deceiving investors.  Defendants' fraudulent practices began prior to the Company's IPO when Redback provided undisclosed "friends and family" shares of its stock to insiders and executives at certain telecommunications companies in exchange for commitments from those companies to purchase Redback's products, whether they needed the products or not.

48.     A former District Sales Manager who worked at Redback from 1997 to 2001 and was the sales representative who handled Qwest's account in 1999 (the "Redback Sales and Marketing Manager") interviewed by Plaintiffs' Counsel stated that he knew that "friends and family" shares had been provided to many potential customers and that pre-IPO shares were offered to Level 3, SBC and GTE.  He further stated that there was a limited amount of stock and therefore Redback had to use some care to "dole it out."  He said that the IPO stock gifts were

1   given with the intention of inducing business by indicating to potential customers that "the better

2   we do, the better you do."  A former Director of sales for WorldCom and other accounts at

3   Redback who worked for the Company from December 1999 through March 2002 (the

4   "Redback Sales Director") said that Redback sales representatives and account managers met

5   with decision makers at WorldCom's UUNET ("UUNET") division and other

6   telecommunications companies to offer "friends and family" shares to these company executives

7   as an incentive to purchase Redback's products and create by these purchases a false impression

8   of demand.

9        49.    The Redback Sales Director stated that while he was employed at Redback, he

10  attended meetings in which it was discussed that UUNET had received stock from Redback in

11  the "friends and family" secret offerings.  A former account manager who worked at Redback in

12  1999 and left in or around August 2001, and who personally handled the UUNET account for

13  Redback (the "UUNET Account Manager"), stated that there was a block of "friends and family"

14  stock set aside by Redback's management for distribution to "favored customers."  The UUNET

15  Account Manager confirmed that UUNET received "friends and family shares" of Redback's

16  stock before Redback's IPO.

17       50.    In return, UUNET was one of the first reported users of Redback's SMS™

18  technology.  On February 1, 1999, three months prior to Redback's IPO, Redback announced

19  that UUNET had selected Redback's "flagship" SMS™ 10000 system to rollout Digital

20  Subscriber Line ("DSL") services.  Throughout the Class Period, Redback heralded UUNET as a

21  major-player in the telecommunications industry and repeatedly emphasized that UUNET was

22  purchasing Redback's SMS™ product to support its DSL services.  However, the Individual

23  Defendants failed to disclose that Redback had provided undisclosed sales incentives in the form

24  of pre-IPO shares to UUNET to facilitate UUNET's agreement to purchase Redback's SMS™

25  product.  As described below, during the Class Period, UUNET had technical problems with the

26  SMS™ products and also discovered problems with features of the SmartEdge™ product when

27  UUNET was testing the product in its labs, but neither Redback nor UUNET ever publicly

28  disclosed these problems.

51.    In March 1999, Redback also provided a warrant to purchase 4,500 shares of Redback's stock at the IPO price ($23) to Concentric Networks ("Concentric").  Defendant Khosla served on Concentric's Board of Directors prior to and at the time Redback issued the undisclosed warrant to Concentric.  On May 3, 1999, Redback announced that Concentric had signed a contract to purchase Redback's SMS™ 10000 and unspecified services.  However, defendants failed to disclose that Redback had issued a lucrative stock warrant – worth more than $3 million within one year of being issued – to Concentric to obtain Concentric's commitment to deploy Redback's SMS™ product.

### Redback's Illicit Agreement With Weisberg And Qwest

52.    According to the criminal Indictment filed against Weisberg in the United States District Court for the District of Colorado on or about February 16, 2005 Case No. 05-CR-081RB, to which Weisberg later (on December 28, 2005) pled guilty, Weisberg devised and engaged in a scheme pursuant to which he improperly conditioned Qwest business on the receipt of personal investment opportunities including investment opportunities from Redback.  *See* Indictment at 5-6, 9.  Specifically, Weisberg managed and developed Qwest's corporate development group and was responsible for evaluating, securing and managing corporate investments for the benefit of Qwest and its shareholders.  The Indictment states that, pursuant to Qwest company policy and at Weisberg's direction, Qwest purchased stock through a "directed share program" in private technology companies before or at the time of their IPOs.  Many of these investments were made through a company called U.S. Telesource, which is a subsidiary of Qwest that was formed by Qwest executives to hold securities and other investments including pre-IPO shares that Qwest received from Redback and other private technology companies.  *See* Indictment at 2-4.  Prior to entering into commercial transactions with technology companies like Redback, Qwest, through Weisberg, demanded as a *quid pro quo* for its business, equity in the supplier companies.  *Id.* at 3.  This *quid pro quo* was not disclosed to Redback investors.

53.    Specifically with regard to Redback, the Indictment states that:

> In or around April of 1999, and continuing through on or about May 17, 1999 [the date of Redback's IPO], **while negotiating and participating in a multi-million dollar commercial transaction**

**with Redback on behalf of Qwest**, Defendant Marc B. Weisberg
secretly used his position, power, and influence as a Qwest executive
to obtain personal investment opportunities in Redback in a manner
not authorized by or in the best interests of Qwest.

*See* Indictment at 10 (emphasis added).

54.     The Indictment states that in connection with the personal investment
opportunities that he obtained in Redback, Weisberg made material omissions and materially
false misrepresentations and used false pretenses, including:  failure to disclose making
misleading statements, intimidating and threatening to fire a Qwest employee who attempted to
disclose Weisberg's conduct as it related to one of Qwest's vendors and attempting to destroy
and causing the destruction of personal and corporate records reflecting his conduct.  *See*
Indictment at 11-12.  Weisberg reaped a net profit in excess of $2 million as a result of his
personal investments in Redback and other telecommunications companies that were selling
products to Qwest.  *See* Indictment at 12-13.

**Redback's Undisclosed Relationship With Qwest**

55.     In or around May 1999, Redback first secretly transferred to Weisberg and other
Qwest executives "friends and family" shares of stock worth millions in Redback's IPO.

56.     On June 28, 1999, Redback issued a press release announcing that Qwest was
deploying Redback's SMS™ product in Qwest's network.  Redback announced that Qwest
"would use the Redback SMS™ 10000 to aggregate traffic from DSL, cable and wireless POPs,
providing customers with high-speed connectivity to the Qwest nationwide IP-based network
and the Internet."  The Company stated that the deal was a "multi-year, multi-million dollar
agreement."  Two witnesses, the Redback Sales and Marketing Manager and a former Redback
Sales Director (the "Former Sales Manager"), who personally managed the Qwest account
between February 2000 and July 2002, both confirmed that the arrangement was only for $5
million in equipment over 3 years.  Both witnesses also stated that the agreement was a *quid pro
quo* for the "friends and family" pre-IPO shares of Redback stock that Qwest and its executives
had received.  Moreover, according to the Redback Sales and Marketing Manager**,** Qwest signed
off on the announcement even though it had no immediate plans to actually deploy Redback's
products.  Qwest agreed to the announcement because Redback had provided friends and family

pre-IPO shares to Qwest in Redback's IPO.  The Individual Defendants knew that using stock kickback payments to purchase the business of a telecommunications giant like Qwest would create the false appearance that there was a real demand for Redback's equipment.

57.     In response to the news regarding Redback's new agreement with Qwest, Redback's stock price jumped more than 25 percent in two days, from a close of $99.49 on June 28, 1999, to $113.39 on June 29, 1999, and to $125.99 on June 30, 1999.  Redback and the Individual Defendants quickly understood that doing business with industry giant Qwest provided instant credibility to Redback and resulted in an immediate jump in the Company's stock price.  With Qwest's stamp of approval for Redback's products, the market perceived Redback not as a young start-up with its attendant risks, but as an established new telecommunications equipment supplier.  Having quickly learned the value of Qwest's endorsement, Redback, throughout the Class Period, reported that Qwest had selected Redback's SMS™ products to deploy in its network and continually emphasized that Qwest was one of Redback's largest customers.

58.     However, unbeknownst to the Class and the investing public, Qwest's purported multi-year, multi-million dollar agreement had been induced through undisclosed stock kickback payments from Redback.  When Redback announced the agreement with Qwest, Redback's officers and directors (the Individual Defendants named herein) deliberately and recklessly failed to disclose the lucrative stock incentives that had been provided to Qwest's executives because they wanted to create the appearance that there was a real demand by Qwest for Redback's products to artificially inflate Redback's stock price.  The Individual Defendants and their affiliates collectively held millions of shares of Redback' stock and therefore stood to gain hundreds of millions of dollars by boosting Redback's stock price.

59.     According to the Redback Sales and Marketing Manager, despite the existence of the purported agreement, there was no real commitment from Qwest in June 1999 to actually issue purchase orders for and take possession of Redback's SMS™ equipment.  He stated that he personally called upon representatives at Qwest in 1999, and that they refused to actually issue purchase orders for Redback's SMS™ 10000 product unless Redback provided certain additional

incentives beyond the friends and family shares already received, i.e. bribes, to Qwest such as more Redback stock.  He further stated that Qwest demanded that Redback "show us that you are a partner" in return for which Qwest purportedly would give Redback orders.  The Redback Sales and Marketing Manager said that he and others at Redback complied with Qwest's demands by providing stock and other sales incentives and by referring customers to Qwest, but he said it was to no avail because from May to November 1999, Qwest had still not agreed to take possession of any equipment from Redback in flat contradiction to Redback's June announcement.

60.    The Redback Sales and Marketing Manager stated that, in exchange for the friends and family stock, Qwest had agreed to allow Redback to issue a press release announcing that Qwest had deployed Redback's products, but that there were no revenues generated during 1999, because products were not actually purchased by Qwest.  He further stated that the June press release was part of a "barter" with Qwest and that Qwest allowed Redback to issue press releases if Redback provided stock, prospects and customer referrals to Qwest.  The Redback Sales and Marketing Manager stated that press releases were "dribbled out strategically" to create a "buzz to the stock," in other words, the press releases were used to drive up the market price of Redback's stock by creating an impression of a strong demand for Redback's products, where there was none.  He further stated that, while getting orders was "problematic," the press releases were more important because they added more value to the stock price.  He indicated that Larry Blair in marketing created the press releases, and former Redback Vice President of Sales for North America who worked at the Company from August 1999 to March 2002 (the "Redback Sales VP") confirmed that Kruep provided material information for the releases.

61.    The Redback Sales and Marketing Manager said that he "took a lot of heat" for managing the Qwest account because, despite the agreement to purchase $5 million in equipment over 3 years, Qwest did not provide any purchase orders to Redback in 1999, while he was managing the account.  He stated that he received pressure from Defendants Barsema, Garg and Kruep to get orders from Qwest, and that they each emphasized to him that Redback had

provided stock and customer referrals to Qwest and that Qwest had promised orders for Redback's equipment in return.

62.     According to the Redback Sales and Marketing Manager, Redback had a difficult time selling its equipment to Qwest because the equipment was not better than substantially similar equipment sold by Redback's competitors.  He stated that Qwest executives were constantly intimating that Qwest would only buy Redback's products if Redback would "help them out," and when Redback continued to send him and others to Qwest to get orders in 1999, Qwest's executives were not even courteous and blatantly stated:  "When I want to reach you, I will call you."  He said that the Qwest executives were too busy trying to enrich themselves to provide orders for Redback's products, even though Qwest had agreed to provide orders if Redback gave Qwest executives stock.  The Redback Sales and Marketing Manager stated that he did not know how many "friends and family" shares Redback had given to Qwest executives, but he was aware that Redback had given 1,000 shares of pre-IPO stock to the "top guys" and to Lewis Wilks, who was the president of a Qwest subsidiary.  He also stated that he did not deal directly with Weisberg, but that Lew Wilkes had introduced him to Weisberg one day when the Redback Sales and Marketing Manager was at Qwest's offices.  He said that Wilkes told him that "you will be dealing with Marc down the road," and the Redback Sales and Marketing Manager understood Wilkes to mean that Weisberg would handle more "shakedowns" on behalf of Qwest, like the pre-IPO stock in exchange for favorable press releases and equipment purchase commitments.

63.     The Redback Sales and Marketing Manager stated that one day during May 1999, when he walked into Redback's offices in California, Barsema showed him a document and said that it was "some paperwork from U.S. Telesource."  He said that apparently U.S. Telesource was the named recipient of Redback stock that Redback had agreed to provide to Qwest's executives.  Barsema asked the Redback Sales and Marketing Manager "What is U.S. Telesource," and the Redback Sales and Marketing Manager stated in response that he had never heard of U.S. Telesource.

64.     According to the Redback Sales and Marketing Manager, Redback executives lost sight of what was important because the press releases added more value to the stock price than actual orders.  He also stated that providing pre-IPO shares to Qwest and other customers boosted the stock price because in exchange for the stock, Redback earned the right to issue a press release announcing that Qwest or the other customers had entered into agreements to purchase and deploy Redback's equipment.  He further commented that the press releases were "not worth the paper that they were written on."

65.     As Redback continued to report a growing customer base (without disclosing bribes and other material sales incentives used to purchase the new customers and new orders for Redback), the Company's stock continued to climb, reaching $214.98 on August 19, 1999, and splitting two-for-one the next day, closing at $104.76 on August 20, 1999.  In November 1999, the stock had continued to soar and closed at $150.02 on November 29, 1999.

66.     Redback and the Individual Defendants decided to use the Company's rising stock as currency for acquisitions.  On November 29, 1999, the Company announced that it would acquire another communications company, Siara Systems, Inc. ("Siara"), for approximately $4.5 billion (using Redback's stock as currency).  Siara had only $7.6 million of book value assets and a $14.2 million deficit in stockholders' equity.  In addition, Siara had yet to record any revenue and had no saleable products at the time of the acquisition.  It did have the SmartEdge™ technology under development.

67.     Redback again bribed executives at Qwest, this time so that they would actually purchase Redback products.  Prior to consummation of Redback's merger with Siara, Defendants Ragavan (Siara's President and CEO), Khosla (a member of Siara's Board of Directors who assumed a position on Redback's Board through the merger) and others caused Siara to issue a warrant for 100,000 shares of Siara's stock to Qwest and its executives (through U.S. Telesource) in exchange for an agreement by Qwest Communications to purchase $40 million worth of equipment that was currently under development from Siara **or its successors** on or prior to December 31, 2001.  This agreement is referred to herein as the "Siara Warrant Agreement."  The Siara Warrant Agreement was never publicly disclosed by Redback, Siara or

Qwest or any of their affiliates or insiders.  Lead Plaintiff obtained a copy of the agreement and become aware of its terms and the parties to the Agreement for the first time when Weisberg filed his motion to dismiss the First Amended Complaint in this action and attached a copy of the agreement as an exhibit to his motion.

68.     The Siara Warrant Agreement was signed on November 27, 1999, the same day that Siara's Board approved the purchase price offered by Redback, and within days of Redback executing a definitive merger and acquisition agreement with Siara.  Therefore, the purchase agreement entered into by Qwest was in fact a commitment to purchase $40 million in products **from Redback** at the time that Siara entered into the Agreement, because Redback was to be the successor to Siara.  According to Redback's Registration Statement filed in connection with the Redback/Siara merger and acquisition, Defendants Khosla and Ragavan participated in special meetings of Siara's Board of Directors to discuss the status of the possible acquisition throughout November 1999.  Khosla also was on the Board of Directors for Qwest at the time that Siara entered into the Siara Warrant Agreement, and consequently he and Ragavan understood that the Siara Warrant Agreement obligated Qwest to purchase $40 million worth of Siara's SmartEdge™ equipment (which was still under development in late 1999) from Redback on or before December 31, 2001.  Ragavan signed the Siara Warrant Agreement on behalf of Siara, and Weisberg signed on behalf of U.S. Telesource <u>and</u> on behalf of Qwest Communications.

69.     Qwest and U.S. Telesource shared many common Board members and executive officers, including Weisberg (President and Chief Executive Officer of U.S. Telesource; Senior Vice President of Qwest Communications Corporation; and Senior Vice President Corporate Development of Qwest); Joseph P. Nacchio (Director of U.S. Telesource and Director and Chairman and Chief Executive Officer of Qwest); and Drake S. Tempest (Director of U.S. Telesource and Director, Executive Vice President and General Counsel of Qwest).  In addition, U.S. Telesource was wholly owned by Qwest.  At the time that Siara issued the warrant to U.S. Telesource, the exercise price of the warrant was $2 per share, and the stock issued under the warrant (100,000 shares of Siara stock that were exchanged for 119,000 shares of Redback's stock at $136.50 per share) had a value of approximately $16 million.  Within weeks of

Redback's merger with Siara, the stock issued under the Siara Warrant Agreement soared in value to approximately $45 million.  Therefore, Qwest directly benefited from the Siara Warrant Agreement, pursuant to which Qwest obtained at least $45 million worth of Redback's stock.

### The Broadband Office Warrant

70.     On December 1, 1999, Siara announced that Broadband Office had selected "Siara's software and platforms (which were still in the production phase) for deployment in Broadband's Office's network, which was then under development.  Siara stated that the new contract was valued at $40 million, and that implementation was scheduled to begin in the first half of 2000.  Redback and Siara had already announced their merger, and therefore investors and shareholders understood that the contract was really an agreement between Redback and Broadband Office.  Like Qwest's obligations under the secret Siara Warrant Agreement, Broadband Office had secretly agreed to allow Siara to announce that Broadband Office was going to deploy $40 million of Siara's equipment, in exchange for lucrative shares of Siara's stock.  Neither Siara nor Broadband Office disclosed (nor did Redback later in the Class Period when it reported sales to Broadband Office) that Ragavan and others had secretly given the Siara warrant for 4500 shares of the stock (which were to be exchanged for lucrative Redback stock or a warrant in the merger) to Broadband Office as payment for Broadband Office's commitment to use Siara's SmartEdge™ technology.  KPCB owned more than 10% of Broadband Office, which purchased $8 million in products from Redback in 2000, and like Qwest's affiliates received a warrant for stock that was exchangeable for Redback stock worth millions of dollars.

71.     In connection with the Siara merger and acquisition, Redback filed a series of Registration Statements and Prospectuses with the SEC.  The fact that Siara had issued unspecified, unregistered securities to Broadband Office and U.S. Telesource is buried in a series of exhibits and appendices to an amended Investors' Rights Agreement from 1998 that was attached to the Registration Statement.  There is no disclosure in the prospectus that these securities were a *quid pro quo* for business from Qwest and Broadband.  In fact, a reader of the prospectus would be unable to even determine that the securities had been issued to a Redback customer.  The prospectus reveals only that U.S. Telesource and Broadband Office held non-

1   registered securities under a warrant for Siara stock.  Defendant Barsema signed the amended

2   Investors' Rights Agreement on behalf of Redback, and Defendant Ragavan signed it on behalf

3   of Siara.  Ragavan also signed the Siara Warrant Agreement with U.S. Telesource, and therefore

4   he knew that Redback had provided undisclosed sales incentives to U.S. Telesource, and he and

5   Barsema knew that Siara had provided undisclosed stock incentives to U.S. Telesource and

6   Broadband Office because they signed the amended Investors' Rights Agreement.

7                              **Redback's Scheme Continues**

8           72.     In March 2000, Redback consummated its acquisition of Siara, and holders of

9   shares, warrants and options of Siara received over 31 million shares of Redback's common

10  stock, which was more than 38% of the Company's total outstanding common stock.  The Siara

11  warrants were exchanged for Redback warrants when the merger of these companies was

12  consummated.  The value of the Siara warrants given to Broadband Office was never disclosed

13  and is not currently known to the Class, but was likely in excess of $1.48 million at the time that

14  Siara merged with Redback.

15          73.     Pursuant to the Merger Agreement between Redback and Siara, Defendants

16  Haque, Khosla and Ragavan, who were members of Siara's board of directors, became members

17  of Redback's Board.  Defendant Ragavan, a director and the Chief Executive Officer of Siara,

18  also became the CEO of Redback after the merger.  Redback and Qwest now shared a common

19  Board member, Khosla, who through his powerful Silicon Valley venture capital firm, Kleiner,

20  Perkins, Caufield & Byers ("KPCB") was a large investor in Redback.  Khosla, now serving on

21  the board of directors of both Redback and Qwest, was in a unique position to manage the

22  important relationship between Redback and Qwest, including the impact on Redback's reported

23  revenues of $40 million of equipment purchases by Qwest before December 31, 2001, as

24  required under the Siara Warrant Agreement.   Defendant Khosla also was on the Board of

25  Directors for Concentric Networks, one of Redback's earliest customers and another rising

26  telecommunications company that also secretly entered into a lucrative stock *quid pro quo*

27  purchase transaction with Redback to create the illusion for strong demand for Redback's

28  SMS™ products.

74.     The Redback Sales VP became aware of the secret payments and other sales incentives and inducements provided by Redback to Qwest in late 1999, when Kruep informed him that there were large Qwest orders that "were going to come" in the near future.  This news surprised the Redback Sales VP, as he was in charge of the Qwest account and would thus be aware of Qwest's purchases or plans to purchase Redback products.  Additionally, prior to making any purchases, Qwest routinely conducted field trials and lab tests on products to ensure the quality of the products and their usefulness to Qwest, but such tests by Qwest had not been conducted on any Redback products.  Kruep told the Redback Sales VP that Kruep was communicating with Weisberg regarding products to be ordered by Qwest to fulfill its obligations under the Siara Warrant Agreement.  The Redback Sales VP stated that on or about December 18 or 19, 1999, Kruep and Weisberg worked out the basic terms of the "specifics" of Qwest's product order that was provided in exchange for the transfer of Siara warrants to Qwest executives (through U.S. Telesource).

75.     Reporting of revenue growth was critical to maintaining and increasing Redback's stock price.  Since Redback was not profitable, and had no expectation of being profitable in the near future, the only metric of success that it could report was revenue growth.  Thus, for Redback and the Individual Defendants, to keep the stock price up, increased revenue had to be reported – whether it was real or not.  For example, a Wells Fargo analyst who covered Redback reported in the Spring 2001 that Redback's revenue potential supported a "Buy" recommendation.

76.     In 1999, Redback reported total revenues of only $64.3 million.  However, the Company soon began to report the revenues it desperately needed to satisfy investors.  In early 2000, Redback began reporting financial results derived in substantial part from its undisclosed stock transfers, payments and other sales incentives provided to Qwest, UUNET, Concentric, Broadband Office and other customers.  For the first two quarters of 2000, Redback reported record revenues of $183 million, a 370% increase over the first two quarters of 1999.  As Redback and the Individual Defendants expected, Redback's stock price continued its steep

1   ascent and closed on April 12, 2000 at $96.01, which (adjusted for a two-for-one split on April 4,

2   2000) was an 834% increase from the stock's IPO price.

3       77.     Having touted numerous multi-million, multi-year agreements in place by April

4   2000, Redback could hold itself out as a pioneer in network services with a proven client base

5   including Qwest.  Redback and the Individual Defendants decided to capitalize on their fraud by

6   tapping the secondary markets again, this time in a debt offering.  In or around July 21, 2000,

7   Redback sold $500 million of 5% Convertible Notes due 2007 to the investing public.  The

8   Registration Statement was materially false and misleading because it omitted that Redback had

9   provided millions of dollars worth of stock to customers in order to obtain commitments to

10  purchase Redback's equipment.  In the Registration Statement, Redback reported that the first

11  customer shipments of SmartEdge™ equipment were expected in the second half of 2000, and

12  claimed that Redback's "position" would be used to penetrate the subscriber management

13  market, without disclosing that the Individual Defendants had already purchased commitments

14  for Qwest and Broadband to buy Redback's products through secret stock kickback payments.

15      78.     Redback and the Individual Defendants needed additional revenues from Qwest to

16  sustain the illusion of business success at Redback.  Accordingly, they expanded their fraudulent

17  scheme and deceitful course of business to include another instance of Redback buying revenues

18  from Qwest.  As part of this scheme, in the third quarter 2000, Redback agreed to purchase $18

19  million of Application Service Provider ("ASP") services from Qwest Cyber Solutions, LLC

20  ("QCS"), an affiliate of Qwest that was founded in July 1999, in exchange for Qwest's

21  commitment to purchase $20 million of Redback's SMS™10000 product.

22      79.     According to a former Vice President of North American Sales that worked at

23  Redback from August 2000 through December 2001 and was in charge of sales for all of

24  Redback's equipment lines for all of North America (the "VP NA Sales"), Qwest had not tested

25  Redback's SMS™ 10000 product in Qwest's labs as required under Qwest's routine business

26  practices.  The VP NA Sales also stated that Qwest did not have Redback's SmartEdge™

27  product in its labs, and he knew from frequent interaction and sales presentations to Qwest that

28  new products could not be deployed by Qwest before going through lab trials at Qwest to make

sure that the products were "interoperable" in Qwest's network and that they met certain technical requirements.  Working with Perusse, who was the Senior Vice President of Engineering at Qwest, the VP NA Sales said that he and others suggested that Qwest purchase the SMS™10000 to satisfy Qwest's obligations under the Siara Warrant Agreement as they were working hard to determine what Qwest could buy to meet these contractual obligations.

80.     In the third quarter of 2000, Qwest -- at Perusse's direction -- agreed to purchase the SMS™ 10000.  According to both the Redback Sales VP and the VP NA Sales, Defendant Perusse knew at the time that Qwest (at Perusse's direction) agreed to purchase the SMS™ 10000 that the product was not operational.  Numerous former Redback officers and employees, including the Redback Sales VP, the VP NA Sales, the Redback Sales Director, the UUNET Account Manager and the Sales Engineer, stated that the SMS™ 10000 was not operational at all in 2000, when the product was shipped to Qwest and other customers, including UUNET.

81.     According to the Redback Sales VP and the VP NA Sales, all of the Individual Defendants, including Kruep, Ragavan and others, also knew that the SMS™ 10000 product was not operational in 2000, based upon tests conducted by Redback's engineers, including Patel. The VP NA Sales recalled that at weekly executive meetings attended by senior executives and sales managers, including the VP NA Sales, Ragavan, Kruep, Barsema, Gentner and others, Patel provided weekly oral reports regarding numerous bugs and problems with the SMS™ 10000 product that caused it to be non-operational.  Patel and these same senior executives and sales managers also knew that the product was not able to pass beta testing in UUNET's labs. Nevertheless, according to the Redback Sales VP and the NA Sales, the Individual Defendants knowingly concealed problems with the product from the public and used undisclosed sales incentives and secret contractual obligations arising from lucrative friends and family stock and secret warrant deals to create the false illusion that Redback was generating sales and revenue from large telecommunications companies like Qwest and UUNET, and that these companies had selected the SMS™ 10000 for deployment in their networks.

82.     According to the VP NA Sales, in September 2000, Qwest did give Redback a large order for the SMS™ 10000.  The Redback Sales VP stated that Perusse provided a $20

million order for a large number of Redback's SMS™ 10000 "boxes" after demanding -- and expressly on the condition -- that Redback buy approximately $20 million of ASP services from QCS. He further stated that Perusse demanded that Redback purchase ASP services from QCS, although there had not been any previously-expressed interest, need or testing of such services by Redback. The ASP services offered by QCS essentially allowed companies to outsource their information and technology ("IT") departments, but Redback did not need them as it successfully internally managed its own IT systems. Perusse also told the Redback Sales VP that Redback had to agree to give QCS a $20 million order before Qwest would purchase anything from Redback. The fact that Perusse selected the services to be purchased by Redback, and suggested the dollar amount to be purchased, further demonstrates that Redback had no real need for the services. Nevertheless, Redback entered into a five-year contract to purchase $18 million (essentially $300,000 per month) of unneeded ASP services from QCS. Moreover, the amount that Redback agreed to pay QCS was astronomical compared to the market price for ASP services. Indeed, the Redback Sales and Marketing Manager confirmed that for $300,000 per month, Redback could have gotten a "gold-plated IT department."

83. In 2000, after starting his position in Redback's marketing department, the Redback Sales and Marketing Manager stated that he became aware that Redback agreed to purchase ASP services from Qwest, and that he knew that the ASP services were not a product that Redback really needed but were purchased as an inducement to obtain press releases and equipment-purchase commitments from Qwest to increase Redback's stock price. He heard the Redback executives, when referring to the $18 million ASP services deal, state "if we gotta, we will do what we gotta do," meaning that management would do what it had to in order to get Qwest's business. The *quid pro quo* agreement with Qwest provided no benefit to Redback because, under the terms of the agreement as disclosed in a press release issued by Qwest in September 2000, QCS was to service four existing software applications that Redback had already been successfully servicing in house. The Redback Sales and Marketing Manager said that in response, he just started shaking his head in disgust.

84.     The former Redback Sales VP stated that Kruep, Ragavan, Khosla and others at Redback agreed to purchase the services from Qwest solely to obtain Qwest's agreement to purchase the SMS™10000, so that Redback could meet Wall Street's revenue expectations for the third quarter of 2000.  He further stated that the $18 million purchase by Redback required senior management's approval and that Ragavan sought and received Khosla's approval before Ragavan authorized the purchase.  As noted above, because it was the revenue numbers that were driving the stock price, Redback executives were willing to enter into deals that  provided no real benefit in order to keep the stock price inflated.  The false statements about the Company's revenues and business, which eventually were issued after this agreement with Qwest, flowed as a natural consequence of the Individual Defendants' deceptive acts in entering into the deal with Qwest.

85.     Qwest had no need or use for the SMS™10000 product because the product had not been tested in Qwest's labs and was not even operational, and therefore it could not have been used by Qwest or deployed in Qwest's network.  A former sales engineer who worked at Redback throughout 2000, 2001 and 2002 (the "Sales Engineer") explained that the SMS™10000 units that Redback shipped to Qwest were not operational because the optical cable "card" that was developed to run the SMS™10000 was woefully incapable of running at speeds and capacity to support an OC-12, which is the description for the bandwidth that the SMS™ 10000 had been designed to support.  The Redback Sales Director explained that at OC-12 speed, a certain amount of bandwidth can be transmitted, but at OC-3 speeds a significantly narrower bandwidth of data can be transmitted, and the SMS™10000 only transmitted 25% of what it was guaranteed to transmit because the OC-12 card for the SMS™10000 would only run at OC-3 speed.  The Redback Sales Director stated that Redback was not able to fix this serious problem with the SMS™10000 before he left the Company in March 2002.  Therefore, the Sales Engineer stated that the SMS™10000 was not stable and never worked reliably and therefore was not operational.  He further stated that while he was at Redback there was no record of any technical support from Redback because the SMS™10000 was never deployed by Qwest or UUNET or any other customer.

86.     The Sales Engineer stated that Redback shipped 40 units (which he said was a massive quantity) of the SMS™10000 to Qwest, but they did not work, and Qwest returned the units to Redback in early to mid-2002.  The Sales Engineer also stated that he knew that Qwest had bought and paid for 40 SMS™10000 units in 2000 and 2001, but that there was a great deal of conversation at Redback about whether the Company was going to have to "debook" the revenue from those units.  He also commented that a problem with commissions owed to Redback sales persons handling the Qwest account arose as a result of the problems with the Qwest SMS™10000 sales because of "a year's worth of revenue recognition problems." According to the Sales Engineer, he was closely tied to Redback's support organization and was responsible for consulting engineering at the Company, and, over the summer of 2002, they "rebuilt" the SMS™10000 units that were to be returned by Qwest.  He further stated that Redback shipped the SMS™10000 units back to Qwest in or around September 2002, although the SMS™10000 was still not capable of running an OC-12 card at the time.  He understood that Qwest never took the units out of the box, and he said that the SMS™10000 was not operational and never deployed by Qwest in its network, and that Qwest held the product in a warehouse with no intention of ever deploying the equipment.

87.     Indeed, the Redback Sales VP confirmed that the SMS™10000 product was a "stillborn" product that was never operational and that Patel admitted that the SMS™10000 product was not operational at weekly sales management and executive meetings that he and others regularly attended in 2000 and 2001, including the CEO (Ragavan, and then Lamond after Ragavan's resignation, and then DeNuccio); the CFO (Gentner and then Wolf); the Sales VP, the VP NA Sales, Kruep and others.  The Redback Sales VP confirmed that the SMS™10000 units that Qwest purchased from Redback languished for years in Qwest's warehouse where that product was stored.  While these facts were material to investors, they were not important to Redback or Qwest, as Redback was simply seeking ways to book revenue, and Qwest was seeking a customer to purchase and endorse the QCS product.

88.     The Redback Sales VP was informed that Perusse was trying to create revenues for QCS in or around September 2000, because Qwest was planning an IPO of QCS, which, if

successful, would enable Qwest's executives to reap millions from their QCS stock holdings. The Redback Sales VP stated that the ASP services that Redback purchased from QCS would not properly function and only worked intermittently.  He further stated that he told Perusse, after Redback received some of the ASP services from QCS, that because the ASP service quality "stinks", Redback was withholding payment.  The Redback Sales VP stated that Redback's order constituted 40% of QCS's revenue in 2000, and therefore Perusse was alarmed because of the contemplated IPO for QCS.  In response to Redback's complaints and refusal to pay for the services, Perusse informed the Redback Sales VP that Qwest was not going to pay for a large order of SmartEdge™ products that had been purchased by Qwest in the fourth quarter of 2000, because of Redback's position on the ASP purchase.

89.     According to the Redback Sales VP, neither Redback nor Qwest wanted the other to publicly disclose operational problems with the products that they had exchanged because both wanted to create the false appearance of strong demand for viable products.  He discussed the accounts receivable and ASP services problem with Defendant Ragavan after the accounts receivable for the non-functioning SmartEdge™ equipment that Redback had shipped to Qwest in late 2000 had been outstanding for several months.  The Redback Sales VP recalled that Redback had to "jump through all kind of hoops" to process the ASP order.  He also stated that Redback had to agree to backdate the contract with QCS so that QCS could book revenue from the contract by the end of a certain quarter.  The Redback Sales VP stated that Kruep worked with Lew Wilkes (who had become the President of QCS) to negotiate the specific details (such as actual amount purchased and timing of the sale) for the *quid pro quo* agreement with QCS. Further, according to the Redback Sales VP, Kruep provided information on sales and revenues for press releases and SEC filings, even though Kruep knew that these revenues were not honestly earned, but were the result of barter and bribery.  Also according to the Redback Sales VP, Khosla and Ragavan both approved the *quid pro quo* deal with Qwest in third quarter 2000, when Redback was desperate to generate revenues.  Both Ragavan and Khosla became involved in solving the outstanding receivables problem with Qwest in the first or second quarter of 2001, when Qwest refused to pay for the $20 million worth of SmartEdge™ equipment because the

DS-3 cards in the equipment would not work, and subsequently "management [of Qwest and Redback] met in the street for a showdown and exchanged checks."  The Redback Sales VP recalled that after Defendant Wolf had arrived at Redback and became aware of the material amount of the outstanding receivables from Qwest and the *quid pro quo* nature of Redback's business dealings with Qwest, and that the transactions had no valid business purpose, Wolf told the Redback Sales VP that Perusse and other Qwest executives were "crooks" and "extortionists."

90.     The end result of these various unnecessary and undisclosed transactions was to create the false impression of legitimate orders and revenues.  Defendants' scheme and fraudulent course of business was successful in propping up Redback's stock price, which traded as high as approximately $150 - 160 per share in the third quarter of 2000.

91.     Based upon the purported sales to Qwest, Redback continued to report growing revenues.  On October 13, 2000, Redback issued an earnings release announcing its financial results with net revenues of $80.6 million for the third quarter of 2000, a 291% increase over the third quarter of 1999.  Upon news of the record revenues, Redback's stock price soared 35 percent in three trading days, increasing from $102.70 on October 12, to $121.53 on October 13 and to $138.76 on the next trading day, October 16, 2000.  Redback sales to Qwest during third quarter 2000, all of which were the result of illicit agreements between the companies, constituted 24% of Redback's revenues.  The Individual Defendants intentionally or with deliberate recklessness concealed the *quid pro quo* nature of Qwest's purchase of non-operational equipment and Redback's purchase of services that Redback did not really want or need.  Defendants also intentionally or with deliberate recklessness concealed that through the Individual Defendants' deceitful course of business with Qwest, Redback had essentially paid $18 million as an inducement to Qwest so that the Company could improperly book and report $20 million in revenues during the third quarter of 2000.

92.     According to the UUNET Account Manager, Redback also sold $4 - $5 million of the non-operational SMS™ 10000 product to UUNET in late (around December) 2000.  This order was part of the *quid pro quo* transactions with UUNET in exchange for Redback's "friends

and family" stock that had been given to UUNET's executives prior to Redback's IPO.  Redback

then shipped between 5 and 10 SMS™ 10000 units to UUNET.  The UUNET Account Manager

stated that before Redback shipped the units to UUNET, lab tests at Redback had "turned up

problems with the OC-12 cards," which read data in the SMS™ 10000 units.  Therefore,

Redback shipped the SMS™ 10000 units to UUNET without the OC-12 cards."  According to

the UUNET Account Manager, Redback booked the revenue from the sale to UUNET at the end

of 2000 when the units without the cards were shipped even though the units were not

operational without the cards.

93.     In late September 2000, Redback's stock traded as high as $169.83 per share.  In

October 2000, the stock traded as high as $138.76.

94.     The Individual Defendants used Redback's artificially inflated stock during the

Class Period as currency to acquire more companies and their attendant revenues.  In October

2000, Redback acquired Abatis Systems Corporation ("Abatis Systems"), a developer of systems

for IP service management solutions, for approximately $655 million.  Former holders of shares,

warrants and options of Abatis Systems acquired 5.2 million shares of Redback's common stock

in that transaction, not aware that those shares were inflated by the defendants' fraud.

95.     According to the Redback Sales and Marketing Manager, Defendant Khosla

brought the Abatis deal to Redback, and Abatis was a company that Khosla had ties to through

his family.

96.     Redback's CEO, Defendant Ragavan, heralded the acquisition as having

"significant operational cost savings and revenue generating benefits."  In reality, Redback

manipulated its accounting in connection with both Abatis and the Siara acquisitions to

understate the Company's expenses.  Through its acquisitions of Siara in March 2000 and Abatis

in September 2000, Redback improperly allocated $40.4 million of the purchase price for those

companies to in-process research and development ("IPR&D") in order to manipulate future

earnings.  By inappropriately allocating excessive amounts of the purchase price to IPR&D

instead of to goodwill, Redback was able to charge-off the entire $40.4 million in the year of the

1    acquisition as a one time "non-recurring" event instead of over the life of the goodwill asset and

2    therefore, Redback eliminated future reductions in earnings.

3          97.     Defendants' fraud had a material effect on Redback's reported revenue, and

4    therefore, its stock price as well.  Sales to Qwest accounted for 24% of Redback's total revenue

5    for the third quarter 2000, more than 18% for the fourth quarter 2000 and 15% of the Company's

6    total revenue for all of 2000.  During the third and fourth quarters of 2000, Redback's sales to

7    Qwest totaled approximately $40 million.

8                        **Material Delay of the New SmartEdge™ Router**

9          98.     According to the VP NA Sales, in or around August and September 2000, Patel

10   and other Redback engineers reported to Kruep and others at Redback that development on the

11   new capabilities for the SmartEdge™ product was not complete and that the product would not

12   be ready to ship in 2001 as had been anticipated by senior executives and sales managers.

13   Although Redback had developed a basic routing product known as the "SmartEdge™ 800

14   metropolitan optical access platform, " the technology for a new SmartEdge™ router with

15   additional capabilities was still under development in 2000 and was highly anticipated by large

16   telecommunications customers.  Kruep then immediately communicated these facts to Ragavan

17   and all of the other Board members and warned that the Company's established revenue targets

18   for 2001 could not be met without sales from the SmartEdge™ product that was then currently

19   under development.

20         99.     According to the VP NA Sales, in 2000, Redback established forecasts of revenue

21   of $750 million, but the revenues were based in large part on anticipated sales of the

22   SmartEdge™ equipment which was still under development with additional router capabilities.

23   The VP NA Sales said that he informed Ragavan in 2000 (and Lamond in 2001 when Lamond

24   stepped in as acting CEO after Ragavan's resignation), that Redback could not meet the

25   forecasted revenues if the new SmartEdge™ equipment was not going to be available for sale in

26   2001, as definitively reported by Patel.

27         100.    Also, according to the Redback Sales VP, when the Board refused to revise

28   forecasts, Kruep became disgusted.  From August to October 2000, Kruep – taking advantage of

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION              39
OF THE FEDERAL SECURITIES LAWS
Case Number C 03-05642 JF

material non-public information - started dumping his Redback stock holdings.  During this

period, Kruep sold 64,600 shares of Redback stock worth more than $9.6 million. Ragavan,

Khosla and the rest of the Board, however, refused to revise the unrealistic revenue targets or

Redback's business plan for 2001, even though they knew, because they had been informed by

Kruep and the VP NA Sales, that the Company could not generate sales sufficient to meet

Redback's guidance or Wall Street's expectations.  Taking advantage of this non-public material

adverse information, however, in August to October 2000, the Board members and other insiders

started dumping their Redback holdings, and the venture capital firm designees on Redback's

Board (Khosla, Lamond and Haque) caused their venture capital funds to distribute over $1.7

billion in Redback stock to the funds' partners and investors.

101.   By November 2000, Redback's stock price began to decline, along with the stock

of Redback's telecommunication peers and other Internet companies.  However, the Individual

Defendants desperately wanted to distinguish their Company from other telecommunication and

Internet companies.  The Individual Defendants were determined to announce another big deal

with Qwest, and, as a result, drive up the price of Redback's stock, or at least keep it at an

artificially-inflated level and avoid the decline affecting the stocks of the Company's peers.

102.   In order to book more revenues from Qwest, Redback once again turned to

Perusse and requested that Qwest order Redback's SmartEdge™ equipment to fulfill Qwest's

obligations under the Siara Warrant Agreement.  Redback had announced the new SmartEdge™

line of equipment in the second quarter of 2000, but the Company did not start shipping the

SmartEdge™ 800 product until the third quarter of 2000.  According to the Redback Sales VP, in

the fourth quarter of 2000, Qwest – at the direction of Perusse -- agreed to purchase

approximately $20 million of the SmartEdge™ 800 product as a quid pro quo for the lucrative

stock warrant that Qwest's executives had received under the terms of the secret Siara Warrant

Agreement.  At the time Perusse agreed to the proposed purchase, Qwest did not have the

SmartEdge™ 800 equipment in its testing labs.  During fourth quarter 2000, Redback shipped

approximately $20 million of the SmartEdge™ 800 to Qwest and booked $20 million in

revenues from the sale, without disclosing the stock bribe worth $45 million that Redback had

given to Qwest under the Siara Warrant Agreement to induce Qwest to purchase the equipment. Defendants Gentner, Ragavan, Kruep and other Individual Defendants also caused Redback to overstate its revenues from the sale by failing to reduce the net revenues generated from the SmartEdge™ transaction by the value of the stock incentive that had been provided to Qwest's affiliates under the Siara Warrant Agreement.

103.    Revenues generated from sales to Qwest in the fourth quarter 2000 constituted 18% of Redback's revenues that quarter and enabled Redback to keep its stock price at an artificially-inflated level.  Redback's stock price closed between $39.32 and $48.75 in the weeks following the Company's January 18, 2001 announcement of revenues of $114.6 million and strong demand for the SMS™ 10000 and SmartEdge™ 800 products.

104.    On February 5, 2001, Redback announced that Qwest had agreed to another multi-year, multi-million dollar purchase of Redback's SmartEdge™ 800 product.  Redback's stock price increased 9% on news of the new contract, going from $40.25 on February 2, 2001 to $44.25 the next day – a ten percent increase – even though Redback's announcement did not specify the terms or amount of this new deal.  According to a former Redback Sales Director who personally handled Qwest's account for Redback from February 2000 through July 2000 (the "Former Redback Sales Manager"), there was no new agreement with Qwest in February 2001.  He stated that in first quarter 2001 Qwest placed an additional $30 million order for the SmartEdge™ equipment under an old contract that had been in place prior to the former Redback Sales Manager's arrival at Redback.  The Redback Sales VP and VP NA Sales confirmed that Qwest was purchasing the equipment to fulfill its obligations under the Siara Warrant Agreement and no new multi-million, multi-year agreement had been entered by Qwest in or around February 2001.  The press release also was materially false and misleading because it failed to disclose the *quid pro quo* nature of Redback's agreement with Qwest or the shares of stock that had been provided to Qwest executives under the Siara Warrant Agreement in exchange for Qwest's commitment to buy Redback's products.

105.    When the VP NA Sales and Redback Sales VP attempted to ship to Qwest the SmartEdge™ 800 equipment before the end of first quarter 2001, so that Redback could meet its

forecasted revenue numbers and Wall Street's expectations, Perusse refused to go forward with the order.  According to the Redback Sales VP, when he met with Perusse late in March 2001, Perusse said that he would not allow Redback to ship any more SmartEdge™ 800 units to Qwest unless Redback purchased an Indefeasible Right of Use ("IRU") from Qwest before the end of the first quarter.  The Former Redback Sales Manager stated that Perusse held Qwest's $30 million order for equipment in first quarter 2001 "hostage" and demanded that Redback buy an IRU before Qwest would issue a purchase order for the equipment.

106.    The Redback Sales VP reported Perusse's highly-unusual demand for the IRU purchase to Ragavan and others, and the Redback Sales VP explained that he researched Qwest's request and determined that Qwest wanted Redback to purchase a right of use for a huge quantity of capacity (known as a DS-3) on Qwest's fiber-optic network.  An IRU is a right to use a specific amount of fiber capacity for a specified time period, which was not something that Redback needed because the Company sold equipment and had no need for fiber-optic capacity and would never have any need for an astronomical amount of capacity from a DS-3 IRU.

107.    Nonetheless, the Redback Sales VP stated that Ragavan, Khosla and Wolf authorized the IRU purchase from Qwest in exchange for Qwest's agreement to purchase $30 million of SmartEdge™ equipment in first quarter 2001, because Redback needed to generate revenues from sales to Qwest to meet Redback's own revenue targets.  The Former Redback Sales Manager stated that the Redback executives authorized the IRU purchase over his objection.  The Redback Sales VP said that he tried to no avail to purchase fiber-optic capacity that could be resold by Redback, but was forced by Qwest to buy capability that Redback could not resell, as Qwest had an excess of capacity between Denver and Dallas that it demanded that Redback purchase, though Redback did not want or need that capacity.  When the Redback Sales VP went to Enron Corporation to try to resell the capacity, he said that "Enron laughed at him" because of the glut of capacity between Denver and Dallas and remarked that Qwest had "skimmed Redback too" meaning that several other Qwest customers had been forced to purchase worthless IRUs from Qwest to obtain Qwest's business.

108.     Even though Redback had no need for and would never have <u>any</u> need for the IRU, Redback desperately needed additional revenues, so it agreed to Perusse's demands in order to obtain the needed business from Qwest.  According to the Redback Sales VP, Defendant Wolf authorized the $7 million payment to Qwest for the IRU.  In addition, according to the VP NA Sales, Defendant PwC was aware that Redback had purchased the IRU and was trying to determine how to book the revenue for Redback's sale of the SmartEdge™ equipment to Qwest in first quarter 2001, because PwC was trying to determine whether the revenues should be decreased by $7 million for the cost of the worthless IRU that Redback had purchased from Qwest.  The VP NA Sales stated that PwC did not make Redback reduce its first quarter revenues by $7 million for the IRU.  In addition, according to the Redback Sales VP, for several quarters in 2001, Qwest refused to pay for the $30 million worth of SmartEdge™ equipment that Redback had shipped because the "key cards" that make the equipment operational would not support the DS-3 fiber optic capacity requirements on Qwest's network.  He further stated that when Qwest refused to pay for the SmartEdge™ equipment, Redback in turn refused to pay for the ASP services that it had purchased from QCS because the services were not properly functioning.  After Redback's large outstanding receivable from Qwest drew the attention of PwC, Redback and Qwest agreed to "swap checks" according to the Redback Sales VP.

109.     Redback's secret *quid pro quo* arrangements with, and undisclosed sales incentives to, Qwest during the Class Period resulted in huge contributions to Redback's total reported revenues.  Redback disclosed that sales to Qwest accounted for 28% of Redback's total revenue in the first quarter of 2001, and 27% of Redback's total revenue for the six-month period ended June 30, 2001.  These revenues would not have been generated without Redback's undisclosed bribes and other sales inducements, including $45 million worth of Redback's stock and secret agreements to purchase products from Qwest (and services from Qwest's affiliate QCS) that Redback did not want or need.

110.     During the Class Period, Redback booked over $80 million in revenues from sales of equipment and other unspecified services to Qwest.  The reported revenues from Qwest's purchases enabled Redback to complete at least three acquisitions in the Class Period and

artificially inflated the price of Redback's stock.  However, unbeknownst to investors and the investment community, the impressive sales (for a start-up company) to an established industry titan (Qwest) resulted from an undisclosed scheme in which Redback either bribed Qwest executives or "round-tripped" Redback's own money to Qwest which was then returned to Redback through bogus deals designed to artificially inflate Redback's reported revenues, income and assets.  Redback entered these deals with Qwest solely to obtain Qwest's business and to record revenues from sales that would not have occurred but for the fraud.

111.   Redback had not inked any new deals with Qwest since the first quarter 2001 SmartEdge™ 800 equipment sale (though that sale was actually pursuant to the undisclosed November 1999 Siara Warrant Agreement and was therefore not a new deal, as Redback represented).  Additionally, the effect of Redback's earlier *quid pro quo* deals with Qwest had dissipated.  Therefore, Redback had to condition the market to a drop in its revenues as a result of the end of its improper deals with its biggest customer.  Accordingly, on April 2, 2001, Redback began to announce lower than expected revenues.  Shortly thereafter, analysts began reporting that Qwest was buying less than expected product from Redback.

112.   The following chart illustrates the significance of Qwest's purchases to Redback's reported revenues during the Class Period:

### REDBACK REPORTED REVENUE

| TIME PERIOD | QWEST PERCENTAGE | TOTAL REVENUES | APPROX. QWEST PORTION | REVENUES W/OUT QWEST SALES |
|---|---|---|---|---|
| 3 Q '00 | 24% | $80.56M | $19.33M | $61.23M |
| 4 Q '00 | 18% | $114.6M | $20.62M | $93.98M |
| All of '00 | 15% | $278M | $41.7M | $236.3M |
| 1 Q '01 | 28% | $90.94M | $25.46M | $65.48M |
| 1st Half of '01 | 27% | $150.36M | $40.6M | $109.76M |
| All of '01 | 18% | $227.5M | $40.95M | $186.55M |
| 1 yr July '00 – June '01 | 23% | $345.5M | $80.5M | $265.0M |

**The Williams Deal**

113.    On January 29, 2001, Redback announced yet another "multi-year, multi-million dollar" agreement, this time with Williams Communication Group ("Williams").  According to a January 29, 2001 LightReading.com article, "the $120 million contract calls for Williams to deploy several SmartEdge™ platforms in both its metro networks and long-haul networks over the next two years."  According to the article, a Redback marketing vice president called it a "very significant win" for Redback.  It was the largest deal Redback had entered into and made Redback "a serious contender" for the "multibillion" dollar business in next-generation broadband equipment.  In fact, a February 5, 2001 LightReading.com article stated that "Brean Murray & Co. Inc. analyst Gina Sockolow, in a note to clients, estimated the Williams deal could represent 10 percent and 20 percent, respectively, of Redback's SmartEdge™ revenues for fiscal years 2001 and 2002."

114.    Just like the deals with Qwest, the deal with Williams created a buzz that increased the value of Redback's stock.  Also like Qwest, pay to play and *quid pro quo* deals were *de rigueur* at Williams, as reported in a November 23, 2003 *Denver Post* article.  In fact, Redback's former Sales VP stated that there was no way to get equipment into Williams unless a vendor provided stock incentives.

115.    In May 2001 (3 months after Redback announced the $120 million contract with Williams), the Redback Sales VP said that he told Wolf and others that Williams representatives had informed him that Redback was not going to receive any revenues from Williams because Williams was cash strapped and on the brink of bankruptcy.  Redback had counted on at least $15 million in revenues from Williams in the second quarter 2001, and had issued guidance based in part on those revenues.  Redback failed to disclose that Williams would not be ordering any equipment, and Wolf and others knowingly failed to revise the Company's published guidance for the second quarter, of 2001, which they now knew was false and misleading.

**Redback Uses Artificially-Inflated Stock For A Third Acquisition**

116.    In September 2001, Redback completed its third acquisition since going public in 1999.  In another all-stock deal valued at approximately $57 million, Redback acquired Merlin

Systems ("Merlin") by issuing 3.5 million shares of Redback's stock in exchange for all of Merlin's outstanding stock, warrants and options.

117.    Also, in September, Redback repriced outstanding options that were held by the Individual Defendants and others.  Because Redback's stock price had fallen below $5.00 in August 2001, after Redback missed its revenue forecasts and finally admitted that the new SmartEdge™ router product was delayed and would not be released until late 2001, all of the options issued to the Individual Defendants in 1999 and 2000 were "out of the money" by August 2001.  Therefore, Redback's Board authorized outstanding options to be repriced at $3.16 or $4.17 per share, depending on the original price of the options.  Significantly, the vesting period for the option was extended to a full year from the repricing, which meant that the newly-priced options did not vest until September 2002.  By August 2002, Redback's stock price had fallen below $1.00 per share, and therefore the Individual Defendants options were again "out of the money."

**Redback's SMS™ 10000 Operational Product's Problems Continued In 2001 And 2002**

118.    Throughout 2001 and 2002, Redback's SMS™ 10000 equipment remained inoperable because the software and hardware could not support the capacity for which it was designed.  Redback did not disclose these problems to shareholders.  Instead, Ragavan and the other Individual Defendants falsely claimed that the launch of the SMS™ 10000 product was a "major milestone" and falsely claimed that the product would support 100,000 users.

119.    In early 2002, UUNET had an outstanding $2.9 million credit from a previous purchase in December 2000, of the SMS™ 10000 units, which according to the UUNET account manager were returned by UUNET because the equipment was not operational.  To prevent having to reverse the $2.9 million in revenues from the UUNET SMS™ 10000 sales, the Redback Sales Director and Redback's Senior Vice President of Product Management and Marketing, Georges Antoun, held a meeting at UUNET in early 2002, to try to convince UUNET to use the $2.9 million credit to purchase Redback's SmartEdge™ equipment.  However, some of the features of the SmartEdge™ product did not work well for UUNET, and the Redback Sales Director told Antoun that Redback could not ship the SmartEdge™ product to UUNET

because it had not been lab tested and approved as required under UUNET's purchasing procedures. Undeterred, Antoun arranged a meeting with UUNET's director of purchasing, Boots Bagby ("Bagby"). The meeting culminated with Bagby agreeing to UUNET's purchase of the SmartEdge™ equipment with the $2.9 million credit from Redback.

120.    The Redback Sales Director stated that he was shocked that UUNET agreed to purchase the SmartEdge™ equipment because it had not been tested and therefore could not be deployed by UUNET. He later understood what happened. Antoun had cut a *quid pro quo* deal with Bagby. Bagby's son was hired as a sales person in Redback's Dallas, Texas office, notwithstanding his complete lack of credentials for the position. UUNET agreed to accept SmartEdge™ equipment from Redback as a favor-for-a-favor to Antoun so that Redback could falsely inflate its revenues by $2.9 million. Thus, Redback had improperly recognized revenues from UUNET's long-returned SMS™ 10000 units in December 2000, and continued to engage in deceitful business practices to avoid having to write down the revenues as the Company should have when the product was not accepted.

### Qwest's Illicit Practices Begin To Come To Light

121.    In March 2002, Qwest disclosed that the SEC was investigating its revenue recognition practices, including its sales of IRUs and equipment to customers from which Qwest bought equipment or services or to which it contributed equity financing. The SEC and the Justice Department began investigating Qwest in early 2002, for fraudulently inflating revenues by at least $3 billion through fraudulent transactions with other telecommunications companies. Criminal charges were filed in connection with some of those fraudulent transactions, and numerous shareholder suits were filed against Qwest in 2001 and 2002. The scrutiny of Qwest and its fraudulent business practices intensified by August 2002, when the U.S. Congress began investigating Qwest and its executives' fraudulent practices. In addition, in September 2002, the New York Attorney General, Elliott Spitzer, filed a civil action against Philip Anschutz (Qwest's former chairman) and Joseph Naccio (Qwest's former CEO) for improperly taking millions in profits from inappropriate allocations of IPO stock offerings.

122.     While Redback had not, in fact, been able to ink any new deals with Qwest since the SmartEdge™ equipment sale in the first quarter of 2001 (which was actually a part of the undisclosed Siara Warrant Agreement in November 1999), now, as a result of the SEC investigation, Qwest could no longer engage in the illicit *quid pro quo* deals with Redback, and so Redback lost its largest source of revenue.  In fact, Redback's revenues were reported at only $17.4 million for the third quarter 2002, which was a 57% decrease from the third quarter 2001.  When Redback's true revenues were reported without *quid pro quo* or stock-induced deals with Qwest, Redback's stock price sank further, going from over $4 per share to below $1 per share during March 2002 to August 2002.  Redback falsely blamed the decrease in revenues on a "deepening economic downturn" and a "delayed" demand for the SMS™ products.  The significant drop in Redback's stock price was actually caused because the truth became known, at least in part, about Redback's stagnant sales, lack of purchases by Qwest and declining revenues.  After Redback's stock sank below $1 per share, NASDAQ warned that Redback would be delisted.

123.     On March 21, 2003, Redback filed with the SEC its Annual Report on Form 10-K for fiscal 2002 and reported that the Company had yet to be profitable.  Redback further reported that revenues had "decreased 45% to $125.6 million in 2002 from $227.5 million in 2001, which included a reduction in quarterly revenue from a high during 2001 of $90.9 million in the first quarter of 2001."  The Individual Defendants, including DeNuccio, Cronan, Haque, Kurtz, Garg and Lamond, caused Redback falsely to state that the reported revenues in 2002 were "substantially lower than . . . . we had anticipated coming into 2002" because of lower than anticipated product deployments by customers, a downturn in the economy and a slow-down in "networking business."  Reporting only $22 million from SmartEdge™ equipment sales in all of 2002, these Individual Defendants knowingly failed to disclose that scrutiny of Qwest by the SEC, Congress, Elliot Spitzer and the Justice Department had shut down its fraudulent quid pro quo transactions with Qwest.  They further knowingly, deliberately and recklessly omitted material facts regarding Qwest's obligations to purchase $40 million worth of Redback's

equipment by December 31, 2001, and material facts regarding serious impairments to the functionality of Redback's SMS™ 10000 and SmartEdge™ products.

124.    The Company failed to restructure its huge and growing debt and on November 3, 2003, Redback filed a pre-packaged bankruptcy plan of reorganization under Chapter 11. Through the Company's bankruptcy reorganization, Redback eliminated $467 million of debt to Convertible Noteholders and executed the approximate 73:1 reverse stock split.  After emerging from bankruptcy in January 2004, Redback had 52 million shares of common stock outstanding, compared to 183 million before its restructuring.  Through the complex recapitalization, shareholders' stake in Redback's common stock was reduced to 5%, with the other 95% of the shares created by the reverse split going to former Noteholders.

125.    Additional facts regarding Redback's fraudulent acts, practices and course of business were revealed when Plaintiffs obtained a copy of the Siara Warrant Agreement from Weisberg in late 2004, and again in March 2005 when Weisberg was indicted by the U.S. Attorney's office in Denver for his participation in a fraudulent scheme to personally benefit from undisclosed stock kickback payments with Redback and other telecommunications companies in connection with multi-million dollar transactions he negotiated for Qwest.

## IV.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

126.    Beginning prior to Redback's IPO, Redback gave its stock, or extremely valuable warrants for Siara stock (to be exchanged for Redback stock during the merger), to executives at Qwest and other telecommunications companies in exchange for those companies' commitments to purchase Redback's products.  From the start of the Class Period, Redback reported product sales and revenues which, unbeknownst to investors, were based upon the business Redback had acquired through these secret grants of stock and warrants.

### Defendants' Pre-Class Period False and Misleading Statements

127.    On February 1, 1999, Redback announced that WorldCom's UUNET was using Redback's SMS™ product.  The Press Release stated:

> Redback Networks announced today that UUNET, an MCI WorldCom Company and a global leader in Internet communications solutions, is deploying its flagship Subscriber

Management System™ (SMS) throughout UUNET DSL Points of Presence (PoPs).  The Redback products are an integral part of UUNET's nationwide rollout of business and consumer Digital Subscriber Line (DSL) services announced at Fall Comdex.  UUNET is deploying the SMS 10000 at major Network Access Points to offload the processing burden of existing backbone routers while enabling thousands of new subscribers to come "on-net" quickly and cost effectively.

\*   \*   \*

UUNET has announced DSL availability in more than 600 PoPs by March 1999, the largest DSL deployment offered by any service provider to date.

\*   \*   \*

Once users are online, the SMS 10000 can aggregate as many as 4000 logical connections over high-speed links issuing from various Central-Office sources.  That means UUNET and its partners can work with multiple carriers to deliver DSL services and thus offer the widest range of coverage at the most competitive prices.

At each UUNET PoP, the SMS 10000 acts as an edge device that performs all of the aggregation, management, and conversion functions necessary to deliver router-ready IP data streams to the backbone.  UUNET thus can handle the extra volume of traffic resulting from high-speed DSL without adding any more router power to its backbone.

UUNET became a leading Internet Service Provider by designing their network to support huge amounts of traffic, without compromising performance," said Dennis Barsema, president and CEO at Redback.  "In like fashion, Redback has designed the SMS 10000 to support thousands of high-speed data links without compromising existing IP backbones.   The combination of Redback and UUNET is a natural fit."

128.    On March 16, 1999, Redback filed its Form S-1, IPO Registration Statement and Prospectus (the "Registration Statement"), in which it stated that it "believe[d]" that its software "differentiates" its product from others and provided the Company with a "competitive advantage."  This was false and misleading because Redback failed to disclose that its competitive advantage and ability to sell its product also depended upon outright bribes.  While Redback noted in its IPO Prospectus that "competition in [its] market is intense," it did not inform investors that it had already embarked on its scheme to obtain a competitive edge by paying third parties such as UUNET, Concentric and Qwest for their business.  Additionally, in

the MD&A section, Redback stated that "a significant portion of [its] revenues has resulted from a small number of relatively large orders" and that most of its sales were based upon "purchase orders rather than long-term agreements."  Unbeknownst to investors, a significant portion of Redback's revenues resulted from bribery, and most of its sales were based upon bribes, not legitimate purchase orders.  Defendants Barsema and Lamond knowingly or with deliberate recklessness signed the materially false and misleading Registration Statement.

129.    On May 3, 1999, Redback announced that Concentric "ha[d] signed a contract to purchase the Subscriber Management System™ (SMS) 10000 and associated service."  In the press release, Defendant Barsema is quoted as saying:

> As one of our earliest customers, Concentric has worked closely with Redback during the past year and has come to appreciate the advanced capabilities of the SMS 10000 . . . As Concentric grows, it continues to rely on Redback to provide market-leading solutions that enable it to enter new geographic areas and turn up large numbers of users quickly.

130.    The press release regarding Redback's contract with Concentric was materially false and misleading because it failed to disclose that Redback had induced the sale by providing a lucrative warrant for Redback stock worth $3 million to Concentric in exchange for the contract, and more importantly for the right to issue a press release announcing that Concentric had chosen Redback's products to deploy in Concentric's network.  Defendants Barsema and Lamond knew or deliberately and recklessly disregarded that the press release was materially false and misleading, as they signed an amended Registration Statement filed with the SEC on April 22, 1999, which stated that Redback had provided a warrant to Concentric for 4,500 shares of Redback's stock in March 1999.  Redback never disclosed that the stock warrant provided to Concentric was a stock kickback payment for Concentric's business.  Announcements like the Concentric press release were intended to and did create the appearance of strong demand for Redback's products, which hyped Redback's stock and caused Redback's stock to reach record-high increases for post-IPO trading.  Redback's IPO was at the time the fifth most successful IPO in history.

131.    The next month, on June 28, 1999, Redback issued a press release announcing that Redback had entered into a "multi-million, multi-year agreement" with Qwest to use Redback's SMS1000™ equipment to aggregate traffic on Qwest's network.  The press release stated:

> "We selected the Redback solution because the SMS 10000 has the proven scalability to accommodate thousands of subscribers and multiple services," said Lewis O. Wilks, President of Internet and Multimedia Markets at Qwest. "The flexibility of the platform enables us to integrate the SMS 10000 seamlessly with the Qwest fiber network as we expand our service offerings globally. Redback's ability to handle large concentrations of traffic ensures that customers can fully benefit from our high-capacity network to exchange multimedia content with the speed and reliability they require."

132.    When Redback announced the agreement with Qwest, Redback's officers and directors (Barsema, Lamond, Kruep and others) deliberately and recklessly failed to disclose the "friends and family" stock bribes that had been provided to Lewis Wilks and other Qwest executives because Barsema, Lamond and Kruep wanted to create the appearance that there was a real demand by Qwest for Redback's products to artificially inflate Redback's stock price. These Individual Defendants and their affiliates collectively held millions of shares of Redback' stock and therefore stood to gain hundreds of millions of dollars by boosting Redback's stock price.  Redback's total reported revenues in second quarter 1999 were only $11 million, and the announcement of a multi-million, multi-year agreement with Qwest caused the stock price to soar to over $125 per share by the end of June 1999.

133.    In July 1999, with Redback's stock trading in the range of $153 to $168 per share, Kruep sold over $6.3 million worth of Redback stock, and on the same two days in July, Barsema sold over $15.3 million.  Likewise, within days of Kruep's and Barsema's sales, Lamond and his affiliates distributed 461,427 shares of Redback stock for an astronomical $77.68 million in proceeds.  Subsequent to Redback's IPO, company insiders had been restricted from trading for 180 days, but the lock up was released to allow insiders to trade on July 27, 1999, which is when Barsema, Kruep and others started dumping their Redback holdings while

1   in possession of material non-public adverse information.  By the end of November 1999,

2   Defendant Barsema had dumped over $47 million of Redback stock.

3   **Defendants' False And Misleading Statements During The Class Period**

4   134.   On November 29, 1999, Redback issued a press release announcing its merger

5   with Siara.  The press release valued the transaction at $4.3 billion and promised to create an

6   entity with a total market value of $11.2 billion.  In the press release, Defendant Barsema was

7   quoted as saying:

8
9   > We expect the combination of Siara Systems and Redback to
   > create a powerful supplier in the communications industry, focused
   > on serving the next generation access and service creation
10  > requirements of carriers and service providers.

11  135.   In this same press release, Defendant Ragavan was quoted as saying:
12  > In this very competitive market, retaining a customer base and
   > increasing revenue are the key business issues service providers
13  > and carriers are facing . . . Redback Networks has been extremely
   > successful in developing and selling solutions that achieve those
14  > objectives for the broadband access market.   Now, with the
   > addition of Siara's core technologies and products, Redback
15  > Networks expects to deliver next-generation and networking
   > solutions our customers could leverage to define the transport and
16  > value-added services of the future.

17  136.   Afshin Mohebbi, Qwest's Chief Operating Officer and President, was one of the

18  chief architects of the Siara merger -- as well as the secret Siara Warrant Agreement, according

19  to the Redback Sales VP.  Mohebbi is quoted in the November 29 press release as stating:

20  > Qwest is a leading edge broadband network provider, and needs
   > vendors that are highly responsive and intimately understand our
21  > technical and market requirements . . . With the prospect of a
   > powerful Redback-Siara combination, we would have a single
22  > supplier we could work with to obtain next generation platforms
   > for combining all types of access, from the core all the way to the
23  > subscriber, with creation and delivery of next generation
   > broadband IP services.
24

25  137.   At the time the Siara merger was announced, Siara had no products, customers or

26  revenues.  In fact, Siara's first generation SmartEdge™ product was not available for delivery

27  until late in second quarter 2000.  Thus, Qwest had not tested the SmartEdge™ product in its

28  labs in November 1999, and was not able to test the product, because the product was not even

1   out of production in November 1999.  Qwest's executive's comments in the press release touting

2   the powerful prospects of the merger were bought (through lucrative stock bribes) and sold (to

3   unsuspecting investors).

4       138.   On December 10, 1999, Redback filed a Form 8-K, signed by Defendant Gentner,

5   with the SEC.  The 8-K incorporated the November 29, 1999 press release and the Siara merger

6   agreement.  The 8-K stated in relevant part:

7   > Upon consummation of the Merger, the holders of capital stock of
8   > Siara will receive an aggregate of 31,341,986 shares of Common
9   > Stock of the Company, representing approximately 38% of the
10  > Company's total Common Stock (including options, warrants and
11  > other purchase rights exercisable for such Common Stock)
12  > outstanding immediately after the consummation of the Merger.

11      139.   The merger agreement, incorporated into the 8-K, stated in relevant part:

12  > Pursuant to the Merger, among other things, and subject to the
13  > terms and conditions of this Agreement, (iii) all [Siara] Warrants
14  > then outstanding shall be converted into warrants to purchase
15  > shares of [Redback] Common Stock . . .

15      140.   As noted above, immediately prior to the announcement of the Redback/Siara

16  merger, Siara had entered into the Siara Warrant Agreement to obtain sales from Qwest in

17  exchange for Warrants.  At the time that Siara issued the warrant to Qwest executives, the

18  exercise price of the warrant was $2 per share, and the stock issued under the warrant (100,000

19  shares of Siara stock that were exchanged for 119,000 shares of Redback's stock at $136.50 per

20  share) had a value of approximately $16 million.  Within weeks of Redback's merger with Siara,

21  the stock issued under the Siara Warrant Agreement soared in value to approximately $45

22  million.  The Individual Defendants knowingly or deliberately and recklessly failed to disclose in

23  its press releases and SEC filings that Redback had provided stock, which quickly rose in value

24  to $45 million, to Qwest executives in exchange for promises of Qwest business and the right to

25  issue glowing press releases stating that Qwest was selecting Redback's products for its network.

26      141.   On December 1, 1999, Siara announced its very first contract, a $40 million

27  contract with Broadband to use "Siara's next-generation platforms and network operations

28

software for deployment in [Broadband's] new broadband backbone infrastructure."  Defendant Ragavan is quoted in the press release:

> Next-generation providers of bundled services like Broadband Office will dramatically redefine local access options for enterprises in multi-tenant buildings and office parks nationwide . . . . Broadband Office's incredibly rapid start is being fueled by market demand, the company's depth in management, and the backing of eight of the largest U.S. real estate companies.  Siara joins this powerhouse team to deliver the access platform for rapid, multi-service delivery.

142.   This press release had the intended effect.  Business Wire reported that:

> Among the top analyst upgrades and downgrades covered included Redback Networks Inc. (Nasdaq:RBAK).   Siara Systems Inc., which is being bought by Redback Networks said it received its first contract.   Siara, which develops equipment for the next generation of communications networks that work in the Internet's backbone, said it has a contract from Broadband Office Inc. valued at $40 million.   Redback's acquisition is valued at nearly $4.5 billion based on a Redback share price of $143-1/4.

143.   The December 1, 1999 press release reminded the investing public that "Siara, conceived as the access market component of Kleiner Perkins' telecommunications portfolio, recently announced plans to merge with Redback Networks."  Unknown to the investing public was the fact that the sale by Siara to Broadband Office was due to a *quid pro quo* deal among Broadband Office insiders, including Khosla, and Siara insiders, including Khosla (working both sides of the deal) and Ragavan, covertly to provide valuable Redback stock to Broadband Office, in exchange for Broadband Office issuing a press release stating that it was deploying Siara's SmartEdge™ product (which was still under development and had not been tested by Broadband Office) in Broadband's broadband network (which was still under development and had no customers).  Ragavan knowingly failed to disclose that he and Khosla and others had purchased Broadband Office's business and the impressive press release with undisclosed stock kickback payments.  The Company also failed to disclose in press releases and SEC filings that Ragavan, Khosla and others were using Redback's merger with Siara as a fraudulent device to disguise stock bribes to telecommunications customers, in exchange for announcements that those customers were going to deploy the SmartEdge™ product.

144.     On news of the new Broadband Office multi-million dollar contract, Redback's stock price rose from a close of $139.95 on November 30, 1999 to $143.14 on December 1, 1999, and to $153.02 by December 3, 1999.  On December 9, 1999, Defendant Barsema sold 40,000 shares of Redback stock, reaping more than $6 million in illegal insider trading proceeds.

145.     On December 7, 1999, Redback announced that "it will close 1999 with a client base of more than 120 provider customers."  The press release went on to tout its IPO as "one of the most successful IPOs in history" and stated that:

> [Redback] has dramatically expanded its market base in 1999, extending operations globally and moving into the cable, wireless, fiber-to-the-curb, dial offload, and multi-dwelling unit markets. With its announced merger with Siara Systems, Redback will also extend its service creation and management capabilities into the optical and SONET markets.
>
> * * *
>
> During 1999, Redback announced many new large provider customers standardizing on its SMS to deliver both wholesale and retail broadband services.  Carriers and network service providers using Redback's SMS to wholesale access downstream to ISPs include Bell Canada, GTE, Qwest and UUNET.  Providers utilizing SMS to offer retail services include Concentric, Earthlink and Verio.  Today, Redback estimates that it owns in excess of 80 percent of the broadband subscriber and service management market worldwide.
>
> * * *
>
> Redback's announced merger with Siara Systems will expand the company's opportunities to offer integrated solutions across the entire New Access Network, a network that will span all layers of transport and services from the edge of the optical core to global corporate networks and individual broadband subscribers. Utilizing Siara's expertise in optical, silicon, and IP technologies, Redback expects to accelerate providers' plans for leveraging the New Access Network to increase revenue and decrease operational costs.

146.     The Company failed to disclose in the press release that Ragavan, Khosla and others were using Redback's merger with Siara as a fraudulent device to disguise stock bribes to Qwest and Broadband Office, and that Redback had provided additional secret "friends and family" stock bribes to Qwest and Concentric and other telecommunications company customers, in exchange for announcements that those customers were going to deploy Redback's products.  The success of Redback's IPO was possible because of the hype provided by Qwest

1  and other beneficiaries of Redback's undisclosed stock bribes, but this information was

2  knowingly and recklessly concealed from investors.

3      147.   On February 2, 2000, Redback filed its Form S-4 Registration Statement and Joint

4  Proxy Statement/Prospectus ("Redback/Siara Merger Prospectus") relating to the merger of

5  Redback and Siara.  As in its IPO Registration Statement, Redback stated in the Redback/Siara

6  Merger Prospectus that "competition in [its] market is intense," but did not inform investors that

7  Redback's plan to succeed in this competitive environment was to simply pay bribes to obtain

8  business from others.  Redback also again disclosed that a "significant portion" of its revenues

9  resulted from a small number of large orders and that sales were made on the basis of purchase

10  orders.  These statements were misleading, as a significant portion of the Company's business

11  and revenues depended on sales closed because bribes were paid to the buyer.  While Redback

12  disclosed certain risks and stated that it had "a limited operating history," it did not disclose that

13  the operating history that it did have was no indication of future business because a significant

14  portion of its past sales were generated by commercial bribery in the form of millions of dollars

15  worth of Redback's stock.

16      148.   On February 11, 2000, Redback filed its Form 10-K for the year ended December

17  31, 1999 (the "1999 10-K").  The 1999 10-K was signed by Defendants Barsema, Gentner, Kurtz

18  and Lamond.  The 1999 10-K held Qwest out as a significant customer and stated that Qwest had

19  purchased "at least $200,000 worth of [Redback] products and services."  The 1999 10-K also

20  summarized the terms of the Siara merger and a $25 million loan agreement to Siara.  It stated in

21  relevant part:

22          On November 28, 1999, Redback entered into an agreement to
23          merge with [Siara] in a transaction to be accounted for as a
        purchase.  Siara stockholders, option holders and warrant holders
24          will receive an aggregate total of 31,341,986 shares of Redback
        common stock and shares subject to options or warrants, as
        applicable, in the merger.  The aggregate purchase price of the
25          Siara acquisition is estimated to be approximately $4.5 billion[.]

26      149.   The 1999 10-K was materially false and misleading because it failed to disclose

27  the multi-million agreement ($5 million over three years) obtained from Qwest in exchange for

28  "friends and family" pre-IPO stock or the stock provided under the Siara Warrant Agreement in

exchange for Qwest's commitment to buy $40 million of Redback's products within two years. A commitment from Qwest to purchase at least $45 million of Redback's equipment resulting from two separate bribes was material to Redback's financial condition and business and should have been disclosed.  Redback further should have disclosed that certain of its customers that had purchased more than $200,000 in products from the Company had been bribed with lucrative stock payments.

150.     In the 1999 10-K, the Company disclosed net revenues of $9.2 million and $64.3 million for 1998 and 1999, respectively, and a net loss for those years of $9.8 million, and $7.9 million, respectively.  The Company stated that "[s]ince inception, a substantial majority of their revenues have been generated through direct sales," but did not mention that a substantial portion of those direct sales did not result from a genuine demand for Redback's products but had been obtained through the payments of bribes.  The Company stated that it employed a "variety of marketing and sales initiatives" without telling anyone that some of those "initiatives" were improper and in fact illegal.  The Company also disclosed the following "Risk Factors":

- The business "is difficult to indicate because we have a limited operating history."  This was misleading by failing to disclose that its operating history was dependent on business obtained from bribes.

- Redback expected "to incur future losses."  This was false because the Company failed to disclose that it would not be able to sell a substantial amount of its product, and would incur huge losses, if it stopped bribing Qwest.

- Redback is dependent on a "level of demand for broadband access services."  What Redback should have disclosed was that it was also dependent on bribes to generate demand for its products.

- "Redback's operating results are likely to fluctuate significantly" due to fluctuations in demand for Redback's products.  Investors should have been informed that operating results fluctuated with the deals struck by bribes to Qwest.

- "Redback's business may be adversely affected by class action litigation due to stock price volatility."  This was false and misleading, as Redback did not disclose that its business could be adversely affected by the disclosure (or third party discovery) of the bribes paid to Qwest and others, or the cessation of those bribes, and resulting shareholder class action litigation.

151.     Redback's statements in its 1999 10-K, were materially false and misleading because:  the revenue, operating income, income before taxes, net income, basic net income per

share, diluted net income per share figures, and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest. Redback misrepresented its prospects for 2000 and beyond because Redback failed to disclose that it engaged in improper undisclosed bribes and *quid pro quo* transactions with Qwest as a primary means to generate revenue and that such conduct could lead to severe civil and criminal liability. Redback's reported results were false and misleading because the Company failed to reserve sufficient amounts to cover the cost of civil and criminal liabilities associated with its improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

152. Redback also misled investors by assuring the market that the Company's 1999 10-K was prepared in accordance with SEC rules and regulations and by failing to disclose that improper conduct, such as paying undisclosed bribes to material customers, was a key component to its business model. Further, the Company failed to disclose all material aspects of revenue earned from sales that were induced by bribes and *quid pro quo* transactions. Redback's financial results in its 1999 10-K also were materially false and misleading as a result of GAAP violations. Redback also mislead investors by assuring the market that the Company's annual report was prepared in accordance with GAAP when, in reality, Redback violated GAAP as discussed in Section V below.

153. On March 8, 2000, Redback issued a press release that confirmed the completion of the Siara merger and announced a two-for-one split (effective April 3, 2000) of Redback's outstanding common stock.

154. A Form 8-K filed with the SEC on March 20, 2000 and signed by Gentner, included the March 8, 2000 press release announcing the consummation of the Siara merger and included a Certificate of Merger by and between Redback Networks Inc. and Siara Systems, Inc. The Certificate of Merger was signed by Defendant Barsema. The 8-K stated:

> As a result of the Merger, Redback became the owner of all the issued and outstanding shares of Siara common stock, and each outstanding share of Siara common stock was converted to the right to receive 1.1901347 shares of Redback's common stock. The holders of capital stock of Siara are entitled to receive an

aggregate of 31,341,986 shares of Redback, representing approximately 38% of Redback's total common stock (including options, warrants and other purchase rights exercisable for such common stock) outstanding.

155.    The 8-K was materially false and misleading because Redback failed to disclose that Ragavan, Khosla and others had purchased Qwest's and Broadband Office's business (and their glowing stamp of approval in press releases) with undisclosed stock kickback payments and 100,000 and 4,500 shares of Siara stock, respectively, that were converted into Redback stock in the merger.  The Company also failed to disclose in the press releases and SEC filings that Ragavan, Khosla and others were using Redback's merger with Siara as a fraudulent device to disguise stock bribes to telecommunications customers, in exchange for announcements that those customers were going to deploy the SmartEdge™ product.

156.    On April 12, 2000, Redback issued a press release in which it reported record results for the quarter ending March 31, 2000.  The April 12, 2000 press release and subsequent Form 8-K filed with the SEC stated, in relevant part, as follows:

> Net revenues for the first quarter of 2000 were $34.2 million, compared with $6.5 million for the same period in the prior year, an increase of 424 percent. Pro forma diluted net income for the first quarter of 2000 was $5.6 million or $0.05 per share after giving effect to the Company's two-for-one stock split effective April 3, 2000, and excluding acquisition-related and stock compensation charges and the research and development expense related to Siara Systems' operations. This compares to the first quarter of 1999 pro forma net loss of $2.7 million or $(0.16) per share on a post-split basis. Before pro forma adjustments, net loss for the first quarter of 2000 was $85.2 million or $(0.96) per share .
> . . .
>
> * * *
>
> "The first quarter of 2000 was a period of expansion for Redback in the subscriber management market," said Dennis Barsema, chief executive officer at Redback.
>
> * * *
>
> "In addition to expanding our presence in the subscriber management market, we executed on a major milestone by announcing the SMS 10000, the third platform in our subscriber management product line," said Vivek Ragavan, president and chief operating officer at Redback.  "In the metropolitan optical networking market, Redback took a major step forward by completing its merger with Siara Systems on March 8.  The merger gives Redback a strong advantage in terms of developing products and technologies for the New Access Network, including core

competencies in IP development, SONET and optical networking, and ASIC design."

157.    On May 15, 2000, Redback filed with the SEC its Form 10-Q for the first quarter of 2000 (the "May 2000 10-Q"), signed by Defendant Gentner.  The May 2000 10-Q repeated the financial results reported by Redback in its April 12 press release.  The Company also explained that it would use its stock as currency for future acquisitions.

158.    The May 2000 10-Q also disclosed various "Risk Factors" disclosed in the 1999 10-K, again omitting the material risk that it was subject to a huge undisclosed liability from its use of bribes to obtain business, and the undisclosed risk that its sales would drastically shrink if its improper sales practices were discovered or were terminated.  Redback's statements in its April press release and May 2000 10-Q were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  Redback also failed to provide material information regarding multi-million agreements with Siara and Qwest, which had been obtained through the Siara merger, which would have a material impact on the Company's reported revenues and earnings.  The press releases and SEC filings issued in April and May 2000 were also materially false and misleading because Ragavan announced the launch of the new SMS™10000 product as a "major milestone" when in fact he and all of the other Redback executives knew that the product was not operational and could not be deployed because the cards necessary to operate the equipment would not support the capacity for which the product was designed.

159.    On May 30, 2000, Redback issued a press release introducing to the market its new SmartEdge™ 800 product "for the fast-growing metropolitan optical market."  In order to demonstrate the immediate success of this new product launch, Redback reported that Qwest would be a significant purchaser of the SmartEdge™ 800, stating (and quoting a top Qwest executive) as follows:

"Qwest is building tremendous momentum for our nationwide all-optical network initiative," said David Boast, executive vice president of engineering and operations from Qwest.  "To ensure

that our aggressive implementation proceeds at unprecedented speed and quality, Qwest intends to use the SmartEdge 800 for deployment in our network.  Redback has been working with Qwest for the past 18 months designing SmartEdge capabilities for our next generation network."

160.    In response to this materially false and misleading press release, the Company's stock jumped from $72.07 on May 26, 2000 to $82.32 by May 30, 2000, going to $83.88 the next day, and climbing throughout the month of June 2000 to finally close at $179.14 on June 30, 2000.  Redback omitted materially false and misleading information regarding the Siara Warrant Agreement and the fact that Redback had purchased Qwest's commitment to purchase the SmartEdge™ equipment by bribing Qwest executives with 100,000 shares of Redback stock, which were worth over $45 million.  Redback further failed to inform shareholders that Qwest had entered into a multi-million dollar purchasing agreement with Redback in exchange for lucrative "friends and family" pre-IPO stock, or that Redback had paid a secret stock kickback to Qwest executive Weisberg in connection with that transaction.  Ragavan stated in the press release that carriers (i.e., Qwest) "are looking to migrate leased-line data traffic to more efficient packet architectures.  Existing metro alternatives solve either one problem or the other – leaving carriers and service providers at a dead end for a total solution.  The SmartEdge is the first product that gives providers the boost they need to improve the bottom line for SONET services while giving them a software-enabled migration path to IP."  As Ragavan provided sound bites for the press release, he and other Redback executives had a duty to fully disclose information regarding Qwest's commitments to purchase the SmartEdge™ equipment.

161.    On July 12, 2000, Redback issued a press release reporting record revenues for the quarter ended June 30, 2000.  In addition to providing detail on the financial results, the press release and subsequent Form 8-K filed July 20, 2000, which incorporated the press release, quoted Barsema, who boasted that Redback had received multi-million dollar orders for the SmartEdge™ equipment.  The press release stated:

Net revenues for the second quarter of 2000 were $48.7 million, compared with $11.1 million for the same period in the prior year, an increase of 340 percent.  Pro forma net loss for the second quarter of 2000 was $5.7 million or $(0.05) per share, which excludes acquisition-related and stock compensation charges.  This

compares to the second quarter of 1999 pro forma net loss of $2.6 million or $(0.06) per share.  Before pro forma adjustments, net loss for the second quarter of 2000 was $286.7 million or $(2.41) per share compared to a net loss of $3.7 million or $(0.08) per share for the same period in the prior year.  All share and per share amounts reflect the Company's two-for-one stock split effective April 3, 2000.

"The second quarter of 2000 was a period of strong execution for Redback," said Dennis Barsema, chief executive officer of Redback Networks.  "The company continued its momentum in the metropolitan optical networking market with the launch and first production shipments of the SmartEdge 800," stated Barsema. "The SmartEdge platform has been well received by Redback customers and prospects, and we have received multi-million dollar orders from both carriers and service providers." (emphasis added)

* * *

"Redback was buoyed by strong demand for our existing SMS platforms, and also achieved a major milestone in shipping the first production of SMS 10000 systems. . . . (emphasis added)

162.   Barsema omitted material adverse information when he touted Redback's multi-million orders from customers because he failed to inform shareholders and investors that Redback had bribed Qwest, Concentric, Broadband Office and UUNET with lucrative stock kickback payments to purchase Redback's equipment, or to commit to purchase multi-million dollar orders so that the Individual Defendants could boast about the agreements and create a buzz for Redback's stock price.

163.   The numbers released in the July 20, 2000 Form 8-K and appended press release were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  The press release issued to report second quarter earnings also falsely stated that the shipment of the SMS™10000 product was a "major milestone" because the product was not even operational and was failing beta tests at the labs of Redback, UUNET and others, according to the Redback Sales VP and the Redback Sales Director.

164.    Also on July 12, 2000, Gentner, Ragavan and others held an earnings conference call with investors in which they discussed Redback's financial performance and outlook.  In that call, they alluded to an important agreement that Redback had reached with Qwest, but they failed to inform analysts and investors that Redback had purchased $40 million agreements with each of Broadband Office and Qwest to purchase SmartEdge™ equipment through stock kickback payments, or that Redback had provided "friends and family" pre-IPO shares to Qwest and to Weisberg in April and May 1999 when Weisberg was negotiating a multi-million dollar agreement for Qwest to purchase Redback's equipment over the next three years.

165.    Reiterating information from the earnings conference call, on July 13, 2000, research analyst First Security Van Kasper ("First Security") issued a research report that increased Redback's price target and reiterated its "Strong Buy" rating.  First Security based its recommendations on revenue estimates that were ahead of First Security's original estimate and Redback's expected shipment of the SmartEdge™ 800 system to Qwest one quarter ahead of schedule.  The report stated, in part, as follows:

> The company noted that its recently introduced SMS 10000 . . . shipped ahead of schedule.  We believe that these solutions position Redback ahead of the next technology transition in the New Access markets and will establish the company as the dominant NextGen access vendor. (emphasis added)
>
> * * *
>
> The company also stated that its recently introduced SMS 10000 and SmartEdge multi-service platform shipped and will generate revenues in Q3.  We believe that Redback's SMS 10000, armed with the industry's most tested SMS software and highest capacity solutions and supporting up to 100,000 users, will allow the company to retain its 70%+ DSL North America market share position and also to continue penetrating the cable and wireless markets.
>
> More importantly, management reported very positive results for the SmartEdge 800.  The company announced that it has added several new betas and has shipped one quarter ahead of schedule to Qwest.. . . Release II of the SmartEdge (layer 0-4 solution) is on target to begin trials in 4Q00.  (emphasis added)
>
> * * *
>
> Driven by the software-intensive SMS solution, the company reported strong gross margins of 71.3%, ahead of our 70%

estimate.  Going forward, we expect margins to decrease slightly as the lower margins of the SmartEdge and service revenues increase as a percentage of sales over the next year . . . .  We are also increasing our FY00 and FY01 EPS estimates to $0.10 and $0.49, respectively.  Redback's balance sheet remained strong with cash of $492 million and convertible debt of $500 million.

166.   These statements by the Company were materially false and misleading because Barsema, Gentner and Ragavan (the Company spokesmen on the conference call) knew the SMS™ 10000 would not ship on schedule and therefore could not generate revenue in third quarter 2000.

167.   On July 16, 2000, Lightreading.com, a widely-read Internet news source in the telecommunications industry, reported that the Qwest contract discussed in Redback's July 12, 2000 conference call "may be a bigger deal than people think."  The article went on to state:

Redback will shortly be announcing a deal with Qwest that includes an initial purchase order of roughly $6 million of its metropolitan optical product, the SmartEdge 800.   More importantly, however, the deal has the potential to reach hundreds of millions of dollars over the next couple of years, according to Light Reading sources.

The SmartEdge 800 is Redback's first optical product, which it gained in its acquisition of Siara last year. . . .

* * *

"Cerent will have a lot more revenue than Redback's optical product this year, but following that conference call we are a lot more confident in [Redback's] ability to become more prominent in that market," says Conrad Leifur, analyst with U.S. Bancorp Piper Jaffray.

"The [SmartEdge 800] was an interesting product from an architectural perspective, but it had development risk," said Leifur. "Now they've shown it's being deployed in networks."

Redback officials have raised their "guidance" numbers on the SmartEdge product line with financial analysts, indicating they foresee an increase in sales growth.  They believe the company can ship $10 million worth of SmartEdge products in the next quarter and $150 million during 2001, says Leifur.

Redback officials confirmed that details about a Qwest purchase order for a number of SmartEdge products are forthcoming.  One Redback spokesperson described the number of SmartEdge units involved as "North of dozens but South of thousands."   The product lists for between $70,000 and $150,000, depending on the configuration. (emphasis added)

\* \* \*

> But Redback's rising visibility at Qwest may mean the telecom engineers are taking a closer look at the IP services promised for the SmartEdge.   The product is designed to include seven application specific integrated circuits (ASICs), four of which handle Sonet and TDM capabilities (available now) and three of which will handle IP services (not yet available).  The IP services capabilities set the SmartEdge product apart from Cisco's offering. (emphasis added)

168.    As the Lightreading.com article demonstrated, the defendants' fraud had its intended effect on the market.  The stock-induced deals with Qwest had provided credibility to Redback and created the illusion of huge demand for and sales of Redback's products.  The comments provided on Redback's conference call were materially false and misleading and caused research analysts and telecommunications industry analysts to repeat and disseminate the materially false and misleading information to the public.  The Individual Defendants, including Gentner and Ragavan, knowingly or deliberately and recklessly caused Redback and analysts repeating information to falsely report that the SMS™10000 had shipped ahead of schedule, that it was generating revenues in third quarter 2000 and that its software had the highest capacity use and supported 100,000 users.  In fact, the product was a failure and would not support 100,000 users as reported by Redback.  The product's software was malfunctioning and would only support one-fourth of the capacity and speed that it was designed to support, according to the Redback Sales Director, the Redback Sales VP and the Redback Sales Engineer.

169.    Redback's forecasts regarding the SmartEdge™ equipment orders by Qwest and its raised guidance were known to be materially false and misleading when made because they omitted material information regarding the bribes paid to Qwest to obtain such purchase orders.  Because Qwest's obligations to purchase $40 million of the SmartEdge™ equipment was highly material to Redback's reported sales and revenues, Redback had a duty to provide full disclosure regarding its agreement with Qwest when it announced an agreement with Qwest to purchase the SmartEdge™ equipment and the expected $10 million and $30 million in orders in late 2000 and in 2001, respectively.  Redback also announced that the new release of the SmartEdge™ product would be available in the fourth quarter 2000, and later had a duty to correct this information when it was known to be incorrect by at least August 2000.

170.     On August 14, 2000, Redback filed with the SEC its Form 10-Q for the second quarter of 2000 (the "August 2000 10-Q"), signed by Defendant Gentner.  The August 2000 10-Q repeated the financial results Redback reported in its July 12 press release and July 20 Form 8-K.

171.     The August 2000 10-Q also repeated the "Risks Factors" disclosed in prior filings, again keeping concealed its improper sales and accounting practices.

172.     In response to the materially false and misleading statements contained in the Company's August 2000 10-Q, and other false and misleading information provided by the Individual Defendants regarding the Company's second quarter 2000 performance and prospects, the Company's stock jumped from an August 14, 2000 close of $146.59 to an August 15, 2000 closing price of $150.09, adjusted for the Company's two-for-one stock splits in August 1999 and April 2000.

173.     From the beginning of the Class Period through the Company's August 2000 10-Q, the defendants misrepresented the terms of the Siara merger (by failing to disclose the provision requiring the transfer of warrants to Qwest executives) and falsely stated that Qwest intended to buy and use Redback's products, when the defendants knew that Qwest did not need or want Redback's products, but purchased them only because Redback had given Qwest executives "friends and family" shares of Redback, and Siara warrants, as payments for Qwest's business.  In another attempt to obtain orders from Qwest, Redback purchased services it did not want or need from a Qwest affiliate to obtain Qwest's reciprocal purchase of products from Redback, which Qwest did not want or need.  The defendants used this next facet of their fraudulent scheme to report artificially inflated revenues at Redback which, as the defendants intended, resulted in an artificial inflation of Redback's stock price.

174.     Redback's statements in its August 2000 10-Q were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  The August 2000 10-Q also failed to

disclose Redback's potential liability for bribery and drastically reduced sales if the improper

sales practices were discovered or terminated.

175.    On September 25, 2000, Qwest announced that Qwest Cyber.Solutions LLC

("QCS"), deemed by Qwest to be the largest enterprise Application Service Provider ("ASP"),

had been awarded a five-year contract worth $18 million from Redback.  QCS is a joint venture

between Qwest and KPMG Consulting.  The press release quotes Ragavan:

> At Redback, our aggressive schedule for turning out product
> requires us to have a system that keeps pace with our high
> customer demand. So we chose QCS to provide our IT application
> infrastructure because of their ability to respond quickly and
> enable us to refocus on the business of satisfying our customers . . .
> With today's market becoming increasingly competitive, we
> appreciate the value brought by QCS' ASP services that will allow
> us to further accelerate our business.

176.    Defendants fraudulently concealed that Redback had no need for QCS's services,

but was purchasing them only to obtain Qwest's reciprocal agreement to purchase $20 million of

Redback's products.  As Ragavan and the other defendants knew, Redback planned to report,

and later did report, revenues based upon Qwest's purchases from Redback made solely in

exchange for Redback's agreement to purchase web-hosting services from QCS.

177.    Ragavan's statements were materially false and misleading because Redback had

not chosen to purchase ASP services from QCS based upon any legitimate business need.

Indeed, according to the Redback Sales VP, Redback had not expressed any interest in the

services or tested them when Qwest's Senior Vice President of Engineering, Michael Perusse,

demanded that Redback purchase the ASP services in exchange for a $20 million purchase order

from Qwest for approximately 40 of the SMS™10000 units.  The VP NA Sales stated that Qwest

did not need anywhere near 40 of the units (even if the units had worked), and the Redback Sales

VP confirmed that Qwest had not even tested the SMS™10000 equipment, which had severe

software and hardware problems and, as Perusse knew, was not operational when Redback

shipped the units to Qwest.  Nevertheless, Redback booked $20 million in revenues from the sale

in third quarter 2000, which allowed Redback to meet its projected revenues and earnings

according to the Redback Sales VP and the VP NA Sales.  The Redback Sales VP further stated

that Ragavan, Khosla, Patel and others were all aware that the SMS™10000 equipment that had been shipped to Qwest did not work because the equipment had failed lab tests at Redback and other beta tests, and the equipment's OC-12 cards would only run at OC-3 speeds, which was one-fourth of the capacity that the product was designed to support, and further that the software problems created by the malfunctioning cards were completely debilitating for the SMS™10000 equipment.

178.   Defendants' fraud was successful.  Upon news of the sales to Qwest and the resulting multi-million dollar revenues, Redback's stock price rose from a close on September 25, 2000 of $156.83 to a close on September 28, 2000 of $169.83 which, adjusted for a two-for-one split in August 1999 and another two-for-one split in April 2000, represented a 2854% increase from Redback's $23 IPO price.  In August and September 2000, Barsema sold in the open market over 262,000 shares of Redback stock worth more than $36 million while he was in possession of material non-public adverse information.  In August 2000, he also donated 200,000 shares of Redback stock worth $30 million to his college alma mater, which named a building for Barsema to acknowledge the gift.  In August and September, Kruep also sold 50,000 shares of Redback stock worth more than $7.5 million, while in possession of material non-public adverse information.  In addition, the venture capital affiliates of Lamond, Haque and Khosla collectively distributed more than $1.7 billion of Redback stock to their partners and investors in August and October 2000, which distributions were well timed to take advantage of material non-public adverse information possessed by these defendants.

179.   On October 11, 2000, the Company issued a press release signed by Gentner announcing its financial results for the third quarter ended September 30, 2000.  In the October 11, 2000 press release and subsequent Form 8-K, the Company reported huge increases in its revenues, stating as follows:

> Redback Networks, Inc., leading provider of advanced networking solutions, today reported record revenues for the quarter ended September 30, 2000, as well as its first profit on a pro forma basis since closing its merger with Siara Systems.
>
> Net revenues for the third quarter of 2000 were $80.6 million, compared with $20.6 million for the same period in the prior year,

an increase of 291 percent. Pro forma net income for the third quarter of 2000 was $3.2 million or 0.02 per share diluted, which excludes acquisition-related and stock compensation charges. This compares to the third quarter of 1999 pro forma net loss of $569,000 or $(0.01) per share. Before pro forma adjustments, net loss for the third quarter of 2000 was $308.1 million or $(2.50) per share compared to a net loss of $1.6 million or $(0.02) per share for the same period in the prior year.

180.    Defendant Ragavan was quoted in the October 11 press release (filed with the SEC in an 8-K on October 13, 2000) as stating:

"The Company continued its momentum in the metropolitan optical networking market with full production shipments of the SmartEdge 800," said Ragavan.   The platform has been well received by Redback customers and prospects, and the Company continues to receive multi-million dollar orders from both carriers and service providers, as well as a significant number of system trials globally.  "In the subscriber management market, Redback was buoyed by strong demand across our complete line of SMS platforms," said Ragavan, "with particular demand and resulting deployments for the SMS 10000."

181.    Redback's reported revenues and earnings were materially false and misleading because the Company improperly booked at least $20 million of its $80.6 million in revenues from a *quid pro quo* transaction with Qwest that had no valid business purpose, and was for equipment that was not operational at the time it was shipped.  Moreover, there was no "strong demand" for Redback's SMS™10000 equipment, and it had not been deployed by any customers because the product would not work.  Qwest stored the SMS™10000 units in a warehouse and returned them to Redback to be rebuilt in 2002.  In addition, the multi-million orders for SmartEdge™ equipment were in part owing to an $8 million order by Broadband Office, which was induced by an undisclosed stock bribe from the Individual Defendants, including Ragavan, who knew or with deliberate recklessness disregarded that the press release and Form 8-K were materially false and misleading.  The materially false and misleading statements contained in the Company's October 11, 2000 press release and its October 13, 2000 Form 8-K drove up the Company's stock price, as had other prior false statements by the Company and the Individual Defendants.  Between October 10, 2000 and October 16, 2000, the Company's stock price rose from $120.57 to $138.76.

182.   The *Motley Fool* reported on the numbers in Redback's October 11 press release and stated that Defendant Gentner:

> told analysts in a conference call that revenues should hit $100 million next quarter, and continue to grow 20% each quarter next year.  <u>As a result, the company expects sales to hit $645 million in 2001</u>.  (emphasis added)

183.   As someone who attended weekly executive meetings with Patel, Ragavan, Kruep, the VP NA Sales and others, Gentner knew (because he and all other Redback executives were told by Patel and because as CFO he had helped create Redback's revenue forecasts) that Redback's projected sales were based in part on sales of Redback's new generation SmartEdge™ router equipment, which Patel had specifically stated would not be ready early in 2001 as had been anticipated when sales and revenues targets had been forecasted.  The VP NA Sales told Ragavan, Gentner and other Individual Defendants at weekly meetings in August 2000 and thereafter (and later Lamond in early 2001 when Ragavan was ousted as CEO) that the Company could not meet the projected $645 million of revenues in 2001 without sales from the new SmartEdge™ router equipment.  Gentner knew that these sales and revenue forecasts were false when he made the statements, and he knowingly or with deliberate recklessness provided false projections to the public.

184.   On November 13, 2000, Redback filed with the SEC its Form 10-Q (the "November 2000 10-Q") for the third quarter of 2000 (the period ending September 30, 2000) signed by Gentner in which it reported the financial results previously reported in the Company's October 11, 2000 press release.  Redback also reported that during that quarter (the third quarter of 2000), Qwest accounted for 24% of Redback's total revenue.  According to the Redback Sales VP, Kruep (as head of Worldwide Sales for Redback) provided and certified the sales revenue figures to be included in Redback's press releases and SEC filings.

185.   The November 2000 10-Q repeated the "Risk Factors" previously disclosed, including its "limited operating history," that the demand for its products would fluctuate, and that its industry sector was "competitive," but this was all false and misleading because the Company did not disclose that its operating history misrepresented the actual demand for its

products inasmuch as a substantial amount of sales were obtained through bribes paid to the buyers, that demand for Redback's products would fluctuate with the frequency with which bribes were paid and that Redback's competitive edge resulted from improper sales and accounting practices.  Two of the reported Risk Factors:  i) unexpected delays in introducing new or enhanced products; and ii) manufacturing delays, which were stated as likely to cause "quarterly fluctuations in revenues and operating results" were known to exist because the SMS™ 10000 product was not operational, and the new SmartEdge™ equipment router was significantly delayed in production.  Gentner and other Individual Defendants knowingly or with deliberate recklessness omitted this material information in Redback's SEC filing.

186.    Redback's statements in the November 2000 10-Q were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

187.    The Company also stated that it was "not aware of any pending legal proceedings" against it, but kept concealed its future liability arising from its use of bribes and deceptive accounting practices, including the shipment of material amounts of equipment to improperly book revenues in third quarter 2000.  The Company also failed to book a reserve based upon known, probably adverse contingencies arising from its improper revenue recognition and fraudulent business practices.

188.    In a November 13, 2000 press release, the Company announced that Defendant Gentner would retire in the first quarter of 2000 "due to family medical issues."  The Company also stated that "due to strong business demand" its financial figures released on October 11, 2000 "remain[ ] unchanged."

189.    On November 14, 2000, the Company filed a Form 8-K with the SEC attaching its "unaudited pro forma combined financial data for the nine months ended September 30, 2000, that presents the effect of the merger between Redback and Siara . . . as if the merger occurred on January 1, 2000."  These reported results were materially false and misleading because they

1   included improperly booked revenue from Redback's SMS™10000 sale to Qwest, and failed to

2   account for the fact that all of its financial data was false because of undisclosed stock kickback

3   payments.

4        190.    The Company also filed a Registration Statement on Form S-3 on November 14,

5   2000 in which it registered 2,440,526 shares of its common stock for use in the acquisition of

6   Abatis.  The Company repeated statements contained in prior filings regarding the importance of

7   the timing and amount of its sales to its reported revenues, and the concentration of sales in the

8   hands of a few customers.  Redback identified Qwest as contributing 24% to the Company's

9   revenues in its third quarter, more than any other customer.  The Registration Statement was

10  signed by defendants Ragavan, Barsema, Gentner, Haque, Lamond, Khosla, and Kurtz, and they

11  knew or with deliberate recklessness disregarded that the Registration Statement was materially

12  false and misleading because it failed to disclose:  the secret stock bribes provided to Qwest in

13  exchange for Qwest's business; the *quid pro quo* transaction for ASP services that Redback did

14  not want or need; the non-operational nature of the $20 million worth of equipment shipped to

15  Qwest; or that Redback improperly booked material amounts of its reported revenue from its

16  transactions with Qwest.

17       191.    The Registration Statement also explained that Redback leased important

18  technology for its SmartEdge™ equipment from Qwest, as follows:

19               Cerent Corporation has granted Siara a non-exclusive license to
20               technology related to two ASICs and parts of Cerent's system-level
                 hardware technology that are used in the SmartEdge product. In
21               November 1999, Cerent was acquired by Cisco Systems, a provider
                 of networking products and a significant competitor of ours.
22               Although we believe we have sufficient rights to this Cerent
                 technology to conduct our business as currently conducted, we do
23               not have a business relationship with Cisco. Any loss of access to the
                 technology that is the subject of the agreement with Cerent would
24               seriously harm our business.

25  The technology that Redback leased from Cisco also was incorporated in similar optical routing

26  equipment that Qwest was purchasing from Cisco.  In July 2000, a spokesperson for Cisco stated

27  in a LightReading.com article dated July 16, 2000 that Qwest had purchased $70 million of this

28  equipment from Cisco.  The fact that Qwest had already purchased $70 million of equipment that

was identical in material ways to Redback's SmartEdge™ product indicates that Qwest had no real need for Redback's SmartEdge™ equipment.

192.    The materially false and misleading statements contained in the November 2000 10-Q, the November 14, 2000 Form 8-K, and the November 14, 2000 Registration Statement caused the Company's stock price to rise from $72.76 on November 13, 2000 to $79.95 on November 15, 2000.

193.    Again in the fourth quarter 2000, Redback sold approximately $20 million of equipment to Qwest.  To fulfill part of its obligations under the warrant agreement (requiring Qwest to purchase $40 million on or before December 31, 2001), Qwest agreed to purchase $20 million of Redback's new SmartEdge™ equipment from Redback.  The SmartEdge™ product had been launched by Redback in second quarter 2000, but had been riddled with software and hardware problems, and therefore Redback was desperate to report successful deployment of the new product at an industry titan like Qwest.  In fact, Redback reported in its Annual Report on Form 10-K for 2000 that Qwest was one of only two customers that had purchased the SmartEdge™ product in all of 2000.

194.    On January 17, 2001 the Company issued a press release announcing its financial results for both the fourth quarter and year ending December 31, 2000. The press release and subsequent 8-K incorporating the press release stated, in relevant part, as follows:

> Redback Networks, Inc., leading provider of advanced networking solutions today reported record revenues for the quarter ended December 31, 2000, as well as a profit of $.05 per share diluted on a pro forma basis.
>
> Net revenues for the fourth quarter of 2000 were $114.6 million, compared with $26.1 million for the same period in the prior year, an increase of 339 percent. Pro forma net income for the fourth quarter of 2000 was $7.8 million or $0.05 per share diluted, which excludes acquisition-related and stock compensation charges. This compares to the fourth quarter of 1999 pro forma net income of $2 million or $0.02 per share diluted. Before pro forma adjustments, net loss for the fourth quarter of 2000 was $327.6 million or $(2.47) per share compared to a net income of $1.2 million or $(0.01) per share for the same period in the prior year.
>
> For fiscal year 2000, net revenues were $278.0 million, an increase of 333 percent from the $64.3 million posted in 1999. Pro forma

net income for the fiscal year was $6.8 million or $0.04 per share diluted, which excludes acquisition-related and stock compensation charges. Before pro forma adjustments, net loss for fiscal 2000 was $1.0 billion or $(8.68) per share compared to net loss of $7.9 million or $(0.15) per share for the prior year.

195.     The January 17, 2001 press release quoted Defendant Ragavan as boasting about the Company's record revenue and net income as follows:

"Redback continued to achieve key objectives during the fourth quarter of 2000," said Vivek Ragavan, chief executive officer and president of Redback. "From a financial perspective, we delivered another profitable quarter with record revenue and net income. Equally important was the strong global demand for both our next generation products, the SMS 10000 and SmartEdge 800, as well as our industry-standard SMS 500 and SMS 1800 subscriber management systems. We continue to consolidate our market position as a leading vendor of broadband subscriber management systems and next-generation metro optical solutions." (emphasis added)

"With global customer base and growing international presence, our strong cash position and powerful product portfolio, we begin 2001 well positioned to capitalize on the coming migration to next generation broadband and metro optical networks."

196.     These materially false and misleading statements caused an artificial inflation of the Company's stock and further caused analysts to overvalue Redback's stock. A January 18, 2001 Research Report by Morgan Stanley rated Redback as "outperform," in part because of the Company's new relationship with Qwest which generated "greater than 10% of [Redback's] quarterly revenues."

197.     All of the above statements by the defendants were false and misleading. Throughout third and fourth quarter 2000 and in the January 17, 2001 press release, the Individual Defendants, including Barsema, Ragavan, Kholsa, Lamand, Haque, Kruep, Gentner and Kurtz fraudulently concealed that Redback had no need for QCS's services, but was purchasing them only to obtain Qwest's reciprocal agreement to purchase $20 million of Redback's products. As Ragavan, Kruep, Khosla and the other defendants knew, Redback planned to report, and later did report, revenues based upon Qwest's purchases from Redback made solely in exchange for Redback's agreement to purchase web-hosting services from QCS.

198.    The purported "strong demand" for Redback's products was an illusion, created by outright bribes to and contrived *quid pro quo* deals with Qwest and its executives that had no legitimate business purpose.  In fact, Qwest did not perform its standard verification and laboratory tests on Redback's products to determine if they worked and would be useful to Qwest, as Qwest had no intention of ever using those products.  Indeed, the $20 million of SMS™10000 products shipped to Qwest in third quarter 2000 were not even operational.  The defendants kept these facts concealed from investors.  Also concealed was the fact that, as stated by a former Redback Sales VP, the SMS™ products that Qwest was "purchasing" were "unstable" and would not meet Qwest's standards, had Qwest bothered to test the products.  As the Individual Defendants and Qwest knew, Qwest was simply storing Redback's products in a warehouse, and building inventory would likely lead to drastically reduced sales to Qwest.  The Individual Defendants also knew that Redback's new SmartEdge™ product had not been fully developed and so would not be available for sale until late in 2001, and, therefore, that Redback's sales and revenues would be adversely affected.

199.    Finally, Redback's financial reporting in the third quarter of 2000 and throughout the Class Period was materially false because Redback was not properly accounting for the stock and warrants it was giving Qwest executives, Broadband Office, Concentric and others in exchange for sales contracts.  As a result of the defendants' fraud, Redback's stock price was artificially inflated, enabling the Individual Defendants to sell their Redback stock at inflated prices, and enabling the Company to complete its acquisitions of Abatis and Siara.

200.    The Individual Defendants continued to misrepresent Redback's sales to Qwest and the Company's revenues throughout 2001.

201.    On January 18, 2001, research analysts at Morgan Stanley Dean Witter commented on Redback's reported financial performance and repeated the Company's statements of "strong revenue growth in Q4'00."  The research report stated that: "Last night Redback reported Q4:00 revenue growth of 42% sequentially, versus our estimate of 24%. . . We raised our FY01 revenue estimates from $644 million to $725 million, slightly below guidance."  The research analysts repeated information from Redback's executives that

"Redback will be running trials with IP-enabled SmartEdge™ products in Q1:01 and in the first half of Q2:01." This was blatantly false. The report further listed Qwest as a new customer win for Redback in fourth quarter 2000. This research report further disseminated materially false and misleading information that was provided by Redback and the Individual Defendants on an earnings conference call. All of the Individual Defendants, including Ragavan, Khosla, Kruep, Haque, Lamond and Kurtz had refused to revise the Company's materially false and misleading guidance for 2001. The VP NA Sales said Kruep had told all of these Individual Defendants in fourth quarter 2000, and the VP NA Sales again told Ragavan and Lamond in early 2001, that Redback could not meet its target revenues for 2001 because a large part of the revenues were based upon a product that would not be ready for deployment until late 2001. The Board members refused to revise the guidance issued to analysts and investors, and knowingly caused materially false and misleading information regarding the Company's forecasted revenues and product development to be disseminated to the public.

202. On January 19, 2001, Redback filed its Form S-3/A with the SEC in which it amended a previously-filed Registration Statement. Among the familiar refrain of "Risk Factors," the Company stated that its "operating results differ due to risks associated with mergers and acquisitions generally." What Redback failed to disclose was that any decline in operating results would be associated with a decline or temporary halt in the use of bribes to pay for business; such a decline would have little or nothing to do with mergers and acquisitions.

203. On February 5, 2001, just days after announcing a "multi-year, multi-million dollar" agreement ($120 million) with Williams Communications Group ("Williams"), Redback announced that Qwest had agreed to yet another "multi-year, multi-million dollar purchase of the Redback SmartEdge 800." The press release and subsequent Form 8-K incorporating the press release quoted Ragavan and stated, in part, as follows:

> Qwest plans to deploy the SmartEdge 800 multi-service optical platform as part of its strategy to enhance and expand local broadband services for businesses and consumers in key metropolitan markets.
>
> The SmartEdge 800 features high port densities to efficiently aggregate Internet Protocol (IP) and traditional time division

multiplexing (TDM) traffic, delivering operational efficiencies for Qwest and simplifying the migration to IP for customers.

"We're pleased to extend our successful relationship with Redback to accelerate the delivery and enhance the efficiency of our IP-based metropolitan networks," said Augie Cruciotti, Qwest's executive vice president of national local networks. "We look forward to continuing our relationship with Redback to further improve service for our customers."

"Since embarking on the design of the SmartEdge 800, Redback has strongly believed that a successful metropolitan optical device must support providers delivering both TDM as well as IP-based services," said Vivek Ragavan, Redback's president and chief executive officer. As a result, we are very pleased to be a part of Qwest's all-optical metro network initiative." (emphasis added)

204. A February 5, 2001 article on LightReading.com called the Qwest contract a "big deal for Redback, coming days after a $120 million contract with Williams." The article also pointed out that "partly due to this Qwest announcement, Redback shares rose [10%]." According to the article, "Redback officials have only given specific contract details on the Williams deal and won't say how much its SmartEdge™ platform contributes to the company's overall revenues or how many SmartEdge™ boxes it's shipped to customers."

205. The press release announcing the purported new multi-million, multi-year agreement with Qwest was materially false and misleading when issued by Redback and the Individual Defendants. Kruep provided the information for the press release based upon the "specifics" of the Siara Warrant Agreement, which he had negotiated with Weisberg. According to the Redback Sales Manager and the Redback Sales VP, there was no new agreement with Qwest in February 2001. Qwest had simply provided Redback with a purchase order. The Redback Sales and Marketing Manager stated that the press releases regarding Qwest and other companies were strategically dribbled out by Redback to artificially boost its stock price. The Individual Defendants, including Kruep, Ragavan, and Khosla, all knowingly or with deliberate recklessness caused Redback to issue the press release, which omitted material information regarding the stock bribes provided to Qwest under the Siara Warrant Agreement and the true nature of Qwest's obligations. The press release bogusly announcing a material multi-year, multi-year agreement with Qwest was completely devoid of reality.

206.    The effect of this materially false and misleading information regarding the purported agreement with Qwest caused the Company's stock price to rise from its February 2, 2001 close of $40.25 to $44.25 by the close on February 5, 2001.

207.    On February 9, 2001, the Company issued a press release announcing the departure of Kruep "who has accepted the position of CEO at a start-up company."  Kruep was replaced by Richard Bibb as the Senior Vice President of Worldwide Sales.  Richard Bibb (and Kruep before him) reported directly to Defendant Ragavan.  Subsequent to Ragavan's ouster, Bibb reported directly to Lamond when Lamond was interim CEO, and subsequently to DeNuccio when DeNuccio was hired as CEO.  According to the VP NA Sales, each of the CEOs at Redback during each of their tenures was well informed of the true nature of Qwest's business dealings with Redback, including the non-public stock and sales incentives and the *quid pro quo* transactions.

208.    On February 6, 2001, the Company filed a Form S-8 with the SEC.  The Registration Statement was signed by Defendants Ragavan, Wolf, Barsema, Garg, Lamond, Khosla and Kurtz.  The Registration Statement incorporated all of the materially false and misleading statements in the May, August and November 2000 10-Qs, and the Company's Forms 8-K filed with the SEC on March 20, 2000, July 20, 2000, August 2, 2000, October 12, 2000, October 13, 2000, January 18, 2001 and January 25, 2001.  The Registration Statement was false for the same reasons the statements in the forms 8-K were false.

209.    On April 2, 2001, Redback filed a Proxy Statement, which stated, in relevant part, as follows:

> In the fiscal year ended December 31, 2000, we sold an aggregate of approximately $8.0 million of goods and services to Broadband Office, Inc.  Vinod Khosla, a director of the Company, is a general partner of Kleiner Perkins Caufield & Byers, which owns more than 10% of the outstanding stock of Broadband Office, Inc.

210.    The Proxy Statement was materially false and misleading because it only partially disclosed the related-party transactions between Redback, Khosla and Broadband Office.  The Proxy Statement omitted material information that Redback (through Siara after the merger had been announced) had issued a lucrative stock-kickback payment to Broadband Office to induce it

1   to purchase equipment from Redback, and further to allow Redback to issue a materially false

2   and misleading press release announcing another purported "multi-year, multi-million" dollar

3   agreement that was designed to and did artificially inflate Redback's stock price.  The Proxy

4   Statement also was materially false and misleading because it further created the false illusion of

5   demand and deployment of Redback's products at Broadband Office.

6   211.   On April 2, 2001, Redback filed its Form 10-K for the year ended December 31,

7   2000 (the "2000 10-K").  The 2000 10-K repeated the financial results for the fourth quarter of

8   2000 and for the fiscal year ended December 31, 2000 first reported in Redback's January 17,

9   2001 press release.  Defendants Ragavan, Wolf, Barsema, Garg, Haque, Khosla, Lamond and

10  Kurtz signed the 2000 10-K.

11  212.   Redback explained in the 2000 10-K that in the fourth quarter of 2000 and for the

12  entire 2000 fiscal year, Qwest accounted for 18% and 15%, respectively, of Redback's total

13  revenue, more than any other company.

14  213.   The 2000 10-K contained a Report of Independent Accountants, signed by

15  Defendant PwC, stating that:

> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Redback Networks Inc. and its subsidiaries at December 31, 2000 and 1999 and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2000 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.  We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

214.   The 2000 10-K stated that Redback sold "products through a direct sales force" and that "substantially all of [its] revenues have been derived from sales to providers of digital subscriber line services," omitting the fact that it closed the sales through secret payoffs to Qwest and its executives.  For the fourth quarter 2000, Redback reported "record" revenues of $114 million and a pro forma net profit of $7.8 million.  Reporting "strong global demand" for the SMS™10000 and SmartEdge™ products, the Individual Defendants heralded Qwest as a marquee customer that had purchased both products and generated over $41 million in revenues for Redback in 2000.  These revenues generated by Qwest's purchases were highly material to Redback's business and reported financial performance.  The Individual Defendants knowingly, deliberately and with extreme recklessness caused Redback to overstate its reported revenues and earnings by failing to properly account for the undisclosed stock bribes issued to Qwest's executives, and the *quid pro quo* ASP services and $7 million IRU transactions with Qwest. PwC also failed to require Redback to properly book the cost of the $7 million IRU, which PwC knew was anomalous to Redback's business and purchased only to obtain Qwest's $30 million order in first quarter 2001.  PwC also should have required Redback to produce a copy of its purported multi-million, multi-year agreement with Qwest as part of PwC's annual audit procedures, and by failing to obtain this agreement PwC deliberately and recklessly certified materially false and misleading financial statements that failed to account for the stock bribes provided to Qwest's executives.

215.   Redback's statements in its 2000 10-K were materially false and misleading because:  the revenue, operating income, income before taxes, net income, basic net income per share, diluted net income per share figures, and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and quid pro quo transactions with Qwest.  Redback misrepresented its prospects for 2000 and beyond because Redback failed to disclose that it engaged in improper undisclosed bribes and quid pro quo transactions with Qwest as a primary means to generate revenue and that such conduct could lead to severe civil and criminal liability.  Redback's reported results were false and misleading because the Company failed to reserve sufficient amounts to cover the cost of

civil and criminal liabilities associated with its improper and undisclosed stock kickback payment schemes and quid pro quo transactions with Qwest.

216.    Redback also misled investors by assuring the market that the Company's 2000 10-K was prepared in accordance with SEC rules and regulations and by failing to disclose that improper conduct, such as paying undisclosed bribes to material customers, was a key component to its business model.  Further, the Company failed to disclose all material aspects of revenue earned from sales that were induced by bribes and *quid pro quo* transactions.  Redback's financial results in its 2000 10-K also were materially false and misleading as a result of GAAP violations.  Redback also misled investors by assuring the market that the Company's annual report was prepared in accordance with GAAP when in reality Redback violated GAAP as discussed in Section V below.

217.    The 2000 10-K also falsely stated that the SMS™ 10000 supported technologies and speeds such as "the faster data connection technologies and speeds commonly known as OC-12, asynchronous transfer mode, or ATM, and Gigabit Ethernet."  This statement was materially false and misleading because the SMS™10000 product was not able to support an OC-12 data connection in 2000 or 2001 or by the summer of 2002 when the Redback Sales Engineer left the Company after working on the 40 SMS™10000 units that had been returned by Qwest to be "rebuilt" in late 2001, according to the Redback Sales Engineer.

218.    Once again, Redback disclosed various "Risk Factors" while omitting the biggest risks of all:  (1) that its products were not properly functioning; (2) that its new SmartEdge™ equipment was significantly delayed in production with faulty technology; (3) that it was subject to a huge contingent liability from its scheme to bribe others to obtain their business; and (4) that its sales would plummet once it terminated its scheme or it was discovered.  Redback attempted again to blame any downturn in its business on a downturn in the economy and in the telecommunications sector generally, but that was a lie, as any downturn was experienced only when Redback stopped paying bribes to its biggest customers.  Once again, the Company gave itself a clean bill of health, stating that it was not aware of any legal proceedings against it which "would have a material adverse effect on its business," through it knew its fraudulent bribery

scheme presented an undisclosed potential liability that would, upon discovery, adversely effect its business.

219.   On April 2, 2001, armed with the knowledge that Redback had not inked any new deals with Quest since the early 2001 SmartEdge™ equipment sale (and that that sale was actually pursuant to the undisclosed Siara Warrant Agreement in November 1999), Ragavan, Wolf and the other Individual Defendants began to condition the market to an absence of new deals and a loss of revenue from the Company's biggest customer, so they caused Redback to foreshadow that the Company expected lower first quarter revenues.  Citing a weakened global telecommunications market, Redback announced that it expected revenues of $85 to $90 million and that it was writing off $24 million in excess inventory.  Redback hid the true reasons behind the anticipated revenue decline, which were that Redback's fraudulent scheme with Qwest was coming to a close as Qwest had fulfilled its purchase obligations under the friends and family agreement and the Siara Warrant Agreement and would not be purchasing any more of the SMS™10000 or SmartEdge™ 800 products; that the new SmartEdge product was seriously delayed in production; and that the excess inventory write-off was for SMS™ 10000 equipment that was inoperable and not saleable.  Nevertheless, as the partial truth became known regarding Redback's stagnant sales, lack of hard sales to back up previously-announced multi-million dollar agreements, excess equipment and declining revenues, Redback's stock price to fell from a close of $13.08 on March 30, 2001 to $11.07 on April 2, 2000 and then to $9.77 the next day.

220.   On April 11, 2001, the Company issued a press release announcing its financial results for its first quarter ended March 31, 2001. The press release and subsequent Form 8-K stated, in relevant part, as follows:

> Net revenue for the first quarter of 2001 was $90.9 million, compared with $34.2 million for the same period in the prior year, an increase of 166 percent. Pro forma net loss for the first quarter of 2001 was $18.4 million or $0.13 per share, which excludes acquisition-related charges, stock compensation charges, restructuring and certain inventory charges. This compares to pro forma diluted net income of $0.05 per share for Q4 2000 and $0.01 per share for the same period one year ago. Before pro forma adjustments, net loss for the first quarter of 2001 was $400.5 million or $2.92 per share compared to a net loss of $85.2 million or $0.96 per share for the same period in the prior year.

221.   The materially false and misleading statements contained in the April 11, 2001 press release caused the Company's stock price to rise from $15.84 to $17.70, an increase of $1.86, or 12%, between April 11, 2001 and April 12, 2001, which was caused by Redback's reported results that exceeded lowered expectations announced weeks earlier.

222.   Not only was the investing public misled, so were analysts.  Wells Fargo Van Kasper ("Wells Fargo") maintained its "Strong Buy" rating on Redback in its April 12, 2001 research report, in part because of the addition of Qwest as a customer.  Although the research report pointed out that "[m]anagement noted that several of its larger customers delayed deployments for both SMS™ and SmartEdge™ products," defendants knew that there was no delay on the part of Qwest because, in fact, Qwest would not be purchasing any Redback products whatsoever.  Moreover, defendants failed to disclose that Redback had not developed certain router capabilities for the SmartEdge™ product that had been promised to customers. Redback's Board and senior executives, including Kruep, Garg, Lamond, Ragavan and Kurtz, had known since August or September 2000, that the product would not be available and intentionally or with deliberate recklessness failed to revise Redback's sales and revenue forecasts for 2001, which included hundreds of millions of dollars in revenues based on the new product.

223.   On April 17, 2001, the Company filed a Form S-3/A Registration Statement and Prospectus for a secondary offering of 2,440,526 shares of the Company's common stock.  The Prospectus stated that Qwest accounted for 18% of the Company's revenue, more than any other Company, and failed to disclose the stock kickback bribes and *quid pro quo* transactions that had induced the sales to Qwest.  Defendants Wolf, Ragavan, Barsema, Garg, Haque, Khosla, and Lamond signed the Registration Statement filed in connection with the offering.

224.   Again, the Company's disclosure of "Risk Factors" and liabilities did not include any disclosure of its biggest risk and liability arising from its use of commercial bribery to operate sales and revenues.

225.   The April 17, 2001 Registration Statement contained the consent of PwC to the incorporation of the Company's 2000 10-K and the reference to PwC as "Experts".

226.   The Company's share price rose from $18.80 on April 17, 2001 to $19.93 on April 18, 2001, a gain of $1.13, or 6%, as a result of the materially false and misleading statements contained in the Company's April 17, 2001 filings.

227.   On May 15, 2001, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2001 (the "May 2001 10-Q").  The May 2001 10-Q was signed by Defendant Wolf.  It reiterated the financial results previously announced on April 11, 2001, and acknowledged:

> In each of the periods presented, we have had at least one customer that accounted for 10% or more of our total revenue in the quarter. In the first quarter of 2001, Qwest Communications International Inc. . . . accounted for 28% . . . of our total revenue.  For the twelve months ended December 31, 2000, sales to Qwest Communications International Inc. . . . accounted for 15% of our total revenue.

228.   Wolf was keenly aware of the $7 million IRU purchase demanded by Qwest, and he knowingly signed the materially false and misleading SEC filing, without disclosing the *quid pro quo* nature of Redback's sales to Qwest, and without requiring the Company to reduce its reported revenues and earnings to account for the cost of the economically worthless IRU.

229.   The filing of the May 2001 10-Q drove the Company's stock price higher – it rose $3.40 between May 15, 2001 and May 21, 2001, going from $15.60 to $19.00, a 22% increase.

230.   The May 2001 10-Q and April 11, 2001 8-K and press release were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

231.   On May 21, 2001, Redback announced that Defendant Ragavan had resigned from the Company and that Lamond would temporarily take the CEO spot.  In the press release, Defendant Lamond confirmed that "[t]he current business and the product schedules continue to be on track with the guidance that we have previously given."

232.   Ragavan's departure and Redback's analyst conference report were widely reported in the media.  A May 22, 2001 report on *Forbes.com* reported that Lamond reassured

investors that product schedules remain on track, yet Redback's newest SmartEdge™ product would hit the market one quarter later than expected.  The acceptance of this new product by carriers "is particularly critical to the company's intermediate-term revenue and gross margin prospects," said the analyst, who cut Redback to "neutral."  Lamond provided materially false and misleading information regarding the new SmartEdge™ product, which he had known since August 2000 was terminally delayed in production.  In May 2001, Lamond knew through meetings with Patel and others and the weekly executive meetings that the product would not be ready to ship until fourth quarter 2001, at the *earliest*, and that Redback could not meet its forecasted revenues without sales of that product, according to the VP NA Sales, and the Redback Sales VP.  The stock promptly fell 10.3%, to $17.05, during the midday trading.

233.    Ragavan's departure, coupled with the relatively recent departure of Wolf and Kruep, were viewed by most analysts as a sign of turmoil within Redback.  However, the continued reassurances by Lamond that product deployments would be back-end loaded in the quarter and that these departures would not affect the continued deployment of Redback's products, lulled investors into a false sense of security.  Not only was the new SmartEdge™ product delayed, but also analysts at Dain Rauscher Wessels on May 23, 2001 reported that Qwest had begun to order less product than expected.  The Dain Rauscher analyst stated that he believed that the reason for the decrease in orders was that Qwest was working through some inventory it already had on hand.  The truth, as Lamond well knew, was that Qwest did not need the equipment that it had purchased; the SMS™ 10000 equipment was inoperable; and Qwest's obligations under the secret stock-induced agreements had been fulfilled.  Therefore, Redback could no longer count on its illicit deals with Qwest and had to find other ways to pump up the stock.  In reaction to the news that Qwest was not ordering as much product as expected, Redback's stock dropped from a close of $17.31 per share on May 22, 2001 to a close of $16.05 the next day and continued to decline to $15.71 by the end of the week on May 29, 2001.

234.    On June 27, 2001, not even three months after issuing its first-quarter warning about lower revenues, Redback announced lower expected revenues in the second quarter 2001 of approximately $55 to $60 million and additional write-offs for excess and obsolete inventory.

Again Lamond, Wolf and other Individual Defendants caused the Company to attribute the lower revenues to an "unprecedented downturn in the telecommunications marketplace" and "back end loading of [Redback's] quarterly sales."  Redback failed to inform shareholders and investors that neither Qwest nor Williams were ordering any equipment from Redback in second quarter 2001 because Redback's fraudulent scheme with Qwest had come to an end as Qwest had fulfilled its obligations to Redback under secret stock-induced agreements and further because Williams was on the brink of bankruptcy and would not be ordering any equipment from Redback.  Even though the Company misled investors and shareholders as to the true reasons behind the significant decline in revenues and the write-offs, as the truth started to become known regarding Redback's stagnant sales, lack of hard sales to back up previously-announced multi-million dollar agreements with Qwest and Williams, excess equipment and declining revenues, Redback's stock price to fell from a close of $11.31 per share on June 27, 2001 to a close of $8.64 the next day.

235.    On July 11, 2001, the Company issued a press release announcing its financial results for its second quarter ended June 30, 2001. The press release and subsequent Form 8-K stated, in relevant part, as follows:

> Net revenue for the second quarter of 2001 was $59.4 million, compared with $48.7 million for the same period in the prior year. Pro forma net loss for the second quarter of 2001 was $37.0 million or $0.26 per share, compared to pro forma net loss of $0.13 per share for Q1 2001 and $0.05 per share loss for the same period one year ago.  The Q2 GAAP loss, which includes acquisition-related charges, stock compensation charges, restructuring charges and charges for inventory and other impairments, was $460 million or $3.26 per share.  During Q2 the Company determined that based on the current business outlook, the carrying value of certain assets would not be recoverable and should be adjusted.  As a result, the Company recorded GAAP reserves and write-offs that totaled $74.9 million for inventory and related claims and commitments in excess of projected demand, as well as investment impairments.  In addition, under a headcount reduction program announced in April 2001, the Company recorded a charge of $3.9 million for severance and related benefits.

236.    The Company's stock, which had traded at $19.00 on May 21, 2001, closed at $6.66 on July 12, 2001.  The Company's stock price dropped in response to recent announcements of declining revenues, losses, reserves and write-downs, which had been masked

1   by the Defendants' fraud.  The Company did not disclose that its poor financial performance

2   resulted from its inability to continue to generate revenues from the fraudulent deals with Qwest

3   and other telecommunication companies.  Redback's fraudulent scheme ended, and therefore its

4   revenues from that scheme dried up.  As Redback's true financial picture began to come into

5   focus, Redback's stock price fell.

6        237.   On July 12, 2001, Morgan Stanley Dean Witter research analysts issued a research

7   report recapping information provided by Redback the night before.  Without the surge of big

8   orders from Qwest, Redback's revenues fell 35% from first to second quarter 2001, with reported

9   revenues of $55 million.  The report stated that delays from Williams and other

10  telecommunications companies compounded Redback's problems, but Redback knew as early as

11  May 2001 that Williams would not be placing any orders with Redback because it was on the

12  brink of bankruptcy, according to the Redback Sales VP.  He further stated that he told Wolf that

13  Williams would not be ordering any product, and therefore, the Company would not meet its

14  second quarter 2001 targeted sales and revenues, but he said that Lamond and Wolf refused to

15  revise the Company's guidance.  The report stated that Redback's new version of the

16  SmartEdge™ product was "in trials with 5 customers," but the Redback Sales VP stated that he

17  was not aware of any trials of the product in July 2001, and that he knew that the new product

18  remained delayed in production at that time.

19       238.   On August 14, 2001, the Company filed with the SEC a Form 10-Q for its second

20  quarter ended June 30, 2001 (the "August 2001 10-Q").  The August 2001 10-Q, which was

21  signed by Defendant Wolf, reiterated the financial results previously announced on July 11, 2001

22  and, as in prior filings, noted the importance of Redback's sales to key customers.  The filing

23  stated that Qwest accounted for 27% of the Company's total revenue for the first six months of

24  2001 and 15% of Redback's revenue for all of 2000.  Redback's stock, which had closed on July

25  11, 2001 at $6.53, closed on August 14, 2001 at $6.05, a 7.3% drop.  Redback's stock was

26  dropping because of the revelation that the Company's revenues were declining as a result of

27  Redback's failure to obtain any business from Qwest.  This inevitable result, once the bribes had

28  stopped being paid, was hidden from investors.

239.     Redback's statements in its August 2001 10-Q and prior press release contained in its Form 8-K were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

240.     Wolf and the other Individual Defendants caused Redback falsely to attribute a fall off in the Company's revenues and decreased gross margins to: "a shift in product mix from the higher margin, SMS™ products, to the lower margin, SmartEdge product."  In addition, the Company falsely reported that: "gross margin will fluctuate in the future based on several factors, which include our ability to: 1) Control the mix of sales between our SMS™ and SmartEdge™ product families, 2) Introduce competitive product enhancements and upgrades, 3) Introduce new products, 4) Successfully integrate the Service Management products into our current SMS™ and SmartEdge™ product lines, 5) Control inventory costs, and 6) Maintain current price levels in an increasingly competitive environment."  Wolf and the other Individual Defendants omitted material information regarding a fall-off in revenues from sales to Qwest and the fact that Qwest's *quid pro quo* obligations under the "friends and family" and Siara Warrant Agreement stock bribes had been fulfilled.  They also knew that Qwest had not deployed the SMS™10000 product and was storing the unwanted Redback products in a warehouse.  While the Company told investors that Redback's business was suffering, Redback did not disclose that the reason for the poor performance was that the Company could no longer generate revenues from fraudulent deals that had in prior quarters sustained the Company.

241.     On August 17, 2001, the Company offered former senior Cisco executive Kevin DeNuccio employment with the Company.  The offer letter revealed that the Company provided Defendant DeNuccio with a base salary of $500,000 as well as $2.1 million in restricted stock, 6.5 million options to buy shares at $4.17 each, and a $3 million signing bonus.  These terms were confirmed in Redback's 2001 10-K.  On August 29, 2001, Redback announced that DeNuccio had joined Redback as President and Chief Executive Officer.  DeNuccio also became a member of Redback's Board, while Pierre Lamond remained Chairman of the Board.

242.    In an August 30, 2001 article, Light Reading.com reported on Redback's August 29, 2001 conference call.  In it, DeNuccio said new products were finished and in trials with 10 customers.  He further stated:

> "One of the most exciting things we have in the company is the IP router coming to market now. . . Cisco's virtually the only player in that space right now, and there's plenty of room for competition."  DeNuccio also commented briefly on how he views Redback's product after having helped sell Cisco's ONS 15400 next-generation Sonet add/drop multiplexer.  DeNuccio then called "the [Redback SmartEdge] a very competitive product in its space. . . It's a more intelligent platform, in my opinion."

243.    According to the Redback Sales VP, the new SmartEdge™ product's hardware and software were both not performing properly in August 2001, and Redback continued to try to correct the problems.  He further stated that he was not aware of, and would have been aware if there had been, 10 customers of Redback that had the new product in trials in August 2001. DeNuccio's comments were materially false and misleading, and he deliberately and recklessly disregarded material problems with the new SmartEdge™ router product when he touted the equipment to the public.

244.    In third quarter 2001, Redback's sales to Qwest completely dried up.  With paltry revenues, inventory write-offs and no sales or announcements of agreements with Qwest, Redback's stock fell from $9.05 per share at the beginning of July 2001 to $1.45 per share at the end of September 2001.  Although the disclosure of the fact that Qwest stopped buying product drove Redback's stock price down, Redback and the Individual Defendants still never disclosed the reasons why Qwest stopped purchasing Redback's products.  Later on in March 2002, word of Qwest's SEC, Justice Department and criminal investigations unfolded, and the truth regarding Qwest's, Weisberg's and Perusse's improper and illegal activities came out.

245.    Also, on October 10, 2001, the Company issued a press release announcing its financial results for its third quarter ended September 30, 2001. The press release and subsequent Form 8-K stated, in relevant part, that:

> Net revenue for the third quarter of 2001 was $37.0 million, compared with $59.4 million in the prior quarter and $80.6 million for the same period in the prior year.  Pro forma net loss for the third quarter of 2001 was $40.9 million or $0.28 per share,

1
2

compared to pro forma net loss of $0.26 per share for Q2 2001 and $0.02 per share net income, using fully diluted shares, for the same period one year ago.

3    246.    On October 10, 2001, the Company filed a Form S-8 Registration Statement with

4    the SEC, signed by Defendants DeNuccio, Wolf, Garg, Haque, Khosla, Lamond and Kurtz.  The

5    Registration Statement incorporated by reference the Company's prior May 2001 and August

6    2001 10-Qs and it registered 10.7 million shares of Redback stock, including 6,500,000 shares at

7    $1.675 by Defendant DeNuccio pursuant to a Stock Option Agreement.

8    247.    On October 11, 2001, research analysts at CIBC World Markets reported that

9    Redback's new SmartEdge™ router product was "targeted for launch within the next several

10   weeks," which as had been known by the Individual Defendants was a significant delay from the

11   Company's earlier promised first quarter 2001 launch.  Lamond, Wolf and other Individual

12   Defendants never disclosed the true target launch date in early 2001, and knowingly forecasted

13   revenues based upon sales of a product that they knew was moribund in production.  In reaction

14   to the news of the new SmartEdge™ product release, Redback's stock price increased from a

15   close of $1.64 on October 10, 2001 to $2.46 on October 11, 2001, and steadily climbed to $3.60

16   per share by October 15, 2001, after Wolf announced in a press release that a fourth-quarter sales

17   increase would "reverse a decline in the third-quarter from the previous and year-earlier

18   periods."  Analysts were quoted in an October 11, 2001 press release as interpreting Wolf's

19   comments as a "signal" that "demand will increase for [Redback's] products."  Wolf knowingly

20   or with deliberate recklessness omitted material information regarding the true reasons for the

21   decline in demand for Redback's products by Qwest, Williams, UUNET and others.

22   248.    On November 13, 2001, Redback filed its Form 10-Q (the "November 2001 10-

23   Q") with the SEC.  The Company's November 2001 10-Q was signed by Defendant Wolf and

24   repeated the Company's financial results announced on October 10, 2001.  The November 2001

25   10-Q stated that Qwest accounted for 22% of the Company's revenues for the first nine months

26   of 2001 and 15% of its revenues for all of 2000, more than any other company.  Redback's stock

27   price started to rise, reaching more than $6 per share in January 2002.

28

249.   All of the above statements by the defendants were false and misleading.  From Redback's February 5, 2001 announcement of its "multi-year, multi-million dollar" agreement with Qwest, through the rest of 2001, the defendants fraudulently misrepresented the Company's business deals with Qwest (and the Company's revenues), and falsely concealed that Qwest had no plans to purchase Redback's Smart Edge™ 800 product or any other Redback product absent Redback's reciprocal agreement to pay $7 million for IRU bandwidth on Qwest's network which Redback did not want or need and which it could not even unload on any third parties.  All of the above statements in 2001, like the Company's previous filings in the Class Period, were false and misleading, principally in their failure to disclose that the Company was, in effect, paying for Qwest's business, through Redback's transfers of securities (of Redback and Siara) to Qwest, and Redback's purchases of web-hosting services and Qwest products that Redback would not have purchased but for Qwest's agreement to purchase Redback products in exchange.  In disclosing that a large portion of the Company's revenues were from sales to Qwest, Redback was obliged to disclose that Qwest had no demand for Redback's products and, in fact, Redback's products were not functioning properly, and were not even being tested by Qwest pursuant to its customary business practices.  Unbeknownst to investors, Qwest was "purchasing" useless and "unstable" Redback products and storing them in a warehouse, because Redback had agreed to buy certain Qwest products and services, or because Redback had simply paid Qwest executives for their allegiance.  The statements were materially false and misleading because the revenue, operating income, income before taxes, net income, basic income per share, diluted net income per share figures and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

250.   As a result of Redback's secret and illicit scheme with Qwest, Redback's stock price was artificially inflated.  Additionally, the Company's financial statements were not prepared in accordance with GAAP, as represented by PwC, nor had PwC completed its audit in accordance with GAAS.  Had PwC properly audited Redback's books and records, it would have investigated the Company's largest sales accounts – to Qwest – and discovered that these sales

1   were not the result of a real demand for Redback's products, but rather, the sales had been

2   purchased by Redback through payments of securities to Qwest executives, or payments to

3   Qwest and Qwest affiliates.

4          251.   Throughout the remainder of the Class Period, Defendant Lamond and the other

5   Board members and executives failed to disclose to shareholders and investors that router

6   capabilities for the Company's SmartEdge™ product had been significantly delayed in

7   development and production, and consequently, Redback had no ability to meet its announced

8   target sales and revenues.  Furthermore, the effects of the illegal *quid pro quo* deals with Qwest

9   and others continued to roll forward throughout the financial statements and SEC filings in the

10  rest of the Class Period.

11         252.   In January 2002, Redback hired Arnold.  Prior to joining Redback, Arnold held

12  several positions at Qwest, including Senior Vice President of Global Business Markets, Senior

13  Vice President of General Business and Regional Vice President of National Accounts, in which

14  capacities Arnold structured and negotiated sales of Qwest products that would later be found to

15  be improper.  Defendants failed to disclose that Arnold at that time was the subject of an SEC

16  investigation into allegations that he and others at Qwest improperly inflated Qwest's revenues

17  by approximately $144 million in 2000 and 2001, through improper sales in order to meet

18  earnings projections and revenue expectations.

19         253.   On January 16, 2002, the Company issued a press release announcing its financial

20  results for its fourth quarter of fiscal year 2001 and year ended December 31, 2001. The press

21  release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the fourth quarter of 2001 was $40.2 million, compared with $37.0 million in the prior quarter. For the full fiscal year 2001 net revenue was $227.5 million compared to $278.0 million in fiscal year 2000.
>
> The GAAP net loss for the fourth fiscal quarter was $0.67 per share compared to a loss of $21.71 in Q3 2001. For fiscal 2001 the GAAP loss was $28.78 per share compared to an $8.68 loss in fiscal 2000. The GAAP loss in fiscal Q3 2001 included a write down of goodwill aggregating $2.7 billion.
>
> Pro-forma loss for the quarter was $0.20 per share compared to a loss of $0.28 in fiscal Q3.   Pro forma results exclude certain

> impairment charges, restructuring charges, stock and other compensation related charges, amortization of intangibles and other items . . . .

The press release showed the effect of the cessation of the fraudulent sales to Qwest – Redback's net revenues were declining – but there was no disclosure of the fraud or that it had ended. Investors were not aware that the Company's poor financial performance resulted from improper or illegal activities.

254.    On March 11, 2002, Qwest issued a press release acknowledging that the SEC was investigating its revenue recognition practices, including its sales of IRUs and the sale of equipment by Qwest to customers from which Qwest bought services or to which it contributed equity financing.  Because Qwest was Redback's largest customer, PwC knew or with deliberate recklessness disregarded (because it failed to investigate) that Qwest's IRU sale to Redback in 2001 was an improper reciprocal transaction of the kind being investigated by the SEC.

255.    On March 27, 2002, the Company filed its 2001 10-K, which was signed by Defendants DeNuccio, Wolf, Garg, Haque, Khosla, Lamond and Kurtz.  The 2001 10-K reiterated the financial numbers contained in the January 16, 2002 press release, and reported that during 2001, Redback sold $41.5 million of goods and services to Qwest, representing 18% of the Company's revenue that year.

256.    The 2001 10-K contained a Report of Independent Accountants signed by Defendant PwC.  The audit opinion contained substantially the same language as in the audit report contained in the 2000 10-K, noting, in particular, that Redback's financial statements had been prepared in accordance with accounting principles generally accepted in the United States (or GAAP) and audited by PwC in accordance with auditing standards generally accepted in the United States (or GAAS).

257.    The 2001 10-K also reported that:

> In 2000, we sold an aggregate of approximately $8 million of goods and services to Broadband Office, Inc.  One of our directors is a partner in an entity that owns more than 10% of Broadband's outstanding stock.  In 2001 and 2000, we sold an aggregate of approximately $41.5 million and $41 million, respectively, of goods and services to Qwest Communications, Inc. ("Qwest") and purchased an aggregate of approximately $10.5 million and $3

million, respectively, of goods and services from Qwest.   A director of Redback is also a director of Qwest.

258.   The 2002 10-K contained a Report of Independent Accountants signed by Defendant PwC.  The audit opinion contained substantially the same language as in the audit report contained in the 2000 10-K noting that Redback's financial statements had been prepared in accordance with GAAP and audited by PwC in accordance with GAAS.  The 2002 10-K also included false and misleading financial data from 1997 to 2001.

259.   The 2002 10-K stated:

These revenues were substantially lower than the sales we had anticipated coming into 2001 as a result of lower than anticipated deployments of our products by our customers, as the networking business specifically, and the economy generally, slowed down in 2001.

260.   Redback's statements in its 2002 10-K were materially false and misleading because:  the revenue, operating income, income before taxes, net income, basic net income per share, diluted net income per share figures, and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  Redback misrepresented its prospects for 2000 and beyond because Redback failed to disclose that it engaged in improper undisclosed bribes and *quid pro quo* transactions with Qwest as a primary means to generate revenue and that such conduct could lead to severe civil and criminal liability.  Redback's reported results were false and misleading because the Company failed to reserve sufficient amounts to cover the cost of civil and criminal liabilities associated with its improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  Furthermore, the decline in SMS™ revenue was not due to a downturn in the market, but instead was because Redback and the Individual Defendants could no longer rely on *quid pro quo*  deals with Qwest and other insiders.

261.   Redback also misled investors by assuring the market that the Company's 2001 10-K was prepared in accordance with SEC rules and regulations and by failing to disclose that improper conduct, such as paying undisclosed bribes to material customers, was a key component to its business model.  Further, the Company failed to disclose all material aspects of

revenue earned from sales that were induced by bribes and *quid pro quo* transactions.  Redback's financial results in its 2001 10-K also were materially false and misleading as a result of GAAP violations.  Redback also mislead investors by assuring the market that the Company's annual report was prepared in accordance with GAAP when in reality Redback violated GAAP as discussed in Section V below.

262.    Additionally, the Company's financial statements were not prepared in accordance with GAAP, as represented by PwC, nor had PwC completed its audit in accordance with GAAS.  Had PwC properly audited Redback's books and records, it would have used professional skepticism auditing the Company's largest sales accounts – to Qwest – and discovered that these sales were not the result of a real demand for Redback's products but rather, the sales had been purchased by Redback through payments of securities to Qwest executives, or payments to Qwest and Qwest affiliates.

263.    On April 10, 2002, the Company issued a press release announcing its financial results for its first quarter of 2002. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the first quarter of 2002 was $40.6 million, compared to $40.2 million in the prior fiscal quarter and $90.9 million for the same quarter in the prior year.

> The GAAP net loss for the quarter ended March 31, 2002 was $0.23 per share compared to a loss of $0.67 in fiscal Q4 2001 and $2.92 in fiscal Q1 2001.

> Pro-forma loss for the quarter was $0.19 per share compared to a loss of $0.20 in Q4 2001 and a loss of $0.13 in the first fiscal quarter of 2001.  Pro forma results exclude certain impairment charges, restructuring charges, stock and other compensation related charges, amortization of intangibles and other items . . . .

264.    Without the benefit of sales to Qwest, Redback's revenues had fallen by more than 50% from first quarter 2001 to first quarter 2002.

265.    On April 10, 2002, Wells Fargo Securities, LLC issued a research report in which it reiterated its strong buy rating on Redback based, in part, on the fact that "Redback has now stabilized its dominant position in the SMS™ industry.. . . [T]hree of the four domestic ILECs (Verizon, Qwest, and SBC) . . . have now bought into the SMS™ 10000."  According to the

Redback Sales Engineer, the SMS™10000 product was still not operational and would not support an OC-12 card in April 2002.  The purported success of the product was hyped in large part from Redback's early sale to Qwest, which was a bogus transaction that Redback entered in order to fraudulently book $20 million in revenue.  Redback never disclosed that Qwest and UUNET had returned to Redback all of the SMS™10000 products that they had purchased in third and fourth quarter 2000.

266.   On April 22, 2002, Redback filed with the SEC a Form 10-Q for the period ended March 31, 2002 (the "April 2002 10-Q").  The April 2002 10-Q, which was signed by Defendant Wolf, reiterated the financial results previously announced on April 10, 2002 and failed to disclose that Redback no longer had the benefit of secret sales deals with Qwest, which were induced by illegal stock bribes and used to artificially inflate Redback's revenues and stock price.

267.   On July 10, 2002, Qwest announced that the SEC had begun a criminal probe of Qwest.

268.   Also on July 10, 2002, the Company issued a press release announcing its financial results for its second quarter of 2002. The press release and subsequent Form 8-K reported, in relevant part, as follows:

> Net revenue for the second quarter of 2002 was $40.1 million, compared to $40.6 million in the prior fiscal quarter and $59.4 million for the same quarter in the prior year.
>
> Pro-forma net loss for the quarter was $0.16 per share compared to a loss of $0.19 in Q1 2002 and a loss of $0.26 in the second fiscal quarter of 2001.
>
> The GAAP net loss for the quarter ended June 30, 2002 was $0.40 per share compared to a loss of $0.23 in fiscal Q1 2002 and $3.26 in fiscal Q2 2001.

269.   During the July 10, 2002 Redback earnings conference call, Defendant Wolf stated that the Company "had basically doubled the revenue from [the SMS] 10000 this quarter from two quarters ago."  The product breakout for revenues for the Company was "roughly 6 million for service, 6 million for SmartEdge™ products and 28 million for SMS."  The SMS™ 10000 made up approximately 60 percent of the sales of SMS™ products, but the Company

1   failed to disclose that the SMS™10000 product would not support OC-12 speeds and capacity as

2   repeatedly reported by Redback in its SEC filings.

3         270.    On August 14, 2002, Redback filed with the SEC a Form 10-Q for the period

4   ended June 30, 2002 (the "August 2002 10-Q").  The August 2002 10-Q, which was signed by

5   Defendant Wolf and Defendant DeNuccio, repeated the financial results previously announced

6   on July 10, 2002.  The August 2002 10-Q falsely attributed Redback's decrease in revenues to a

7   "current downturn in economic activity [that] is continuing into 2002."  DeNuccio and Wolf and

8   the other Individual Defendants falsely reported in the 10-Q that "we currently have limited

9   visibility into our business prospects. On a forward-looking basis, we are planning our business

10  on the assumption that annual revenue in 2002 will be lower than in 2001."  DeNuccio, Wolf and

11  the other Individual Defendants did not wish to admit that the Company's prior growth and

12  business success had resulted from a fraudulent scheme which could no longer continue due in

13  part to the SEC criminal probe of Qwest and market scrutiny of that company.  Instead of

14  disclosing the fraud, they rationalized Redback's poor financial performance as caused by a

15  general "downturn in economic activity," when they knew that was not true.  They failed to

16  disclose that a material decline in Redback's revenues had resulted in large part from the loss of

17  its fraudulent business partner Qwest, and from the decline of other companies like Broadband

18  Office and Williams, to whom the Individual Defendants had provided secret stock kickback

19  payments in return for their promise of business.  Williams had filed bankruptcy in April 2002

20  after negotiating a restructuring with its creditors in November 2001.  Broadband Office

21  similarly filed bankruptcy and failed to pay millions in outstanding accounts receivable to

22  Redback for equipment purchases in 2001.

23        271.    On September 26, 2002, the Company announced that it expected lower third

24  quarter 2002 results.  The press release stated, in relevant part, that:

25            [The Company] expects revenue in the current fiscal quarter
          ending September 30, 2002 will be approximately, $15 to $20
26            million and a pro forma net loss of between $0.23 and $0.25 per
          share.

27

28

272.     During the September 26, 2002 Redback conference call, Defendant DeNuccio stated, in relevant part, that:

> [O]ur Q3 shortfall was compounded by the pending transition to the Next Generation SMS 10000 product, which we call Streamliner, which is scheduled for delivery in Q4.
>
> After working with our customers over the last couple weeks, and realizing the cost and margin impact to continue SMS 10000 deployment in Q3, we decided to preserve our long-term pricing model and gross margins and wait for the Next Generation delivery of the SMS product, which is expected to be delivered in Q4.  With current SMS 10000 sales now accounting for approximately 70 percent of overall SMS sales, some customers delayed orders and/or delivery of current SMS 10000s, deciding to wait for the new technology.

273.     Defendants knew the statements in the September 26, 2002 conference call were false and misleading because they knew the SMS™ 10000 was not capable of sustaining the speeds and capacity that Redback had touted in 2000 and 2001.  DeNuccio knew or deliberately and recklessly disregarded that the product was not operational and that material customers had returned material amounts of the equipment to Redback.  He and other Individual Defendants failed to correct prior disclosures regarding the product's capabilities and the truth regarding Qwest's returned purchases of non-operational units.

274.     On October 9, 2002, the Company issued a press release announcing its financial results for its third quarter of 2002. The press release reported, in relevant part, as follows:

> Net revenue for the third quarter of 2002 was $17.4 million, compared to $40.1 million in the prior fiscal quarter and $37.0 million for the same quarter in the prior year.
>
> Pro forma net loss for the quarter was $0.20 per share, compared to a loss of $0.16 in fiscal Q2 2002 and a loss of $0.28 in the third fiscal quarter of 2001.   Pro forma results exclude certain impairment charges, excess and obsolete inventory charges, restructuring charges, stock and other compensation related charges, amortization of intangibles and other items . . . .
>
> The GAAP net loss . . . for the quarter ended September 30, 2002 was $0.30 per share, compared to a loss of $0.40 in fiscal Q2 2002 and $21.71 in the third fiscal quarter of 2001.

275.     During the October 9, 2002 Redback earnings conference call, Defendant DeNuccio stated:

We do not believe these numbers reflect a new trend in business activity for Redback. The revenue shortfall was driven by significantly lower SMS sales, which resulted in only seven million in revenue for the quarter, versus our projected 28 million.

\*   \*   \*

The Redback Board of Directors and management team remain fully committed to achieving cash flow break even in the first half of 2003. . . . Let me reiterate our conviction – number one, we have enough cash to sustain us through the industry downturn; number two, we have a strategy to reach cash flow break even in the first half of 2003 through revenue growth, gross margin improvement and cost-cutting. Number three – we are the only router vendor in the top three that have optimized its product portfolio and operating system with a user to network focus for the network edge, which positioned us right in the sweet spot for being the router vendor of choice to build next generation edge networks for service providers. Finally, that our incumbent customer base continues to be delighted with our quality, our product design and our technical capability and is moving forward with us on both SMS and SmartEdge technology.

This was patently false, and DeNuccio knew it, as Qwest was not, as DeNuccio represented, "delighted with [Redback's] quality."

276.    On November 14, 2002, Redback filed with the SEC a Form 10-Q for the period ended September 30, 2002 (the "November 2002 10-Q"). The November 2002 10-Q, which was signed and certified by Defendants DeNuccio and Wolf, repeated the financial results previously announced on October 9, 2002. DeNuccio and the other Individual Defendants falsely reported in the 10-Q that Redback's reported sales and revenues declined because of a "current downturn in economic activity [that] is continuing into the latter half of 2002." They further falsely stated that they "currently have limited visibility into our business prospects," but DeNuccio and other defendants knew that the Company would no longer be reporting any revenues from Qwest, and they failed to disclose the truth behind bribes paid to Qwest's executives in exchange for Qwest's business and false and misleading press releases stating that Qwest was deploying Redback's products, when in fact it was not.

277.    On January 15, 2003, the Company issued a press release announcing its financial results for its fourth quarter of 2002 and fiscal 2002. The press release and subsequent Form 8-K reported, in relevant part, as follows:

Net revenue for the fourth quarter of 2002 was $27.6 million, compared with $17.4 million in the prior quarter. For the fiscal year 2002, net revenue was $125.6 million compared to $227.5 million in fiscal year 2001.   The company also announced the restructuring of Redback's executive team to more appropriately reflect the size and direction of the company.

The GAAP net loss for the fourth quarter of 2002 was $0.20 per share compared to a net loss of $0.30 in the prior quarter. For fiscal year 2002 the GAAP net loss was $1.13 per share compared to a $28.78 net loss in fiscal year 2001.  The GAAP net loss in fiscal year 2001 included a write down of good will aggregating $ 2.7 billion.

Pro-forma net loss for the fourth quarter was $ 0.15 per share compared to a net loss of $0.20 in the prior quarter.

278.   During the January 15, 2003 Redback earnings conference call, Defendant DeNuccio stated that he was "especially pleased with the company's cash management.  The cash burn during the quarter was 21 million, brings our total cash to 118 million, higher than the range we had forecasted during the last call."  Defendant DeNuccio also announced the imminent departure of Defendant Wolf from Redback.

279.   The above statements were materially false and misleading because the defendants knew Redback's SMS™ 10000 product was not functioning properly and the reduction in customer orders resulted from problems with the SMS™ 10000 and new SmartEdge™ product, and not with delayed orders.  Additionally, the defendants knew that, as the SEC was investigating Qwest's deals with equipment vendors, defendants could no longer purchase Qwest's business with illicit stock transfers and other schemes.  DeNuccio, Lamond, Garg, Kurtz and the other Individual Defendants knowingly or with deliberate recklessness overstated the Company's reported revenues and earnings because they were aware of significant contingent liabilities arising from Redback's secret stock bribes and improper *quid pro quo* deals with Qwest, which were then currently under investigation.

280.   On February 25, 2003, the SEC filed civil fraud charges against Arnold, among other executives at Qwest, charging him with violations of the federal securities laws.  The SEC's complaint charged Arnold with artificially inflating Qwest's revenue.  The SEC civil suit against Arnold specifically addressed transactions involving sales of Internet equipment and

1   services to the Arizona School Facilities Board and Genuity Inc.  Surprisingly, DeNuccio and

2   Redback's Board of Directors did not place Arnold on administrative leave until the SEC charges

3   were resolved, or if they did place Arnold on leave, they did not disclose the action to the public.

4       281.    The Company filed its Form Def 14A Proxy Statement (the "2002 Proxy

5   Statement") on March 28, 2003, which stated, in relevant part, as follows:

> In 2001, Broadband Office, Inc. went into bankruptcy.  Kleiner
> Perkins Caufield & Byers, of which Vinod Khosla, a director of
> the company is a general partner, owns more than 10% of the
> outstanding stock of Broadband Office, Inc.  Redback is currently
> a creditor of the bankruptcy estate in the amount of $1.9 million.

> In 2001, Redback sold an aggregate of approximately $41 million
> of goods and services to Qwest Communications and purchased an
> aggregate of approximately $8 million of goods and services from
> Qwest Communications.  Vinod Khosla, a director of Redback, is
> also a director of Qwest Communications.

12      282.    The Proxy Statement was materially false and misleading because it only partially

13  disclosed the related-party transactions between Redback, Khosla, Qwest and Broadband Office.

14  The Proxy Statement omitted material information that Redback (through Siara after the merger

15  had been announced) had issued a lucrative stock-kickback payment to Broadband Office and to

16  Qwest to induce each of them to purchase equipment from Redback, and further to allow

17  Redback to issue materially false and misleading press releases announcing additional purported

18  "multi-year, multi-million" dollar agreements that were designed to and did artificially inflate

19  Redback's stock price.  The Proxy Statement also was materially false and misleading because it

20  further created the false illusion of demand and deployment of Redback's products at Broadband

21  Office and Qwest.

22      283.    On March 31, 2003, the Company filed with the SEC a Form 10-K for the year

23  2002 (the "2002 10-K"), which was signed and certified by Defendants DeNuccio and Cronan,

24  reaffirming the financial results released on January 15, 2003.  The 2002 10-K was also signed

25  by Defendants DeNuccio, Cronan, Garg, Haque, Lamond and Kurtz.  The 2002 10-K reaffirmed

26  that "[d]uring 2001, revenue from Qwest Communications . . . accounted for 18% . . . of our

27  revenue . . . [and d]uring 2000, revenue from Qwest . . . accounted for 15% . . . of our revenue."

28

284.    Redback's statements in its 2002 10-K were materially false and misleading because:  the revenue, operating income, income before taxes, net income, basic net income per share, diluted net income per share figures, and pro forma figures were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  Redback misrepresented its prospects for 2000 and beyond because Redback failed to disclose that it engaged in improper undisclosed bribes and *quid pro quo* transactions with Qwest as a primary means to generate revenue and that such conduct could lead to severe civil and criminal liability.  Redback's reported results were false and misleading because the Company failed to reserve sufficient amounts to cover the cost of civil and criminal liabilities associated with its improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

285.    Redback also misled investors by assuring the market that the Company's 2002 10-K was prepared in accordance with SEC rules and regulations and by failing to disclose that improper conduct, such as paying undisclosed bribes to material customers was a key component to its business model.  Further, the Company failed to disclose all material aspects of revenue earned from sales that were induced by bribes and *quid pro quo* transactions.  Redback's financial results in its 2002 10-K also were materially false and misleading as a result of GAAP violations.  Redback also mislead investors by assuring the market that the Company's annual report was prepared in accordance with GAAP when in reality Redback violated GAAP as discussed in Section V below.

286.    The 2002 10-K contained a Report of Independent Auditors, signed by Defendant PwC.  The audit opinion was unqualified and in substantially the same form as the 2000 and 2001 10-Ks.

287.    The 2002 10-K stated that Arnold was no longer a Redback director and also stated, in relevant part, as follows:

> One of our officers is facing a civil SEC lawsuit related to his previous employment.
>
> On February 25, 2003, the SEC filed a civil lawsuit against eight current and former officers and employees of Qwest

1   Communications, regarding activities that occurred while each was
2   employed at Qwest.  One of the individuals named is Joel Arnold,
    our Senior Vice President of Field Operations, who was formerly
3   Executive Vice President of Qwest's Global Business Unit.  The
    SEC is seeking, among other remedies, that Mr. Arnold and four
    other defendants be permanently barred from serving as an officer
4   or director of any public company.

5   Although it is expected that such a civil procedure will take two to
    three years or longer to be adjudicated, an unfavorable result at the
6   end of such action against Mr. Arnold may result in him being
    unable to serve as an officer.  In addition, Mr. Arnold may be
7   distracted while defending against the allegations.

8       288.    Although the SEC investigation was ongoing, the 2002 10-K failed to mention

9   any investigation, informal or otherwise, by the SEC into Redback's dealings with Qwest

10  although, as Arnold knew, that was, in fact, a subject of the SEC investigation.

11      289.    On April 16, 2003, the Company issued a press release announcing its financial

12  results for the first quarter of 2003. The press release reported, in relevant part, as follows:

13  Net revenues for the first quarter of 2003 were $29.5 million,
    compared with $27.6 million for the fourth quarter of 2002 and
14  $40.6 million for the first quarter of 2002.

15  GAAP net loss for the first quarter of 2003 was $24.9 million or
    $0.14 per share compared to a net loss of $34.7 million or $0.23
16  per share in the first quarter of 2002.  Non-GAAP net loss for the
    first quarter of 2003 was $23.2 million or $ 0.13 per share
17  compared to $29.0 million or $0.19 per share in the first quarter of
    2002. Non-GAAP results exclude amortization of intangible assets,
18  stock-based  compensation,  and  realized  gain  on  certain
    investments.

19

20      290.    During Redback's April 16, 2003 Financial Release Conference Call, Defendant

21  DeNuccio stated as follows:

22  First of all, gross margins improved to 46 percent, which
    represents a 10 percent sequential improvement from Q4.  And
23  second, the important improvement in our cash management.  We
    reduced our cash use to only 16 million this quarter, also our
24  lowest in two years leaving our cash balance at 103 million.

25      291.    All of the above statements, beginning with the January 16, 2002 press release,

26  and continuing through the 2001 and 2002 10-Ks and interim quarterly reports, and the

27  Company's other filings, press releases and public statements, were false and misleading, and the

28  defendants knew it, as those filings failed to disclose that:

a.     Qwest did not need or want the products it purchased from Redback, and only purchased the products because Redback had transferred securities to Qwest executives, or because Redback agreed to purchase services or products from Qwest (or QCS) that Redback did not want or need;

b.     The SMS™10000 units that Qwest had purchased for $20 million in third quarter 2000 had been returned to Redback, but the revenue from the sale was not debooked;

c.     Qwest was not using the products sold by Redback, but was simply storing them in a warehouse;

d.     Qwest's buildup of its inventory of unwanted Redback products would likely lead to drastically reduced sales to Qwest, no sales at all, or decreased demand if Qwest sold the products on the gray market as it sometimes did with excess equipment, which would materially impact Redback's revenues and earnings;

e.     Redback's financial reporting was materially false because Redback was not properly accounting for the securities it gave the Qwest insiders in exchange for sales contracts, and was not properly accounting for Redback's reciprocal agreements to purchase Qwest products and services; and

f.     The Company failed to reserve sufficient amounts to cover the cost of civil and criminal liabilities associated with its improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.

292.    Each of the defendants knew that but for their false and misleading statements and fraudulent scheme, Redback's stock price would have been much lower and Lead Plaintiffs, and other members of the Class, would not have purchased Redback's stock which, at the time of each purchase, was artificially inflated by defendants' fraud and false and misleading statements.

293.    When the true performance of Redback began to be known by investors, Redback's stock price sank.  Although investors may not have known about who was lying or what the specific lies were, they learned that Redback was not what it was represented to be.  As that realization became evident to more and more investors, Redback's stock price dropped.

**Without the Sales From Bribery and Quid Pro Quo Transactions with Qwest,
Redback Descends Into Bankruptcy and Investors Begin to Learn Why**

294.    On May 15, 2003, the Company filed its Form 10-Q for the first quarter 2003 (the "May 2002 10-Q"). The May 2003 10-Q was signed by Defendants Cronan and DeNuccio. It reaffirmed the financial results announced on April 16, 2003.

295.    The May 2003 10-Q informed the investing public for the first time that the SEC was examining certain Qwest transactions involving Redback, stating, in relevant part, as follows:

> The Company has been informed that the SEC is examining various transactions involving Qwest Communications, some of which were entered into between the Company and Qwest. The Company is fully cooperating with the SEC regarding this matter. The transactions of which the Company is aware that are being reviewed were entered into prior to fiscal year 2002. The Company cannot predict the duration or outcome of the SEC's examination.

296.    On July 7, 2003, the Company announced that on June 23, 2003 it received a decision from the NASDAQ's Listing Qualifications Panel ("Panel") granting Redback's request for an exception to the National Market's minimum bid price requirement, as set forth in NASDAQ Marketplace Rule 4450(a)(5). According to the press release, the Panel decided to provide Redback with additional time to allow for developments in the SEC's rulemaking process and that, accordingly, Redback had until August 23, 2003 to regain compliance with NASDAQ's minimum bid price requirement.

297.    The Company also announced on July 7, 2003 that it had "entered into a lock-up agreement with holders of 67% of Redback's 5% Convertible Subordinated Notes due 2007 ("Notes") relating to a proposed recapitalization transaction involving a debt for equity exchange." The press release further stated, in relevant part, that:

> "We're very excited that this restructuring will significantly improve Redback's balance sheet and cash flows, therefore creating financial stability," said Kevin A. DeNuccio, President and CEO of Redback Networks. "This new financial model will increase our ability to innovate and grow."
>
> As part of the recapitalization, the Notes will be exchanged for common stock. If all of the Notes are exchanged, the noteholders

will receive approximately 95% of the issued and outstanding common stock immediately following completion of the transaction and the existing holders of common stock will initially retain approximately 5% of the issued and outstanding common stock of the company.  In addition, Redback's existing common stockholders will receive the right to increase their ownership by approximately an additional 10% of the company's outstanding common stock through the issuance of two types of seven-year warrants:  one for up to approximately 5% of the issued and outstanding common stock at an exercise price based on a company enterprise value of $250 million and one for up to approximately an additional 5% of the issued and outstanding common stock at an exercise price based on a company enterprise value of $500 million.

\*   \*   \*

Completion of the transaction is subject to the completion of the note exchange offer, which requires a minimum tender of 98% of the outstanding principal amount of the Notes, approval of existing stockholders, regulatory approval and other customary conditions.

298.    In Redback's July 7, 2003 Conference Call, Defendant DeNuccio pointed out that "the Lock-up Agreement . . . provides for the exchange of $467 million in outstanding debt for common equity."  Defendant DeNuccio further stated, in relevant part, that:

All in all, by accepting this deal, noteholders will receive common equity and can now participate in the upside of the company as we grow and regain our market leadership.  These noteholders have given us a strong vote of confidence by agreeing to take common equity in return for the elimination of our debt obligations.

Stockholders will no longer have $467 million in debt senior to their interest, and take a long-term view of the company, and once again begin to grow long-term value in our equity.

299.    During the July 7, 2003 conference call, Defendant Cronan pointed out that the lock-up agreement, combined with a reverse stock split shortly thereafter, maintained the Company's eligibility to list on the NASDAQ.

300.    During this same conference call, Defendant Cronan stated that:  "[w]ith two-thirds having agreed to the deal, we could go into a prepackaged reorganization plan if [the note exchange] fails to obtain adequate support."

301.    On July 16, 2003, the Company issued a press release announcing its financial results for the second quarter of 2003. The press release and subsequent Form 8-K reported, in relevant part, as follows:

Net revenue for the second quarter of 2003 was $22.2 million, compared with $29.5 million for the first quarter of 2003 and $40.1 million for the second quarter of 2002.

GAAP net loss for the second quarter of 2003 was $51.0 million or $0.28 per share compared to a GAAP net loss of $65.1 million or $0.40 per share in the second quarter of 2002. Non-GAAP net loss for the second quarter of 2003 was $26.3 million or $0.15 per share compared to a non-GAAP net loss of $26.4 million or $0.16 per share in the second quarter of 2002. Non-GAAP results exclude amortization of intangible assets, restructuring charges, stock-based compensation, realized gain and write-off of certain investments and certain impairment and inventory charges.

302.    During Redback's July 16, 2003 Earnings Conference Call, Defendant Cronan stated, in relevant part, that the Company's "quarter-end cash stood at $69.2 million, down $33.5 million from the previous quarter."  Defendant Cronan further stated that "of the $33.5 million, about $7.6 million was working capital.  About $10.4 was loss from operations, $2 million for capital purchases and $13.5 for the interest payments and restructuring."

303.    On August 6, 2003, the Company filed a Form S-4 Registration Statement containing an offer to exchange up to 47,500,000 post-reverse split shares of common stock for $467,500,000 aggregate principal amount of 5% convertible subordinated notes due 2007 and related accrued interest.

304.    On August 14, 2003, the Company filed its Form 10-Q for the second quarter of year 2003 (the "August 2003 10-Q").  The August 2003 10-Q reaffirmed the financial information released on July 16, 2003, and was signed and certified by Defendants DeNuccio and Cronan.

305.    On August 27, 2003, the Company announced that it had received another extension from the NASDAQ Listing Qualifications Panel to October 11, 2003.

306.    On October 1, 2003, Redback launched an exchange offer for all outstanding debt set to expire at 12:00 midnight, Eastern Standard Time, on October 30, 2003.  Under the terms of the offer, "[h]olders of notes will receive approximately 101.6 shares of common stock, after giving effect to an approximate 73.39:1 reverse stock split, for each $1,000 of principal amount of notes and related accrued interest exchanged."

307.   As reported on the website Lightreading.com on October 2, 2003, the SEC commenced an investigation into Redback's past involvement with Qwest.  The article, entitled "SEC Digging Deeper at Redback?" states as follows:

> In a filing with the SEC on Wednesday, [October 1, 2003], Redback said the SEC was looking at "the sale of products by Redback to Qwest, the purchases of certain products and services by Redback from Qwest, and certain equity investments."
>
> Redback senior VP Joel Arnold, who was an executive VP at Qwest until joining Redback in early 2002, is accused by the SEC of helping artificially accelerate Qwest's recognition of revenue in two transactions, one of which involved reselling telecom equipment.  "The SEC is seeking, among other remedies, that Mr. Arnold and four other defendants be permanently barred from serving as an officer or director of any public company," Redback's filing says.
>
> Redback notes in the filing that the SEC's civil suit against Arnold might cause some "distraction." . . . In this latest filing, however, Redback says the suit "may affect [Arnold's] ability to serve as an officer of our company."
>
> *   *   *
>
> Four former Qwest officials have been indicted this year for helping the carrier falsely recognize more than $33 million in revenues in 2001.   And at least one government agency has considered barring Qwest from future government business.

308.   The October 2, 2003 article further stated, in relevant part, as follows:

> The filing may raise some eyebrows, as it looks as if the SEC is taking a more particular interest in the Redback/Qwest relationship.  Qwest was a big player in Redback's rise as a startup, and the companies had several common ties that predate [Joel] Arnold's arrival at Redback.
>
> In 2000, Redback's sales to Qwest accounted for 15 percent of its annual revenues, or about $42 million.   In 2001, Qwest sales accounted for 18 percent of Redback's revenues, or about $40.8 million.  For a time, the two companies shared a board member in Kleiner Perkins Kaufield & Byers partner Vinod Khosla, who was an investor in Redback.  SEC filings and sources say that under Khosla's watch, several of Qwest's startup equipment suppliers gave top Qwest executives chances to buy their stock at dirt cheap prices.
>
> Shortly after Redback began supplying Qwest with equipment, in late 2000, Qwest's Cyber Solutions group announced a five-year, $18 million contract with Redback to help the vendor with

enterprise resource planning, customer relationship management, and manufacturing operations.

The revelation that the SEC is snooping into Redback's past came buried in the vendor's latest filing, which outlined to shareholders its proposed financial restructuring. Under terms of the plan, Redback needs its shareholders to approve a $467 million debt-for-equity swap that will leave them with only 5 percent of the company. If shareholders don't accept the deal, Redback would likely file for bankruptcy protection.

309. On October 10, 2003, the Company filed a SEC Form S-4, which was signed and certified by Defendants DeNuccio and Cronan, stating in pertinent part:

We have been informed that the SEC is examining various transactions involving Qwest Communications, some of which were entered into between us and Qwest. We are fully cooperating with the SEC regarding this matter and have provided relevant information in response to its requests. The transactions with respect to which the SEC has requested information from us were all entered into prior to fiscal year 2002 and involve the sale of products by Redback to Qwest, the purchases of certain products and services by Redback from Qwest and certain equity investments. We cannot predict the duration or outcome of the SEC's examination, and to date, the SEC has not informed us of their intent to pursue enforcement or any other action against us. If, however, the SEC determines to pursue enforcement or other action against us, our management could be distracted, we could incur substantial costs and there could be a material adverse effect on our business.

Redback's stock closed at $0.55 on October 10, 2003.

310. An article published on Broadbandlog.com on October 14, 2003 titled "All Eyes on Qwest?" states in relevant part as follows:

As you might already know companies like CoSine and Redback are under the microscope for giving stock options and other benefits to some Qwest executives in exchange for hefty equipment orders.

And that is not all. The Post reports that a "top Redback executive and a former Redback director have ties to Qwest." And they would be Joel Arnold, a former Qwest sales manager who left the company in December 2001 and was sued by the SEC in February, joined Redback in 2002. Vinod Khosla, a director at Qwest, served on Redback's board until last year.

311. A Wall Street Journal article published on October 15, 2003 also reported on the SEC investigation into Redback as follows:

Regulatory filings by Redback said the Securities and Exchange Commission is looking into "certain equity investments" by Qwest. Redback, based in San Jose, California, sold $81.5 million of goods and services to Qwest in 2000 and 2001, and bought about $13.5 million in services from Qwest, according to the filings. A federal grand jury is investigating business transactions between Denver-based Qwest and 11 of its vendors [including Redback] ....The grand jury is investigating whether former Qwest executives took discounted stock from some vendors in exchange for giving them business, some of which Qwest may not have needed.

312.    On November 3, 2003, Redback filed for Chapter 11 bankruptcy protection.  After trading as high as $179 during the Class Period, Redback's stock closed at $0.36 per share.  The prepackaged bankruptcy plan was approved and became effective on January 2, 2004.

313.    A November 24, 2003 investigation by *The Denver Post* reported that Michael Perusse, "Qwest's former top vendor-relations executive," was described by former employees of two Qwest suppliers – Redback and Corvis – as "Qwest's point man for deals in which Qwest pressured those companies to buy unneeded services from it before it would complete orders for their telecommunications equipment."  The article described the secret *quid pro quo* deal between Qwest and Redback as follows:

Perusse approached Redback Networks in late March 2001 with a surprise demand:  Before Qwest would complete its $30 million order for Redback gear, Redback had to buy something from Qwest.

Perusse wanted Redback to buy $7 million worth of transmission rights on Qwest's fiber-optic network, according to two former Redback employees familiar with the talks.

Redback, a small maker of telecom gear, had no use for the rights, which most often were sold to much larger companies.  But Redback gave in to Qwest's demands anyway as a way to get Qwest to close its purchase.

*            *            *

After relenting to Qwest's pressure, Redback tried to recoup its money by unloading the network rights – also called indefeasible rights of use, or IRUs – but found no takers, even at auction.

It wasn't Qwest's only swap with Redback.  In the third quarter of 2000, . . . Redback bought roughly $14 million of Web-hosting services from Qwest, the Redback veterans said.

> In return, Qwest bought $20 million of a Redback product called SMS 10,000, which Qwest had not tested in its labs before the deal, the two said.  Big telecom firms rarely, if ever, buy equipment without extensive testing.

314.    It was not until this news article exposed Redback's fraudulent course of business and *quid pro quo* transactions with Qwest that investors had reason to know why Redback's stock price had been artificially inflated.

## V.    REDBACK'S FRAUDULENT ACCOUNTING PRACTICES

### Generally Accepted Accounting Principles ("GAAP")

315.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice.  Those principles are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").  GAAP includes various authoritative pronouncements and literature, including Statements of Financial Accounting Standards ("FAS"), APB Opinions and Statements of Financial Concepts ("CON").

316.    Management is responsible for preparing financial statements that conform to GAAP.  As noted by the AICPA Auditing Standards ("AU"), Section 110.03:

> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

### SEC Regulations

317.    SEC Regulation S-X sets forth the form and content of and requirements for financial statements required to be filed as part of annual reports under Sections 13 and 15(d) of the Exchange Act.  The Company, as a registrant under the Exchange Act, is subject to Regulation S-X and its accompanying rules.  As set forth in SEC Rule 4-01 (a) of SEC

Regulation S-X, "financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a) (1). SEC Regulation S-K states the requirements of non-financial statement portions of annual reports under Section 13 or 15(d) of the Exchange Act.  The financial and non-financial information required to be disclosed in accordance with Regulations S-X and S-K are reported within Form 8-K, Form 10-Q and Form 10-K, among others.

318.   The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."  SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).  In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition."  SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (Oct. 15, 1970).  The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."  SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (Nov. 19, 1981).

319.   In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

320.   Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. §229.303].  In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable or unfavorable impact on net sales or revenues or income from continuing operations.

321.   The Instructions to Paragraph 303(a) further state:

[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . .

322.   The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As Securities Act Release No. 33-671 states:

The Commission has long recognized the need for a narrative explanation of the financial statements, because of a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

### Redback's Financial Disclosures Violated GAAP And SEC Regulations

323.   During the Class Period, Redback at the direction of Defendants Barsema, Ragavan, Khosla, Lamond, Kruep, Wolf, DeNuccio and certain of the other Individual Defendants, engaged in improper accounting practices and other improper disclosure practices in order to inflate the Company's reported revenues and overstate income from operations in violation of GAAP and SEC Regulations.  All of the Individual Defendants and Defendant PwC knew or, with deliberate recklessness, disregarded that Redback and Qwest engaged in a scheme and fraudulent course of business to materially misrepresent Redback's financial results and prospects, as well as its compliance with applicable accounting rules and regulations requiring proper disclosures.  The illicit practices were undertaken with the knowledge OF Redback's Board of Directors and at the direction and approval of Redback's top management, including defendants Barsema, Ragavan, Khosla, Lamond, Gentner, Kruep and Wolf, and were knowingly participated in by Perusse and Weisberg of Qwest.  Defendant PwC also knew or with deliberate recklessness disregarded that Redback and Qwest were entering into undisclosed *quid pro quo* arrangements and providing undisclosed material sales incentives to Qwest and other customers

1  to artificially inflate Redback's revenues and misrepresent the demand for and sales of

2  Redback's products.

3      324.   Regulation S-K, paragraph 229.101, required Redback to disclose the *quid pro*

4  *quo* arrangements and sales incentives that Redback provided to Qwest and others.  That

5  regulation requires the following matters to be disclosed within the narrative description of the

6  business:  "The dependence of [the Company] upon a single customer, or a few customers, the

7  loss of which would have a material adverse impact on the [Company]. The name of the

8  customer and its relationship, if any, with the registrant or its subsidiaries shall be disclosed if

9  sales to the customer…are made in an aggregate amount equal to 10 percent or more of the

10  registrant's consolidated revenues…."  Redback was required to fully disclose the nature of its

11  relationship with Qwest, including the undisclosed inducements and sales pacts with Qwest and

12  Qwest's executives.

13      325.   In each quarter during the one-year period from July 2000 through June 2001,

14  Redback's sales to Qwest generated between 18 and 24 percent of Redback's reported revenues.

15  Beginning in 1999 and continuing through the Class Period, Redback repeatedly announced

16  multi-million, multi-year agreements with Qwest and reported that Qwest was one of Redback's

17  largest customers, and that Qwest had selected Redback's SMS™ and SmartEdge™ products to

18  deploy in Qwest's vast network.  Redback's senior executives and Board members knowingly or

19  with deliberate recklessness caused Redback to create the false illusion that Qwest was a loyal

20  customer with long-term commitments to purchase Redback's equipment.  Through Defendants'

21  fraudulent scheme and course of business, Redback generated more than $80 million in reported

22  revenues from sales to Qwest, but the Company concealed from shareholders and investors that

23  Redback had bought and induced its sales through multi-million dollar agreements and bribes to

24  Qwest's executives.  Defendants Barsema, Ragavan, Khosla, Lamond, Kruep, DeNuccio, Wolf

25  and Gentner also concealed that Redback purchased $25 million in products and services from

26  Qwest that it did not really want or need to induce purchases under another undisclosed

27  agreement that obligated Qwest to purchase $40 million of Redback's equipment before

28  December 31, 2001.

### a.    Improper Purchase Accounting And Abuse Of Goodwill

326.    In March 2000, Redback purchased Siara for $4.5 billion in stock, of which $4.4 billion of the purchase price was allocated to goodwill, and in September 2000, Redback purchased Abatis for $655 million in stock, of which $567 million of the purchase price was allocated to goodwill.  In less than one year, in the quarter ended September 30, 2001, Redback, in essence, admitted that it had overpaid for Siara and Abatis and wrote-off $2.7 billion or 85% of the remaining unamortized amount of goodwill.  In other words, Redback overpaid for these two companies by $2.7 billion, meaning that Redback paid two times more for these two companies than they were worth.  Using its artificially-inflated stock as currency, Redback paid $5.1 billion for two companies that were only worth $2.4 billion.

327.    Under GAAP, specifically SFAS 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of*, goodwill should be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of goodwill may not be recoverable.  At the end of 2000, Redback knew that the new SmartEdge™ product would not be available to sell and generate significantly less revenue than when it had purchased Siara only nine months earlier.  Therefore, in compliance with GAAP, Redback should have estimated the future cash flows expected to result from the sales of SmartEdge™ equipment.  Because the expected future cash flows from SmartEdge™ sales were far less than the carrying amount of goodwill, an impairment loss should have been recognized in the fourth quarter of 2000 rather than during the third quarter of 2001.  Until the Siara goodwill was written down, Redback was reporting in its balance sheets overstated assets and stockholders' equity and overstating earnings in its operating statement.  At December 31, 2000, Redback overstated its assets and stockholders' equity by approximately $3 billion, or 174% and 269%, respectively, and its net loss for the year-ended December 31, 2000 was understated by $3 billion or 300% as a result of delaying the write down of goodwill in violation of GAAP.

328.    In connection with the Company's acquisitions, Redback also further violated GAAP through improper purchase accounting.  Under APB 16, *Business Combinations*, the purchase price paid to acquire a company should be allocated to all identifiable assets and

liabilities based on their fair market values.  FAS 2, *Accounting for Research and Development Costs*, provides that research and development costs should be charged to expense when incurred unless they have an alternative future use.  Redback's improper accounting techniques for IPR&D in the Company's acquisitions enabled Redback to acquire valuable research projects and technology from Siara and Abatis that would generate future revenue without incurring any associated costs, thus resulting in artificially inflated earnings.  By shifting $40.4 million from goodwill to one-time charge-offs in violation of GAAP, Redback was able to increase annual earnings by more than $10 million for each of the next 4 years.

### b.      Hidden Revenue-Generating Inducements

329.    By hiding revenue-generating inducements to Qwest, Redback materially misstated its financial statements during the Class Period.  In an ongoing scheme to inflate revenue, earnings and its stock price, Redback routinely purchased unneeded services from Qwest and gave a valuable warrant for Redback's stock to Qwest to obtain Qwest's commitment to buy equipment from Redback.  Without Redback giving "friends and family" stock and the Siara Warrant kickback (valued initially at $16 million and ballooning to $45 million) to Qwest insiders, and agreeing to purchase $25 million of unneeded services from Qwest, Redback would have been unable to sell any equipment to Qwest.  Qwest used several vendors to supply its equipment needs, and without these lucrative inducements Qwest refused to purchase equipment from Redback.  These events, which provided a material favorable impact on Redback's net sales, revenues and income, should have been disclosed.

330.    On November 27, 1999, one day before Redback's acquisition of Siara, Qwest agreed to purchase $40 million of equipment over the next two years in exchange for a warrant for 100,000 shares of Siara stock, which was exchanged for Redback stock.  The agreement allowed Qwest to exercise the warrant at $2 per share.  Under the agreement, Qwest was required to purchase "currently under development" equipment from Siara or its successors (which was known to be Redback) over the next two years.  The equipment price to be paid by Qwest was to be the same price as offered to third-parties.  The type of equipment was not defined in the agreement, and the warrant vested immediately and was not based on Qwest performing its part

of the agreement.  The Siara Warrant Agreement constituted a material event that Redback's management knew would have a favorable impact on net sales and revenues, and they further knew that the consequential Qwest sales would not necessarily be indicative of future operating results because of the limited time frame of Qwest's obligations under the agreement (2 years) and the fixed value of the sales ($40 million).  Thus, the terms of the agreement should have been fully disclosed.

331.  Because the Redback and Siara merger was imminent the value of the stock issued under the warrant was at least $16 million on November 27, 1999 and within a few months the value of the stock soared to over $45 million.  This meant that before Qwest purchased anything, the value of the warrant exceeded what Qwest was going to purchase from Redback.  Based on the lack of equipment specifications and preferential pricing in the agreement, the equipment purchase was clearly not important to Qwest, whereas the overall deal was extremely important to Barsema, Ragavan, Khosla and Kruep, who purposefully engineered the transaction in order to inflate Redback's revenue and earnings.

332.  Redback engineered the Siara Warrant Agreement and equipment transaction to make it extremely valuable to Qwest.  Without Redback's secret bribes to Qwest and its executives which added value to the transaction, Qwest would have had little motivation to enter into the transaction to purchase unspecified, "under development" equipment.  The transaction did not provide Qwest with any preferential pricing or any other benefits other than the huge incentive of obtaining stock with an initial value of $16 million, and the potential of increasing in value (through Qwest's $40 million revenue-generating purchases), which the stock did within a few months to an excess of $45 million.  The substance of the Siara Warrant Agreement was an agreement between Redback and Qwest, rather than between Siara and Qwest, and should have been accounted for accordingly.

333.  Under GAAP, specifically EITF 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring or in Conjunction with Selling, Goods or Services*, Redback should have accounted for the stock issued to Qwest as a sales incentive. The initial value of the stock was $16 million on November 27, 1999, and then increased to $45

1  million within a few months.  Under GAAP, the value of the warrant should have been

2  accounted for as a sales incentive which should have reduced the selling price of Redback's

3  equipment sales to Qwest.  The value of the warrant should have been recorded as a reduction of

4  revenue in the operating statement at the time of the related Qwest sales.

5       334.  In the Company's Consolidated Financial Statements in its 2000 and 2001 10-Ks,

6  Redback reported that it had "issued 18,400 …shares of common stock to consultants [and other

7  non-employees] in 1999. Grants to non-employee service providers and other non-employees

8  were vested at the date of issuance…No shares were issued to consultants [and other non-

9  employees] in 2001 or 2000."  These disclosures were inadequate and violated both FAS 123 and

10  SEC Regulation S-X.

11       335.  FAS 123, Accounting for Stock-Based Compensation, governs the accounting and

12  disclosure requirements for transactions that involve the issuance of equity instruments such as

13  stock, options and warrants to employees and non-employees.  FAS 123, paragraph 8, states that,

14  "[e]xcept for transactions with employees that are within the scope of [APB] Opinion 25, all

15  transactions in which goods or services are the consideration received for the issuance of equity

16  instruments shall be accounted for based on the fair value of the consideration received or the

17  fair value of the equity instruments issued, whichever is more reliably measurable."

18       336.  In addition, FAS 123, paragraph 46 states that "an entity [that issues stock to

19  employees and non-employees] shall provide a description of the [reason the shares were issued]

20  including the general terms of the [stock] awards, such as vesting requirements, the maximum

21  term of options granted, and the number of shares authorized for grants of options or other equity

22  instruments."  Redback's failure to disclose the transfer of 100,000 shares of Redback's stock

23  under the Siara Warrant Agreement and unknown quantities of "friends and family" stock to

24  Qwest and its executives violated FAS 123 and SEC Regulation S-X.

25       337.  In violation of Regulation S-K, the Individual Defendants also knowingly or with

26  deliberate recklessness failed to disclose the uncertainties that they knew or reasonably expected

27  to have a material unfavorable impact on Redback's net sales, revenues and income from

28  Qwest's reported multi-year, multi-million dollar sales contracts.  In reality, Qwest made no

1  commitment to purchase Redback's products and refused to honor its obligations unless Redback

2  met Qwest's demands to purchase products and services from Qwest and its affiliates that had no

3  value to Redback.  Further, in violation of Regulation S-K, the Individual Defendants also

4  knowingly or with deliberate recklessness disregarded and failed to disclose Qwest's demands

5  that Redback transfer securities to Qwest executives or purchase products or services from

6  Qwest and QCS, in order for Qwest to purchase products from Redback.

7          **c.      Material *Quid Pro Quo* Transactions Artificially Inflated Revenues**

8          338.    In fiscal year 2000, Redback agreed to purchase $18 million of unneeded ASP

9  services from Qwest as an inducement for Qwest to purchase $20 million of SMS™ 10000

10 equipment.  Then the following year, in fiscal year 2001, Redback agreed to purchase $7 million

11 of useless telecommunication transmission capacity from Qwest as an incentive for Qwest to

12 complete its $40 million purchase of SmartEdge equipment.

13         339.    Through these transactions with Qwest, Redback was in essence "purchasing" its

14 own revenue.  In order to generate $65 million of revenue from Qwest during the period from

15 July 1, 2000 to March 31, 2001 Redback gave a warrant for 100,000 shares of stock to Qwest

16 valued at $16 million and purchased $25 million of useless services from Qwest.  Therefore,

17 during this nine month period, Redback paid Qwest $41 million to get $65 million of revenue.

18 Redback was improperly paying $2 for every $3 of revenue generated from Qwest, and failing to

19 account for the transactions in accordance with GAAP.

20         340.    GAAP pronouncements prohibit a company's attempts to structure transactions in

21 order to circumvent accounting principles and present better operating results than actually exist.

22 In CON 5, *Recognition and Measurement in Financial Statements of Business Enterprises*,

23 GAAP requires that transactions are recorded in financial statements based on what GAAP refers

24 to as their "representational faithfulness."  Representational faithfulness is the correspondence or

25 agreement between a measure or description of the transaction and the event it purports to

26 represent. Representational faithfulness leaves no room for accounting that presents form and not

27 substance.  GAAP emphasizes the economic substance of events even though the legal form may

28 differ from the economic substance.  GAAP requires accounting for the substance of

1  transactions, rather than their form, so that the information provided in financial statements fairly

2  reflects the economic activities of the company.

3       341.    The $25 million of products and services that Redback purchased from Qwest

4  should have been recorded as a reduction of revenue in the operating statement at the time of the

5  related Qwest sales.  Although the form of the agreements between Redback and Qwest may

6  have the appearance of separate sale and purchase agreements, the simultaneous timing of the

7  agreements coupled with the useless nature of the ASP services and IRU that Redback received

8  from Qwest demonstrates that Redback's purchases were nothing more than inducements to have

9  Qwest fulfill its part of the fraudulent scheme.

10      342.    Redback should have accounted for the *quid pro quo* transactions in accordance

11  with EITF 01-9, *Accounting for Consideration Given by a Vendor to a Customer* (which includes

12  the codification of EITF 00-14, *Accounting for Certain Sales Incentives*).  In compliance with

13  GAAP, the *quid pro quo* purchases made by Redback from Qwest should have been accounted

14  for as a reduction of revenue with a corresponding reduction in earnings when the sales to Qwest

15  were recognized in Redback's consolidated statements of operations.

16                     **d.    Improper Revenue Recognition**

17      343.    Shipments of $20 million of SMS™ 10000 equipment to Qwest were recorded by

18  Redback as sales in the third quarter of 2000 even though the equipment was not operational.  To

19  enable Redback to meet its revenue and earnings targets in third quarter 2000, Qwest agreed to

20  take delivery of $20 million of non-operational equipment but later (after Redback reported

21  revenue from the sale) returned the equipment to Redback to be rebuilt.  Under GAAP,

22  specifically, CON 5, *Recognition and Measurement in Financial Statements of Business*

23  *Enterprises*, revenues are not to be recorded until goods are exchanged for cash and after the

24  goods have substantially satisfied the terms of the sales agreement with the customer.

25  Furthermore, SAB 101, *Revenue Recognition in Financial Statements*, provides that there are

26  four additional requirements before revenue can be recorded which are:

27          i.      Persuasive evidence of an arrangement exists;

28          ii.     Delivery has occurred;

1    iii.    Fee is fixed or determinable; and

2    iv.    Collectibility is probable.

3    344.    In connection with the $20 million sales to Qwest during the third quarter of 2000

4 Redback should have deferred recognition of <u>any</u> revenue until these criteria were met and until

5 <u>after</u> the equipment was made ready for use by Qwest in order to be in compliance with GAAP.

6 As a result of violating GAAP, Redback materially overstated revenue in the third quarter 2000

7 by $20 million or 24%.  Similarly, Redback overstated revenue in fourth quarter 2000 by at least

8 $4 million from sales of inoperable SMS™10000 units to UUNET.  In total, Redback materially

9 overstated revenues by at least $24 million in the second half of fiscal year 2000.

10              **e.    Material Overstatement Of Revenues And Gross Profit**

11    345.    Under GAAP, specifically CON 2, *Qualitative Characteristics of Accounting*

12 *Information*, the omission or misstatement of an item in financial statements is material if, in the

13 light of surrounding circumstances, the magnitude of the item is such that it is probable that the

14 judgment of a reasonable person relying upon the financial statements would have been changed

15 or influenced by the inclusion or correction of the item.  Further, APB 22, *Disclosure of*

16 *Accounting Policies*, states that a company should disclose the specific accounting principles and

17 the methods of applying those principles that are judged by management to be the most

18 appropriate in the circumstances to present fairly financial positions and results of operations in

19 accordance with GAAP.  The usefulness of financial statements for purposes of making

20 economic decisions about a company depends significantly upon the reader's understanding of

21 the accounting policies followed by the company.  Disclosure of accounting policies should

22 identify and describe the accounting principles followed by a company and the methods of

23 applying those principles that materially affect the determination of financial position and results

24 of operations.  Disclosure should encompass important judgments as to appropriateness of

25 principles relating to recognition of revenue.

26    346.    Furthermore, under SAB 99, *Materiality*, considerations of materiality should

27 include the effects on:

28    1.    Trend in earnings;

1     2.   Meeting analysts' consensus expectations [revenue]; and

2     3.   Stock price volatility to certain disclosures.

Sales to Qwest generated revenues of approximately $20 million or 24% of all revenue in the quarter ended September 30, 2000, $21 million or 26% of all revenue during in the quarter ended December 31, 2000, and $25 million or 28% of all revenue in the quarter ended March 31, 2001. All of these sales were dependent upon at least $41 million of sales incentives and *quid pro quo* purchases by Redback to generate the revenue.  Because the Qwest transactions were obviously material, the amounts and nature of the transactions should have been fully disclosed. Furthermore, because Redback was accounting for the sales incentives and *quid pro quo* purchases in violation of GAAP, Redback was overstating revenue by at least 29% in third quarter 2000, 8% in fourth quarter 2000 and by 15% in first quarter 2001.  Clearly, the Qwest sales incentives and *quid pro quo* purchase transactions were material to the operating results of Redback and should have been fully disclosed and recorded correctly in order for Redback to have been in compliance with GAAP.

**f.      Redback's Earnings Were Overstated By Unrecorded Loss Contingencies**

347.    Redback's revenue, operating income, income before taxes, net income, basic net income per share and diluted net income per share were improperly inflated by revenue derived from Redback's improper and undisclosed stock kickback payment schemes and *quid pro quo* transactions with Qwest.  Redback failed to disclose that it engaged in improper undisclosed bribes and *quid pro quo* transactions with Qwest as a primary means to generate revenue and that such conduct could lead to severe civil and criminal liability.  Redback failed to reserve sufficient amounts to cover the cost of civil and criminal liabilities associated with its improper and undisclosed stock kickback payment schemes and quid pro quo transactions with Qwest. Under GAAP, specifically FAS No. 5, *Accounting for Contingencies*, Redback was required to disclose the possibility of a loss contingency because there was at least a reasonable possibility that a loss may have been incurred.  The disclosure in the financial statements should have indicated the nature of the contingency and an estimate of the possible loss or range of loss, or

1  state that such an estimate could not be made.  As a result of the potential loss from these

2  contingencies, Redback's earnings during the Class Period were overstated by at least $80

3  million.

4  **The Overall Impact Of The GAAP And SEC Rules Violations**

5  348.   As a result of accounting for the sales incentives and *quid pro quo* purchase

6  transactions in violation of GAAP, Redback's financial statements were materially misstated:

7  •      For the quarter ended September 30, 2000 revenue and gross profit were each

8         overstated by $18 million, or 29% and 61%, respectively;

9  •      For the quarter ended December 31, 2000 revenue and gross profit were each

10        overstated by $8 million, or 8% and 15%, respectively; and

11  •      For the quarter ended March 31, 2001 revenue was overstated by $15 million,

12         or 15% and gross profit was dramatically altered from an actual <u>gross loss</u> of

13         $2 million to a reported <u>gross profit</u> of $13 million.

14  349.   Also materially overstated during the Class Period as a result of Redback's

15  fraudulent sales pacts with Qwest were Redback's net income, earnings per share, stockholder's

16  equity, and accounts receivable, current assets and total assets.  In addition, Redback's

17  accumulated deficit as reported within the Company's Balance Sheet in all Forms 10-Q and

18  Forms 10-K filed with the SEC subsequent to December 31, 2001 was materially understated to

19  the extent of the net income derived from the $41 million in revenue from the Qwest fraudulent

20  sales pacts.

21  350.   Furthermore, and equally as misleading as the above misstatements of revenues, is

22  the fact that the sales incentives and *quid pro quo* transactions were not disclosed, leaving

23  shareholders and investors unaware that Redback paid Qwest over $45 million so that Qwest

24  would become Redback's largest customer.  The omission in the financial statements of the

25  nature of the transactions with Qwest is material, as the undisclosed facts would have impacted

26  the judgment of investors relying upon the financial statements; that is, investors would not have

27  purchased, or would only have purchased Redback stock at substantially lower prices, had they

28  known that Redback paid $45 million worth of stock (not even including the unknown quantity

and value of "friends and family" shares) to Qwest to get $65 million of revenue from Qwest in a nine-month period from July 1, 2000 to March 31, 2001.  Consequently, in violation of GAAP and SEC Regulations, the overall impression created by Redback's financial statements was not consistent with the business realities of the Company's financial position and operations.

**VI.   SCIENTER**

351.   As alleged herein, the Individual Defendants acted with scienter.  They each and in concert knowingly or with extreme or deliberate recklessness engaged in acts, practices and a scheme and course of business that artificially inflated Redback's stock price beginning in May 1999 at the time of Redback's IPO, and continuing during the Class Period.  Defendants also knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and that such statements or documents would be issued to the public.  As alleged above, the Individual Defendants each participated in the fraudulent scheme, and knowingly or with deliberate recklessness caused Redback to issue the materially false and misleading statements, or knowingly or with deliberate recklessness substantially participated in the drafting, or acquiesced in the issuance or dissemination of such statements or documents in violation of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their acts, practices, and course of business, including receipt of information reflecting the true facts regarding Redback, their control over and/or receipt of information of Redback's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Redback, participated in the fraudulent scheme alleged, the principal purpose and effect of which was to create the false appearance of demand and revenue intending to deceive investors.

352.   Each of the defendants knew that Redback's "agreements" with and "revenues" from Qwest were fraudulently induced through bribes and *quid pro quo* transactions that had no valid business purpose and were designed to create a false impression of demand for Redback's products and false revenues, which were recorded by Redback during the Class Period. Defendants Barsema, Ragavan, Kruep, Khosla, Lamond and Garg solicited, negotiated and

1   authorized the deals with and attendant undisclosed bribes and sales incentives paid to Qwest and
2   to other material customers described herein, and each and all of the Individual Defendants with
3   deliberate recklessness allowed those deals and bribes to occur.  Each of the defendants was well
4   aware or with deliberate recklessness disregarded the fact that the purpose and effect of those
5   fraudulent deals was to:  (i) create the false impression that Qwest and other prominent
6   telecommunications companies were purchasing and deploying Redback's products, and (ii) to
7   inflate artificially Redback's revenues and thereby artificially inflate the Company's stock price.
8   All of the defendants were aware (or with extreme or deliberate recklessness disregarded) that
9   the SMS™ 10000 equipment being touted as part of the Qwest deals was not even operational at
10  the time that Redback sold $20 million worth of the equipment to Qwest, and $4-5 million of the
11  equipment to UUNET.  The defendants also knew when they touted the strong demand for the
12  SmartEdge™ product that the product had unstable software and hardware that prevented the
13  product from properly functioning, and that at least as early as mid-2000, the advanced features
14  for the SmartEdge™ equipment were not going to be ready for production or sales in 2001.  The
15  defendants' therefore knew that their predicted revenues from sales of the SmartEdge™ product
16  in 2001(and consequently overall revenues) would not be possible to obtain.

17      353.    Furthermore, the Individual Defendants had the motive to commit the fraud as
18  they enjoyed rich compensation packages, which depended in large part on the Company's stock
19  price.  In fact, the bulk of the Individual Defendants compensation was dependent on the price of
20  Redback's stock.  The Individual Defendants also received numerous options on Redback's
21  stock.  As Redback's stock increased in price, so did the value of the options granted to the
22  Individual Defendants.

23      354.    The Individual Defendants negotiated and approved, or with deliberate
24  recklessness allowed to occur, the *quid pro quo* transactions with Qwest and the falsifications of
25  Redback's financial results, in order to book revenues and convey the impression that there was a
26  sustained demand for Redback's products by Qwest.  The Individual Defendants engaged in the
27  fraud to maintain the illusion of growth and profitability at Redback, and to artificially inflate,
28  and then maintain, Redback's stock price.  Throughout the Class Period, the Individual

1   Defendants shared an overriding motive to enrich themselves through sales of Redback stock at

2   prices inflated by this fraud.

3   **Pierre R. Lamond**

4   355.   Defendant Lamond served as Chairman of Redback's Board from November 1996

5   through May 2003.  As Chairman, Lamond signed Redback's 2000, 2001and 2002 10-Ks, as

6   well as several Registration Statements.  He also served as CEO during May to August 2001.

7   356.   As a member of the Audit Committee, Lamond was responsible for ensuring that

8   Redback properly reported its financial statements in accordance with GAAP and properly

9   reported revenues and the true nature of the Company's material contracts, such as its large

10  contracts with Qwest during the Class Period.  This responsibility includes determining that the

11  auditors had completed their audit in accordance with GAAS.  As stated in Redback's 2001

12  Proxy Statement:

13          The audit committee reviews, acts on and reports to the Board of
            Directors with respect to various auditing and accounting matters,
14          including the selection of Redback's accountants, the scope of the
            annual audits, fees to be paid to Redback's accountants, the
15          performance of Redback's accountants and the accounting
            practices of Redback. The audit committee meets independently
16          with our independent accountants and our senior management and
            reviews the general scope of our accounting, financial reporting,
17          annual audit and the results of the annual audit, interim financial
            statements, auditor independence issues, and the adequacy of the
18          Audit Committee Charter.

19  357.   As alleged herein, Lamond participated in Redback's fraudulent acts, practices,

20  scheme and course of business.  Therefore, he knew or deliberately and recklessly disregarded

21  that the Company's financial statements did not comply with GAAP and that Redback was

22  overstating its revenues in material amounts.  According to the VP NA Sales, Lamond

23  understood the extortionistic tactics used by Qwest to generate revenues, and Lamond approved

24  Redback's improper recognition of revenue from *quid pro quo* sales to Qwest and signed SEC

25  filings that he knew omitted material information regarding Redback's sales, revenues and

26  earnings.  Lamond also breached his duty (both as a member of the audit committee and

27  chairman of the Board) to make sure that PwC properly audited Redback's financial statements,

28  including verification that operational equipment was shipped to Qwest, UUNET and other

material customers and that Redback's financial statements presented a true picture of the Company's operations and financial condition, which they did not because of the undisclosed stock payment kickbacks and *quid pro quo* agreements that were endemic to Redback's business.

358.    Also, according to the VP NA Sales, Lamond frequently interacted with PwC when Qwest refused to pay for $30 million of SmartEdge™ products during the first half of 2001 when Lamond assumed the position of CEO of Redback (in addition to his position as Chairman of the Board), and he discussed Redback's *quid pro quo* agreements and outstanding accounts receivables from Qwest with the VP NA Sales and other executives at Redback's weekly executive meetings in the first half of 2001.  The VP NA Sales said that he reported on the true nature of Redback's agreements with Qwest at Board meetings (while Lamond was present), and he said that the Board members (including Lamond) were all aware of Qwest's $40 million obligations under the Siara Warrant Agreement.  The VP NA Sales said that Lamond discussed with PwC the true facts surrounding Qwest's IRU sale to Redback and was present when PwC questioned Lamond and others regarding whether the $7 million IRU purchase should be charged against revenues recognized on the sale.  Lamond clearly understood the undisclosed fraudulent nature of Redback's reported sales to Qwest and knowingly or with deliberate recklessness caused Redback to issue materially false and misleading statements regarding such sales and the material revenues improperly recognized therefrom.

359.    Lamond personally signed SEC filings that he knew or deliberately and recklessly disregarded were false and misleading statements and omitted material information that was necessary under the circumstances to avoid making statements that were misleading.  Lamond also participated in a conference call in May 2001, and sat idly by when Wolf denied that customers were returning equipment to Redback.  Lamond had had a duty to speak truthfully on the call and correct any false or misleading information provided to analysts, investors and the public, especially when he assumed the helm of Redback in May 2001, and he breached this duty from the inception of his role as CEO.

360.    Lamond was a general partner of Sequoia, a venture capital firm that held a large stake in Redback during the Class Period, and Sequoia designated Lamond as its representative

on Redback's Board member at Redback.    Sequoia is reported to be the most successful Silicon Valley venture capital fund, and the distribution of 6.8 million artificially-inflated shares of Redback stock worth over $877 million to Sequoia partners (including Lamond) and investors in 1999 was a significant boost to the fund's performance.  On August 7, 2000, Sequoia distributed approximately 1.6 million shares (which was almost one-third of its holdings) of artificially-inflated Redback stock worth more than $226 million to the Sequoia partners (including Lamond) and investors.  Venture capital firms like Sequoia demand compensation of approximately 20% of the profit that they make for their limited partners.  This compensation is known as the "carry."  Sequoia's "carry" for the Redback investment was between $220 and $330 million, which was shared by Lamond and other general partners of Sequoia.

361.    With the benefit of Lamond's material non-public information (including information regarding Redback's inability to timely bring a new SmartEdge™ router to the market), Sequoia was able to execute the distribution near the height of the Class Period's artificial price inflation.  It was Sequoia's only distribution of Redback's stock to its partners during the Class Period.

362.    As Chairman of Redback's Board, and at certain times as the CEO of Redback, Lamond knew or with deliberate recklessness disregarded the truth about Redback's fraudulent course of business with Qwest.  Lamond knowingly or with deliberate recklessness signed Redback's materially false and misleading Annual Reports on Form 10-K, including the 2002 10-K filed in March 2003, which stated that sales to Qwest in 2000 and 2001 generated 18 percent ($41.7 million) and 15 percent ($40.95 million) of Redback's revenues in 2000 and 2001, respectively.  Through the Class Period, Lamond knew or deliberately and recklessly disregarded that the overall impression created by Redback's financial statements was not consistent with the business realities of the Company's financial position and operations.

### Vinod Khosla

363.    As stated in the 2001 Proxy Statement, defendant Khosla, along with defendants Ragavan and Lamond, collectively controlled, either directly or through beneficial ownership, at

1   least 11% of Qwest's outstanding common stock.  Khosla was KPCB's designated representative

2   on Redback's Board.

3       364.   On August 11, 2000 and October 17, 2000, when (during the Class Period)

4   Redback's stock traded at its highest levels (and before the price began to decline), affiliates of

5   KPCB (where Khosla was a general partner) distributed to their investors over $941.2 million in

6   Redback stock.  This was a major coup for KPCB and caused its funds to achieve extraordinary

7   performance.  Khosla's firm, KPCB, received compensation from the Redback investment in the

8   form of a "carry" of approximately 20 percent from the distribution in August and October 2000,

9   which amounted to between $188 and $282 million.  This was KPCB's only distribution during

10  the Class Period, and with the benefit of Khosla's material non-public information (including

11  information regarding Redback's inability to timely bring a new SmartEdge™ router to the

12  market), KPCB was able to execute the distribution near the height of the Class Period's artificial

13  price inflation.  It was KPCB's only distribution of Redback's stock to its partners and investors

14  during the Class Period.

15      365.   As a director of both Redback's Board and Qwest's Board, on which he also was

16  KPCB's designated representative, Khosla knew or with deliberate recklessness disregarded the

17  truth about Redback's fraudulent and material relationship with Qwest.  In fact, as Khosla had

18  positions on both sides of the transactions, he was in a unique position to know the true nature of

19  Redback's and Qwest's fraudulent business relationship, and he fostered that relationship by

20  arranging meetings between executives of Redback and Qwest.  Additionally, Khosla was on

21  Siara's board of directors at the time that Siara transferred the warrant for 100,000 share of

22  Siara's stock (which was to be exchanged for Redback stock) to Qwest executives in exchange

23  for Qwest's commitment to purchase Redback's products.  Also, at the time that Siara transferred

24  a warrant to Broadband Office, Khosla similarly was on the Board of Directors for Broadband

25  Office (and Qwest).  Siara transferred a warrant for 4,500 shares of Redback stock (which was to

26  be exchanged for Siara stock) to Broadband Office.  The Broadband Office deal was touted as

27  valued at $40 million, even though Broadband Office had no products, clients or business at the

28  time, and Khosla knew or recklessly disregarded that the deal between Broadband Office and

1  Siara (which was going to merge into Redback within months) was induced by bribes and

2  lucrative stock payments.  Redback's improper deals with Qwest and Broadband Office were

3  known to and facilitated by Khosla, both before and after the time he joined the Redback Board

4  following the Siara merger.

5  366.  Khosla did not confine his improper activities to Redback, as he served on the

6  boards of other equipment vendors who are charged with paying Qwest and Qwest insiders for

7  Qwest's business.  In addition to representing KPCB's financial investments as a director of

8  Redback and Qwest, Khosla also represented KPCB on the boards of Corvis Corp., Siara,

9  CoSine Communications Inc., Cerent and Juniper Networks Inc., while each of these equipment

10  vendors negotiated deals with Qwest.  Khosla similarly was on Concentric's Board of Directors

11  at the time that it accepted an undisclosed stock kickback payment in exchange for committing to

12  purchase Redback's equipment, and for allowing Redback to announce that Concentric had

13  selected Redback's products to deploy in its network.

14  367.  Khosla has admitted that he has helped set up deals between carriers and

15  equipment startups.  In a June 1, 2000 article in *Lightreading.com*, entitled "The Spotlight:

16  Vinod Khosla," Khosla explained how he provided what he called "venture assistance" in

17  arranging deals where a vendor agreed to ship products that it had not even developed.  Khosla

18  also stated that it would be "ethical" for an equipment startup to issue its equity to individuals at

19  its carrier customers, so long as the decision-maker at the carrier was "not the one getting the

20  equity" and as long as there was "full disclosure."

21  368.  Khosla knowingly or with extreme recklessness signed each of Redback's

22  materially false and misleading Registration Statements and Annual Reports on Form 10-K

23  during the Class Period following Siara's merger with Redback when he joined the Board.

24  Khosla knew that Redback had not fully disclosed – or disclosed at all – the covert warrants that

25  he and Ragavan caused Siara to issue in exchange for future commitments of purchase orders

26  (and the right to issue press releases announcing multi-million, multi-year agreements) from

27  Qwest and other companies.  He also authorized Redback's improper and undisclosed *quid pro*

28  *quo* transactions with Qwest, which he knew (or deliberately and recklessly disregarded) had

caused Redback to materially overstate its sales, revenues and earnings.  Khosla also knew or recklessly and deliberately disregarded that Redback's IRU purchase and ASP services purchase from Qwest and its affiliates had no valid business purpose because Khosla was on the Board of numerous telecommunications companies, including Qwest, and was intimately familiar with Qwest's business, and therefore knew that Redback would never have any valid business purpose for an IRU to support DS-3 capacity.  Khosla knew that the quid pro quo transactions with Qwest were simply devices to artificially inflate Redback's revenues, earnings and stock price.

369.    Like all of the other Board members, Khosla also knew that Redback's SMS™10000 product did not work when Redback shipped $20 million to Qwest in third quarter 2000, and he also was aware that the SmartEdge™ product that Redback shipped to Qwest would not support DS-3 capacity as was needed by Qwest.  Khosla personally authorized Redback's IRU and ASP services purchases from Qwest, and he knew or deliberately disregarded that Redback's reported revenues from *quid pro quo* sales to Qwest in exchange for Redback's purchases of the IRU and ASP Services were improper and overstated revenues and earnings at Redback because the products that were shipped were not operational and did not meet Qwest's requirements.

370.    Khosla has been linked directly to the improper activities at Qwest. Lightreading.com reported on October 2, 2003 that, under Khosla's watch, several of Qwest's startup equipment suppliers offered their stock to top Qwest executives at prices far below the prevailing market prices on those stocks.  He knew also that Qwest was being investigated beginning in 2001 for previous improper IRU sales, and nevertheless he knowingly signed off on all of Redback's materially false and misleading reported financial results for 2001 and thereafter, which included improper revenue generated from the worthless IRU purchase and other improper transactions with Qwest, and which he knew created an overall impression that was not consistent with the business realities of the Company's financial position and operations.

**Promod Haque**

371.    Haque obtained his seat on the Redback Board due to the substantial investment of Norwest Venture Partners VII L.L.P. ("Norwest") in Siara, and subsequent to the

1    Siara/Redback merger, he became Norwest's designated representative on Redback's Board.

2    Haque is a managing general partner of Itasca VC Partners VII L.L.P., the general partner of

3    Norwest.  During the Class Period, Norwest held as much as 4.76%, of Redback's common

4    stock.

5         372.    On August 15, 2000 and October 17, 2000, Norwest distributed 4 million shares

6    of Redback's common stock to its partners, disposing of nearly 60% of its holdings.  Based on

7    the closing prices of $150.09 and $135.26 per share on the dates of the distribution, respectively,

8    the total value of the stock distribution was $571.8 million.  Norwest was able to execute the

9    distribution near the height of the Class Period's artificial price inflation.  The August and

10   October 2000 distributions were Norwest's and its affiliates' only distribution of Redback's

11   stock to its partners during the Class Period.  Norwest's and its affiliates' general partners were

12   compensated with a "carry" of approximately 20 percent of Norwest's distributions, which

13   amounted to between $114.36 and $171.54 million in August-October 2000.  This was a major

14   coup for Norwest and caused its funds to achieve extraordinary results.  The distributions were

15   suspiciously timed to take advantage of Haque's material non-public information regarding the

16   delay in the new SmartEdge™ router, which Haque along with all of the other Board members

17   knew would not be available for distribution until late in 2001.  The distributions were also

18   suspiciously identical in timing as the distributions of KPCB and Sequoia during the Class

19   Period.  Nevertheless, Haque and the other Board members refused to revise the Company's

20   forecasted revenues for 2001, which they knew were impossible to reach without the new

21   product, and they delayed disclosure of the product's production problems until two quarters

22   after they had unloaded their Redback's stock holdings.

23        373.    Haque was member of the Audit Committee of Redback's Board.  As a member

24   of the Audit Committee, Haque was responsible for ensuring that Redback properly reported its

25   financials in accordance with GAAP and that the financials had been audited in accordance with

26   GAAS.  This responsibility includes determining that the auditors had completed their audit in

27   accordance with GAAS.  As stated in Redback's 2001 Proxy Statement:

28

> The audit committee reviews, acts on and reports to the Board of Directors with respect to various auditing and accounting matters, including the selection of Redback's accountants, the scope of the annual audits, fees to be paid to Redback's accountants, the performance of Redback's accountants and the accounting practices of Redback. The audit committee meets independently with our independent accountants and our senior management and reviews the general scope of our accounting, financial reporting, annual audit and the results of the annual audit, interim financial statements, auditor independence issues, and the adequacy of the Audit Committee Charter.

374.   As alleged herein, Haque participated in Redback's fraudulent acts, practices, scheme and course of business by knowingly or deliberately and recklessly signing all of the Company's materially false and misleading Registration Statements and Annual Reports on Form 10-K during the Class Period.  He knew or deliberately and recklessly disregarded that the Company's financial statements did not comply with GAAP and that Redback was overstating its revenues in material amounts through improper recognition of revenue from *quid pro quo* sales to Qwest and also breached his duty as a member of the Audit Committee to make sure that PwC properly audited Redback's financial statements, including verification that operational equipment was shipped to Qwest, UUNET and other material customers and that Redback's financial statements presented a true picture of the Company's operations and financial condition, which they did not because of the undisclosed stock payment kickbacks and *quid pro quo* agreements that were endemic to Redback's business.

375.   Haque knew or with deliberate recklessness disregarded the truth about Redback's fraudulent and material relationship with Qwest.  He knowingly signed off on all of Redback's materially false and misleading reported financial results for 2000 and thereafter, which created an overall impression that was not consistent with the business realities of the Company's financial position and operations.

376.   Below is a chart listing the Class Period distributions of over 12.1 million shares of Redback stock by the venture capital firms associated with defendants Khosla, Lamond and Haque during 2000:

**VENTURE CAPITAL FIRMS'**
**REDBACK STOCK DISTRIBUTIONS DURING CLASS PERIOD**

| Director/ Partner | Venture Capital Firm | Dividend Date | Shares Paid in Dividend | Closing Share Price | Value of Transaction on Dividend Date |
|---|---|---|---|---|---|
| **Vinod Khosla** | **KPCB** | | | | |
| | KPCB Entities | 8/11/2000 | 3,299,964 | $149.89 | 494,631,604 |
| | KPCB Entities | 10/17/2000 | 3,299,964 | $135.26 | 446,353,131 |
| | | **Sub Total:** | **6,599,928** | | **$940,984,735** |
| **Pierre Lamond** | **Sequoia Capital** | | | | |
| | Sequoia Capital VII | 8/7/2000 | 1,504,112 | $142.14 | 213,794,479 |
| | Sequoia Tech. Partners VII | 8/7/2000 | 87,044 | $142.14 | 12,372,434 |
| | | **Sub Total:** | **1,591,156** | **$142.14** | **$226,166,913** |
| **Promod Haque** | **Norwest Venture Partners VII** | | | | |
| | **Itasca VC Partners** | 8/8/2000 | 2,000,000 | $150.09 | 300,180,000 |
| | **Itasca VC Partners** | 10/17/2000 | 2,000,000 | $135.26 | 270,520,000 |
| | | **Sub Total:** | **4,000,000** | | **$570,700,000** |
| **GRAND TOTAL:** | | | **12,191,084** | | **$1.7 Billion** |

### Kevin DeNuccio

377.    On August 17, 2001, the Company offered Defendant DeNuccio employment with the Company.  Redback's 2001 10-K stated that the terms of his employment included a $500,000 base salary, 2.1 million in restricted stock, 6.5 million options to buy shares at $4.17 each and a $3 million signing bonus.  His stock grant restricted 4.875 million of the shares subject to the option in equal monthly installments of 2.777 percent over DeNuccio's first 36 months of his employment.  Within six months of his employment, all of DeNuccio's options for Redback stock were "out of the money" and therefore he was unable to unload his Redback stock during the Class Period.

378.    Prior to joining Redback, Defendant DeNuccio was the Senior Vice President of Worldwide Service Provider Sales at Cisco.  He joined Redback in part because of his relationship with Defendant Lamond, a partner at Sequoia.  According to an August 24, 2001

Lightreading.com article, "Sequoia funded Cisco in its early days and, later, it backed several of the companies Cisco has acquired.  Sequoia is also a backer of Callisma Inc., where DeNuccio holds a board seat.  DeNuccio also holds board seats at Salesnet Inc., BroadRiver Communications, Netpliance, and consultancy KPMG, where Cisco has an investment."

379.    As CEO and President of Redback, DeNuccio is (and was throughout the Class Period) responsible for approving major contracts.  Accordingly, the granting of stock to Qwest insiders, and the purchases of Qwest products made as part of the quid pro quo deals to obtain Qwest's business, could not have been made without DeNuccio's knowledge and/or approval, or his deliberate reckless disregard that those fraudulent actions were taking place.

380.    In fact, when Defendant DeNuccio joined the Company in August 2001, the NA VP Sales stated that he brought DeNuccio up to speed regarding the past-year's dealings with Qwest, including the faulty SMS™10000 equipment sale and concomitant quid pro quo purchase of ASP services; the Siara Warrant Agreement and Qwest's SmartEdge™ equipment purchases to fulfill its $40 million contractual obligation; and of course the IRU, which the NA VP Sales told DeNuccio had been purchased because of Qwest's extortionary tactics.  DeNuccio knowingly or with deliberate recklessness signed Redback's false and misleading 2001 and 2002 10-Ks, which reported material sales to Qwest and included fraudulently booked revenue and failed to disclose the stock kickback payments and quid pro quo deals with Qwest.  He also repeatedly touted the advantages of Redback's SMS™10000 and new SmartEdge™ router product as being better than Cisco's well-developed competing products, although he knew (as did all executives and Board members) that the products were not properly functioning.  DeNuccio also deliberately and recklessly falsely stated that the new SmartEdge™ router equipment was in trials with 10 customers in August 2001, when in fact this was not true.

## Vivek Ragavan

381.    Redback's 2002 Proxy Statement states that Ragavan was paid $413,000 in salary and bonus in 2000 and $194,124 in salary and $250,000 in severance in 2001.

382.    On May 1, 2001, Ragavan transferred 1,188,835 Redback shares, valued at the time of the transaction at over $23 million, to the Ragavan Family 2000 Living Trust.  The

1    trustees are Defendant Ragavan and his wife, Nilima Ragavan.  On May 21, 2001, the date of

2    Ragavan's sudden ouster from Redback, the Company repurchased 624,820 common stock

3    shares from the Ragavan Family 2000 Living Trust at an undisclosed price.  Based upon the

4    closing price of Redback stock on that date, the market value of the transaction was almost $11.9

5    million.

6        383.    During February through May 2001, Ragavan also sold 100,000 shares of

7    Redback stock, reaping more than $2.4 million.  These sales were Ragavan's only open market

8    sales during the Class Period and were suspiciously timed to take advantage of non-public

9    material information regarding Redback's new SmartEdge™ equipment production problems

10   and the Company's undisclosed stock kickback payments and *quid pro quo* deals with Qwest,

11   which Ragavan had personally authorized.  Ragavan and other Siara insiders exchanged their

12   stock for Redback stock in the Siara/Redback merger and they were restricted from selling their

13   new Redback shares for 180 days after the merger.  Therefore, Ragavan's significant holdings

14   were not available for sale until September 2000.  After Qwest had fulfilled its obligations under

15   the Siara Warrant Agreement in first quarter 2001, Ragavan knew that Qwest would not be

16   purchasing material amounts of Redback's equipment because the equipment did not meet

17   Qwest's requirements (especially because the SMS™10000 product was not operational when it

18   was shipped) and was not needed or wanted by Qwest.  He also knew that the new SmartEdge™

19   router equipment was not going to be available until late in 2001 and therefore the Company

20   would not be able to meet its forecasted revenues and earnings, and consequently he cashed out

21   over $37 million of Redback stock from February to May 2001.

22       384.    Ragavan signed the Siara Warrant Agreement in late November 1999 after he and

23   other Siara Board members had approved Siara's acquisition by Redback.  Therefore, he knew

24   that the Siara Warrant Agreement was actually an undisclosed agreement for Qwest to purchase

25   $40 million of equipment from Redback by December 31, 2001, which he knew would generate

26   material amounts of sales and revenues for Redback.  The fact that the warrant was issued by

27   Siara in late November 1999 when Siara was on the brink of its merger with Redback, and the

28   fact that it was issued to U.S. Telesource and not Qwest, but was expressly provided in exchange

1   for an undisclosed agreement with Qwest, demonstrates the intentionally covert nature of the

2   agreement and Ragavan's scienter in connection with all announced sales to Qwest during the

3   Class Period.

4       385.   Clearly, Ragavan should have caused, and knowingly failed to cause, Redback to

5   disclose the Siara Warrant Agreement when quarter after quarter, Redback held Qwest out as a

6   material customer that entered into several multi-million, multi-year agreements with Qwest.

7   Ragavan knew or with extreme and deliberate recklessness disregarded that Redback's purported

8   multi-million, multi-year agreement with Qwest in February 2001 was not in fact a new

9   agreement, but was the Siara Warrant Agreement that he and other Individual Defendants

10  intentionally had failed to disclose since 1999.  Ragavan also knew that Siara's warrant to

11  Broadband Office was not and should have been disclosed when Siara announced a multi-

12  million, multi-year agreement with Broadband Office in December 1999, and later in 2000 when

13  Broadband Office purchased over $8 million of equipment from Redback.

14      386.   Ragavan also knowingly or deliberately and recklessly authorized the IRU and

15  ASP services *quid pro quo* transactions with Qwest, which both were used to artificially inflate

16  Redback's reported revenues and stock price.  Throughout 2000 and until his ouster in May

17  2001, Ragavan repeatedly signed materially false and misleading Registration Statements and

18  Annual Reports on Forms 10-K that he and other Individual Defendants caused Redback to issue

19  to the public.  Ragavan knowingly and recklessly failed to disclose the bribes that had been paid

20  to Qwest and other material customers when he announced sales and revenues generated by these

21  customers and created a buzz that artificially inflated Redback's stock during the Class Period.

22  The transfers of securities to Qwest insiders and Redback's purchases of products and services

23  from Qwest and QCS that Redback did not want or need, as part of the illicit *quid pro quo* deals

24  with Qwest, would not have occurred without Ragavan's execution of the Siara Warrant

25  Agreement and authorization of the *quid pro quo* transactions, or his deliberate reckless

26  disregard for the propriety of those actions.

27      387.   During the Class Period, Ragavan also repeatedly emphasized that the Company's

28  release of the SMS™ 10000 product was a "major milestone" when he and all of the other

1   Redback executives and Board members knew that the product was not operational and would

2   not support the bandwidth capacities that Redback claimed.  Each quote and "sound bite" that

3   Ragavan provided for Redback's earnings releases and conference calls, SEC filings and press

4   releases was materially false and misleading, and Ragavan knowingly or with extreme and

5   deliberate recklessness issued the statements, which he knew created an overall impression that

6   was not consistent with the business realities of the Company's financial position and operations.

### Dennis Barsema

8   388.   Barsema was Redback's CEO at the time of the Company's IPO in May 1999 and

9   continuing through early 2000, when Ragavan assumed the position in connection with

10  Redback's merger with Siara.  As alleged herein, Barsema participated in Redback's fraudulent

11  scheme and was aware that Redback and Siara paid undisclosed stock kickbacks to Qwest

12  executives and others to induce Qwest and other companies to purchase Redback's products, or

13  at least to allow Redback to issue a press release announcing that these prominent

14  telecommunications companies had entered agreements to purchase and deploy Redback's

15  products.

16  389.   Barsema signed Redback's SEC filings, including the 1999 and 2000 10-Ks and

17  knew or with deliberate recklessness disregarded that the information therein was materially

18  false and misleading.  In fact, Barsema obtained the "friends and family" stock deal from Qwest

19  (through Weisberg) and knew that Redback failed to disclose the agreement when the Company

20  reported multi-million, multi-year agreements with Qwest and held Qwest out as a material

21  customer even though Qwest had purchased no material amounts of Redback's equipment or

22  deployed the equipment in Redback's network.

23  390.   Barsema left the Company in May 2001, and he cashed out over 1 million shares

24  reaping more than $134 million in Redback stock from July 1999 through December 2000 at

25  artificially-inflated prices.  During the Class Period, Barsemo sold more than 677,00 shares of

26  Redback stock worth more than $86 million, which was more than 23 percent of his Redback

27  holdings.  In March 2000, Redback's stock traded at its highest price during the Class Period,

28  and Barsema sold almost $23 million during the first week of March 2000.  Again, in August

through September 2000, Barsema sold more than $35 million of Redback's stock when the stock price hit a post-split high of approximately $150 per share.  All of Barsema's trades were suspiciously timed to take advantage of defendants' artificial inflation of Redback's stock as alleged herein, as well as non-public material information regarding Redback's product failures and undisclosed stock bribes to Qwest and other customers.

391.    Redback's 2001 Proxy Statement stated that in 1999, Defendant Barsema's last full year as CEO of Redback, Barsema was paid $325,000 in salary and bonus.  In 2000, he was paid $150,801 and received 180,000 Redback options, which had an exercise price between $53 and $163.62 and became vested only after one year from the date of the grants in February and July 2000.  By February 2001, all of these options were "out of the money."

392.    Barsema knew or with deliberate recklessness disregarded the truth about Redback's fraudulent and material relationship with Qwest.  From 1999 through May 2001 when he resigned from the Board, Barsema knowingly signed off on all of Redback's materially false and misleading reported financial results for 1999, 2000 and 2001, which created an overall impression that was not consistent with the business realities of the Company's financial position and operations.

**Gaurav Garg**

393.    Garg was a Redback Director during the Class Period and was the Company's Senior Vice President of Corporate Strategy and Business Development.  In December 2000, Garg took charge of Redback's Product Management to try to resolve some of Redback's problems.  Garg attended weekly executive meetings and was aware in at least August 2000 that Redback's new SmartEdge™ router problem would not be ready to sell until late 2001.  Consequently, Garg began dumping his Redback stock in October 2000, which was suspicious in timing because he, along with all Redback executives and Board members, knew that Qwest and other customers had no commitment to Redback's products, and because that is when Qwest's stock-induced and *quid pro quo* purchases from Redback dried up.  Redback's promising new SmartEdge™ router was delayed in production and consequently Redback's revenues were

1   going to fall woefully short of the Company's guidance and the stock price would fall

2   precipitously.

3       394.    Redback's 2001 Proxy Statement stated that in 2000, Defendant Garg was paid

4   $170,000 in salary and received 240,000 options, which had an exercise price between $53.00

5   and $163.62 and became vested after one year from the date of the grant.  The next year, these

6   options were "out of the money."  Between October 2000 and August 2003, Garg sold 2,206,538

7   shares of Redback stock for $43 million.  The shares sold constituted 12 percent of his Redback

8   holdings in 2000 and 34 percent in 2001.  The timing of Garg's sales was suspicious because he,

9   along with all Redback executives and Board members, knew that Redback's promising new

10  SmartEdge™ router was delayed in production and intentionally or with deliberate recklessness

11  failed to revise Redback's sales and revenue forecasts for 2001, and consequently that Redback's

12  revenues were going to fall woefully short of the Company's guidance and the stock price would

13  fall precipitously.

14      395.    As alleged herein, Garg participated in Redback's fraudulent acts, practices,

15  scheme and course of business.  Therefore, he knew or deliberately and recklessly disregarded

16  that the Company's financial statements did not comply with GAAP and that Redback was

17  overstating its revenues in material amounts.  He was aware that Redback paid undisclosed stock

18  kickbacks to Qwest's executives to induce Qwest to purchase Redback's products and to allow

19  Redback to issue press releases falsely announcing that Qwest was deploying Redback's

20  equipment.  Garg signed all of Redback's 10-K's issued during the Class Period, although he

21  knew or recklessly disregarded that the Company omitted in the SEC filings material, non-public

22  information regarding Redback's fraudulent course of business and deceptive acts and practices.

23  Garg personally signed SEC filings that he knew or deliberately and recklessly disregarded were

24  false and misleading statements and omitted material information that was necessary under the

25  circumstances to avoid making statements that were misleading.

26      396.    Garg knew that Redback had provided stock bribes to Qwest and that Qwest had

27  promised orders for Redback's equipment in return, and he sold material amounts of Redback

28

1  stock while in possession of this material non-public information, which he knowingly and

2  recklessly failed to disclose in order to prop up Redback's revenues and stock price.

3  **William H. Kurtz**

4  397.   Defendant Kurtz became a Redback Director in 1999 and remained on the Board

5  through 2002.  In that capacity, he signed all of Redback's materially false and misleading Forms

6  10- K during the Class Period, which he knew or with deliberate recklessness disregarded were

7  false and misleading.  Kurtz also signed Redback's materially false and misleading Registration

8  Statements during those same years.

9  398.   As a member of Redback's Audit Committee from 2000 through 2003 and a

10  certified public accountant ("CPA") with expertise in financial management, Kurtz was aptly

11  qualified to understand that Redback failed to properly disclose material information about the

12  Company's financial condition and prospects, and its reported sales to Qwest.  Kurtz signed each

13  Form 10-K and Registration Statement Redback filed with the SEC during the Class Period in

14  those same years.

15  399.   As a member of the Audit Committee, Kurtz was responsible for ensuring that

16  Redback properly reported its financial statements in accordance with GAAP and properly

17  reported revenues and the true nature of the Company's material contracts, such as its large

18  contracts with Qwest during the Class Period.  This responsibility includes determining that the

19  auditors had completed their audit in accordance with GAAS.

20  400.   Kurtz had one suspiciously-timed stock sale during the Class Period; for the

21  majority of the Class Period, his Redback options were under water.  In October 2000, Kurtz

22  sold 35,000 shares of artificially-inflated Redback stock, at a peak price reaping almost $2.5

23  million in illicit proceeds.  This sale represented approximately seventy percent of his Redback

24  shares at the time and was suspiciously timed to take advantage of the undisclosed material facts

25  and information described herein.

26  401.   As alleged herein, Kurtz participated in Redback's fraudulent acts, practices,

27  scheme and course of business. Therefore he knew or deliberately and recklessly disregarded that

28  the Company's financial statements did not comply with GAAP and that Redback was

overstating its revenues in material amounts. As a CPA, Kurtz understood that the extortionist tactics used by Qwest to report sales and revenues caused Redback's improperly recognize revenue from *quid pro quo* sales transactions that had no legitimate business purpose, and he signed SEC filings that he knew or deliberately and recklessly disregarded that omitted material information regarding Redback's sales, revenues and earnings. Kurtz also breached his duty as a member of the Audit Committee and a Director to make sure that PwC properly audited Redback's financial statements, including verification and operational equipment that was shipped to Qwest, UUNET and other material customers and that Redback's financial statements presented a true picture of the Company's operations and financial condition, which they did not because of the undisclosed stock payment kickbacks and quid pro quo agreements that were endemic to Redback's business.

## Craig Gentner

402.    Gentner was a Redback director. Redback's 2001 Proxy Statement stated that in 1999, Defendant Gentner received $45,000 in salary ($200,000 annualized) and 500,000 options. In 2000, he received $300,000 in salary and bonus and an additional 50,000 options. During the Class Period, Gentner sold 120,000 shares of Redback stock on October 16 and October 19, 2000, which was his only sale and was suspiciously timed to take advantage of material non-public information. His options were also restricted for one year from the date of the grants, and then vested 25 percent each year thereafter. During the Class Period, most of Gentner's options were under water.

403.    Prior to resigning in January 2001, Gentner knowingly or deliberately and recklessly signed materially false and misleading SEC filings, which he knew were false because he attended all of the Company's Board meetings and was aware that Redback was paying undisclosed stock kickback payments; generating artificially-inflated revenues from *quid pro quo* transactions with Qwest that had no valid business purpose; failing to revise guidance that was known to be false and shipping non-operational equipment to fraudulent book revenues and artificially inflate Redback's stock price.

**<u>Randall Kruep</u>**

404.     As Redback's Vice President of Worldwide Sales, Kruep personally negotiated *quid pro quo* transactions with Qwest.  Kruep communicated directly with Weisberg and worked out the "specifics" of Qwest's product orders that were provided in exchange for Redback's lucrative undisclosed sales incentives.  He also attended weekly sales meetings in August 2000 and thereafter, in which Patel admitted that the new SmartEdge™ technology capabilities that were then under development would not be ready to deploy in Redback's products in 2001.  He also caused Redback to ship non-operational SMS™10000 units to Qwest as part of a *quid pro quo* deal for Redback to purchase ASP services from Qwest, and contemporaneously he caused Redback to issue materially false and misleading press releases regarding purported agreements with Qwest that were in reality illusory and were induced by Kruep, Khosla, Ragavan, Barsema, Garg and others through millions of dollars in stock kickback payments and *quid pro quo* purchases of unneeded and unwanted products and services from Qwest.

405.     Kruep knew that the *quid pro quo* arrangements with Qwest caused Redback to overstate its revenues, assets and earnings, and with knowledge and deliberate or extreme recklessness, provided materially false and misleading information regarding Redback's purported sales and agreements to Larry Blair and others and designed and certified materially false and misleading information regarding sales and revenues that he knew was going to be published in Redback's press releases, financial statements and SEC filings.  The materially false and misleading statements contained in Redback's press releases, financial statements and SEC filings flowed as a natural consequence of Kruep's deceptive actions and conduct.

406.     Kruep was one of Redback's four highest paid executives.  As stated in the 2001 Proxy Statement, a large part of Kruep's compensation was contingent on his meeting sales revenue targets and upon the price of Redback's common stock, which he knowingly or with extreme and deliberate recklessness caused to be artificially inflated during the Class Period. Redback's 2001 Proxy Statement stated that in 1999, Kruep received $125,000 in salary and $295,000 in bonus and sales commission.  In 2000, he received $125,000 in salary, $344,219 in bonus and sales commission and 290,000 options to buy Redback stock in addition to the

1   300,000 options he was granted in 1998.  Thus, the bulk of Kruep's compensation was

2   contingent on reported sales and revenues.  In addition, the options did not vest for one year from

3   the date of the grant and had an exercise price between $53 and $163.62 per share.  Therefore,

4   they were "out of the money" when Kruep left the company in February 2001.

5       407.   In March, August, September and October of 2000, Kruep sold a total of 114,000

6   shares of Redback stock (reaping over $25 million), which was 16 percent of his holdings at the

7   time.  Kruep also reaped $23.5 million from his stock sales in 1999 by selling 189,450 shares of

8   his stock at artificially-inflated prices while in possession of material, non-public adverse

9   information regarding illicit agreements with Qwest and others and the fact that Qwest had not

10  deployed Redback's products as reported to the public.  Kruep timed these sales to take

11  advantage of material non-public adverse information regarding: Redback's non-operational

12  SMS™ equipment sales; the known delay in bringing the new SmartEdge™ equipment (and

13  attendant revenues) to the market; Redback's inability to meet its revenue forecasts in its

14  business plan for 2001; the upcoming fulfillment and expiration of Qwest's obligations under the

15  Siara Warrant Agreement; the *quid pro quo* nature of the ASP Services transaction; Qwest's

16  demands that Redback purchase sales and products from Qwest that Redback did not really want

17  or need; undisclosed stock kickback agreements and the overall chimerical nature of Redback's

18  business practices, revenues, earnings.

19      408.   Immediately prior to and continuing after Redback's IPO, Kruep knowingly

20  engaged in a scheme and course of business that operated as a fraud on Plaintiffs.

21      409.   Kruep was not content with the amount of his trading and complained in an

22  August 12, 2002 Wall Street Journal article "Dialing for Dollars:  Before Telecom Industry Sank,

23  Insiders sold Billions in Stock" that he would have sold much more if he could:

24          [I] "would have gotten out faster if I could have," and now wishes
            he could have sold double the $100 million [sic – it was $50
25          million] he sold in share transactions during 1999 and 2000.  Tight
            trading "windows," which limited when insiders can sell their
26          shares, prevented Mr. Kruep from doing additional selling, he says.

27  But for the trading restrictions in Redback stock, Kruep and the other Individual Defendants

28  would have engaged in more extensive unlawful insider trading based on material non-public

1   information.  Kruep's admission that tight trading windows restricted his selling is further

2   evidence of his scienter because Kruep sold a large percentage of his holdings that were

3   available to sell during the Class Period.

4                                           **Dennis P. Wolf**

5        410.   Redback's 2003 Proxy Statement stated that in 2001, Defendant Wolf received

6   $360,833 in salary and bonus and options for 1,810,683 shares of Redback common stock.  In

7   2002, he received $285,000 in salary and 250,000 Redback options.  In August 2001, Wolf

8   traded in over 700,000 options for re-priced options with an exercise price between $1.75 and

9   $4.17 per share, and the new options did not vest for one year from the date of the grant.  By

10  August 2002, all of Wolf's options were again "out of the money" as Redback's stock price had

11  fallen below $1.00 per share.  Thus, Wolf was not able to trade on the material non-public

12  information that he possessed.

13       411.   As alleged herein, Wolf participated in Redback's fraudulent acts, practices,

14  scheme and course of business.  Therefore, he knew or deliberately and recklessly disregarded

15  that the Company's financial statements did not comply with GAAP and that Redback was

16  overstating its revenues in material amounts.  Wolf understood the extortionistic tactics used by

17  Qwest to generate revenues, and Wolf approved Redback's improper recognition of revenue

18  from *quid pro quo* sales to Qwest (that he had authorized) and signed SEC filings that he knew

19  omitted material information regarding Redback's sales, revenues and earnings.

20       412.   Wolf personally signed SEC filings that he knew or deliberately and recklessly

21  disregarded were false and misleading statements and omitted material information that was

22  necessary under the circumstances to avoid making statements that were misleading.  In May

23  2001, Wolf knowingly or recklessly denied that customers were returning equipment to Redback.

24  Wolf had had a duty to speak truthfully on the call and correct any false or misleading

25  information provided to analysts, investors and the public.

26                                      **Thomas L. Cronan, III**

27       413.   As Redback's General Counsel and CFO, Cronan was in a unique position to

28  know the true nature of Redback's undisclosed *quid pro quo* contracts with Qwest and other

telecommunications companies.  He also had the power to but failed to have Redback disclose that it had transferred securities to Qwest executives and purchased Qwest's products or services solely to obtain Qwest's business.  Redback's 2004 Proxy Statement stated that in 2001, Defendant Cronan received $168,750 in salary and bonus; in 2002, he received $192,500 in salary, and in 2003 he received $271, 875.  He also received 644,659 options in 2003.

414.    The motive of the Individual Defendants to commit fraud included their ability to profit from sales of the Company stock at artificially inflated prices.  The Individual Defendants engaged in extensive insider trading during the Class Period, taking advantage of Redback's stock, which was artificially inflated by the defendants' fraud.  The Individual Defendants sold in the open market almost $178 million of their personal holdings of Redback stock, the majority of the sales taking place at prices many times the market price of Redback shares at the end of the Class Period.  All of these sales took place prior to the revelations of the fraud.

415.    In addition to the distributions that the Redback directors distributed to their venture capital firms, during 1999 through October 2003, Redback insiders dumped over $3.1 billion of the Company's stock at artificially-inflated prices.  During the Class Period and while in possession of non-public material adverse information, Redback insiders dumped over $467.8 million of the Company's stock as follows:

### REDBACK INSIDER STOCK SALES* DURING THE CLASS PERIOD

| NAME | DATE | PRICE | SHARES | PROCEEDS |
|---|---|---|---|---|
| **BARSEMA** President, CEO and Director (November 1997 to May 2001) | **12/9/1999** | **$150.02** | **40,000** | **$6,000,800.00** |
| | 3/1-3/3/2000 | $302.67-311.06 | 75,000 | $22,944,937.00 |
| | **3/9/2000** | **$359.91** | **1,000** | **$359,910.00** |
| | 8/2-8/4/2000 | $113.53-130.73 | 150,000 | $18,147,873.28 |
| | **8/30/2000** | **$137.01** | **8,000** | **$1,096,080.00** |
| | **8/31/2000** | **$149.39** | **200,000** | **$29,878,000.00** |
| | 8/31-9/1/2000 | $148.65-149.00 | 75,000 | $11,157,500.00 |
| | 9/5-9/6/00 | $148.83-150.51 | 47,500 | $7,119,775.75 |
| | 11/2-11/3/2000 | $115.45-119.31 | 39,000 | $4,517,862.40 |

---

* Transactions in bold are gifts or distributions that have been valued based on closing prices.

| NAME | DATE | PRICE | SHARES | PROCEEDS |
|------|------|-------|--------|----------|
| **BARSEMA** | 11/6/2000 | $110.50 | 5,000 | $552,500.00 |
| *cont.* | 11/17/2000 | $80.46 | 20,000 | $1,609,260.00 |
| | 11/21-11/24/2000 | $74.50-76.09 | 50,000 | $3,750,874.00 |
| | 11/27-11/28/2000 | $76.83-82.25 | 45,000 | $3,559,887.50 |
| | **11/29/2000** | **$69.63** | **20,000** | **$1,392,600.00** |
| | 11/29-11/30/2000 | $70.00-74.00 | 41,000 | $2,972,500.00 |
| | 12/5-12/7/2000 | $77.16-82.00 | 110,000 | $8,536,300.00 |
| | **12/8/2000** | **$93.76** | **20,000** | **$1,875,200.00** |
| | 12/8/2000 | $89.50 | 20,000 | $1,790,000.00 |
| | | **TOTAL:** | **966,500** | **$127,261,859.93** |
| **RAGAVANC** EO & Director (March 2000 July 2000) | 2/13/2001 | $31.00 | 30,000 | $930,000.00 |
| | 3/1/2001 | $30.25 | 5,000 | $151,250.00 |
| | 3/6/2001 | $27.31 | 5,000 | $136,562.50 |
| | 4/18/2001 | $20.16 | 10,000 | $201,565.00 |
| | 4/19/2001 | $21.00 | 10,000 | $210,000.00 |
| | 4/20/2001 | $22.00 | 10,000 | $220,000.00 |
| | 4/30/2001 | $19.00 | 10,000 | $190,000.00 |
| | **5/1/2001** | **$19.42** | **1,188,835** | **$23,087,175.70** |
| | 5/2/2001 | $20.01 | 20,000 | $400,200.00 |
| | **5/21/2001** | **$19.00** | **624,820** | **$11,871,580.00** |
| | | **TOTAL:** | **1,913,655** | **$37,398,333.20** |
| **GARG** Founder & Director (May 2001 to May 2001) | 10/19/2000 | $126.00 | 20,000 | $2,520,000.00 |
| | 10/23/2000 | $139.00 | 3,500 | $486,500.00 |
| | 10/24/2000 | $139.00 | 16,500 | $2,293,500.00 |
| | 10/27/2000 | $117.25 | 5,000 | $586,250.00 |
| | 10/31/2000 | $103.00-113.88 | 12,500 | $1,357,187.50 |
| | 11/1-11/3/2000 | $111.00-119.00 | 12,500 | $1,443,750.00 |
| | 11/6-11/8/00 | $95.50-110.65 | 36,000 | $3,833,947.60 |
| | 11/22/2000 | $74.66 | 10,000 | $746,563.00 |
| | 11/24/2000 | $76.65 | 14,000 | $1,073,125.20 |
| | 11/27-11/30/2000 | $71.97-82.61 | 50,000 | $3,871,252.00 |
| | 12/1/2000 | $76.69 | 10,000 | $766,875.00 |
| | 12/4-12/8/2000 | $75.06-89.98 | 90,000 | $7,598,873.00 |
| | 1/22-1/23/2001 | $40.05-41.36 | 20,000 | $814,038.00 |
| | 2/13-2/17/2001 | $32.16-36.91 | 73,500 | $2,457,556.95 |
| | 2/21-02/23/2001 | $29.50-31.37 | 77,500 | $2,342,331.75 |

| **NAME** | **DATE** | **PRICE** | **SHARES** | **PROCEEDS** |
|---|---|---|---|---|
| | 3/1/2001 | $29.15-30.29 | 105,000 | $3,140,700.50 |
| **GARG** | 3/5-3/8/2001 | $23.18-28.02 | 64,000 | $1,722,099.65 |
| *cont.* | 4/19/2001 | $21.00 | 50,000 | $1,050,075.00 |
| | 5/1-5/4/2001 | $19.19-24.78 | 175,000 | $3,767,550.00 |
| | 11/26-11/28/2001 | $5.02-5.24 | 90,000 | $455,490.00 |
| | 11/30/2001 | $4.12-4.20 | 52,500 | $217,252.00 |
| | 8/11/2003 | $0.37 | 1,219,038 | $444,948.87 |
| | | **TOTAL:** | $2,206,538 | **$42,987,866.02** |
| **KRUEP** VP Worldwide Sales (1999 to February 2001) | 3/9/2000 | $327.00 | 50,000 | $16,350,000.00 |
| | 8/10/2000 | $153.33 | 30,000 | $4,599,900.00 |
| | 9/6/2000 | $150.13 | 20,000 | $3,002,500.00 |
| | 10/24/2000 | $140.06 | 14,600 | $2,044,817.60 |
| | | **TOTAL:** | **114,600** | **$25,997,217.60** |
| **KURTZ** Director | 10/16/2000 | $130.64 | 35,000 | **$4,572,330.00** |
| | | **TOTAL:** | **35,000** | **$4,572,330.00** |
| **GENTNER** CFO (1999 to January 2001) | 10/16/2000 | $130.88 | 100,000 | $13,087,500.00 |
| | 10/19/2000 | $129.38 | 20,000 | $2,587,676.00 |
| | | **TOTAL:** | 120,000 | **$15,675,176** |
| **LAMOND** CEO & Director | 8/7/2000 | $142.14 | **1,504,112** | **$213,794,479.68** |
| | | **TOTAL:** | **1,504,112** | **$213,794,479.68** |
| **DENUCCIO** President, CEO and Director (August 2001 - present) | 8/18/2003 | $0.30 | 500,000 | **$150,000.00** |
| | | **TOTAL:** | 500,000 | **$150,000.00** |
| | | **GRAND TOTAL:** | **7,360,405** | **$467,837,262.43** |

**Contemporaneous Trading**

416.    Lead Plaintiff and other members of the Class and Plaintiffs who have filed actions that are consolidated herein purchased Redback stock contemporaneously with defendants' illegal insider sales of Redback stock.  The chart attached as Exhibit "B" hereto compares Plaintiffs' purchases with defendants' contemporaneous sales during the Class Period.

**Suspicious Timing of Sales**

417.    The overwhelming bulk of the Individual Defendants' sales of Redback stock was suspiciously timed and calculated to maximize personal benefit from undisclosed inside information during the six-month period between June and December 2000.  This period is when Qwest was actively purchasing Redback's products in undisclosed *quid pro quo* agreements and immediately follows Redback's May 30, 2000 press release touting its new SmartEdge™ 800 product during the period of the greatest sustained inflated share prices of Redback's common stock.  As demonstrated by the chart below showing, Redback's stock price (adjusted for 2-for-1 splits on August 20, 1999 and April 4, 2000), from June 4, 1999 (before the Class Period) to December 31, 2003, the Company's stock price rose dramatically from the beginning of the Class Period and remained at Class Period highs throughout the period of the greatest insider selling:



(The stock prices shown are adjusted for 2:1 stock splits in August 1999 and April 2000).

## PwC's Scienter And False And Misleading Audit Reports

418.    PwC is the largest firm of certified public accountants in the world and a member of the AICPA.  As the long-time auditor of Redback, PwC was intimately familiar with Redback's financial condition.  PwC had continual access to and knowledge of Redback's confidential corporate financial and business information, including agreements with Qwest and internal monthly financial statements.  Accordingly, PwC was privy to, knew of, or disregarded with deliberate or extreme recklessness the accounting improprieties and violations of GAAP set forth above.  PwC allowed Redback to utilize the improper revenue recognition techniques described herein and other improper accounting practices relating to the illicit *quid pro quo* and undisclosed sales inducements with Qwest, which PwC knew were improper and violated GAAP.

419.    Defendant PwC audited the financial statements of Redback beginning in 1996 and for each year thereafter including fiscal years 2000, 2001 and 2002 during the Class Period. PwC also reviewed the Company's quarterly financial results in fiscal years 2000, 2001 and 2002 through third quarter 2003, before they were publicly reported.  At the conclusion of each audit, PwC issued an unqualified opinion, stating that it had conducted its audits in accordance with GAAS and that the financial statements fairly presented Redback's financial position in accordance with GAAP.  PwC knew and expected that its audit opinions would be disseminated to Redback's stockholders and other potential investors in the Company, who would rely upon those opinions when making investment decisions.

420.    In addition to its audit work, PwC provided significant consulting, tax, restructuring, securities filings, and acquisition-related services to the Company from 1996 through 2003 and received large fees for those services.

The Audit Committee's Report in Redback's 2001 Proxy Statement, stated:

*Audit Fees*.  Fees for the fiscal year 2000 audit and the reviews of the Forms 10-Q are $235,000.

...

*All Other Fees*.  Aggregate fees billed for all other services rendered by PricewaterhouseCoopers LLP for the fiscal year ended

December 31, 2000 are $1,266,000, which principally related to acquisitions.

The Audit Committee's Report in Redback's 2002 Proxy Statement, stated:

*Audit Fees.* Fees for the fiscal year 2001 audit and the reviews of the Forms 10-Q were $320,000.

...

*All Other Fees.* Aggregate fees billed for all other services rendered by PricewaterhouseCoopers LLP for the fiscal year ended December 29, 2001 were $809,509, which principally related to acquisitions, securities filings, restructuring and tax related services.

The Audit Committee's Report in Redback's 2003 Proxy Statement, stated:

*Audit Fees.* Audit fees billed by PricewaterhouseCoopers LLP for the audit of our annual financial statements for the fiscal year ended December 31, 2002, and the review of our financial statements included in our quarterly reports on the Form 10-Q during the fiscal year ended December 31, 2002, totaled approximately $425,000.

*All Other Fees.* Aggregate fees billed for all other services rendered by PricewaterhouseCoopers LLP for the fiscal year ended December 31, 2002 were approximately $530,000, which principally related to tax related services. The audit committee has determined that the provision of such non-audit services is compatible with the independent accountants maintaining their independence.

The Audit Committee's Report in Redback's 2004 Proxy Statement, stated:

*Audit Fees.* For the years ended December 31, 2003 and 2002, PricewaterhouseCoopers billed Redback $936,000 and $425,000, respectively, for professional services rendered for the audits of the consolidated financial statements of Redback, the review of Redback's financial statements included in quarterly reports and assistance with and review of the registration statements and other regulatory filings.

*Audit Related Fees.* For the years ended December 31, 2003 and 2002, PricewaterhouseCoopers billed Redback $59,000 and $54,000, respectively, for assurance and related services related to consultations concerning financial accounting and reporting standards and Sarbanes-Oxley Section 404 advisory work.

*Tax Fees.* For the years ended December 31, 2003 and 2002, PricewaterhouseCoopers billed Redback $398,000 and $476,000, respectively, for services related to federal, state, and international tax compliance, tax advice and tax planning.

*All Other Fees.* PricewaterhouseCoopers billed Redback $2,000 in each of the years ended December 31, 2003 and 2002 for services

rendered for the license of an accounting and reporting research tool.

421.    Thus, in total, PwC received fees of approximately $1.5 million, $1.1 million, $955,000, and $1.4 million respectively, in 2000, 2001, 2002 and 2003 for audit and other services performed for Redback.  PwC also used its audit practice at Redback to cross-sell consulting services to other technology companies that were formed by KPCB and other powerful Silicon Valley venture capital firms and created a lucrative information technology and systems risk management consulting service and practice that brought millions of dollars to PwC and its partners.

422.    PwC held itself out globally as a "recognized leader in information security consulting" and formed many strategic alliances with companies funded and owned by KPCB and other companies affiliated with Defendant Khosla such as Sun Microsystems, which held itself out as "the world's top supplier of open network computing solutions."  Sun Microsystems was founded by Defendant Khosla.  The powerful Silicon Valley venture capital firms, like KPCB, Norwest and Sequoia controlled access to many lucrative business opportunities and provided access to those opportunities to PwC, which allowed PwC to earn millions of dollars in revenues.  As early as 1997, PwC announced an alliance with Internet Security Systems ("ISS"), which was a supplier of security management systems for network protection and also was funded and privately held by KPCB.  PwC's alliance with ISS continued during the Class Period as did another alliance between PwC's Management Consulting Services ("PwC MCS") and Sun Microsystems.

423.    PwC MCS is a member of PwC's worldwide network of firms.  In 1995, PwC and Sun Microsystems announced that they were expanding their existing relationship to provide support for systems information, software, integration, installation and service to simplify and speed for customers implementing "data warehousing projects."  In June 1998, PwC and Sun Microsystems announced another alliance to bring a new service called "Compas" to communications businesses and operators "around the globe."  Compas provided customers with a "fully integrated suite of applications such as customer care, billing, data warehousing, financial procurement and human resource management."  The press release announcing the

Compas alliance between PwC and Sun Microsystems stated that Sun Microsystems had more than $9 billion in annual revenues with business in more than 150 countries.  Also, on May 15, 1998, Sun Microsystems and PwC announced that they had signed a "memorandum of understanding" to set up an "authorized Java centre" at PwC's technology center in Salt Lake, Calcutta.  According to the press release, the center was designed to provide consultancy and customized solutions to manufacturing customers in India.  Similarly, in April 2000, PwC announced that it had launched a company known as Determinet, a European Internet and intranet strategic planning service company created by Sun Microsystems and PwC MCS.  These alliances represent only a few of PwC's lucrative ventures with affiliates of KPCB and Khosla.

424.  Sun Microsystems' formed a second Java center in India in May 1999, and the related press release stated:

> According to Forrester Research, the computing appliances market will grow 300 percent to $16.6 billion by the year 2002 as companies adopt appliances more rapidly than PCs, thanks to their simplicity, reliability and lower total cost of ownership. And IDC estimates that by the year 2002, the number of handheld, non-PC devices will soar to 55 million in the USA rivaling the installed base of home personal computers.

425.  PwC's worldwide information systems consulting practice reaped millions from its alliances with Khosla-affiliated companies and business ventures.  With Khosla, KPCB and Sun Microsystems firmly rooted in the rapidly-developing computing and information technology global sectors, PwC stood to profit handsomely from rubber-stamping Redback's improper accounting and standing idly by while Redback and Qwest boosted each other's revenues and stock price through reported revenues from improperly-induced and *quid pro quo* sales of services and products that were not functional and, as in the case of the economically worthless IRU, had no relation whatsoever to Redback's business.  PwC's Annual Review for fiscal year 2003 states that PwC's revenues exceeded $14.3 billion in 2003.  The InfoComm and Technology segments of PwC's practice constituted approximately 13% of PwC's revenues, and in 2001 and 2002, PwC reported that it earned $5.6 billion and $5.0 billion, respectively.  Thus, PwC had multi-billion dollar incentives to turn a blind eye to Redback's fraudulent scheme and deceitful course of business during the Class Period.

426.    Additionally, PwC was required to review the information in Redback's public filings that was outside the financial statements.  AU § 550, *Other Information in Documents Containing Audited Financial Information*, states that the auditor "should read the other [non-financial] information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, in the financial statements."  If the auditor determines that such other information is either inconsistent with the information contained in the financial statements or is aware of a material misstatement of fact contained in the other information, then the auditor should withhold the use of the audit report from the document containing the inconsistency or misstatement.  AU § 550 at ¶¶ 04-06.  Thus, PwC was required to review the non-financial disclosures in Redback's public filings to determine whether there was any inconsistency with the financial information presented in those filings and, if so, PwC was required to withhold its certification of the financials.

427.    Because PwC did not conduct its audits in accordance with GAAS, and because it acted with extreme and deliberate recklessness and consciously disregarded numerous warning signs that the Company's financial statements and other public statements were materially false and misleading, PwC did not discover, or recklessly disregarded, the fraudulent acts, practices and course of business being perpetrated by the defendants; the fact that the Company's revenues were overstated; and that Redback's financial statements were not prepared in accordance with GAAP.

428.    PwC failed to report or disclose the facts regarding the defendants' fraudulent scheme and deceitful course of business to the public because, by remaining silent and issuing false and misleading audit opinions, PwC could and did continue to receive millions of dollars in auditing and consulting work from Redback (and Redback's affiliated companies) and the Individual Defendants.  Additionally, by participating in the fraud or with deliberate recklessness allowing it to occur, PwC could continue its campaign to increase its market share for auditing, accounting and consulting services to be performed for Internet and telecommunications companies in general.

### PwC's Audits Of Redback Failed To Comply With GAAS

429.    In certifying Redback's financial statements for 2000, 2001 and 2002, PwC falsely represented that it had conducted its audits in accordance with GAAS, and that Redback's financial statements were prepared in conformity with GAAP.  GAAS are those standards recognized by the accounting profession as the professional standards issued by the Auditing Standards Board of the AICPA, which are to be followed by auditors in conducting an audit to determine if financial statements are presented in accordance with GAAP.

430.    During the Class Period, a series of unusual transactions, accounting practices and other facts put PwC on notice that enhanced audit procedures were necessary.  The rapid growth of Redback, especially in the face of a declining telecommunications sector, should have caused PwC to scrutinize Redback's accounting and its relationship with Qwest.  Additionally, the unusual and late-in-the-quarter transactions with Qwest, the unusual (for Redback) IRU purchase from Qwest, and Redback's purchase of redundant and unneeded IT services from QCS, a Qwest affiliate, constituted additional "red flags" to PwC as it planned for and conducted its audit.

431.    Rather than closely scrutinize Redback's financial statements and accounting as required by GAAS, PwC deliberately or with deliberate recklessness chose to overlook irregularities in Redback's sales to Qwest and improper revenue recognition from the sales.  PwC knew that Redback announced several multi-million, multi-year agreements including an agreement with Qwest in June 1999, but subsequently the Company failed to ship any equipment to Qwest or book any revenues for the announced sales for over one year, until the third quarter of 2000.  In addition, PwC knew that Qwest was Redback's single largest customer and that Redback recorded revenues from large sales to Qwest at the end of each quarter, which not coincidentally generated the amount of revenue required for Redback to meet its financial targets and Wall Street's expectations.  PwC knew that Redback booked $80.6 million in revenue (approximately 20% of the Company's total revenue) from its sales to Qwest in *quid pro quo* deals, including the $7 million economically worthless IRU purchase that had no business purpose whatsoever to Redback, but PwC simply ignored the obviously improper nature of the revenue booked in these exchange transactions.

432.     PwC also knew, from its audit, consulting and other non-audit services provided to Redback, that Redback managed its own IT systems internally.  Thus, PwC knew that Redback had no need for the ASP services that Redback purchased from QCS, a Qwest affiliate, as QCS would, under that contract, manage various IT applications that Redback was already managing in-house.  PwC also was well aware of the market cost of IT services, and knew that Redback was paying QCS for such services, and thus knew that such amount was astronomical given Redback's size and needs.

433.     According to the VP NA Sales, PwC also was aware that Redback had between $35-40 million in outstanding receivables for several months from sales of equipment to Qwest and that Redback also refused to pay for non-performing ASP services that it had purchased from Qwest.  PwC also knew that Redback had agreed to purchase the $18 million of unneeded ASP services from an entity – Qwest (or Qwest's affiliate) – that was also agreeing to purchase $20 million of Redback's SMS™ 10000 equipment.

434.     Year after year, Redback announced multi-million, multi-year agreements with Qwest and other customers, and these purported agreements (which clearly reflected the "friends and family" shares and Siara warrants provide to customers) were available to and were or should have been reviewed by PwC because the revenue generated by sales to large customers, and especially Qwest, was highly material to Redback's reported revenues.  PwC knowingly or with deliberate recklessness ignored the obvious material misstatements in Redback's financial statements, particularly with regard to revenues, and the true nature of Redback's fraudulent course of business with Qwest and other customers.

435.     PwC was aware of other facts regarding the fraud.  PwC knew, from its attendance at Redback Board meetings, that Redback was not by August 2000 able to successfully develop the SmartEdge™ product and so could not ship in 2001 as planned.  Thus, PwC knew that Redback could not meet its projected revenue targets, established guidance or Wall Street's expectations in 2001, but the Board refused to revise the Company's revenue targets or business plan for 2001.  Thus, PwC knew that the Company was already lying to

investors, as its projected revenue and guidance, based on the SmartEdge™ sales that would not occur, were false.

436.     Under GAAS, particularly AU § 316, Consideration of Fraud in a Financial Statement Audit, and AU § 110.01A, auditors have a defined responsibility to detect material misstatements in financial statements due to fraud.  AU § 316 specifically identifies risk factors relating to misstatements arising from fraudulent financial reporting, including the lack of internal controls, declining industry conditions, management incentive compensation plans, and other factors showing a declining business operation.  The SEC has long taken the position that auditors are expected to detect certain kinds of fraud.  *See* Accounting Series Releases Nos. 19 and 292 ("Since routine audit procedures cannot always be relied upon to detect management fraud, the auditor must always be alert to unusual discrepancies and inconsistencies – such as . . . illogical management explanations and major confirmation exceptions – and take appropriate steps to investigate them.").

437.     PwC violated AU § 316, which provides that an auditor must have considered the following factors in assessing audit risk:  (a) whether management compensation creates a motivation to engage in fraudulent financial reporting, (b) domination of management by a small group; (c) one's actions which are not supported by proper documentation or are not appropriately authorized; (d) reporting records or files that should be, but are not, readily available and are not promptly produced when requested; and (e) lack of timely or appropriate documentation for transactions.  PwC violated AU § 316 and the SEC rules governing its conduct by failing to properly consider these risk factors and by failing to perform properly the audit procedures required in connection with the audits of Redback's 2000, 2001 and 2002 year-end financial statements.

438.     PwC ignored risk factors that pointed to fraudulent financial reporting as outlined in AU Section 316, *Consideration of Fraud in a Financial Statement Audit.*  Among the many "red flags" putting PwC on notice that the accounting at Redback was improper, or at least demanded more scrutiny, are the following:

a.    Redback's executives had employment contracts that motivated them to engage in fraudulent financial reporting because their bonuses, stock options and other incentives were linked to the Company's operating results and financial position;

b.    Redback's management was dominated by a small group with very significant stock holdings and options, and the Company lacked compensating controls such as effective oversight by an independent board of directors and audit committee;

c.    Redback insiders sold $150 million of their Company stock and distributed $1.7 billion of their Redback holdings and the Company contracted to purchase millions of dollars of products and services from Qwest, all while Redback incurred overall operating losses;

d.    Redback was actively engaging in mergers and acquisitions and relying on an artificially-inflated stock price to fund the acquisitions;

e.    Redback's executives were employing aggressive purchase accounting in connection with the Company's acquisitions;

f.    The telecommunications sector was volatile in 2000 and 2001, and Redback's reported double-digit revenue growth ran counter to the struggling telecommunications industry;

g.    Redback was dependent on a select few customers, including Qwest, for its revenues;

h.    Redback reported two separate multi-year, multi-million dollar contracts with Qwest, but the Company's sales to Qwest immediately ceased in 2002 after the SEC began investigating suspicious revenue-recognition practices at Qwest;

i.    Redback entered into numerous material sales transactions with Qwest close to the end of reporting periods;

j.    Qwest was purchasing millions of dollars of products (including the non-operational SMS™10000) from Redback that had not been tested by Qwest, as was customary and required under Qwest's business procedures, and the purchases were made at the end of reporting periods in amounts that permitted Redback to meet its target revenues;

k.    Redback purchased an economically worthless IRU from Qwest for $7 million in 2001 that had absolutely no business purpose or function at the Company, and PwC was aware that in March 2002, the SEC began a public investigation of Qwest's improper revenue recognition practices in 2000 and 2001, including improper reciprocal IRU sales;

l.    Redback was not able to resell the $7 million IRU that it had purchased from Qwest at the end of the first quarter 2001;

m.    Redback failed to timely pay Qwest for the ASP services purchase, and Qwest failed to timely pay Redback for its $35-40 million purchase in 2000-2001;

n.    At the direction of defendant DeNuccio, Redback hired Arnold for a key executive position immediately prior to public disclosure of an SEC investigation of Arnold's participation in fraudulent revenue recognition practices at Qwest, although Arnold had no experience in Redback's business; and

o.   In February 2003, the SEC named Joel Arnold as a defendant in a civil action relating to his participation in a scheme to artificially inflate revenues while he was a sales executive at Qwest in 2000 and 2001, which was when Qwest and Redback engaged in a series of material reciprocal transactions.

439.   PwC further violated AU § 316, by failing to properly evaluate risks of material misstatements in Redback's financial records by (i) failing to exhibit the requisite professional skepticism with regard to Redback's financial statements, (ii) failing to assign technically proficient personnel to conduct the audits, (iii) failing to recognize that Redback's accounting policies were unusually aggressive, and (iv) failing to ensure that Redback maintained sufficient internal controls to prevent financial and accounting misstatements.

440.   PwC also violated GAAS because its audits improperly departed from GAAS in the following ways:

a.   PwC violated GAAS general standards that auditors should maintain independence in mental attitude for all matters relating to an engagement and that due professional care must be exercised in performance of the audit.

b.   PwC violated GAAS field work standards that require audits to be adequately planned and supervised and require the auditor to obtain a sufficient understanding of internal controls and sufficient, competent evidential matter to afford a reasonable basis to support an opinion on the financial statements under audit.

c.   PwC violated GAAS standards of reporting that require the audit report to state whether financial statements are prepared in accordance with GAAP, to identify circumstances that consistently fail to follow GAAP, to identify informative disclosures that are not reasonably adequate and to contain an expression of opinion or reasons why an opinion cannot be provided.

441.   GAAS required PwC to consider whether the disclosures in Redback's financial statements were adequate.  SEC rules and regulations and GAAS require adequate disclosure of all material matters.  GAAS requires the disclosure of matters related to the "form, arrangement and content of financial statements. . . .  An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time."  AU § 431.02-.03, *Adequacy of Disclosure in Financial Statements*.  PwC knew that Qwest was Redback's largest customer and knew or with deliberate recklessness disregarded that Redback failed to adequately disclose material matters relating to its transactions with Qwest.

442.   PwC needed corroborating documents to support the assertions made by Redback in the financial statements, as mandated by AU § 316, *Evidential Matter*.  Without such evidence to support questionable transactions such as Qwest's purported multi-year, multi-million dollar agreements with Redback, PwC did not have a reasonable basis for its audit opinion.  PwC deliberately ignored or with deliberate recklessness failed to follow the auditing guidance in assessing Redback's inadequate disclosures regarding the Company's *quid pro quo* deals with Qwest, and PwC should have closely evaluated the fair value of all transactions between Redback and Qwest, including Redback's suspicious IRU purchase in 2001.

443.   PwC disregarded with deliberate or extreme recklessness Redback's obvious failure to report the nature of material transactions with Qwest that were essential to Redback's reported financial results.  Contrary to GAAS, PwC failed to require revisions to Redback's disclosures and failed to issue qualified opinions on Redback's financial statements.  If Qwest had properly audited Redback in accordance with GAAS, it would have verified that equipment that Redback shipped was operational (but it was not), made sure that the product actually shipped (and was not subsequently returned)(but it was returned), and sent confirmations to customers to verify purchases and agreements (but PwC did not do so).  PwC also should have requested to review all agreements that Redback announced publicly as being multi-million, multi-year agreements and then should have required Redback to report undisclosed sales incentives and recorded the sales incentives in accordance with GAAP.

444.   Throughout 2000 to October 2003, in connection with its audits of Redback's financial statements, PwC violated numerous professional standards, including the following:

a.   PwC violated GAAS General Standard No. 1, which provides that "the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor."  Given the complex nature of Redback's and Qwest's products and sales transactions and the determination of acquisition-related charges for In-Process Research and Development projects, it was incumbent upon PwC to ensure the individuals who performed the audit had the requisite technical proficiency in those areas. PwC failed to do so.

b.   PwC violated GAAS General Standard No. 2, which requires that an independence in mental attitude be maintained by the auditor in all matters related to the assignment.  Given PwC's substantial non-audit fees paid by Redback, PwC

lacked the requisite independence when it audited the Company's financial statements.

c.   PwC violated GAAS General Standard No. 3, and AU Section 230, *Due Professional Care in the Performance of Work,* paragraph .01 which require that due professional care be exercised by the auditor in the performance of the audit and the preparation of the report, as opposed to the deliberate reckless disregard described herein.  Due professional care concerns what the independent auditor does and how well he or she does it. It also requires that the auditor exercise professional skepticism. PwC violated this standard by not recognizing the questionable nature and accounting for Redback's *quid pro quo* sales to Qwest and its numerous acquisitions.  Given the pervasiveness of the accounting violations discussed herein, PwC failed to exhibit the requisite professional care in performing its audits.

d.   PwC violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  AU § 150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02, *Consideration of Internal Control in a Financial Statement Audit*.  The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, structure and sets the tone of an organization.  After obtaining an understanding of an entity's internal control structure, the auditor assesses the entity's control risk.  AU § 319.02.  Control risk is the risk that a material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures.  AU § 319.29.  The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.  AU §

319.61.  The unrelenting downturn in the telecommunications industry was a significant factor that negatively affected the control environment at Redback and should have been a "red flag" to PwC as it planned for and conducted its audit.  In the course of auditing the financial statements of Redback, PwC either knew or with deliberate recklessness disregarded facts that evidenced that Redback's management was establishing unrealistic financial and sales expectations and entering into reciprocal transactions with Qwest with no real business purpose or need.  PwC disregarded weaknesses and deficiencies in Redback's internal control structures and failed to adequately plan the audit or expand the auditing procedures to include actual review of all agreements with Qwest and substantive tests of account balances as required by GAAS.

e.   PwC violated GAAS Standard of Reporting No. 1, which requires the auditor to attest to whether the financial statements are presented in accordance with GAAP.  PwC's opinion falsely represented that Redback's financial statements were presented in conformity with GAAP when they were not for the reasons alleged herein.  Redback's improper accounting practices discussed above rendered the Company's financial statements materially false and PwC should have detected, corrected and disclosed the misstatements.

f.      PwC violated GAAS Standard of Reporting No. 3, which provides that "informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." The financial statement disclosures failed to adequately disclose the *quid pro quo* nature of the transactions entered into by and between Redback. Furthermore, because of the magnitude and scope of the transactions with Qwest — which accounted for almost 20% of Redback's revenues in 2000 and 2001 — PwC should have insisted on, and in fact had a professional responsibility in demanding, full and complete disclosure of Redback's dealings with Qwest, including the resulting accounting irregularities prior to the public release of Redback's financial statements.

g.      PwC violated GAAS Standard of Reporting No. 4, which requires that when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. PwC should have stated that no opinion could be issued by it on Redback's fiscal 2000, 2001 and 2002 financial statements or issued an adverse opinion stating that those financial statements were not fairly presented. PwC knowingly or with deliberate recklessness allowed Redback to make material misrepresentations regarding the Company to its shareholders and to the investing public during the relevant time period.

h.      PwC violated SAS No. 54 and AU § 316 by failing to perform the audit procedures required in response to known or possible improper acts by Redback. GAAS required PwC to develop a plan that accounted for risks that Redback's financial statements included material misstatements arising from fraudulent financial reporting. AU § 316. Specifically, to comply with GAAS, PwC should have considered, but did not, the risk factors identified above that were present at Redback in designing the audit procedures to be performed. However, PwC ignored the risk factors and permitted Redback to overstate its revenue to meet unrealistic financial targets. Thus, PwC failed to properly audit Redback's financial statements in accordance with GAAS and violated the trust placed in PwC by Redback's shareholders and investors.

i.      PwC violated GAAS and the standards set forth in AU §§ 311 and 316 (Planning and Supervision) at a minimum by, among other things, failing adequately to plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements.

j.      PwC violated GAAS, particularly AU Section 333, *Management Representations,* which requires the auditor to obtain written representations from management and to investigate circumstances and evaluate the reliability of those representations when they are contradicted by other evidential matter obtained in the audit. PwC improperly relied on Redback management's representations as a substitute for the application of thorough auditing procedures as a basis for PwC's unqualified opinions on Redback's financial statements. PwC was aware that any representations made by management were suspect because management was establishing unrealistic financial targets and entering into undisclosed sales pacts with Qwest executives to meet its targets. Redback's executives also had enormous personal financial incentives to prop up the Company's sales and revenues. PwC therefore should have considered the reliability of all Redback management representations prior to accepting them.

k.      PwC violated AU Section 341, *The Auditor's Consideration of an Entity's Ability to Continue As A Going Concern*, which requires the auditor to evaluate, based on

relevant conditions and events that exist at or have occurred prior to the completion of field work, whether there is a substantial doubt about the entity's ability to continue as a going concern and, if so, to include an explanatory paragraph in the auditor's opinion to reflect that conclusion.  As PwC knew that Redback's financial condition was built upon sales to Qwest, Redback's largest customer, and knew or with deliberate recklessness disregarded that Redback was purchasing Qwest's business in the *quid pro quo* deals, PwC knew, or deliberately or with deliberate recklessness ignored the fact that Redback's ability to continue as a going concern was in jeopardy, and so PwC should have provided that conclusion in its audit opinions.

l.  PwC violated GAAS by failing to obtain sufficient "competent evidential matter" to afford a reasonable basis for an opinion regarding Redback's financial statements, as required by AU §326.  PwC issued "clean" unqualified opinions on Redback's financial statements throughout the relevant periods, when the Company's financial statements were not prepared in conformity with GAAP, a clear violation of this auditing standard.  In addition, PwC consistently failed to exercise the required professional skepticism for blatantly suspicious undisclosed related-party transactions with Qwest such as the IRU transaction in 2001.  AU§ 230.

m.  PwC violated GAAS in that it was required to identify all significant estimates for In Process Research and Development ("IPRD") and audit the amounts in relation to historical patterns, review subsequent transactions and develop its own expectation of the estimate in order to verify the amounts recorded in Redback's financial statements.  AU§ 342.  In particular, as part of performing its audits, PwC was required by AU Section 342, *Auditing Accounting Estimates*, paragraph .01 to obtain and evaluate sufficient evidential matter to support significant accounting estimates.  Companies routinely take write-offs in connection with business combinations or acquisitions in a given period that are subject to some uncertainty at the time of the transaction.  If the charge taken is a fair estimate of the assets acquired and the liabilities undertaken, the charge is proper and appropriate.  The SEC has specifically denied excessive write-offs by companies such as WorldCom for IPRD for acquisitions of Internet or telecommunications companies.  By failing to obtain sufficient evidence to confirm the size of the various research projects at companies Redback acquired during the Class Period, or by simply disregarding the overstatement of Redback's charges for IPRD in connection with various acquisitions, PwC violated AU Section 342.

n.  PwC violated GAAS in that it was required to issue a qualified opinion or disclaim an opinion altogether as a result of Redback's ongoing fraudulent scheme with Qwest.  AU § 508, *Reports on Audited Financial Statements*.  AU § 410, *Adherence to Generally Accepted Accounting Principles,* paragraph .01 requires that the audit report state whether the financial statements are presented in accordance with GAAP.  Because a number of Redback's accounting practices violated GAAP, PwC should have issued adverse or negative audit reports. To the contrary, PwC issued "clean" unqualified opinions on Redback's financial statements throughout the Class Period, suggesting that the Company's financial statements were prepared in conformity with GAAP, when in fact they were not, a clear violation of this auditing standard.

o.  PwC was required to qualify its opinion if there was any doubt about the Company's ability to proceed as a going concern.  PwC knew that Qwest was Redback's largest customer and that sales to Qwest comprised a material (in some cases up to 27%) of Redback's total sales in a quarter.  PwC also knew or with deliberate recklessness disregarded that Redback's *quid pro quo* sales to Qwest

were improper and that, as a result, Redback's ability to continue as a going concern was in jeopardy.  PwC ignored other factors that pointed to Redback's demise, such as the suspicious purchase of an IRU from Qwest that was unneeded and unwanted by any other company; excessive write-offs in acquisitions; reliance on Qwest and a few other customers in the declining telecommunications sector for all of Redback's revenues; and material sales to Qwest at the end of reporting periods that enabled Redback to meet unrealistic financial projections.  These facts required PwC to amend its audit report to bring Redback's precarious financial condition to the attention of shareholders as specified in AU Section 341, *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern.*

p.   PwC failed to obtain sufficient, competent evidential matter as to the fair presentation, in all material respects, of Redback's financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles.  AU §§ 110, 150.  AU Section 411, *The Meaning of Present Fairly in Conformity with GAAP*, recognizes the importance of reporting transactions in accordance with their substance.  PwC failed to request and obtain competent evidential matter regarding Redback's sales to Qwest — its largest customer — that would have enabled PwC to determine whether those transactions had a business purpose or were properly accounted for in accordance with GAAP, or whether the substance of these transactions differed from their form, in which case PwC was required to insist that Redback comply with GAAP and fully disclose its relationship with and the nature of its dealings with Qwest.  PwC failed to raise questions regarding Redback's suspicious purchases, obtuse financial disclosures and excessive write-offs in acquisitions.  Had PwC taken those steps, it would have uncovered the fraudulent nature of Redback's accounting practices, but PwC's failure to do so, despite its responsibilities under GAAS, and the presence of the many red flags, constitutes either knowledge of the fraud or deliberate reckless disregard of it.

q.   PwC violated GAAS in failing during its performance of interim reviews of quarterly financial statements to have a sufficient knowledge of internal controls, identify areas of potential misstatement and the likelihood of occurrence, or compare the amounts and ratios in the financial statements with expectations developed by PwC.  Had PwC conducted an adequate quarterly review, PwC would have uncovered significant matters in the quarterly financial statements that were not in compliance with GAAP.  Transactions such as recording revenues for transactions in which Redback was forced to buy valueless products and services from Qwest before Qwest would honor its obligations to Redback should have been adjusted and brought to the attention of the Audit Committee by PwC as required by AU Section 722, *Interim Financial Information.*  PwC deliberately or with deliberate recklessness ignored Redback's routine practice of booking millions of dollars from sales to Qwest immediately prior to the end of a quarter reporting period and simultaneously purchasing unwanted and unneeded products from Qwest.

r.   PwC violated GAAS by failing to obtain evidence directly from third parties as a means of testing Redback's balance sheet amounts, as required by AU § 329.  Had PwC performed any testing through confirmations with Qwest, it would have obtained evidence that Qwest was not testing Redback's products in its labs (as Qwest routinely did before products were incorporated into its network), and PwC would also have learned that Qwest stored products it purchased from Redback in warehouses because Qwest had no real business need for those products.  AU § 330.

d.     AU Section 431, *Adequacy of Disclosure in Financial Statements,* paragraph .01 provides that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. The financial statement disclosures failed to adequately disclose the terms or the motives behind the numerous transactions between Qwest and Redback, a clear violation of this standard.  PwC should have required, and in fact had a professional responsibility to demand, full and complete disclosure of important facts regarding Redback's dealings with Qwest prior to the public release of the Company's financial statements.

445.    Because Redback's financial statements were not in conformity with GAAP, PwC should have required Redback to make the appropriate adjustments to bring them in conformity with GAAP, or should have issued a qualified audit report or an adverse audit opinion stating that the financial statements did not present fairly the results of operations and financial position of Redback in conformity with GAAP as required by AU Section 508, *Reports of Financial Statements.*

**VII.     LOSS CAUSATION**

446.    From prior to the Class Period and through the end of the period, Redback's stock price was massively inflated as the result of a long-standing and comprehensive scheme to inflate its current and anticipated future revenues.  Redback sought to convince the market of its future cash flows by demonstrating its current revenues and by projecting its future results.  Redback's public statements, designed to convince the market of its future cash flows, were knowingly and materially false because much of its reported revenue was the result of illicit *quid pro quo* agreements with its customers such as Qwest and UUNET, and its statements regarding projected results were knowingly false when made because of known technical problems with its products.

447.    Redback's revenue and ability to obtain contracts with large telecommunications businesses was material information to Plaintiffs.  Had Plaintiffs known the truth – that the Company's contracts were nothing more than revenue purchasing and that the products Redback was trying to sell were inoperable – Plaintiffs either would not have purchased Redback stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

448.    The Defendants' fraudulent scheme was gradually revealed to the market through announcements blaming the stock's decline on the economy, the telecommunications market slowdown, announcements concerning investigations into its customers, earnings releases, SEC filings and other public statements.  As alleged herein, the receipt of this information caused progressive declines in the price of Redback's stock, causing Plaintiffs to suffer significant losses.

449.    Beginning in Spring and Summer of 2001, Redback's ability to engage in illicit agreements to promote sales of its equipment was greatly reduced because its customers (Qwest, UUNET, etc.) were themselves under enormous pressure from declining sales and could no longer hide the fact that Redback's products were not desirable to the market and had substantial technical difficulties.  Moreover, SEC and market scrutiny of Qwest effectively ended Redback's ability to engineer fraudulent sales agreements with Qwest.  Thus, Redback began to announce delays in the readiness for market of certain new products, lower than expected sales and declining expectations for the future.

450.    Redback began its effort to condition the market to the decline in and ultimate end of the bribe-induced revenues from Qwest, UUNET and others in April 2001.  On April 2, 2001, Redback foreshadowed lower than expected first quarter revenues.  Instead of blaming it on declining fraudulent deals with Qwest, undisclosed delays in the SmartEdge product, and inoperable excess SMS equipment, they blamed it on a weakened global telecommunications market.  Redback's stock price fell from a close of $13.08 on March 30, 2001, to $9.77 on April 3, 2001, a decline of 25 percent.

451.    More negative news trickled out in May.  A May 23, 2001 analyst report from Dain Rauscher Wessels, reported that Qwest started to order less product from Redback than expected.  While the analyst, accepting Redback's cover story, blamed this on inventory Qwest already had on hand, the real reasons for Qwest's lower orders were that:  a) Qwest did not need the equipment it had purchased; b) the SMS equipment it had ordered was inoperable; and c) all of Qwest's obligations under the secret stock-induced agreements had been fulfilled.  In reaction to this news, the Company's stock dropped from a close of $17.31 per share on May 22, 2001 to

a close of $16.05 the next day.  By the end of the week it had declined to $15.71, a decline of 9.24 percent.

452.    Beginning in late June 2001, and continuing through the end of September 2001, Redback made a series of announcements that provided to the market information demonstrating that, without the bribe-induced orders from Qwest and others, Redback had minimal sales and its stock price was enormously overvalued.  On June 27, 2001, Redback's stock price was $11.31.  By September 28, 2001, its stock price had declined to only $1.45, a loss of 87 percent of Redback's market capitalization.  The summer 2001 announcements by Redback demonstrated (although couched by Redback merely as reports regarding its financial preformance) that Redback's ability to bribe its way to higher revenues was at an end because Qwest and other consumers simply could not purchase from Redback products that did not work and which these telecom providers did not need:

a.    On June 27, 2001, Redback announced lower expected revenues in the second quarter 2001 of approximately $55 to $60 million and additional write-offs for excess and obsolete inventory.  The write-off and disastrous revenue decline was due to the fact that neither Qwest nor Williams were ordering any equipment from Redback in second quarter 2001 because Redback's fraudulent scheme with Qwest had come to an end as Qwest had fulfilled its obligations to Redback under secret stock-induced agreements and further because Williams was on the brink of bankruptcy and would not be ordering any equipment from Redback.  Although Redback tried to attribute the bad news to "an unprecedented downturn in the telecommunications marketplace," the truth started to become known regarding Redback's stagnant sales, lack of hard sales to back up previously-announced multi-million dollar agreements with Qwest and Williams, excess equipment and declining revenues.  From its June 27th close of $11.31, Redback's stock declined to $7.02 by July 10th.

b.    On July 11, 2001, Redback announced its second quarter 2001 financials, largely mirroring its June pre-announcement.  The release of 2nd quarter data by Redback precipitated a July 12, 2001 analyst report.  The analyst report indicated that delays from Williams and other telecommunications companies compounded Redback's financial problems, but discussed the fact that there were trials ongoing with five customers for some of Redback's new equipment.  The bad news overshadowed any positive data and the Company's stock price dropped to $6.66 by the close on July 12 and it continued its decline into August.   As outlined above, the telecommunications downturn was only one piece of the downturn.  Qwest and Williams were not ordering any equipment from Redback in the second quarter 2001 because Qwest had fulfilled all its obligations under the secret agreements and Williams was on the brink of bankruptcy; additionally, the reported trials of the SmartEdge equipment were non-existent.

c.    On August 14, 2001, the Company filed with the SEC the "August 2001 10-Q", which  reiterated the financial results previously announced on July 11, 2001 and,

as in prior filings, noted the importance of Redback's sales to key customers. The filing stated that Qwest accounted for 27% of the Company's total revenue for the first six months of 2001 and 15% of Redback's revenue for all of 2000. Redback's stock, which had closed on July 11, 2001 to $6.53, closed on August 14, 2001 at $6.05, a 7.3% drop.

d.      After the release of the August 2001 10-Q, Redback's stock continued its slide through the end of September, finally closing at $1.45 on September 28, 2001. Redback's stock had begun dropping in June and continued dropping through the end of September 2001 because of the series of revelations that the Company's revenues were declining as a result of Redback's failure to obtain any business from Qwest. The real cause of this inevitable result, once the bribes had stopped being paid, was hidden from investors.

453.    After rebounding during the 3rd quarter of 2001 and the 1st quarter of 2002 on the basis of false reassurances about the target launch of new SmartEdge™ router equipment (which Redback knew was moribund in production) and related revenues (from sales the company knew would not occur) (*see supra* paras. 243-51), beginning in March 2002, a series of announcements demonstrated to investors that Redback would not be able to use sales to Qwest to bolster its revenues. What the market did not know was that Redback never had made any legitimates sales to Qwest and the Company's stock price had been enormously and improperly inflated for years. Thus, between March 11, 2002 and October 10, 2002, Redback's stock price declined from $4.30 to $0.27 per share, a decline of 94 percent. This decline came in spurts as Redback began its selective partial disclosure.

454.    On March 11, 2002, Qwest issued a press release acknowledging that the SEC was investigating its revenue recognition practices, including its sales of IRUs and the sale of equipment by Qwest to customers from which Qwest bought services or to which it contributed equity financing. Because Qwest was Redback's largest customer, the market reacted negatively to this announcement and by March 26th, Redback price had declined to $3.50 per share (a 19 percent decline from March 11th).

455.    On March 27, 2002, Redback filed its 10-K for 2001, reporting lower revenues than expected for 2001, attributing the drop to "lower than anticipated deployments of our products by our customers, as the networking business specifically, and the economy generally, slowed down in 2001." Redback's stock dropped further, from an open of $3.52 on March 27 to

1  a close of $2.85 per share by April 9.   As outlined above, Redback's revenues declined because

2  it could no longer engage in stock kickbacks and revenue or press release purchasing.

3  456.    On April 10, 2002, Redback announced its first quarter 2002 financial results.

4  Redback's press release indicated that without the benefit of sales to Qwest, Redback's revenues

5  had fallen by more than 50% from the first quarter 2001.  Redback's stock dropped from an open

6  of $2.88 on April 10, 2002 to a close of $2.35 on April 11, 2002.  On April 22, 2002, Redback

7  issued its 10-Q for the 2nd quarter, confirming its earlier horrendous results, and Redback's slide

8  continued, with its share price declining to $1.85 per share by July 9, 2002.

9  457.    On July 10, 2002, the market received a double dose of negative news about

10  Redback in which the market learned of the serious problems faced by its business partner Qwest

11  and Redback's enormous decline in revenue, a large part of which was due to the fact that it was

12  no longer obtaining substantial sales from Qwest.  First, Qwest announced that the SEC had

13  begun a criminal probe of Qwest.  Second, Redback issued a press release announcing its

14  financial results for its second quarter of 2002. The press release and subsequent Form 8-K

15  reported that net revenue for the second quarter of 2002 was $40.1 million, compared to $40.6

16  million in the prior fiscal quarter and $59.4 million for the same quarter in the prior year, or a

17  decline of nearly one-third.  Redback's market slide continued, with its stock price falling to

18  $1.20 by August 1, 2002.

19  458.    When Redback filed its second quarter 2002 10-Q on August 14, 2002, the decline

20  in revenues was attributed to a "current downturn in economic activity continuing into 2002."

21  The stock price fell from $1.03 at the open of August 13, 2002 to $0.87 by the close of August

22  14.  The decline in revenue was not because of a decline in the economy; it was due to the

23  decline in revenue from the loss of its fraudulent business partner, Qwest (which was facing an

24  SEC criminal probe by this time), and a decline in the Company's ability to purchase revenue

25  from companies like Broadband Office and Williams.

26  459.    On September 26, 2002, knowing its products were worthless and it could no

27  longer purchase any revenues through illicit bribes, Redback foreshadowed lower third quarter

28  2002 financial results.  It stock price continued the steep decline begun in March, reaching $0.27

per share on October 9.  Throughout this period (March-October 2002), Redback's stock price fell because defendants could no longer hide the fact that an enormous percentage of Redback's purported revenues had been obtained through improper kickback arrangements that could no longer be maintained.  Without these illicitly-obtained revenues, Redback was essentially a worthless company.

460.    On February 25, 2003, the SEC filed civil fraud charges against Arnold and others for artificially inflating Qwest's revenues in transactions with the Arizona School Facilities Board and Genuity Inc.  Redback confirmed these charges in its 2002 Form 10-K on March 31, 2003.  The Company's stock dropped from $0.67 on February 25 to $0.58 on the filing of its 2002 Form 10-K.

461.    By the end of the Class Period, the jig was up.  Redback finally had to admit its involvement with Qwest was being investigated by the SEC since the press was starting to report on the investigation.

462.    Even though Redback did not specifically admit that its statements regarding its revenues and future prospects were fraudulent, which became publicly known in late 2003 and thereafter, the decline in Redback's stock price was the result of the piecemeal disclosure of information about the fraud and thus is sufficient to establish that Plaintiffs' losses were caused by the Defendants' fraud.  This trickle of corrective disclosures failed to alert Plaintiffs to the true fraud and yet managed to cause a gradual correction of Redback's stock price, which dropped from $13.08 at the beginning of April 2001 to $0.55 on October 10, 2003 when the true extent of the fraud was revealed at the end of the Class Period.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

463.    As alleged herein, the defendants acted with scienter in that the defendants knew at the time they issued them that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that persons were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were involved in the issuance or dissemination of

such statements or documents as primary violations of the federal securities law.  As set forth elsewhere herein in detail, the defendants, by virtue of their receipt of information reflecting the true facts regarding Redback, their control over, and/or receipt of Redback's allegedly materially misleading misstatements and/or their association with the Company which made them privy to confidential proprietary information concerning Redback which were used to inflate financial results and which defendants caused or were informed of, participated in and knew of the fraudulent scheme alleged herein.  With respect to non-forward-looking statements and/or omissions, defendants knew and/or with deliberate recklessness disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.

464.   Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of Redback's material false or misleading statements.

465.   Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the defendants are liable for the false forward-looking statement pled herein because, at the time each forward-looking statement was made, the speaker knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Redback who knew that the forward-looking statement was false or misleading.  None of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

466.   The market for Redback's stock was an open, well-developed and efficient market at all relevant times for the following reasons, among others:

a.   Redback common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regulated issuer, Redback was required to file and did file periodic reports with the SEC;

c.   Redback regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national and international circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.   Redback was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, which reports were each publicly available and entered the public marketplace; and

e.   The trading volume of Redback stock was substantial during the Class Period.

467.   As a result, the market for Redback common stock promptly digested current information regarding Redback from all publicly available sources and reflected such information in Redback's stock price.  Under these circumstances, all persons in the Class who purchased Redback common stock during the Class Period based on Defendants' false and misleading statements suffered similar injury through their purchase of shares of such stock at artificially inflated prices and a presumption of reliance applies.

## X.   CLASS ACTION ALLEGATIONS

468.   Connecticut Retirement Plans brings this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure on behalf of itself and all persons who purchased or

acquired common stock in Redback (the "Class") between November 27, 1999 and October 10, 2003, and who were damaged thereby.

469.   Excluded from the Class are defendants and all persons ever named in this action as defendants, their subsidiaries, affiliates and any insurance carriers who provide any insurance coverage to them, and the officers and directors of Redback, members of their immediate families and their legal representations, heirs, successors or assigns or any entity in which any of the foregoing has a controlling interest.

470.   The Class is so numerous that joinder of all members is impractical.  Throughout the Class Period, Redback common shares were actively traded on the NASDAQ.  As of October 10, 2003, Redback had outstanding over 183 million shares of its common stock.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed class, including  individuals and entities too numerous to bring separate actions.  It is reasonable to assume that holders of Redback common stock are geographically dispersed throughout the United States of America.

471.   Record owners and other members of the Class may be identified from records maintained by Redback or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

472.   There are questions of law and fact that are common to the Class which predominate over any questions affecting only individual Class members.  The common questions include:

     a.   Whether the defendants publicly disseminated or caused the Company to publicly disseminate press releases, earnings pronouncements, regulatory filings and other public statements during the Class Period which contained material misrepresentations or omitted to state material facts necessary to make such statements not misleading in violation of the federal securities laws as alleged herein;

b.      Whether the defendants participated in a fraudulent scheme to artificially inflate and misrepresent the proceeds from Redback's sales to Qwest and thereby artificially inflate Redback's stock price;

c.      Whether the defendants acted intentionally with direct knowledge of the falsity of such statements, or at least with deliberate recklessness, in making such statements;

d.      Whether the defendants are "controlling persons" as that term is defined in Section 20(a) of the Exchange Act;

e.      Whether the market prices of Redback's common stock during the Class Period were artificially inflated due to material misstatements and omissions complained of herein;

f.      Whether the defendants concealed their breaches of fiduciary duties in causing, directing and/or approving, or allowing or permitting, material misrepresentations and omissions in the Company's public statements and filings relating to certain transactions with Qwest and the Company's financial condition;

g.      Whether the individual Class members were improperly induced to purchase their Redback shares; and

h.      Whether the members of the Class have sustained damages and, if so, what the appropriate measure of damages should be.

473.    Lead Plaintiff is committed to prosecuting the Class claims and has retained competent counsel experienced in litigating claims of this nature.  Lead Plaintiff's claims are typical of the claims of other members of the Class.  Accordingly, Lead Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

474.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

475.    The prosecution of separate actions would create the risk of:

a.      Inconsistent or varying adjudications which would establish incompatible standards for conduct for the defendants; and/or

b.      Adjudications, which would as a practical matter be dispositive of the interests of other members of the Class.

476.    Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Additionally, because the damages suffered by individual members of the Class may in some circumstances be relatively small, the expense and burden of individual litigation make it impossible for such class members individually redress the wrongs done to them.

## FIRST CAUSE OF ACTION

### Violation Of Section 10(b) of The Exchange Act
### And Rule 10b-5(b) Promulgated There under
### (Against All Defendants)

477.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

478.    This Cause of Action is asserted by Lead Plaintiff on behalf of itself and the Class against all of the defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5(b), 17 C.F.R. 240.10b-5, promulgated there under.

479.    During the Class Period, the defendants, singularly and in concert, directly carried out a common plan, scheme and unlawful course of conduct, pursuant to which they intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Redback=s stock; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire Redback=s stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the defendants, collectively and each of them, took the actions set forth herein.

480.    The defendants knowingly or with deliberate recklessness made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce, which operated as a

1  fraud and deceit upon the purchasers and acquirers of the Company=s stock in an effort to

2  maintain artificially high market prices for Redback=s stock in violation of Section 10(b) of the

3  Exchange Act and Rule 10b-5(b).

4       481.   The defendants engaged in the fraudulent activity described above knowingly and

5  intentionally or with such extreme or deliberate recklessness as to constitute willful deceit and

6  fraud upon Plaintiff and the Class.  The defendants knowingly or with extreme or deliberate

7  recklessness caused their reports and statements to contain misstatements and omissions of

8  material fact as alleged herein, which caused Redback's stock price to be inflated at the time of

9  Plaintiffs' purchases.

10       482.   As a result of the defendants= fraudulent activity, the market price of Redback's

11  stock was artificially inflated during the Class Period, and remained inflated until the market

12  began to no longer believe the defendants' fraudulent statements.  Defendants'

13  misrepresentations induced a disparity between the transaction price and the true investment

14  quality and value of Redback's stock at the time Plaintiffs purchased or acquired the stock.

15       483.   The market price of Redback's stock declined materially when the defendants

16  could not prop up Redback's stock price any more through their fraud.

17       484.   In ignorance of the true financial condition of Redback, Plaintiff and other

18  members of the Class, relying to their detriment on the integrity of the market and/or on the

19  statements and reports of Redback containing the misleading information, purchased or

20  otherwise acquired Redback stock at artificially inflated prices during the Class Period.

21       485.   Had Plaintiff and the other members of the Class known the truth, they would not

22  have purchased Redback's stock or would not have purchased the stock at the inflated prices that

23  were paid.

24       486.   Plaintiffs' losses were proximately caused by defendants' material

25  misrepresentations and omissions regarding reported revenue, assets and cash flow; market

26  demand for Company products; material contracts; sales to Qwest and other customers; *quid pro*

27  *quo* transactions for product and services; stock payment kick backs; sales inducements; product

28  development; and cash flow.

487.     Plaintiff and the other Class members purchased Redback's stock in reliance on the integrity of the market price of the stock and/or defendants' fraudulent and misleading statements and regulatory filings, and defendants manipulated the price of Redback's stock through their misconduct as described above.

488.     Further, defendants' misconduct proximately caused the losses of Plaintiff and other Class members.  Plaintiffs' losses were a direct and foreseeable consequence of defendants' failure to disclose and concealment of, *inter alia*, the true nature of the Company's contracts with Qwest including Redback's *quid pro quo* stock grants to U.S. Telesource and Qwest insiders; Redback's purchase of services and products from Qwest (and Qwest affiliates) solely to obtain Qwest's business; and the true nature of Redback's revenue, assets and cash position.  As a direct and proximate cause of the defendants= wrongful conduct, Plaintiff and other members of the Class suffered substantial damages in connection with their respective purchases and sales of Redback's stock during the Class Period.

### SECOND CAUSE OF ACTION

**Violation Of Section 10(b) of The Exchange Act
And Rule 10b-5(a) and (c) Promulgated There under
(Against All Defendants)**

489.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

490.     This Cause of Action is asserted by Lead Plaintiff on behalf of itself and the Class against all of the defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5(a) and (c), 17 C.F.R. 240.10b-5, promulgated there under.

491.     During the Class Period, the defendants, singularly and in concert, directly carried out a common plan, scheme and unlawful course of conduct, pursuant to which they intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Redback=s stock; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire Redback=s stock at artificially-inflated prices.  In furtherance of this unlawful

1   scheme, plan and course of conduct, the Defendants, collectively and each of them, took the

2   actions set forth herein.

3        492.    The defendants intentionally or with deliberate recklessness employed devices,

4   schemes, and artifices to defraud; and engaged in acts, practices, and a course of business, which

5   operated as a fraud and deceit upon the purchasers and acquirers of the Company=s stock in an

6   effort to maintain artificially high market prices for Redback=s stock in violation of Section

7   10(b) of the Exchange Act and Rule 10b-5(a) and (c).

8        493.    The defendants engaged in the fraudulent activity described above knowingly and

9   intentionally or with such extreme or deliberate recklessness as to constitute willful deceit and

10  fraud upon Plaintiff and the Class.  The defendants knowingly or with extreme or deliberate

11  recklessness employed a fraudulent scheme and deceitful course of business as alleged herein,

12  which caused Redback's stock price to be inflated at the time of Plaintiffs' purchases.

13       494.    As a result of the defendants= fraudulent activity, the market price of Redback's

14  stock was artificially inflated during the Class Period, and remained inflated until the market

15  began to no longer believe in the value of Redback's stock.  Defendants' acts, practices, scheme,

16  and course of business induced a disparity between the transaction price and the true investment

17  quality and value of Redback's stock at the time Plaintiffs purchased or acquired the stock.

18       495.    The market price of Redback's stock declined materially when the defendants

19  could not prop up Redback's stock price any more through their fraud.

20       496.    In ignorance of the true financial condition of Redback, Plaintiff and other

21  members of the Class, relying to their detriment on the integrity of the market and/or on the

22  statements and reports of Redback containing the misleading information, purchased or

23  otherwise acquired Redback stock at artificially inflated prices during the Class Period.

24       497.    Had Plaintiff and the other members of the Class known the truth, they would not

25  have purchased Redback's stock or would not have purchased the stock at the inflated prices that

26  were paid.

27       498.    Plaintiffs' losses were proximately caused by defendants' active and primary

28  participation in Redback's scheme to defraud the investing public by artificially inflating

1   Redback's revenues, assets and cash flows; improperly accounting for reported revenue;

2   employing aggressive purchase accounting to overstate earnings; intentionally misrepresenting

3   market demand for Company products; shipping products that were not operational to falsely

4   generate revenues; inducing material contracts through stock payment kickbacks to Qwest and

5   other material customers and their insiders; providing undisclosed stock kick back payments to

6   customers in exchange for the right to issue false and misleading press releases regarding their

7   purported deployment of Redback's products; engaging in *quid pro quo* transactions that had no

8   real business purpose and caused Redback to pay millions of dollars for products and services

9   that the Company did not want or need; propping up Redback's revenues to meet established

10  guidance and targets that were unrealistic and unobtainable absent fraudulent acts and practices.

11         499.    Plaintiff and the other Class members purchased Redback's stock in reliance on

12  the integrity of the market price of the stock and/or defendants' fraudulent scheme and deceitful

13  course of business, and defendants manipulated the price of Redback's stock through their

14  misconduct as described above.

15         500.    Further, defendants' misconduct proximately caused the losses of Plaintiff and

16  other Class members.  Plaintiffs' losses were a direct and foreseeable consequence of

17  defendants' fraudulent devices, schemes, acts, practices and course of business, including, *inter*

18  *alia*, the undisclosed stock payment kickbacks and sales incentives provided to Qwest and other

19  material customers and their insiders, and Redback's *quid pro quo* purchases and transactions

20  with Qwest (and Qwest affiliates) solely to obtain Qwest's business, and the true nature of

21  Redback's revenue, earnings and cash position.  As a direct and proximate cause of the

22  defendants= wrongful conduct, Plaintiff and other members of the Class suffered substantial

23  damages in connection with their respective purchases and sales of Redback's stock during the

24  Class Period.

25

26

27

28

**THIRD CAUSE OF ACTION**

**Violation of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder
(Against The "Insider-Selling Defendants,"
Barsema, Garg, Gentner, Kruep, Kurtz,
Lamond Ragavan and DeNuccio)**

501.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

502.    This cause of action is asserted by Lead Plaintiff on behalf of itself and the Class against the Insider-Selling Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b–5, promulgated thereunder, in connection with their insider trading in Redback stock.

503.    During the Class Period, the Insider-Selling Defendants were at various times high-ranking officers and/or directors at Redback, by virtue of which they had access to material, non-public information about Redback's business, operations, operational trends, sales, finances, revenue recognition, markets, and present and future business prospects.  At all relevant times, the Insider-Selling Defendants by virtue of their positions with Redback owed a duty to the Company and its shareholders to maintain the confidentiality of the Company's material, non-public information until that information was properly disclosed to the public.  In addition, pursuant to the Company's Insider Trading Policy, the Insider-Selling Defendants owed the Company and its shareholders a duty not to trade, or direct others to trade, in Redback stock on the basis of their possession of material, non-public adverse information.

504.    As outlined in the Section IV above, during the Class Period, the Insider Selling Defendants sold over $178 million of their Redback stock in open market trades.

505.    At the time that Insider-Selling Defendants sold their Redback common stock as set forth herein, by reason of their high-level executive and/or director positions with Redback, the Insider Defendants had access to highly-material information regarding the company, including the information set forth herein regarding the true facts of Redback's undisclosed sales incentives, inoperable products, improper accounting and false and misleading disclosures regarding Redback's sales agreements and deployment of its products.  At the time of the

1   Insider-Selling Defendants' sales, that information was not generally available to the public or

2   the securities markets.  Had such information been generally available, it would have

3   significantly reduced the market price of Redback shares at that time.

4          506.    The Insider-Selling Defendants, collectively and individually, had actual

5   knowledge of material, adverse non-public information and thus sold their Redback common

6   stock in violation of Section 10(b) and Rule 10b-5.  In violation of duties that each of the Insider-

7   Selling Defendants owed to Redback and its shareholders, they knowingly used the material,

8   non-public adverse information they possessed to sell Redback stock at artificially inflated prices

9   as set forth in paragraph Section IV above.

10          507.    As a result of the Insider-Selling Defendants= fraudulent activity, other than the

11   trading activity set forth herein, the market price of Redback's stock was artificially inflated

12   from May 17, 1999 (the date of Redback's IPO) and continued to be artificially inflated

13   throughout the Class Period and at the time that each defendant sold Redback stock.

14          508.    Without the benefit and knowledge of the true financial condition of Redback and

15   its fraudulent business practices, Lead Plaintiff and other members of the Class, relying to their

16   detriment on the integrity of the market and/or on the statements and reports of Redback

17   containing false or misleading information, purchased Redback stock at artificially inflated

18   prices during the Class Period.

19          509.    The Insider-Selling Defendants' sales of Redback stock based on material non-

20   public adverse information in violation of their duties to the Company and its shareholders

21   constituted a manipulative and deceptive device in violation of Section 10(b) of the Exchange

22   Act and Rule 10b-5 promulgated thereunder.

23

24

25

26

27

28

**FOURTH CAUSE OF ACTION**

**Violation of Section 20(A) Of The Exchange Act
Against, Barsema, Garg, Gentner, Kruep,
Kurtz, Lamond, Ragavan and DeNuccio
(the "Section 20(A) Defendants")**

510.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

511.    This Cause of Action is asserted by Lead Plaintiff on behalf of itself and the Class against the Section 20(A) Defendants, and is based upon Section 20(A) of the Exchange Act, 15 U.S.C. § 78t-1 in connection with their insider trading in Redback stock.

512.    The Section 20(A) Defendants collectively sold more than 1,352,500 shares of Redback stock, reaping total proceeds in excess of $52.3 million.

513.    The Section 20(A) Defendants knowingly or with deliberate recklessness sold their Redback common stock during the Class Period while in possession of material, adverse, non-public information.  As set forth in Exhibit B, attached hereto, contemporaneously with sales of Redback stock by these defendants, Plaintiffs purchased Redback common stock sold by these defendants.

514.    By reason of Plaintiffs purchases of Redback stock contemporaneously with certain of the Defendants' sales of stock, Plaintiffs suffered recoverable damages.  Under Section 20(A) of the Exchange Act, the Section 20(A) Defendants are liable to Plaintiffs for all profits gained and losses avoided by them as a result of these contemporaneous transactions.

1

**FIFTH CAUSE OF ACTION**

2

3

**Violation of Section 18(a) of the Exchange Act
Against DeNuccio, Lamond, Cronan, Kurtz, Khosla, Wolf,
Gentner, Ragavan, Barsema, Garg, Haque, and PwC
(the "Section 18 Defendants")**

4

5      515.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

6    set forth herein.

7      516.    This Cause of Action is asserted by Lead Plaintiff on behalf of itself and the Class

8    against the Section 18 Defendants and is based upon Section 18 of the Exchange Act, 15 U.S.C.

9    78r.

10      517.    As set forth above, in reports and documents filed with the SEC filed during the

11   Class Period, including without limitation Redback's Forms 2000, 2001 and 2002 10-K and its

12   Forms 8-K issued during the Class Period, Defendants made or caused to be made statements

13   which were, at the time and in light of the circumstances under which they were made, false or

14   misleading with respect to material facts.

15      518.    Each of the above reports was filed with the SEC pursuant to the Securities and

16   Exchange Act of 1934.

17      519.    Each of the Section 18 Defendants that were officers and directors of the

18   Company signed certain of Redback's Forms 10-K and Forms 8-K filed with the SEC during the

19   Class Period, and PwC certified the financial statements in Redback's Forms 10-K as set forth

20   herein.

21      520.    The Section 18 Defendants knew or with extreme or deliberate recklessness

22   disregarded that such statements were false and misleading because these Defendants: (a) knew

23   that Qwest was a material Redback customer; (b) knew the materially adverse non-public

24   information regarding the true *quid pro quo* nature of Redback's contracts with Qwest and

25   undisclosed stock and other sales incentives provided to Qwest and other material customers and

26   their insiders; and (c) had an obligation to inform themselves of the publicly-issued statements of

27   the Company.

28

521.    PwC consented to the use of its unqualified opinions in Redback's financial statements and reports filed with the SEC.  These financial statements were incorporated into and made a part of the Company's Exchange Act filings with the knowledge and express consent of PwC.  PwC knew or with extreme or deliberate recklessness disregarded that its unqualified opinions filed with the SEC were in fact false and misleading.

522.    The Section 18 Defendants' conduct resulted in the Company issuing false and misleading statements with respect to its revenues, income, earning per share and market demand for its products.  The Section 18 Defendants' conduct also resulted in the Company misrepresenting that its financial statements filed during the Class Period were presented in conformity with GAAP or principles of fair reporting.

523.    In connection with the purchase of Redback's stock, Plaintiff and other Class Members read and reasonably relied upon the statements contained in the reports and documents set forth above not knowing that such statements were false and misleading.

524.    As a direct result of the false and misleading statements in the Forms 10-K and Forms 8-K described herein, Plaintiff and other Class Members purchased Redback stock and an artificially-high price, and they were significantly damaged thereby.

525.    As a result of the Section 18 Defendants' fraudulent activity, the market price of Redback's stock was artificially inflated during the Class Period, and remained inflated until the market began to no longer believe the defendants' fraudulent statements.  Defendants' misrepresentations induced a disparity between the transaction price and the true, investment quality and value of Redback's stock at the time Plaintiffs purchased or acquired the stock.

526.    The market price of Redback's stock declined materially when the Defendants could not prop up Redback's stock price any more through their fraud.

527.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

528.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection their purchases of Redback common stock during the relevant period.

**SIXTH CAUSE OF ACTION**

**Violation of Section 20(a) of the Exchange Act
Against The Individual Defendants**

529.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

530.    This Cause of Action is asserted by Lead Plaintiff on behalf of itself and the Class against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. 78t(a).

531.    The Individual Defendants acted as controlling persons of Redback within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions, Board membership and/or stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various materially false and misleading statements, and artificially creating revenue and false product demand by entering into *quid pro quo* transactions with Qwest in which both companies sold products and services to each other that neither company needed or wanted to prop up each of Redback's and Qwest's revenues and stock price, and providing undisclosed stock payment kickbacks and other sales incentives to Qwest and other material customers and their insiders to secure large contracts, or the right to publish materially false and misleading press releases reporting that certain material customers were purportedly deploying Redback's equipment in their networks.  The Individual Defendants each had material contributions to the preparation and dissemination of Redback's press releases and SEC filings, or signed the SEC filings, and each and all of the Individual Defendants were provided with or had unlimited access to copies of the Company=s internal reports, press releases, public filings and other statements that they knew or with extreme or deliberate recklessness disregarded were materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

532.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and contracts with Qwest and other material customers, or oversight responsibilities thereof, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

533.    As set forth above, Redback committed a primary violation of Section 10(b) and Rule 10b-5 and Section 18 of the Exchange Act by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Redback, all of the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants= wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Redback's stock.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and all other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Compelling the Individual Defendants to disgorge the proceeds from their unlawful insider trading;

(d)    Awarding Lead Plaintiff and all Class members their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees and experts' fees; and

(e)    Awarding such other and further relief as may be just and proper.

1

**JURY TRIAL DEMANDED**

2

Plaintiffs hereby demand a trial by jury on all claims so triable.

3

Dated this 19th day of May 2006.

4

Of Counsel:

5

6

Catherine E. LaMarr
General Counsel
Office of the Treasurer
7  State of Connecticut
55 Elm Street
8  Hartford, Connecticut  06106

9

Richard Blumenthal
Attorney General of Connecticut
10  Joseph Rubin
Associate Attorney General of
11  Connecticut
55 Elm Street
12  Hartford, Connecticut  06106

_____/s/ Stuart M. Grant_____
Stuart M. Grant *(pro hac vice)*
John C. Kairis *(pro hac vice)*
Lauren E. Wagner *(pro hac vice)*
Kimberly L. Wierzel *(pro hac vice)*
**Grant & Eisenhofer P.A.**
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: 302.622.7000
Fax: 302.622.7100

*Lead Counsel for Lead Plaintiff The
Connecticut Retirement Plans and Trust Funds*

Merrill Glen Emerick (State Bar No. 117248)
**Anderlini, Finkelstein, Emerick & Smoot**
400 S. El Camino Real, Suite 700
San Mateo, CA  94402
Tel: 650.348.0102
Fax: 650.348.0962

*Local Counsel for Lead Plaintiff The
Connecticut Retirement Plans and Trust Funds*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served by the method noted upon the following counsel of record on May 19, 2006:

**Via U.S. Mail**
Robert A. Jigarjian, Esquire
Robert S. Green, Esquire
**GREEN & JIGARJIAN LLP**
235 Pine Street, 15th Floor
San Francisco, CA 94104
*Counsel for Plaintiffs Robert W. Baker, Jr.*
*and Richard Wimble*

**Via U.S. Mail**
Rowan D. Wilson , Esquire
Thomas G. Rafferty, Esquire
LaShann M. DeArcy, Esquire
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
*Counsel for Defendant Pricewaterhousecoopers*
*LLP*

**Via U.S. Mail**
Luke O. Brooks, Esquire
**LERACH, COUGHLIN, STOIA,**
**GELLER,   RUDMAN & ROBBINS,**
**LLP**
100 Pine Street, Suite 2600
San Francisco, CA 94111
lukeb@lerachlaw.com
*Counsel for Plaintiffs Robert W. Baker, Jr.*
*and Central States, Southeast and*
*Southwest Areas Pension Fund*

**Via CM/ECF**
Frederick Sexton Fields, Esquire
**COBLENTZ PATCH DUFFY & BASS, LLP**
One Ferry Building, Suite 200
San Francisco, CA 94111-4213
fields@cpdb.com
*Counsel for Defendant Pricewaterhousecoopers*
*LLP*

**Via U.S. Mail**
Mark C. Gardy, Esquire
Charles H. Dufresne, Esquire
**ABBEY GARDY, LLP**
212 East 39th Street
New York, NY 10016
*Counsel for Plaintiff Robert W. Baker, Jr.*

**Via CM/ECF**
Terry T. Johnson, Esquire
John P. Stigi III, Esquire
Laura R. Smith, Esquire
Cameron P. Hoffman, Esquire
Kristin Anne Dillehay, Esquire
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 94304-1050
kdillehay@wsgr.com
*Counsel for Defendants Thomas L. Cronan III,*
*Kevin A. Denuccio, Pierre R. Lamond, Vinod*
*Khosla, Vivek Ragavan, Dennis P. Wolf, Dennis*
*Barsema, Guarav Garg, Craig Genter, Promod*
*Haque, William Kurtz*

1

2  **Via CM/ECF**
   Darren J. Robbins, Esquire
3  **LERACH, COUGHLIN, STOIA,**
   **GELLER, RUDMAN & ROBBINS LLP**
4  401 B Street, Suite 1700
   San Diego, CA  92101
5  drobbins@lerachlaw.com
   *Counsel for Plaintiff Central States,*
6  *Southeast and Southwest Areas Pension*
   *Fund*

7

**Via CM/ECF**
Francis M. Gregorek, Esquire
Betsy C. Manifold, Esquire
Rachele R. Rickert, Esquire
**WOLF, HALDENSTEIN, ADLER,**
 **FREEMAN & HERZ LLP**
Symphony Tower – Suite 2770
750 B Street
San Diego, CA  92101
manifold@whafh.com
rickert@whafh.com
*Counsel for Plaintiff Bartnik Group*

8

9

10        I further declare, pursuant to Civil L.R. 23-3, that on the date hereof I served the

11  foregoing on the Securities Class Action Clearinghouse by electronic mail through the following

12  electronic mail address provided by the Securities Class Action Clearinghouse at:

13

14                 Securities Class Action Clearinghouse
         Attention: Juan-Carlos Sanchez or Cara Mia Perlas
15                 Stanford University School of Law
                   Crown Quadrangle
16                 Stanford, CA 94305-8612
              Email:  scac@law.stanford.edu

17

18

19                                    /s/ Lauren E. Wagner
                                      Lauren E. Wagner
20

21

22

23

24

25

26

27

28