1

2                                                      **E-Filed 12/04/07**

3

4

5

6

7                              NOT FOR CITATION

8                 **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                          **SAN JOSE DIVISION**

11

12   IN RE REDBACK NETWORKS, INC.          Case Number C 03-5642 JF (HRL)
     SECURITIES LITIGATION.
13                                         ORDER[1] GRANTING REDBACK
                                           DEFENDANTS' MOTION TO
14   _____        DISMISS WITHOUT LEAVE TO
                                           AMEND
15   THIS DOCUMENT RELATES TO ALL
     ACTIONS.
16                                         [re: doc. no. 263]

17

18

19         In this securities fraud class action, Plaintiffs have sued a number of individual officers

20   and directors of Redback Networks, Inc. (collectively, "Defendants").[2]  The Defendants move to

21   dismiss the operative fifth amended consolidated complaint ("5AC").  The Court has considered

22   the briefing filed by the parties as well as the oral arguments presented at the hearing on

23   November 16, 2007.  For the reasons discussed below, the motion will be granted without leave

24   to amend, and judgment will be entered for Defendants.

25   _____

26         [1] This disposition is not designated for publication and may not be cited.

27         [2] The Redback Defendants are Kevin DeNuccio, Pierre Lamond, Thomas Cronan III,
28   Vinod Khosla, Dennis Wolf, Vivek Ragavan, Dennis Barsema, Gaurav Garg, William Kurtz,
     Craig Gentner, Promod Haque and Randall Kruep.

1

**I. BACKGROUND**

2        Plaintiffs are purchasers of stock in Redback Networks, Inc. ("Redback"), a

3  telecommunications equipment provider based in San Jose, California.  Several parallel class

4  actions have been consolidated into the instant action, and the Court has appointed the

5  Connecticut Retirement Fund ("CRF") as lead plaintiff.  Plaintiffs allege that Defendants

6  engaged in a scheme to defraud the market that injured persons who purchased Redback stock

7  during a four-year class period from November 27, 1999 through October 10, 2003.

8        The alleged scheme is described in great detail in this Court's order of March 20, 2006

9  dismissing Plaintiffs' third amended consolidated complaint ("March 2006 Order"), and need not

10  be set forth with particularity again here.  *See* March 2006 Order at 2-7.  In brief, Plaintiffs allege

11  that starting even before Redback's initial public offering, Redback in essence bought revenues

12  from Qwest Communications International, Inc. ("Qwest") and others through bribery and *quid*

13  *pro quo* arrangements.  While Plaintiffs characterize the revenues resulting from the alleged

14  bribery and *quid pro quo* arrangements as "improper" and "illegitimate," it is undisputed that the

15  revenues were real in the sense that Redback actually sold products to Qwest and others and

16  actually received the stated revenues in return.  Plaintiffs' theory is that Redback's recognition of

17  these revenues created a false impression that Redback was doing well financially, causing the

18  price of Redback's stock to rise.  Plaintiffs allege that class members purchased Redback stock at

19  resulting inflated prices – the stock traded at well over $150 per share for most of the first year of

20  the class period.  5AC ¶ 196.  By October 10, 2003, the last day of the class period, Redback's

21  stock price was $0.55 per share.[3]  Ultimately, Redback filed a pre-package bankruptcy plan of

22  reorganization.  5AC ¶ 128.

23        In the 5AC, Plaintiffs allege that the truth of Redback's dealings with Qwest began to

24  emerge on March 11, 2002, when Redback's stock was trading at or about $4 a share. 5AC ¶¶

25  455-56.  Plaintiffs claim that "the first partial disclosure of fraud at Redback, and the first time

26

27        [3] Defendants ask the Court to take judicial notice of Redback's stock price pursuant to
28  Fed. R. Evid. 201.  Mem. at 3, n.3.  The Court grants the request.  *See Ravens v. Iftikar*, 174
    F.R.D. 651, 661 (N.D. Cal. 1997) (taking judicial notice of stock prices on NASDAQ).

2

1 investors had any inkling that Redback's sales, earnings and revenues were generated by bribes

2 and *quid pro quo* deals with Qwest and others" was a press release by Qwest issued on March 11,

3 2002 announcing that Qwest was under SEC investigation. 5AC ¶10. This press release did not

4 mention Redback. Plaintiffs also allege that a Denver Post article published in late 2003

5 "exposed Redback's fraudulent course of business and *quid pro quo* transactions with Qwest."

6 5AC ¶¶ 10, 318.

7 Throughout the stock slide, Redback continually attributed its decline in revenues to "a

8 current downturn in economic activity," and concealed the fact that the real reason for the decline

9 was the loss of improper revenues from Qwest and others. 5AC ¶ 460. The truth of Redback's

10 fraud was not revealed until October 2003. 5AC ¶ 464. It appears from the 5AC that Redback's

11 stock already was trading below $1 per share in October 2003; Plaintiffs do not allege that the

12 stock fell further "when more of Redback's connection to the fraud was revealed." *Id.*

13 Plaintiffs assert the following claims against the Defendants: (1) violation of § 10(b) of

14 the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated

15 thereunder; (2) violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated

16 thereunder; (3) violation of § 10(b) of the Exchange Act and Rule 10b-5 by means of insider

17 trading; (4) violation of § 20A of the Exchange Act by insider trading; (5) violation of § 18(a) of

18 the Exchange Act; and (6) control person liability under § 20(a) of the Exchange Act.

19 ## II. SECTION 10(b) CLAIMS

20 ### 1.    New Factual Allegations

21 Section 10(b) of the Exchange Act makes it unlawful for any person, by means of any

22 instrumentality of interstate commerce, the mails, or any facility of any national securities

23 exchange, to use or employ "any manipulative or deceptive device or contrivance in

24 contravention of such rules and regulations as the Commission may prescribe" in connection

25 with the purchase or sale of any security registered on a national securities exchange. 15 U.S.C.

26 § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC") under

27 § 10(b), makes it unlawful to: (a) "employ any device, scheme or artifice to defraud"; (b) "make

28 any untrue statement of a material fact or to omit to state a material fact necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading"; or (c) "engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person in connection with the purchase or sale of any

security." 17 C.F.R. § 240.10b-5.

The United States Supreme Court has held that these provisions give rise to liability for

two types of conduct:  (1) the making of a material misstatement or omission or (2) the

commission of a manipulative act.  *Central Bank of Denver v. First Interstate Bank of Denver,*

*N.A.*, 511 U.S. 164, 177 (1994).  Plaintiffs allege a "fraud on the market" claim based upon

Defendants' alleged material misstatements and omissions (first claim); a claim that Defendants

committed manipulative acts for which they are independently liable even absent misstatements

and omissions (second claim)[4]; and a claim that Defendants committed manipulative acts by

insider trading (third claim)[5].

---

[4] In its March 2006 Order, the Court concluded that a § 10(b) "manipulative act" claim
cannot be asserted separately from a § 10(b) misstatements and omissions claim merely because
the alleged misstatements and omissions were made in the context of an organized "scheme" to
defraud.  March 2006 Order at 8.  In a subsequent Order dated March 30, 2007 ("March 2007
Order"), the Court requested, based on its ruling in the March 2006 Order, that Plaintiffs
eliminate this claim because it was duplicative to the first claim.  March 2007 Order at 5.
However, in the 5AC, Plaintiffs continue to assert a manipulative act claim.  Plaintiffs add a
statement to this claim in the 5AC that "Plaintiffs' losses were proximately caused by defendants
. . . reporting such figures without disclosing how they were generated."  (added material
underlined).  However, because the Court previously concluded that this claim is duplicative of
claim 1, the claim with be dismissed with prejudice.

[5] In 2005, the Court ruled that the allegations relating to the stock sales were insufficient
to support a strong inference of scienter.  January 2005 Order at 11.  In the March 2006 Order,
the Court noted that "the [third amended complaint] provides much more specificity than
Plaintiffs' previous pleadings with respect to the alleged illicit transactions, and the Court is
satisfied that Plaintiffs have provided the basis for their belief that those transactions occurred."
March 2006 Order at 10.  In its March 2007 Order, the Court stated that "[w]ith respect to claim
3, alleging a § 10(b) claim based upon insider trading . . . insider trading may constitute a
manipulative act for purposes of § 10(b) liability.  *See United States v. O'Hagan*, 521 U.S. 642,
652 (1997) (holding that an insider who trades on material, non-public information in breach of a
fiduciary duty to the corporation may be held liable under § 10(b) and Rule 10b-5).  While the
cases addressing insider trading sometimes refer to a "deceptive device" rather than a
"manipulative act," *see id.*, liability under this theory is not based upon the making of a material
misstatement or omission but upon the breach of the relationship of trust and confidence existing

4

In its March 2007 Order, the Court held as follows:

> Given these defects in Plaintiffs' [third amended complaint], the Court will dismiss the § 10(b) claims against the Redback Defendants once again. As the Redback Defendants point out, Plaintiffs have been afforded numerous opportunities to allege a viable § 10(b) claim and have failed to do so. However, in light of the liberal standard for amendment in securities fraud cases, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and the complexity of the issues presented by Plaintiffs' theory of liability, the Court will grant Plaintiffs one final opportunity to allege a viable § 10(b) claim. The Court emphasizes that further leave to amend these allegations will not be granted. It would be helpful to the Court's understanding of Plaintiffs' theory if they would clearly allege what portion of the stock drop they believe was caused by the alleged fraud. It also would be helpful if Plaintiffs would streamline their amended pleading by omitting their second claim, which the Court has found duplicative of their first claim, and by shortening the amended pleading in any other manner that may be appropriate.

March 2007 Order at 9.

Plaintiffs assert that the 5AC further explains why Redback's statements about its revenue, even though the revenue was "real" in a sense that money changed hands, were misleading. Plaintiffs assert that this is an "omission case" in which the alleged "failure to disclose the bribes and *quid pro quo deals* . . . rendered the representations about the sales and other transactions materially false or misleading." Opp. at 2, 6-7. Plaintiffs argue that "what is relevant is the undisclosed reason why the sales occurred." *Id.*

However, Plaintiffs' arguments in the 5AC are not meaningfully different from their previous theory, already rejected by the Court:

> [A]lthough Plaintiffs characterize the sales in question as "improper" and "illegitimate," it is clear on the face of the complaint that the sales in question, and the resulting revenues, were real. However it obtained business from Qwest and other companies, Redback sold real products for real money. Plaintiffs have not cited, and the Court has not discovered, any cases holding that accurate reporting of revenues can constitute the basis of a securities fraud claim . . . .[A]bsent any decisions holding that the accurate reporting of revenues can give rise to a § 10(b) claim, the Court is not persuaded that the Plaintiffs can state a viable claim based upon the facts alleged.

March 2007 Order at 7-8.

Plaintiffs cite *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F.Supp.2d 192, 202 (S.D.N.Y. 2004) (restatement); *In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018,

---

between a corporation's shareholders and persons who have obtained confidential information by reason of their position within that corporation, *id*." March 2007 Order at 5-6.

1    1020 (C.D. Cal. 2003) (restatement); *In re Northpoint Communications Group, Inc. Sec. Litig.*,

2    221 F.Supp.2d 1090, 1102 (N.D. Cal. 2002) (fraudulent revenue recognition adequately alleged)

3    in support of their argument that the 5AC states an actionable § 10(b) claim.  However, the Court

4    previously has found these cases distinguishable.  March 2007 Order at 7-8.  Further, the Court

5    noted that "[i]n fact, at least one district court has held expressly that plaintiffs failed to state a

6    claim for securities fraud based upon corporate defendants' accurate reporting of revenues while

7    failing to disclose that those revenues were 'boosted' by large one-time sales that would not

8    recur, such that the future would not be as bright as the past.  *In re Verifone Sec. Litig.*, 784

9    F.Supp. 1471, 1485 (N.D. Cal. 1992)."  March 2007 Order at 7-8.  Plaintiffs argue that *Verifone*

10   did not involve undisclosed bribery, and that "[i]n contrast, investors could not suspect that

11   Redback's weakening sales were the result of the cessation of improper activities because

12   Redback told shareholders that the slowdown was due to general economic trends.  It was not

13   until March 11, 2002 that there was any partial disclosure putting investors on notice that

14   something improper may have been going on at Redback."  Opp. at 7.  However, as this Court

15   stated in its March 2007 Order, the fact remains that the revenues were accurately reported, and

16   even though they allegedly were increased in a way that could be misleading to investors, there

17   was no actionable securities fraud that could be alleged.  Plaintiffs have not provided any new

18   facts or authority that would persuade the Court to depart from its previous rulings.[6]

19

20        **2.    Loss Causation**

21   In the March 2006 Order, the Court concluded as follows:

22   While Plaintiffs' allegations might support a claim that class members were
     injured by the drop from $4 to $1 per share, this does not appear to be the claim

23   that Plaintiffs are making here.  Based upon the extremely lengthy four-year class
     period, the chart depicting the stock price over that class period, and the

24   arguments presented by Plaintiffs, it appears that Plaintiffs are claiming injury
     based upon the fact that class members purchased Redback stock at inflated prices

25   well over $100 per share throughout the class period.  The Court is at a loss to
     understand how Plaintiffs' injury for such purchases was *caused by* the alleged

26   fraud when the stock price already had fallen to $4 per share before the Qwest

27   ─────────────────────

28        [6] Indeed Plaintiffs state in their opposition brief that they have "clarified" their existing
     allegations rather than allege new facts or authority.  Opp. at 2, 6-7.

Case No. C 03-5642 JF (HRL)
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT LEAVE TO AMEND.
(JFLC3)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

revenues dried up and before the truth about the Qwest transactions was made public. *See Dura Pharmaceuticals, Inc. v. Broudo*, --- U.S. ----, 125 S.Ct. 1627, 1633 (2005) (holding that it is insufficient to allege that plaintiffs purchased stock at prices that were inflated as a result of defendants' fraud, and that plaintiffs must demonstrate loss causation, i.e., a causal connection between the material misrepresentation and the loss).

March 2006 Order at 10.  Plaintiffs subsequently amended their complaint in response to the

March 2006 Order.

In the March 2007 Order, the Court concluded that:

Plaintiffs have amended their complaint in an attempt to address the Court's concerns [in the March 2006 Order] and, it seems, in an attempt to expand recoverable damages beyond the drop from $4 to $1 referenced by the Court in its prior order.  As noted above, Plaintiffs now allege that the "truth" began coming out in June 2001, at which time Redback's stock was trading at a little more than $11 per share.  FAC ¶¶ 234, 452.  What is confusing about Plaintiff's allegations is that they simultaneously allege that Defendants *concealed* the true cause of Redback's revenue drop, i.e., the loss of Qwest revenues.  FAC ¶ 452(d).  It appears that Plaintiffs are both trying to capture more damages by alleging that the "truth" began coming out at an earlier date than previously alleged, and trying to avoid the statute of limitations bar that would apply if Plaintiffs' claims accrued in June 2001.  A claim under Rule 10b-5 must be brought within two years after the discovery of facts constituting the violation.  28 U.S.C. § 1658(b).  Plaintiffs cannot have it both ways.  If the "truth" began coming out in 2001, Plaintiffs' § 10(b) claims appear to be time-barred.  If the "truth" did not come out until later, as originally alleged, Plaintiff cannot capture damages for the greater stock drop.

March 2007 Order at 5.

In the 5AC, Plaintiffs assert that they have amended their loss causation allegations to

show that the partial disclosures (which gradually informed investors that Redback's business

has been built on fraud) began on March 11, 2002 and continued through October 10, 2003.

Plaintiffs argue in the 5AC that a March 11, 2002 press release regarding Qwest satisfies the

defect with respect to the loss causation that existed in their previous complaints.  Plaintiffs

allege that the stock price drop caused by the fraud is the decline from $4.30 on March 11, 2002

to $0.27 per share on October 10, 2003.  The corrective disclosure began, Plaintiffs allege, on

March 11, 2002 when investors were told of an SEC investigation of Qwest's revenue

recognition practices, and thereby received their first hint that the poor economy "excuse"

Redback had been offering for declining revenues was suspect.  5AC ¶ 456.  Citing *Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), Plaintiffs argue that their "only obligation in

7

1   pleading loss causation is 'to provide a defendant with *some indication* of the loss and the causal

2   connection that the plaintiff has in mind.'"  Opp. at 7 (emphasis added).   Plaintiffs claim that

3   their new loss causation allegations satisfy this pleading standard.

4          Defendants respond, correctly, that Plaintiffs must do more than give "some indication"

5   of what a causal connection "might be," and that Plaintiffs' must show a *plausible* factual theory

6   of the causal connection between the alleged misrepresentation and the claimed loss.  Defendants

7   point out that the March 11, 2002 Qwest press release did not even mention Redback and thus it

8   would not be plausible to assume that the press release caused the drop in Redback's stock.

9   Reply at 4.  Defendants show that the day the Qwest release was issued, Redback's stock price

10  actually closed higher, thus negating any inference that the disclosure caused investor losses by

11  revealing fraud at Redback.  Mem. at 9,  n.7.  Defendants further note that Redback's stock did

12  not drop at all until eleven days after the announcement.  Mem. at 9.  Defendants argue that the

13  Court would have to infer that the decline in the stock price as of October 10, 2003 was in

14  connected to the March 11, 2002 Qwest press release, and that such an inference would be

15  unreasonable  because the two dates were eighteen months apart.  *See, e.g. In re Gilead Sciences*

16  *Sec. Litig.*, No. 03-4999, 2006 WL 1320466, at *7 (N.D. Cal. May 12, 2006); *In re Compuware*

17  *Sec. Litig.*, 386 F. Supp. 2d 913, 919 (E.D.Mich. 2005).  Defendants assert that "[r]equiring the

18  Court to draw inferences from the effect of the Qwest release would be especially unreasonable

19  in this case, considering the general decline in the telecommunications industry during the

20  alleged Class Period[7], as well as plaintiffs' position that 'the truth about Redback's relationship

21  with Qwest did not become known until late 2003."  Reply. at 4.

22          Plaintiffs continue to argue inconsistent positions that Defendants both concealed the

23  truth until October 2003 and that the truth emerged prior to the 2003 date.   5AC at ¶ 455 ("The

24  entire truth about Redback's relationship with Qwest did not become known until late 2003, but

25  a series of disclosures from March 11, 2002 through October 10, 2003 caused investors to begin

---

[7] The Court has previously taken judicial notice to this fact. 2005 Order at 3 n.2.

to doubt that the weakening economy 'excuse' Redback offered was the real reason for

Redback's poor performance and caused investors to suspect that something was amiss at

Redback.")  Plaintiffs have not demonstrated how a Qwest press release that did not even name

Redback caused Redback investors to doubt Redback's claims regarding its performance. *See*

*Powell v. Indacorp, Inc.*, No. 04-249, 2007 WL 1498881, *4 (D. Idaho May 21, 2007).

Given these defects in Plaintiffs' 5AC, the Court will dismiss the § 10(b) claims against

the Defendants.  Pursuant to the discussion in the March 2007 Order, because Plaintiffs have

been afforded numerous opportunities to allege a viable § 10(b) claim and have failed to do so

despite explicit direction from the Court, the Court concludes that further leave to amend is not

warranted.[8]

### III. SECTION 20A CLAIM

Plaintiffs' fourth claim is asserted under § 20A of the Exchange Act, which imposes

liability on any person who violates the Act or the rules and regulations promulgated thereunder

by trading on securities while in possession of material, non-public information.  15 U.S.C. §

78t-1(a).  A § 20A claim may be brought by any person who traded contemporaneously with the

person possessing material, non-public information.  15 U.S.C. § 78t-1(a).  Claims under § 20A

are derivative, and require proof of a separate underlying violation (a "predicate violation") of the

Exchange Act.  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).  Plaintiffs have

failed to allege a predicate violation of the Exchange Act, and thus their § 20A claim also is

subject to dismissal with prejudice.

### IV. SECTION 18 CLAIM

Plaintiffs' fifth claim is asserted under § 18 of the Exchange Act.  The elements of a § 18

claim are:  (1) a misrepresentation or omission (2) of a material fact (3) contained in an SEC

---

[8] Consistent with previous orders, in light of the Court's disposition of the Redback Defendants' motion, the Court again need not reach additional issues raised by the motion regarding the adequacy of Plaintiffs' scienter allegations and the viability of the group pleading doctrine.

Case No. C 03-5642 JF (HRL)
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT LEAVE TO AMEND.
(JFLC3)

filing (4) upon which the plaintiff relied in the purchase of a security.  15 U.S.C. § 78r(a).

Scienter is not an element of a § 18 claim.  *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057,

1062 (9th Cir. 2000) (discussing differences between claims under § 10(b) and § 18).

Nonetheless, the heightened pleading standard applicable to alleging a material misrepresentation

or omission must be met in § 18 cases.  *Cyber Media Group, Inc. v. Island Mortgage Network,*

*Inc.*, 183 F.Supp.2d 559, 577 (E.D.N.Y. 2002).  Moreover, a plaintiff suing under § 18 must

demonstrate *actual* reliance on the fraudulent statement, and may not rely upon the "fraud on the

market" theory that is available under § 10(b).  *Howard*, 228 F.3d at 1062.

        The Court previously dismissed  the § 18 claim with leave to amend because the § 18

claim was based upon the same theory as Plaintiffs' § 10(b) claim, with the exception that the

alleged misrepresentations and omissions regarding Redback's revenues are limited to those

statements set forth in Redback's SEC filings.  March 2007 Order at 10.  In the 5AC, Plaintiffs

once again have failed to allege adequately actual reliance on an actionable misstatement.

Accordingly, the § 18 claim also will be dismissed.

## V. SECTION 20(a) CLAIM

        Finally, Plaintiffs allege that a number of the Redback Defendants are control persons

under § 20(a) of the Exchange Act.  That section  imposes joint and several liability on any

"person who, directly or indirectly, controls any person liable" for securities fraud, "unless the

controlling person acted in good faith and did not directly or indirectly induce" the violations.  15

U.S.C. § 78t(a).  Because Plaintiffs have failed to allege a viable claim of securities fraud, there

is no basis for asserting controlling person liability under § 20(a).

1

**IV. ORDER**

2        In light of the numerous opportunities Plaintiffs have been afforded to plead a viable

3  claim and Plaintiffs' continued failure to plead such a claim, Defendants' motion to dismiss is

4  GRANTED WITHOUT LEAVE TO AMEND.  The Clerk shall enter judgment and close the

5  file.

6

7  IT IS SO ORDERED.

8

9

10  DATED: December 4, 2007

11                                              _____
                                                JEREMY FOGEL
12                                              United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

This Order has been served upon the following persons:

Eric J. Belfi     ebelfi@murrayfrank.com

Luke O Brooks     lukeb@mwbhl.com, e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com

Merrill G. Emerick     memerick@afelaw.com,

Frederick Sexton Fields     ffields@cpdb.com, ral@cpdb.com

Marc L. Godino     service@braunlawgroup.com

Michael M. Goldberg     info@glancylaw.com

Stuart M. Grant     sgrant@gelaw.com, cmarks@gelaw.com

Robert S. Green     CAND.USCOURTS@CLASSCOUNSEL.COM

Cameron Powers Hoffman     choffman@wsgr.com,

Robert A. Jigarjian     CAND.USCOURTS@CLASSCOUNSEL.COM

Betsy C. Manifold     manifold@whafh.com

Marlon Quintanilla Paz     pazm@sec.gov, marlonpaz@vzavenue.net

Rachele R. Rickert     rickert@whafh.com

Darren J. Robbins     e_file_sd@lerachlaw.com, e_file_sf@lerachlaw.com

John P. Stigi , III     jstigi@wsgr.com, mmsmith@wsgr.com

Lauren E. Wagner     lwagner@gelaw.com,
sgrant@gelaw.com;jkairis@gelaw.com;cmarks@gelaw.com;kwierzel@gelaw.com;mswift@gelaw.com

Case No. C 03-5642 JF (HRL)
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT LEAVE TO AMEND.
(JFLC3)